John B. Scherling (SBN 122234)
Scott H. Davison (SBN 228807)
SUGHRUE MION, PLLC
501 West Broadway, Suite 1600
San Diego, California 92101-3595
Telephone:  619.238.3545
Facsimile:  619.238.4931
jscherling@sughrue.com
sdavison@sughrue.com

William H. Mandir (admitted *pro hac vice*)
John F. Rabena (admitted *pro hac vice*)
Carl J. Pellegrini (admitted *pro hac vice*
Chandran B. Iyer (admitted *pro hac vice*)
SUGHRUE MION, PLLC
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone:  202.293.7060
Facsimile:  202.293.7860
wmandir@sughrue.com
jrabena@sughrue.com
cpellegrini@sughrue.com
cbiyer@sughrue.com

Attorneys for Plaintiff
GIRAFA.COM, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| GIRAFA.COM, INC.,<br><br>            Plaintiff,<br><br>    v.<br><br>ALEXA INTERNET, INC.; NIALL O'DRISCOLL,<br><br>            Defendants. | Case No.:  08-2745 RMW (RS)<br><br>**DECLARATION OF JOHN B. SCHERLING IN SUPPORT OF PLAINTIFF'S OPPOSITIONS TO DEFENDANTS' (1) MOTION TO DISMISS PLAINTIFF'S THIRD CLAIM FOR RELIEF UNDER FED. R. CIV. P.  12(b)(6), (2) SPECIAL MOTION TO STRIKE PLAINTIFF'S THIRD CLAIM FOR RELIEF AND (3) MOTION TO DISMISS, TRANSFER OR STAY**<br><br>Date:   September 5, 2008<br>Time:  9:00 a.m.<br>Dept:  6, 4th Floor<br>Judge:  Honorable Ronald M. Whyte |

Scherling Dec. in Support of Plf's Oppos. To Def.s' Motions to Dismiss
3d Claim for Relief, Special Motion to Strike & to Dismiss
08-2745 RMW (RS)

I, John B. Scherling, state and declare as follows:

1.    I am a partner in the law firm of Sughrue Mion, PLLC, counsel for Girafa.com, Inc. ("Girafa").  I submit this declaration in support of Girafa's Oppositions To Defendants' Motion To Dismiss Plaintiff's Third Claim For Relief Under Fed. R. Civ. P. 12(B)(6), Special Motion To Strike Plaintiff's Third Claim For Relief and Motion To Dismiss, Transfer or Stay.

2.    Attached to this Declaration are true and correct copies of the following documents with the following exhibit designations:

Exhibit A:  March 7, 2008 Declaration of Shirli Ran in Support of Plaintiff Grafa.com, Inc.'s Motion for Preliminary Injunction (Redacted Public Version) – District of Delaware Case No. 07-787-SLR

Exhibit B:  August 14, 2008 Declaration of Dr. Brad A. Myers

Exhibit C:  March 7, 2008 Declaration of Shirli Ran in Support of Preliminary Injunction (Filed Under Seal) - District of Delaware Case No. 07-787-SLR

Exhibit D:  Complaint, *Girafa.com, Inc. v. Amazon Web Services, LLC, et al.* - District of Delaware Case No. 07-787-SLR

Exhibit E:  Complaint, *Alexa Internet, Inc. v. Girafa.com, Inc.* - Eastern District of Texas, Marshall Division Case No. 2:08-cv-121

Exhibit F:  Alexa Website Thumbnail FAQs

Exhibit G:  *In re Acacia Media Technologies Corp.,* 2005 U.S. Dist. LEXIS 37009 (N.D. Cal. 2005)

Exhibit H:  *Monolithic Power Systems, Inc. v. O2 Micro Int'l Ltd.,* 2007 U.S. Dist. LEXIS 22556 (N.D. Cal. 2007)

Exhibit I:  *Allergan Sales, Inc. v. Pharmacia & Upjohn, Inc.,* 1997 U.S. Dist. LEXIS 7648 (S.D. Cal. 1997)

Exhibit J:  Northern District of California Judicial Caseload Profile

Exhibit K:  Eastern District of Texas Judicial Caseload Profile

Exhibit L:  March 12, 2008 Declaration of Dr. Brad A. Myers in Support of Preliminary Injunction (Filed Under Seal) - District of Delaware Case No. 07-787-SLR

Exhibit M:  *Formula One Licensing, B.V. v. Purple Interactive Ltd.* 201 U.S. Dist. LEXIS 2968 (N.D. Cal. 2001)

Exhibit N:  *CoxCom, Inc. v. Hybrid Patents Inc.,* 2007 U.S. Dist. LEXIS 67168 (N.D. Cal. 2007)

Exhibit O:  Girafa.com, Inc.'s Motion for Preliminary Injunction – District of Delaware Case No. 07-787-SLR

Exhibit P:  June 2, 2008 Declaration of Shirli Ran in Support of Plaintiff Girafa.com, Inc.'s Motion to Dismiss or Transfer – Eastern District of Texas Case No. 07-787-SLR

Exhibit Q:  *Intuitive Surgical, Inc. v. Cal. Inst. of Tech.,* 2007 U.S. Dist. LEXIS 31753 (N.D. Cal. 2007)

Exhibit R:  *London & Hull Maritime Ins. Co. v. Eagle Pac. Ins. Co.,* 1996 U.S. Dist. LEXIS 22893 (N. D. Cal. 1996)

Exhibit S:  *Ellis v. Hollister, Inc.,* 2006 U.S. Dist. LEXIS 28171 (E.D. Cal. 2006)

Exhibit T:  Laura Majerus (Graham & James, LLP, Palo Alto, California) Patent Transmittal Letter

Exhibit U:  Laura Majerus (Fenwick and West, LLP, Palo Alto, California) Office Communication

Exhibit V:  Laura Majerus (Google, Inc., Mountain View, California) PLI Faculty Profile

Exhibit W:  *Langford v. Ameritanz, Inc.*, 2006 U.S. Dist. LEXIS 32823 (E.D. Cal. 2006)

I declare under penalty of perjury that the foregoing is true and correct

DATED:  August 15, 2008

By:    *s/ John B. Scherling*                          
John B. Scherling

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GIRAFA.COM, INC.,

        Plaintiff,

        v.

AMAZON WEB SERVICES, LLC,
AMAZON.COM, INC.,
ALEXA INTERNET, INC.,
IAC SEARCH & MEDIA, INC.,
SNAP TECHNOLOGIES INC.,
YAHOO! INC.,
SMARTDEVIL INC.,
EXALEAD INC., AND
EXALEAD SA,

        Defendants.

C.A. No. 07-787-SLR

REDACTED
PUBLIC VERSION

DECLARATION OF SHIRLI RAN
IN SUPPORT OF PLAINTIFF GIRAFA.COM, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

I, Shirli Ran, hereby declare as follows:

1.     I am the Chief Operating Officer ("COO") for Girafa.com, Inc. ("Girafa") and have held this position since 1999. As COO of Girafa, I oversee the company's product development, operational and business activities.

2.     I have personal knowledge of the following facts and, if called as a witness, could and would competently testify thereto.

3.     Girafa was formed in 1999 and, since this time, it sought to be and has been an industry leader in revolutionizing the experience of information search and Web navigation on the Internet via its thumbnail services that allow internet users to preview a hyperlinked URL without leaving the page they are viewing and without accessing or loading the hyperlinked page.

These previews are thumbnail-sized visual images of the hyperlinked website/s. The previews

can be displayed automatically by the website and/or the controlling software, or can be

displayed based in part on the user's cursor or mouse movement. (An example of a "hyperlinked

URL" is a search result listing displayed by a search engine website after a user conducts a

search).

    4.    Girafa's business plan is largely based on the technology described in Girafa's

U.S. Patent No. 6,864,904 ("'904 patent"), which is attached as **Exhibit 1**.

    5.    The '904 patent, which is titled "Framework for providing visual context to www

hyperlinks," was filed on November 8, 2000 and issued on March 8, 2005. The '904 patent is

based on provisional application No. 60/169,328 filed by Girafa on December 6, 1999. This

patent is assigned to Girafa and names Shirli Ran, Eldad Barnoon and Yuval Yarom as the

inventors.

    6.    Girafa's visualization technology makes sorting through search result listings and

hyperlinks in general, easier and more efficient, by enabling users to view thumbnail sized

images of the web sites listed on textual search result pages and other WWW hyperlinks, thereby

providing web users with additional information about such hyperlinks, without the time

consuming task of loading each web page.

    7.    More specifically, Girafa's technology offers web users the ability to see what a

web page looks like, without having to leave the originating site and without accessing the site

and waiting for the requested web page to load. Girafa's thumbnail previews offer users

additional information about the hyperlinked site, allowing a user to quickly view branding, and

look & feel information for that site, which offers the user additional relevancy criteria, and helps evaluate the site, and identify relevant and familiar sites faster.

8.    This visual representation of textual hyperlinks, as described in Girafa's '904 patent, brings simplicity, productivity and efficiency to the WWW search and browsing experience.

9.    Since 2000/2001, Girafa's business model for generating its revenue has been to create thumbnail images ("thumbnails") of web pages, and charge its customers for accessing these thumbnails stored on Girafa's image servers, and for serving these thumbnails for display on customers' sites.  For example, customers seeking to display thumbnails of search results listing on their own websites pay Girafa based on the number of thumbnails they want Girafa to create, and the number of thumbnails they need Girafa to serve their users from Girafa's image servers.

10.   Girafa stores thumbnails of over 30 million different websites in a farm of image servers.  These image servers are separate from the servers that host Girafa's website www.Girafa.com.  The image servers are also separate from Girafa's customer's website servers. The use of separate image servers has enabled Girafa to spawn this industry of selling thumbnail images to third party websites.  The use of servers that are separate from the customer's web site also allows Girafa and the customer to reduce the costs associated with creating a server of thumbnails, as customers share the cost of creating/capturing the thumbnails with other Girafa customers, and can therefore pay lower service fees.

11.   Girafa's technology, which stores the thumbnail images on separate image servers, allows Girafa to sell access to those image servers, to third party websites all over the world.

Because the thumbnail images are stored on Girafa's image servers which are easily scalable, Girafa can ensure that peak load periods of thumbnail requests will not impact the responsiveness of its customer's websites, or of www.girafa.com . By providing thumbnail images from Girafa's image servers, new thumbnail images can be added, and existing thumbnails updated, without interruptions to the customer's site or services.

12.    Some earlier thumbnail technologies would generate thumbnail images of websites only in real time when a user requested a thumbnail image preview. Other systems might store all of the thumbnails on the server(s) that hosted part or all of a website search engine. These approaches could not support the industry that Girafa has created, or offer the enhanced user experience that Girafa's thumbnail service was designed to provide. First, real-time generation of thumbnails requires users to wait for the thumbnail/s to be created, thereby failing to offer the value the thumbnails aim at providing, which is immediate preview of hyperlinks. Generating the thumbnails after the user requests a preview is too slow for today's Internet users, and fails to offer an efficient, fast solution, resulting in a poor user experience.

13.    Similarly, had Girafa not maintained its image servers to operate separately from its customers' website servers, an interdependency between the customers' website servers and the image servers would exist. Such an interdependency would require customer/s to invest time and effort in integrating the system, and in its continuous monitoring and testing following any change to the web site or image server. Such an interdependency may also, in some circumstances, cause interruptions to the web site, and could even slow it down. From Girafa's standpoint, such an interdependency would make it extremely cumbersome to maintain a reasonable quality of service.

### Success of Girafa's Thumbnail Technology

14.    As noted above, Girafa's main revenue source is to charge its customers for using thumbnails stored and served from its servers.

15.    Girafa instituted this business model in 2000, and it was initially successful because of the technology described in the '904 patent.

16.    Since launching in 2000, Girafa's thumbnail technology has been frequently recognized as a significant innovation.  Attached as **Exhibits 2-4**, are some of the news articles discussing Girafa's thumbnail technology, including articles and ratings from PC Magazine (**Ex. 2**), CNET (**Ex. 3**), and ZDNet. (**Ex. 4**).  In 2003, CNET rated Girafa's thumbnail toolbar technology one of the fifty best downloads of the year.

### REDACTED

### Harm from Competitors

18.    Girafa's business model has served Girafa well until recently when the defendants that are the subject of this preliminary injunction motion began providing the same type of thumbnail image access.

19.    Snap uses its website www.snap.com to advertise, demonstrate, sell, and give away for free, access to thumbnail images of websites as well as code to display those thumbnails on the customer's website.

20.    Smartdevil uses its websites www.thumbshots.com, www.thumbshots.org, and www.thumbshots.net to advertise, demonstrate, sell, and give away for free, access to thumbnail images of websites as well as code to display those thumbnails on the customer's website.

21.     The Amazon defendants (Amazon.com, Alexa.com, and Amazon Web Services or "AWS") sell access to thumbnails of websites to other website owners, as well as code so that the customer can display the thumbnails on the customer's website.

22.     After Girafa began selling its thumbnail services, competitors such as Snap.com, Amazon/Alexa/AWS, and Smartdevil began to both sell and give away thumbnail access to third parties based on the same technology as in the '904 patent.

23.     In April 2004, Snap's incubator company, Idealab, contacted Girafa and requested information about Girafa's thumbnail services and pricing.  I spoke with and exchanged emails with Aaron Boyer from a Research and Development department of Idealab and later sent him quotes for Girafa's services. See, **Exhibit 5**, which is a chain of emails between me and Mr. Boyer.  I also informed him that Girafa had a pending patent that covered this technology.

**REDACTED**

Attached as **Exhibit 6** is an email received from Compete.com in which they decline to use thumbnail services from Girafa because they have a relationship with Snap.

25.     Because Snap, Smartdevil, and Amazon/Alexa/AWS are using Girafa's patented technology, Girafa has lost and will continue to lose significant market share that cannot be replaced unless these defendants stop infringing the '904 patent.  The loss of market share and customers is expected to continue and to increase, in part due to offerings from at least Snap and Smartdevil of Girafa's patented technology for free, ie., without charging any service fees for its usage.

**REDACTED**

**REDACTED**

27.    Girafa's thumbnail services are provided and offered to customers as a fully
hosted service, where Girafa hosts, runs, maintains, monitors and supports the servers, networks,
applications and thumbnails used to provide the thumbnail service to customers and end users.
All a customer needs to do to use Girafa's thumbnails is add Girafa's code to its web pages.
Customers can have the service up and running on their site in minutes. This is the level of
service that is required in the industry Girafa operates in.

28.    Running a fully hosted service means that there are ongoing costs of operating the
service such as bandwidth costs (needed to create the thumbnails and serve them), hardware,
space, power etc.

**REDACTED**

I declare under the penalty of perjury that the above is true and accurate to the best of my
knowledge.

Dated: March 7, 2008            By: _Shirli Ran_
                                         Shirli Ran

# EXHIBIT B

# EXHIBIT B
# Part 1

DECLARATION OF DR. BRAD A. MYERS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIRAFA.COM, Inc, <br><br> Plaintiff, <br><br> v. <br><br> Alexa Internet, Inc.; <br> Niall O'Driscoll, <br><br> Defendants. | C.A. No. 08-2745 |

## DECLARATION OF DR. BRAD A. MYERS

1

<u>TABLE OF CONTENTS</u>

<u>Page</u>
I.      Introduction .......................................................................................................... 3
II.     Summary of Opinions ........................................................................................... 3
III.    My Qualifications ................................................................................................. 3
IV.     Report Preparation ............................................................................................... 5
V.      Instructions........................................................................................................... 5
VI.     Person of Ordinary Skill in the Art ...................................................................... 7
VII.    Overview of the '548 Patent ................................................................................. 7
VIII.   US Patent 5,706,507 to Schloss ........................................................................... 8
IX.     Claim Construction .............................................................................................. 10
X.      Infringement Analysis........................................................................................... 11
   A.   Girafa Toolbar..................................................................................................... 11
   B.   Girafa Thumbnail Service .................................................................................... 13

**Myers Declaration Exhibits:**
Exhibit A:      CV of Brad A. Myers, Ph.D.
Exhibit B:      List of cases where Brad A. Myers has testified
Exhibit C:      Excerpts from the file history of U.S. Patent No. 6,282,548 (highlighted).
Exhibit D:      US Patent 5,706,507 to Schloss
Exhibit E:      Screen shots used in this report

DECLARATION OF DR. BRAD A. MYERS

## I.    Introduction

1.    It is my understanding that in the case "Alexa Internet, Inc. v. Girafa.com, Inc." in the United States District Court For The Eastern District Of Texas Marshall Division, Case No. 2:08-cv-121, that Alexa Internet, Inc., ("Alexa") has asserted that Girafa.com ("Girafa") has infringed US patent 6,282,548 ("the '548 patent") assigned to Alexa. I understand that Alexa has not yet specified which claims are being asserted, and which Girafa products are alleged to infringe those claims. Therefore, I have had to make certain assumptions in writing this report. I reserve the right to supplement this declaration if necessary should those assumptions prove incorrect.

2.    I have been retained as a technical expert in this case by Girafa.com.  I am being compensated for the time that I spend consulting in this matter at $400/hour. This compensation is not dependent on the outcome of the case.  I have no personal interest in this litigation.

3.    At this time, I have been asked to address certain specific issues of claim construction and infringement. I reserve the right to supplement this declaration if necessary based on new issues raised by the parties.

## II.    Summary of Opinions

4.    Based on my understanding of the patent and its claims, and my analysis of the various products with the information available to me at this time, I believe Girafa's products cannot infringe any of the claims of the '548 patent.

## III.    My Qualifications

5.    I am currently a Professor in the Human-Computer Interaction Institute, which is part of the School of Computer Science at Carnegie Mellon University.  My areas of expertise

3

DECLARATION OF DR. BRAD A. MYERS

include user interface design, user interface software, computer science, visual programming, handheld devices, and demonstrational interfaces.

6.    I have been working in the field of user interfaces (also called Human Computer Interaction or "HCI") for over 25 years, and I am the author or editor of over 350 publications. I have been on the editorial board of five journals, including the premier journals in the field of HCI. I have been a consultant on user interface design and implementation to over 60 companies.

7.    I received a Bachelor of Science in Computer Science and Engineering and Master of Science in Computer Science from the Massachusetts Institute of Technology ("MIT") in 1980. I received my Doctorate in Computer Science from the University of Toronto in 1987.

8.    I worked at the Three Rivers Computer Corporation (later renamed Perq Systems Corporation) from 1980 to 1983 where I designed and implemented software, including one of the first commercial window managers.

9.    Over the course of my career, I have authored multiple articles relating to, among other subjects, window management, handheld computing, user interface software, visualization, intelligent interfaces, and novel interaction techniques. In recognition of my contributions to research, I was selected as a Fellow of the Association for Computing Machinery ("ACM") in 2005, and elected to the "CHI Academy" by the Special Interest Group on Computer-Human Interaction ("SIGCHI") of the ACM in April 2004, as one of the top 25 "principal leaders of the field" of HCI. I have also received a number of "best paper" awards, for example at the 27th and 30th International Conferences on Software Engineering in 2005 and 2008, at the ACM SIGACCESS Conference on Computers and Accessibility in 2004, and at the ACM SIGCHI 2006 Conference on Human Factors in Computing Systems.

10.    I regularly teach courses on user interface design and software. In particular, I have taught a course on Human-Computer Interaction in eCommerce since 2001.

11.    I am listed as an inventor on U.S. Patent No. 5,581,677, relating to interaction techniques for creating charts and graphs. I am also listed as an inventor on two pending patent

4

DECLARATION OF DR. BRAD A. MYERS

applications, one relating to a more stable technique of entering text for handheld devices for
people with muscular disabilities, and the other relating to a technique for debugging computer
programs that displays a visualization to show why certain events happen in a program.

12.    My qualifications for forming the opinions set forth in this report are listed in this
section and in Exhibit A attached which is my *curriculum vitae*.  Exhibit A also includes a list of
my publications.

13.    Exhibit B provides a listing of when I have testified as an expert at trial or in a
deposition within the last four years.

## IV.    Report Preparation

14.    In developing the opinions discussed in this report, I studied the '548 Patent, its
prosecution history and US Patent 5,706,507 to Schloss discussed in the prosecution history. I
also operated the Girafa toolbar, used the Girafa Thumbnail service, and examined the Girafa
web site. I also reviewed the "Plaintiff Alexa's Patent Infringement Complaint" in the United
States District Court for the Eastern District of Texas Marshall Division, filed on March 21,
2008, "Defendant GIRAFA.COM, Inc.'s Answer to Alexa Internet, Inc's. Complaint," filed on
June 6, 2008, and "Complaint for Declaratory Judgment of Noninfringement, Declaratory
Judgment of Invalidity and Unfair Competition" in the United States District Court, Northern
District of California, filed on June 2, 2008.

## V.    Instructions

15.    I am not an attorney.  For the purposes of this report, I have been informed about
certain aspects of the law that are relevant to my analysis and opinion.  In formulating my
opinions, I have taken into account the following principles of the law regarding patent
infringement and validity, which I understand to be accurate statements of the law:

16.    I understand that infringement involves a two-step analysis and that the first step
is determining the proper construction of the asserted claims.

DECLARATION OF DR. BRAD A. MYERS

17.    I have been instructed that ultimately claims are construed by the judge in light of how one of ordinary skill in the art would understand the claims. It is my understanding that what is to be considered includes the claims, the patent specification and drawings, and the prosecution history including any art listed by the Examiner or the applicant. It is my understanding that information external to the patent, including expert and inventor testimony and unlisted prior art, are to be considered in construing the claims only if ambiguities remain. However, expert testimony may be useful in helping to explain the technology. I further understand technical dictionaries, encyclopedias, and treatises may also be used in claim construction, as long as these definitions do not contradict any definition found in or ascertained by a reading of the patent documents. Finally, I am informed that if the inventors distinguished over certain prior art technologies ("disavow the technology") during prosecution, then the relevant claims should be interpreted to not cover those technologies.

18.    I understand that the second step of the infringement analysis is determining whether the accused products contain the elements of the asserted claims. A product is covered by and, thus, infringes a patent claim if the product meets or embodies each and every limitation of the patent claim, either literally or under the doctrine of equivalents. A method claim is infringed when each of the recited steps are performed.

19.    I understand that an accused product literally infringes if it contains every limitation of the claim. I further understand that the failure to meet a single limitation is sufficient to negate literal infringement of a claim.

20.    It is my understanding that an accused product that does not literally infringe a claim may nonetheless infringe the claim under the doctrine of equivalents. It is my understanding that, to establish infringement under the doctrine of equivalents, the accused product must be shown to include an equivalent for each claim limitation that is literally absent. However, it is my understanding that if the inventors disavowed a certain type of structure or operation during the prosecution of the patent, then the doctrine of equivalents is not available.

6

DECLARATION OF DR. BRAD A. MYERS

21.     It is my understanding that infringement under the doctrine of equivalents may be established by showing that the elements of the accused product perform substantially the same function, in substantially the same way, to achieve substantially the same result as the corresponding elements of the patented invention. An insubstantial change to the claimed element is an equivalent. I understand that if it is known at the time of infringement that two elements are interchangeable, then their differences may be insubstantial for purposes of the doctrine of equivalents.

**VI.    Person of Ordinary Skill in the Art**

22.     The patent says the field of the invention is "World Wide Web and, specifically, to a method and apparatus for augmenting a web page currently displayed by browser software with metadata relating to the displayed web page" (col. 1, lines 9-13). Thus, one of ordinary skill in the art would have a bachelor's degree in computer science or related degree or equivalent experience, and at least 2 years of experience with design or implementation for the World Wide Web.

**VII.    Overview of the '548 Patent**

23.     This patent describes a way to augment the display of a web page by providing extra information, called "metadata" about that web page. The patent Abstract says:

A method and apparatus that displays metadata about a web page currently being displayed by a browser. While the web browser is communicating with a web server to obtain the requested web page, client software communicates with a database metadata server to obtain metadata about the requested page. After the browser receives its requested information from the web server, it displays the requested web page in a conventional manner. The client concurrently displays its received metadata on the same computer as the web page, and concurrently with the web page.... ('548 patent at 57)

24.     Figure 8 of the patent (reproduced below – all of the screen shots in this report are also reproduced in Exhibit E) shows some examples of this "metadata", such as the popularity of

7

DECLARATION OF DR. BRAD A. MYERS

the current web page, whether the page is classified as "fast" or "slow" to access, and links to other pages relevant to the current web page, as determined by the system (see also '548 patent at 11:57-11:62, 12:48-52).



**Figure 8**

VIII.    US Patent 5,706,507 to Schloss

25.    During the prosecution of the '548 patent, the examiner said that the initial submitted claims were invalid due to US Patent 5,706,507 to Schloss (the '507 patent) (attached as Exhibit D).

26.    The '507 patent describes a system in which "prior to display [of a web page], the client [browser] sends a request signal to the advisory server asking that it advise the client on the content of the web page. The advisory server rates the page and sends a classification rating back to the client." ('507 patent abstract at (57))  One use of these classifications is to display advisories as "balloons" over links to pages rated objectionable, as shown at **505** in FIG. 12(A)

DECLARATION OF DR. BRAD A. MYERS

below (see also '507 patent at 10:4-23). "FIG. 12(B) shows how the advisory for a link may be shown by changing the pointer icon" ('507 patent at 10:27-29). "FIG. 12(C) shows how the advisory returned for a link may be shown at the bottom of the screen when the mouse is over a link." ('507 patent at 10:34-36). "FIG. 12(D) shows how the advisory 508 may be added into the content of the page 500 in place." ('507 patent at 10:43-44)



FIG.12A

DECLARATION OF DR. BRAD A. MYERS

27.    The inventors, to get around this rejection, said:

The Examiner further contends that Schloss, at col. 10, lines 8-36, discloses a system that includes displaying information about a web page concurrently with the web page. Schloss, at col . 10, lines 8-36, describes displaying a warning message that a link is to an offensive web page. This occurs under Schloss when a user is viewing a non-offensive web page (web page A), which contains a link to an offensive web page (web page B). Schloss then displays a warning that web page B is offensive. This message is not displayed concurrently with web page B, as web page B is not being displayed at all. The-purpose of the warning message is to alert the user that web page B is offensive, so that the user does not attempt to access it. Of course, the message does not describe the web page being displayed, web page A, which is not offensive....

The claimed invention is advantageous because, unlike Schloss, it provides a user with additional information about the current web page. ... Schloss only requests data about web pages that have not yet been displayed, in order to determine if the pages are offensive. ... Although Schloss provides advisory messages about links to other pages, the links are provided not by Schloss, but by the web page being displayed. When Schloss prints a message warning a user that a displayed link would lead to an offensive page, Schloss is not providing the link to the other page as information about the page being displayed, but is instead providing information about the undisplayed page to which the link pertains. ('548 file history, paper 6 at pp. 7-8, reproduced in my Exhibit C on pages 10-11)

28.    Later, the inventors explained:

Metadata is supplemental information about the web page being displayed, not about the target pages of links on the web page being displayed. ('548 file history, paper 12 at p. 11, reproduced in my Exhibit C on page 24)

## IX.    Claim Construction

29.    As clearly stated by the inventors, **"metadata"** must be construed as "supplemental information about the web page being displayed, not about the target pages of links on the web page being displayed." ('548 file history, paper 12 at p. 11, reproduced in my Exhibit C on page 24). The term "metadata" appears in every independent claim:

10

DECLARATION OF DR. BRAD A. MYERS

| Independent Claim | Claim Language | Citation in '548 patent |
|---|---|---|
| Claim 1 | "automatically generated metadata" | 20:60 |
| Claim 29 | "automatically generated metadata" | 23:27-28 |
| Claim 31 | "automatically generated metadata" | 23:46-47 |
| Claim 34 | "automatically generated metadata" | 24:12 |
| Claim 36 | "automatically generated metadata" | 24:48 |
| Claim 37 | "automatically generated metadata" | 25:3 |
| Claim 38 | "automatically generated metadata" | 25:22-23 |
| Claim 39 | "metadata" | 25:45 |
| Claim 44 | "automatically generated metadata" | 26:31-32 |
| Claim 45 | "automatically generated metadata" | 26:50-51 |

30.     Since the inventors of the '548 patent specifically disavowed the technology of the '507 patent to Schloss during the prosecution of the patent using the above definition of metadata, the claims cannot be interpreted to cover those technologies. Therefore, metadata in all of the claims cannot cover information about "target pages of links on the web page being displayed" ('548 file history, paper 12 at p. 11, reproduced in my Exhibit C on page 24)

X.     **Infringement Analysis**

31.     Alexa is apparently alleging infringement by the "Girafa Toolbar" and the "Girafa Thumbnail Service". ("Plaintiff Alexa's Patent Infringement Complaint" at ¶11)

A.     **Girafa Toolbar**

32.     I went to http://www.girafa.com/download.acr and downloaded the Girafa Toolbar, version 2.12.50 and installed it under Microsoft Windows XP with Internet Explorer version 6.0. If Alexa asserts infringement of a different product or configuration, I reserve the right to supplement this report if necessary.

33.     I performed a search using Google.com on August 11, 2008 for "California Italian restaurants". A screen shot of the result is shown below. The Girafa Toolbar is shown on the left

11

DECLARATION OF DR. BRAD A. MYERS

of the Google search results. In the Girafa Toolbar, thumbnail images are shown for the Google

search results, and clicking on a thumbnail will go to the corresponding web page.



34.    The Girafa Toolbar displays thumbnail pictures of the targets of the links on the

web page. This is exactly the information about "target pages of links on the web page being

displayed" which the inventors specifically disavowed ('548 file history, paper 12 at p. 11,

reproduced in my Exhibit C on page 24).

35.    Since the thumbnails provided by the Girafa Toolbar cannot be the metadata

required by all claims of the '548 patent, the Girafa Toolbar cannot infringe the '548 patent.

DECLARATION OF DR. BRAD A. MYERS

**B.    Girafa Thumbnail Service**

36.    I studied the information on the Girafa web site about the Girafa Thumbnail
Service,    including    the    pages:    http://www.girafa.com/product2.acr    and
https://tserver.girafa.com/sec/QuickStart.acr, and I signed up for the free service, starting at
https://tserver.girafa.com/sec/signup.acr?fp=1.

37.    The web site explains:

"Using the Girafa Thumbnail Service, thumbnail images of Web pages can be displayed next to
the links to these Web pages on your:
- search result pages,
- directory pages, or
- anywhere else on your site"
(http://www.girafa.com/product2.acr#q2)

38.    Here is an image from the same web page showing how the Thumbnail Service
can be used to embed thumbnails into the user's web page:



39.    I signed up for the free Girafa Thumbnail service, and then used the service to
create my own web page using thumbnails. I used three URLs, used the Girafa Thumbnail
Service to provide thumbnails for each of those URLs, and then created my own thumbnails of
what those pages looked like on August 14, 2008. My web page is temporarily available at:

13

DECLARATION OF DR. BRAD A. MYERS

http://www.pebbles.hcii.cmu.edu/testpage.html and here is a screenshot of what my web page looked like on August 14, 2008 (it may look different when viewed in the future because the Girafa Thumbnail Service may update its thumbnail pictures):



40.     The Thumbnail Service is therefore providing a way for web pages to incorporate pictures as part of the original web pages. The Thumbnail Service cannot be used to generate "supplemental information about the web page being displayed" since the information is not "supplemental" and it is not "about the web page being displayed" – it is part of the web page being displayed.

14

**DECLARATION OF DR. BRAD A. MYERS**

41.    Therefore, since the Girafa Thumbnail Service cannot generate metadata as required by all claims of the '548 patent, the Girafa Thumbnail Service cannot infringe the '548 patent.

42.    I declare under the penalty of perjury that the above is true and accurate to the best of my knowledge.

Dated: August 14, 2008

_____
Dr. Brad A. Myers

15

# EXHIBIT B
## Part 2
### a

Exhibit A

# Brad A. Myers

| |
|---|
| *Office:* |
| Human-Computer Interaction Institute |
| School of Computer Science |
| Carnegie Mellon University |
| Pittsburgh, PA 15213-3891 |
| (412) 268-5150 |
| *FAX:* (412) 268-1266 |
| *E-mail:* bam@cs.cmu.edu |
| *WWW:* http://www.cs.cmu.edu/~bam |

- Research Interests
- Experience
  - Consulting
- Education
- Awards and Honors
- Research Grants
- Publications
- Articles About Me
- Professional Activities
- CMU Activities
- Teaching
- Students
- Invited Presentations

---

## Research Interests:

User Interface Software, Hand-held computers, Demonstrational Interfaces, User Interface Design, Window Managers, Visual Programming, Programming Environments, End-User Software Engineering.

---

## Experience:

**Human Computer Interaction Institute**
*Professor, 2004 - present.*
*Associate Research Professor, 2003 - 2004.*
*Senior Research Scientist, 1995 - 2003.*
**Computer Science Department**
*Senior Research Computer Scientist, 1992 - 1995.*
*Research Computer Scientist, July 1987- 1992.*
**School of Computer Science, Carnegie Mellon University**, Pittsburgh, PA

Principal investigator for the Pebbles PDA project, funded by DARPA, NSF and industry, which is investigating the use of hand-held computers like Pocket PC/Windows CE and PalmOS devices synchronously with PCs. By "synchronously," we mean that a set of hand-helds will be connected to a laptop or desktop computer at the same time, so that the hand-helds will be in continuous two-way communication with the main computer and with each other. We are focusing on situations where the participants are co-located.

Principal investigator for the Natural Programming Project, funded by NSF. This project is creating new programming languages that will be easy to learn for children and adults. Through new experiments and by using the results from the HCI and Empirical Studies of Programming literature, we will determine the most "natural" ways to express programs. We will use these, along with new metaphors, in the design for a new language and environment.

Principal investigator for the Silver Project, funded as part of the second Digital Libraries Initiative,

Exhibit A

which is investigating authoring with digital video.

Principal investigator for the User Interface Software Project, funded by ARPA and industry, which developed sophisticated user interface development environments to help build graphical user interfaces. Garnet, our earlier system, is in Lisp, and introduced encapsulating mouse and keyboard behaviors into abstract "interactors." Amulet, the second system, is in C++ and runs on Unix, Windows NT and 95, and Macintosh. Amulet is downloaded about 10,000 times a year, and incorporates novel object, constraint, input, output, undo, command and animation models to provide high-level support for highly-interactive, multi-media applications for one or multiple users. An important focus is high-level graphical editors which allow the user interface designer to draw all graphical aspects of user interfaces, and to demonstrate most of the behavior of the user interface.

Principal investigator for the Demonstrational Interfaces project, funded by NSF and industry. In a "demonstrational interface," the user gives an example of how the system should operate, and the system automatically generalizes from the example to produce a parameterized procedure. For instance, in the Macintosh Finder, the user might move "foo.PS" and then "bar.PS" to the trash can. The system might notice that a similar operation was performed twice and automatically create a procedure to delete all the "*.PS" files. We are developing a demonstrational visual shell (iconic desktop), a text formatter, an editor for business charts, an editor for dynamic world-wide-web pages, and an architecture for programs that support demonstrational interfaces.

MacGnome project (1987-1988): designed a system that creates visualizations for Pascal data structures.

## Consultant

1984-present:

1. **Sughrue Mion, PLLC,** Washington, DC
2. **Latham & Watkins LLP,** Los Angeles, CA
3. **Sidley Austin LLP,** Dallas, TX
4. **Ropes & Gray LLP,** Washington, DC
5. **Adobe Systems Inc.,** San Jose, CA
6. **National Expert Witness Network,** Paradise, CA
7. **McKool Smith,** Austin, TX
8. **Morris, Nichols, Arsht & Tunnell,** Wilmington, DE
9. **Thompson & Knight L.L.P.,** Dallas, TX
10. **Emerson Process Management,** Austin, TX
11. **Clairvoyance Corporation,** Pittsburgh, PA
12. **Wilmer Cutler Pickering Hale and Dorr LLP,** Boston, MA
13. **University of Pittsburgh Dept. of Nursing,** Pittsburgh, PA
14. **Cooley Godward LLP,** Reston, VA
15. **Level 3 Communications,** Broomfield, CO
16. **Cesari and McKenna,** Boston, MA
17. **Fish & Richardson,** Boston, MA, San Diego, CA and Washington, D.C.
18. **Darby & Darby,** New York, NY
19. **Samsung Electronics,** Seoul, Republic of Korea
20. **Morrison & Foerster,** San Diego, CA
21. **Jones, Day, Reavis & Pogue,** Dallas, Texas
22. **Weil, Gotshal & Manges,** Menlo Park, CA
23. **Fenwick & West,** Palo Alto, CA

Exhibit A

24.  **Kirkland & Ellis,** Los Angeles, CA
25.  **Silicon Valley Expert Witness Group Inc.,** Mountain View, CA
26.  **Jenkins & Gilchrist,** Dallas, TX
27.  **Merchant & Gould,** Minneapolis, MI
28.  **GlobalOne,** Reston, VA
29.  **Lindquist & Vennum,** Minneapolis, MI
30.  **Wilson Sonsini Goodrich & Rosati,** Palo Alto, CA
31.  **Klarquist, Sparkman & Campbell,** Portland, OR
32.  **Leydig, Voit & Mayer, Ltd,** Chicago, IL
33.  **Maya Design Group** Pittsburgh, PA
34.  **McDonnell Boehnen Hulbert & Berghoff,** Chicago, IL
35.  **Serviceware, Inc.,** Pittsburgh, PA
36.  **Secure Computing Corp.,** Roseville, MN
37.  **Venable, Baetjer and Howard, LLP,** Baltimore, MD
38.  **AT&T General Solicitor Organization,** NJ
39.  **Signal Software,** Pittsburgh, PA
40.  **Visual Interface,** Pittsburgh, PA
41.  **Nixon & Vanderhye P.C.,** Arlington, VA
42.  **PROMIS Systems Corp.,** Toronto, Ont, Canada
43.  **Emerson Advanced Materials Ctr,** Columbus, OH
44.  **Boeing Advanced Tech. Center,** Seattle, WA
45.  **Virtual Prototypes, Inc.** Montreal, Canada
46.  **Apple Computer, Inc.** Cupertino, CA
47.  **Teklicon, Inc.** Mountain View, CA
48.  **EJV Partners,** New York, NY
49.  **Horizon Research, Inc.** Waltham, MA
50.  **Carnegie Group, Inc.** Pittsburgh, PA
51.  **Brown and Bain,** Palo Alto, CA
52.  **Microsoft,** Redmond, WA
53.  **Formative Technologies, Inc.** Pittsburgh, PA
54.  **MegaScan,** Gibsonia, PA
55.  **Expert Technologies, Inc.,** Pittsburgh, PA
56.  **Behavioural Team,** Toronto, Canada
57.  **Ashton-Tate, Inc.** Torrance, CA
58.  **Eaton Corporation,** Los Angeles, CA
59.  **Program Products Ltd,** London, England
60.  **Institute for Defense Analyses,** Alexandria, VA
61.  **Infodetics,** Anaheim, CA
62.  **Ventura Technologies,** Toronto, Canada
63.  **PERQ Systems Corporation,** Pittsburgh, PA

Advise on user interface design, user interface software, window manager design and implementation.
Perform usability analyses and redesign of products. Intellectual property consulting for software and
user interface patents. Reports, depositions and trial testimony on claim construction, infringement, prior
art, and validity.

**Manchester Business School, The University of Manchester,** Machester, UK
*Visiting Professor,* 2007-present.

**Helium Networks,** Pittsburgh, PA
*Member of the Scientific Advisory Board, 2004-present*

Myers Dec.

EXH. A

Exhibit A

**EkaTetra Corporation**, (formerly Clarinet Keyboard Corporation), Portland, OR
*Technical Member of the Advisory Committee, 2001-present*

**SCIconics, Inc.**, Pittsburgh, PA
*Member of the Advisory Board, 2002-present*

**Eizel Corporation**, Pittsburgh, PA
*Member of the Advisory Board, 2001-2003*

**PERQ Systems Corporation**, Pittsburgh, PA
(formerly **Three Rivers Computer Corporation**)
*Senior Software Engineer, 1980-1983.*
Designed and implemented the Sapphire Window Manager, which was one of the first commercial window systems and featured full covered windows, a novel use of icons and percent-done progress indicators. Designed and implemented the PERQ directory structure for a hierarchical file system including a Scavenger program to correct file system inconsistencies. Also designed and implemented the PERQ's Pascal debugger, a comprehensive user interface package, various graphical editors, demonstration programs, and games.

**Xerox Palo Alto Research Center**, Palo Alto, CA
*Research Intern, Summer 1977, Summer 1978, and Summer/Fall 1979*
Developed a system called Incense which automatically created graphical, pictorial displays for data structures based on their types. Implemented Ethernet protocols in Smalltalk.

---

# Education:

**University of Toronto**, Toronto, Ontario, Canada
*1983-1987.*
PhD in Computer Science, May, 1987. Was a Teaching Assistant for computer graphics courses. Grade point average for course work = A+.

**Massachusetts Institute of Technology**, Cambridge, Massachusetts
*1975-1980.*
Received Master of Science in Computer Science and Bachelor of Science in Computer Science and Engineering in 1980. Did Master's thesis on Incense while an intern at Xerox PARC. Worked at MIT Architecture Machine Group, 1976-1979. Final grade point average: 5.0 out of 5.0 (A+).

---

# Awards and Honors:

Best Research Award, Non-Physician Category at ISHLT: The International Society for Heart & Lung Transplantation, April 9-12, 2008, for: A. DeVito Dabbs, M.A. Dew, B.A. Myers, R.P. Hawkins, D. Ren, A. Begey, R. Zomak, K.L. Lo Coco, K.R. McCurry. "A Randomized Controlled Pilot Trial of PocketPATH on Early Self-Care Behaviors and HRQoL After Lung Transplant."

ACM SIGSOFT Distinguished Paper Award at the 30th International Conference on Software

Exhibit A

Engineering (ICSE'2008) for "Debugging, Reinvented: Asking and Answering Why and Why Not Questions about Program Behavior" by Andrew J. Ko and Brad A. Myers. May, 2008.

University of Pittsburgh School of Nursing's Nursing Excellence in Teaching and Technology (NETT) Award for 2007 to PocketPATH, by Annette De Vito Dabbs, Brad A. Myers, Kenneth R. McCurry, Jacqueline Dunbar-Jacob, Robert P. Hawkins, Mary Amanda Dew.

CHI 2006 Best Paper, awarded by SIGCHI, for "Trackball Text Entry for People with Motor Impairments," by Jacob O. Wobbrock and Brad A. Myers.

Designated an *ACM Fellow*, 2005. (citation) and (press release)

Elected to the CHI Academy, April, 2004, as one of the top 25 "principal leaders of the field" of HCI.

Distinguished Paper Award at the 27th International Conference on Software Engineering (ICSE'05) for "Eliciting Design Requirements for Maintenance-Oriented IDEs: A Detailed Study of Corrective and Perfective Maintenance Tasks" by Andrew J. Ko, Htet Htet Aung, and Brad A. Myers. May, 2005.

Elected to the grade of Senior Member, IEEE (September, 2004).

First place in the 2004-2005 NISH National Scholar Awards for Workplace Innovation & Design, to Jacob Wobbrock, supervised by Brad Myers. Press release as pdf

Best Paper Award at the ACM SIGACCESS Conference on Computers and Accessibility (ASSETS '04) for "Text Entry from Power Wheelchairs: EdgeWrite for Joysticks and Touchpads" by Jacob O. Wobbrock, Brad A. Myers, Htet Htet Aung, and Edmund F. LoPresti. October 2004.

Best Student Paper award at USENIX 2000 Annual Technical Conference for "Integrating a Command Shell into a Web Browser" by Robert Miller and Brad Myers. June 2000.

Outstanding Paper Award at USENIX 1999 Annual Technical Conference for "Lightweight Structured Text Processing" by Robert C. Miller and Brad A. Myers. June 1999.

Winner, first place in the "Personal Productivity" category in the ACM Quest for Windows CE Applications, 1999.

Listed in *Marquis Who's Who in America, 2007, 2009, Marquis Who's Who in Finance and Industry, 2004-2005, Marquis Who's Who in the East, 1995-2000, Marquis Who's Who in the World, 1996, Marquis Who's Who in the Media and Communications, 1997-1999*, and *Marquis Who's Who in Science and Engineering, 1998-2001*. Included in *2000 Outstanding Scientists of the 20th Century*, International Biographical Centre, Cambridge, England.

PhD thesis nominated for ACM annual best dissertation contest. Selected to join Eta Kappa Nu and Tau Beta Pi. IEEE Student Paper contest winner 1978 and 1979. Awarded University of Toronto Open Fellowship. Graduated First Honor Student from Isadore Newman High School, 1975.

---

# Research Grants:

Exhibit A

- Adobe Systems Incorporated, 2008, to the Human Computer Interaction Institute as part of the Adobe Academic Alliance, $124,950 equipment.
- Adobe Systems Incorporated, 2007, $70,000 cash, for "Making Programming Interactive Behaviors More Natural"
- SAP, Inc., 2007, $160,000. API Usability for E-SOA.
- Microsoft Research, Support for the Pebbles Project. 2007: $10,939 equipment; 2006: $80,000 cash and $2,500 equipment; 2004: $4,000 equipment; 2003: $8,500 equipment; 2002: $80,000 cash; 2001: $70,000 cash; 2000: $70,000 cash; 1999: $150,000 cash; 1998: $100,000 cash + $2,600 equipment.
- IBM. 2006 Eclipse Innovation Award. "Program Understanding and Debugging in Eclipse". $27,000
- NSF. EEC-0540865, "Quality of Life Technology Engineering Research Center". 5/17/2006-5/31/2011. $15,000,000.
- NSF. IIS-0534349. "Automatically Generating Consistent User Interfaces for Multiple Appliances." 12/1/05-11/30/08. $412,000.
- NACME/Philip D. Reed Undergraduate Fellowship. (The National Action Council for Minorities in Engineering). $2,000 for Ivan Gonzalez, Brad Myers. 2005-2006.
- General Motors. "Using Handheld Devices for Information and Control in Vehicles." 2006: $87,365. 2005: $83,678. 2004: $83,678. 2003: $83,678; Summer, 2002: $5000.
- Synaptics, Inc. 2004. Equipment: $600.
- Nokia Research Center, Finland. 2004. Equipment: $2000.
- AT Sciences, LLC. 2004. Equiptment: $1300.
- SMART Technologies, Inc.. 2000: Equiptment: $2998. 2004: Equiptment: $50.
- Lutron, Inc. "Remote Control of UPnP Devices". 2003. $2000.
- Lantronix, Inc. "Remote Control of UPnP Devices". 2003. $1144.
- NSF. IIS-0329090. "Lowering the Barriers to Successful Programming." Brad Myers and Randy Pausch. 2003-2007. $1,200,000
- NSF ITR CCR-0324770: "Collaborative Research: Dependable End-User Software". 2003-2007. Margaret M. Burnett, Gregg Rothermel, Brad Myers, Martin Erwig, Margaret L. Niess, Sebastian Elbaum, Mary Beth Rosson, Mary Shaw, Susan Wiedenbeck. $2,640,000. CMU Portion: $324,000.
- IBM Canada, Ltd. "Update Pebbles for new Palms." 2003. Equipment: USD $1,792.09
- DARPA. "Evolutionary Development of Self-Aware Learning Agents." Dan Siewiorek, Jaime Carbonell, Tom Mitchell, Manuela Veloso, Brad Myers, Randy Pausch, Alex Waibel, Eric Nyberg, Bill Scherlis, Raj Reddy, Howard Wactlar. $38,765,940. 2003 - 2007.
- NEC Foundation of America. "Handhelds as Assistive Technologies for People with Muscular Disabilities." 2003. $50,000.
- NSF. UA-0308065. "Using Handhelds to Help People with Motor Impairments." 2003-2007. $475,232.
- NSF. EIA-0205301. "ITR: Collaborative Research: Putting a Face on Cognitive Tutors: Bringing Active Inquiry into Active Problem Solving." Albert Corbett, Kenneth Koedinger, Scott Stevens, and Brad Myers. $2,414,648. 10/01/02 - 09/30/07.
- Mitsubishi Electric Research Laboratory. "Remote Control of HAVi Appliances in Pebbles." Mitsubishi WS-65909 65" Integrated HDTV Diamond Series television and Mitsubishi HS-HD2000U High Definition Digital VCR. 2002. $6,500 plus $1,500 for VividLogic HAVi toolkit.
- NSF. IIS-0223945. "Research Experiences for Undergraduates (REU) Supplement to IIS-0117658: Making it Easier to Interact with Technology Through Handheld Personal Universal Controllers." Summer, 2002. $6000.
- NSF. IIS-0117658. "Making it Easier to Interact with Technology Through Handheld Personal Universal Controllers." 2001-2004. $505,867.
- TDK Systems Europe, LTD. 2001. Six BlueTooth modules, $700.

Exhibit A

- <u>Pittsburgh Digital Greenhouse</u>, Brad Myers and Jodi Forlizzi, "Using Mobile Devices as Universal Personal Controllers," 2000-2002, $167,000.
- Hewlett Packard, "Ubiquitous Computing at Carnegie Mellon; Delivering Innovative Classroom Applications Using Handheld Devices", Diana Bajzek, Tracy Futhey, Kim Jordan, Dr. Brad Myers, Dr. Dan Sieworiek, Dr. Randy Weinberg, Dr. David Yaron. 2000. Equipment: 330 Jornada computers, $304,170.
- Lucent Technologies, "Ubiquitous Computing at Carnegie Mellon; Delivering Innovative Classroom Applications Using Handheld Devices", Diana Bajzek, Tracy Futhey, Kim Jordan, Dr. Brad Myers, Dr. Dan Sieworiek, Dr. Randy Weinberg, Dr. David Yaron. 2000. Equipment: about 300 Wavelan wireless network PCMCIA cards for the HP Jornada's, approx. $45,000.
- Symbol Technologies, Inc., Support for the Pebbles Project. 2000. Equipment: $7300.
- CMU Small Undergraduate Research Grant (SURG). For work by Geoffrey Washburn: "A Graphics Library for Introductory Programming." Fall, 1999: $425. Summer, 1999: $3000.
- Palm Computing, Inc. Using Handhelds for the Handicapped, 2001: Equipment: $516. Studying Multiple People using Pebbles Software and Hand-helds in Education, 2000: Equipment: $4,788; 1999: Equipment: $3,690.
- IBM. Studying Multiple People using Pebbles Software. 1999. Equipment: $3,725.
- DARPA. "Adding Features to Pebbles," 1999. $40,000.
- NSF, etc. (Interagency program). <u>Digital Library Initiative-2,</u> IIS-9817527. 1999-2002. "An Intelligent Authoring Tool for Non-Programmers Using the Informedia Video Library," Brad Myers, Scott Stevens and Al Corbett. $450,000.
- USENIX Association's Scholastic Committee grant for "Lightweight Structured Text Editing," (work of PhD student Rob Miller). 2000-2001: $19,800. 1999-2000: $18,300. 1998-1999: $17,700.
- NSF. IRI-9900452. 1999-2002. "A More Natural Programming Environment for Children," Brad Myers and Al Corbett. $400,000.
- DARPA under the Command Post of the Future program. "High Bandwidth Command and Control." With Bill Scherlis, Alex Waibel, Randy Pausch and Jie Yang. 1998-2002. $2,706,000.
- Dupont Corporation. Educational Aid Program. 1998. $10,000.
- NSF. IRI-9319969. 1994-1997. Demonstrational Interfaces for Visualization and End-User Programming. $240,000.
- ARPA. Contract N66001-94-C-6037, ARPA Order No. B326. 1994 - 1998. Creating User Interface Software. $1,733,469.
- Siemens Corporation. Unrestricted. 1995: $20,000. 1990: $20,000.
- NEC. Unrestricted. 1993: $5000. 1989: $15,000.
- NSF. IRI-9020089. 1991-1993 (two years). Using Demonstration in Interfaces. $269,061.
- DARPA. Contract F33615-90-C-1465, ARPA Order No. 7597. 1990-1993. Creating Graphical Interfaces. $1,704,000.
- General Electric. 1990-1991. Postscript and Visualization in Garnet. $20,000.
- Apple Computer, Inc. 1990. Garnet on a Macintosh. $7000.
- Apple Computer, Inc. 1989-1991. Demonstrational Interfaces. Equipment $18,978, cash $50,000.

---

# Publications:

## Books:

1. Allen Cypher, Daniel C. Halbert, David Kurlander, Henry Lieberman, David Maulsby, Brad A. Myers and Alan Turransky, eds. *Watch What I Do: Programming by Demonstration*. Cambridge,

Exhibit A

MA: The MIT Press, 1993. web page.

2. Brad A. Myers, ed. *Languages for Developing User Interfaces*. Boston: Jones and Bartlett, 1992. ISBN: 0867204508. http://www.cs.cmu.edu/~bam/langbook.html

3. Brad A. Myers. *Creating User Interfaces by Demonstration*. Boston, MA: Academic Press, May 1988. ISBN: 0125123051.

**Book Chapters:**

*(Does not include reprints of conference articles listed below.)*

4. Chris Scaffidi, Brad Myers, and Mary Shaw. "Trial By Water: Creating Hurricane Katrina 'Person Locator' Web Sites" *Leadership at a Distance: Research in Technologically-Supported Work* S. Weisband, ed, Lawrence Erlbaum, 2008. pp. 209-222.

5. Jacob O. Wobbrock and Brad A. Myers, "Adding gestural text entry to input devices for people with motor impairments", Chapter 14 in J. Lazar (ed.), *Universal Usability*. New York: John Wiley & Sons. 2007. pp. 421-456.

6. John F. Pane and Brad A. Myers, "More Natural Programming Languages and Environments," in *End User Development*, vol. 9 of the Human-Computer Interaction Series, Henry Lieberman, Fabio Paterno, and Volker Wulf, eds. Dordrecht, The Netherlands: Springer, 2006, pp. 31-50.

7. Brad A. Myers. "Graphical User Interface Programming," chapter 48 of *Computer Science Handbook -- Second Edition*. Allen B. Tucker, editor in chief. Boca Raton, FL: Chapman & Hall/CRC Press, Inc., 2004. pp. 48-1 - 48-29. pdf

8. Brad Myers, Scott E. Hudson, and Randy Pausch, "Past, Present and Future of User Interface Software Tools," in John M. Carroll, ed. *HCI In the New Millennium*. New York: ACM Press, Addison-Wesley, 2001. pp. 213-233.

9. Brad Myers and Richard McDaniel. "Demonstrational Interfaces: Sometimes You Need a Little Intelligence; Sometimes You Need a Lot." *Your Wish is My Command*. Henry Lieberman, Ed. San Francisco: Morgan Kaufmann, 2001. pp. 45-60.

10. David Wolber and Brad Myers. "Stimulus-Response PBD: Demonstrating When as Well as What." *Your Wish is My Command*. Henry Lieberman, Ed. San Francisco: Morgan Kaufmann, 2001. pp. 321-344.

11. Brad A. Myers, Rich McDaniel, and Rob Miller, "The Amulet Prototype-Instance Framework," in *Domain-Specific Application Frameworks*, edited by Mohamed Fayad and Ralph E. Johnson. New York: John Wiley & Sons, 2000. ISBN# 0-471-332801. pp. 529-546. http://www.cs.cmu.edu/~amulet/papers/amuletappframe.ps http://www.cs.cmu.edu/~amulet/papers/amuletappframe.pdf

12. Brad A. Myers, Rich McDaniel, Rob Miller, Brad Vander Zanden, Dario Giuse, David Kosbie and Andrew Mickish, "The Prototype-Instance Object Systems in Amulet and Garnet," *Prototype Based Programming: Concepts, Languages and Applications*, James Noble, Antero Taivalsaari and Ivan Moore, eds. Singapore: Springer-Verlag, 1999. pp. 141-176. ISBN 981-4021-25-3. pdf

13. Brad A. Myers. "User Interface Management Systems," *Wiley Encyclopedia of Electrical and Electronics Engineering, Volume 23*. John G. Webster, editor. New York: John Wiley & Sons, 1999. pp. 42-58.

14. Brad A. Myers. "Interface Software Technology," chapter 72 of *CRC Handbook of Computer Science and Engineering*. Allen B. Tucker, editor in chief. Boca Raton, FL: CRC Press, Inc., 1997. pp. 1571-1595.

15. Brad A. Myers. "Program Visualization," *Encyclopedia of Software Engineering*. John J. Marciniak, ed. New York: John Wiley & Sons, Inc., 1994. pp. 877-892.

16. Brad A. Myers. "User Interface Software," *Encyclopedia of Computer Science and Technology*. Allen Kent and James G. Williams, editors. Vol. 33, no. 18. New York: Marcel Dekker, Inc., 1995. pp. 371-405. and *Enyclopedia of Microcomputers*. Allen Kent and James G. Williams,

Exhibit A

editors. New York: Marcel Dekker, Inc., 1996. pp. 223-257.

17. Brad A. Myers. "State of the Art in User Interface Software Tools," *Advances in Human-Computer Interaction, Volume 4*. Edited by H. Rex Hartson and Deborah Hix. Norwood, NJ: Ablex Publishing, 1993. pp. 110-150. Reprinted in: R.Baecker, J.Grudin, W.Buxton, and S. Greenberg, eds. *Readings in Human-Computer Interaction: Toward the Year 2000*. Second Edition. San Francisco: Morgan Kaufmann Publishers, Inc., 1995. pp. 344-356.

18. Brad A. Myers. "Peridot: Creating User Interfaces by Demonstration," *Watch What I Do: Programming by Demonstration*, Allen Cypher, et. al., eds. Cambridge, MA: The MIT Press, 1993. pp. 125-153.

19. Brad A. Myers. "Garnet: Uses of Demonstrational Techniques," *Watch What I Do: Programming by Demonstration*, Allen Cypher, et. al., eds. Cambridge, MA: The MIT Press, 1993. pp. 219-236.

20. Brad A. Myers. "Tourmaline: Text Formatting by Demonstration," *Watch What I Do: Programming by Demonstration*, Allen Cypher, et. al., eds. Cambridge, MA: The MIT Press, 1993. pp. 309-321.

21. Francesmary Modugno and Brad A. Myers. "Graphical Representation and Feedback in a PBD System," *Watch What I Do: Programming by Demonstration*, Allen Cypher, et. al., eds. Cambridge, MA: The MIT Press, 1993. pp. 423-431.

22. David S. Kosbie and Brad A. Myers. "A System-Wide Macro Facility Based on Aggregate Events: A Proposal," *Watch What I Do: Programming by Demonstration*, Allen Cypher, et. al., eds. Cambridge, MA: The MIT Press, 1993. pp. 433-444.

23. Brad A. Myers. "Demonstrational Interfaces: A Step Beyond Direct Manipulation," *Watch What I Do: Programming by Demonstration*, Allen Cypher, et. al., eds. Cambridge, MA: The MIT Press, 1993. pp. 485-512.

24. Brad A. Myers and David Maulsby. "Glossary," *Watch What I Do: Programming by Demonstration*, Allen Cypher, et. al., eds. Cambridge, MA: The MIT Press, 1993. pp. 593-603.

25. Brad A. Myers. "Introduction," *Languages for Developing User Interfaces*. Boston: Jones and Bartlett, 1992. pp. 1-20.

26. Brad A. Myers. "Ideas from Garnet for Future User Interface Programming Languages," *Languages for Developing User Interfaces*. Boston: Jones and Bartlett, 1992. pp. 147-157.

27. Brad A. Myers, David Canfield Smith, and Bruce Horn. "Report of the `End-User Programming' Working Group," *Languages for Developing User Interfaces*. Boston: Jones and Bartlett, 1992. pp. 343-366.

28. Brad A. Myers. "Demonstrational Interfaces: A Step Beyond Direct Manipulation," *People and Computers VI*. Dan Diaper and Nick Hammond, eds. Cambridge, England: Cambridge University Press, 1991. pp. 11-30.

29. Brad A. Myers. "Using AI Techniques to Create User Interfaces by Example," in Joseph W. Sullivan, ed, *Intelligent User Interfaces*. Reading, MA: Addison-Wesley/ACM Press, 1991. pp. 385-401.

30. Brad A. Myers. "Issues in Window Manager Design and Implementation," ch. 6 of *Methodology of Window Management*, F. Robert A. Hopgood, *et. al.*, eds. Berlin: Springer-Verlag, 1986. pp. 59-71. (Also contributed to other chapters, especially pp. 181-187.)

## Refereed Journal Articles:

31. Jacob O Wobbrock, Brad A Myers, Htet Htet Aung, "The Performance of Hand Postures in Front- and Back-of-Device Interaction for Mobile Computing". *International Journal of Human-Computer Studies*, Special issue on mobility and human-computer interaction. 2008. To appear.

32. Christopher Scaffidi, Allen Cypher, Sebastian Elbaum, Andhy Koesnandar, Brad Myers. "Using Scenario-Based Requirements to Direct Research on Web Macro Tools". *Journal of Visual Languages and Computing*. To appear.

33. Jacob O. Wobbrock and Brad A. Myers. "Enabling Devices, Empowering People: The Design and

Exhibit A

Evaluation of Trackball EdgeWrite," *Disability and Rehabilitation: Assistive Technologies*, special issue on Accessibility. Volume 3 Issue 1, January, 2008, pp. 35-56.

34. Andrew J. Ko, Brad A. Myers, Michael Coblenz, and Htet Htet Aung. "An Exploratory Study of How Developers Seek, Relate, and Collect Relevant Information during Software Maintenance Tasks", *IEEE Transactions on Software Engineering*. Vol. 32, No. 12, Dec, 2006. pp. 971-987. pdf

35. Jeffrey Nichols and Brad A. Myers, "Controlling Home and Office Appliances with Smartphones". *IEEE Pervasive Computing*, special issue on SmartPhones, Vol. 5, No. 3, July-Sept, 2006. pp. 60-67. pdf

36. Jacob O. Wobbrock and Brad A. Myers. "Analyzing the Input Stream for Character-level Errors in Unconstrained Text Entry Evaluations." *ACM Transactions on Computer Human Interaction*. Vol. 13, no. 4, December, 2006, pp. 458 - 489. pdf

37. Ben Shneiderman, Gerhard Fischer, Mary Czerwinski, Mitch Resnick, Brad Myers, "Creativity Support Tools: Report from a U.S. National Science Foundation Sponsored Workshop". *International Journal of Human-Computer Interaction*, 20(2), 2006, pp. 61-77.

38. Andrew J. Ko and Brad A. Myers, "A Framework and Methodology for Studying the Causes of Software Errors in Programming Systems". *Journal of Visual Languages and Computing*, Volume 16, no. 1. Feb, 2005. pp. 41-84. pdf

39. Brad A. Myers, Jeffrey Nichols, Jacob O. Wobbrock, and Robert C. Miller. "Taking Handheld Devices to the Next Level." *IEEE Computer*. December, 2004. vol. 37, no. 12. pp. 36-43. pdf or html

40. Jacob O. Wobbrock, Htet Htet Aung, Brad A. Myers, and Edmund F. LoPresti. "Integrated Text Entry from Power Wheelchairs." *Behaviour and Information Technology*. Vol. 24, no. 3. May-June 2005. pp. 187-203. BIT online

41. Bradley T. Vander Zanden, Richard Halterman, Brad A. Myers, Rob Miller, Pedro Szekely, Dario A. Giuse, David Kosbie, and Rich McDaniel. "Lessons Learned from User's Experiences with Spreadsheet Constraints in the Garnet and Amulet Graphical Toolkits," *Software: Practice and Experience*. John Wiley & Sons, Inc. To appear.

42. Brad A. Myers. "Using Handhelds for Wireless Remote Control of PCs and Appliances," *Interacting with Computers*, Elsevier Science Journals. 2005. Volume 17, Issue 3, May 2005, Pages 251-264. DOI ref or local pdf

43. Brad A. Myers, John F. Pane and Andy Ko, "Natural Programming Languages and Environments". *Communications of the ACM*. (special issue on End-User Development). Sept, 2004, vol. 47, no. 9. pp. 47-52. pdf

44. Brad A. Myers. "Using Hand-Held Devices and PCs Together," *Communications of the ACM*. Volume 44, Issue 11. November, 2001. pp. 34 - 41. http://www.cs.cmu.edu/~pebbles/papers/pebblescacm.pdf

45. Bradley T. Vander Zanden, Richard Halterman, Brad A. Myers, Rich McDaniel, Rob Miller, Pedro Szekely, Dario Giuse, and David Kosbie. "Lessons Learned About One-Way, Dataflow Constraints in the Garnet and Amulet Graphical Toolkits." *ACM Transactions on Programming Languages and Systems* (TOPLAS). Vol. 23, No. 6, November 2001, Pages 776-796. PDF

46. James Landay and Brad Myers. "Sketching Interfaces: Toward More Human Interface Design", *IEEE Computer*, March, 2001. Vol. 34, No. 3. pp. 56-64. http://www.cs.cmu.edu/~garnet/silk-ieee-published.pdf

47. Bernhard Suhm, Brad Myers and Alex Waibel, "Multi-Modal Error Correction for Speech User Interfaces," *ACM Transactions on Computer Human Interaction*, vol. 8, no. 1, March 2001, pp. 60-98.

48. John F. Pane, Chotirat "Ann" Ratanamahatana, and Brad A. Myers, "Studying the Language and Structure in Non-Programmers' Solutions to Programming Problems", *International Journal of Human-Computer Studies (IJHCS)*. Special Issue on Empirical Studies of Programmers, vol. 54, no. 2, February 2001, pp. 237-264.

Exhibit A

http://www.cs.cmu.edu/~pane/IJHCS.html

49. Brad A. Myers. "Using Multiple Devices Simultaneously for Display and Control." *IEEE Personal Communications* special issue on "Smart Spaces and Environments." vol. 7, no. 5, Oct. 2000. pp. 62-65. pdf.

50. Brad Myers, Richard McDaniel and David Wolber. "Programming by example: Intelligence in Demonstrational Interfaces," *Communications of the ACM*. March, 2000. vol. 43, no. 3. pp. 82-89. pdf

51. Brad Myers, Scott E. Hudson, and Randy Pausch, "Past, Present and Future of User Interface Software Tools," *ACM Transactions on Computer Human Interaction*. March, 2000. Vol. 7, no. 1. pp. 3-28. Available as ACM pdf or draft pdf.

52. Brad A. Myers, Rich McDaniel, Rob Miller, Brad Vander Zanden, Dario Giuse, David Kosbie, and Andrew Mickish, "Our Experience with Prototype-Instance Object-Oriented Programming in Amulet and Garnet." *Interfaces*, Issue No. 39 (August 1998), ISSN: 1351-119X. A Publication of the British HCI Group. pp. 4-9.

53. Brad A. Myers. "A Brief History of Human Computer Interaction Technology." *ACM interactions*. Vol. 5, no. 2, March, 1998. pp. 44-54. pdf

54. Francesmary Modugno, Albert T. Corbett, and Brad A. Myers. "Graphical Representation of Programs in a Demonstrational Visual Shell -- An Empirical Evaluation," *ACM Transactions on Computer-Human Interaction*. Sept, 1997, vol. 4, no. 3. pp. 276-308.

55. Francesmary Modugno and Brad A. Myers. "Visual Programming in a Visual Shell -- A Unified Approach," *Journal of Visual Languages and Computing*, Volume 8, no. 5/6. Oct/Dec, 1997. pp. 491-522.

56. Brad A. Myers, Richard G. McDaniel, Robert C. Miller, Alan Ferrency, Andrew Faulring, Bruce D. Kyle, Andrew Mickish, Alex Klimovitski, and Patrick Doane. "The Amulet Environment: New Models for Effective User Interface Software Development", *IEEE Transactions on Software Engineering*, Vol. 23, no. 6. June, 1997. pp. 347-365. IEEE pdf or tech report postscript or abstract only

57. Brad A. Myers, Jim Hollan, Isabel Cruz, et. al.. "Strategic Directions in Human Computer Interaction," *ACM Computing Surveys*, vol. 28, no. 4, December, 1996. pp. 794-809. http://www.cs.cmu.edu/~bam/nsfworkshop/hcireport.html

58. Brad A. Myers. "User Interface Software Technology," *ACM Computing Surveys*. Vol. 28, no. 1, March, 1996. pp. 189-191. http://www.cs.cmu.edu/~amulet/papers/uimshandbookuidesign.ps

59. Brad Vander Zanden and Brad A. Myers. "Demonstrational and Constraint-Based Techniques for Pictorially Specifying Application Objects and Behaviors," *ACM Transactions on Computer-Human Interaction*. Vol. 2, no. 4, Dec, 1995. pp. 308-356.

60. Brad A. Myers. "User Interface Software Tools," *ACM Transactions on Computer-Human Interaction*. vol. 2, no. 1, March, 1995. pp. 64-103. http://reports-archive.adm.cs.cmu.edu/anon/1994/CMU-CS-94-182.ps

61. Brad Vander Zanden, Brad A. Myers, Dario Giuse and Pedro Szekely. "Integrating Pointer Variables into One-Way Constraint Models," *ACM Transactions on Computer-Human Interaction*. vol. 1, no. 2, June, 1994. pp. 161-213.

62. Brad A. Myers. "Challenges of HCI Design and Implementation," *ACM Interactions*. vol. 1, no. 1. January, 1994. pp. 73-83. http://reports-archive.adm.cs.cmu.edu/anon/1993/CMU-CS-93-183.ps

63. Robert J.K. Jacob, John J. Leggett, Brad A. Myers, and Randy Pausch. "Interaction Styles and Input/Output Devices," *Behaviour and Information Technology*. March-April, 1993. vol. 12, no. 2. pp. 69-79.

64. Dan R. Olsen, Jr., James D. Foley, Scott E. Hudson, James Miller, and Brad Myers. "Research Directions for User Interface Software Tools," *Behaviour and Information Technology*. March-April, 1993. vol. 12, no. 2. pp. 80-97.

65. Brad A. Myers. "Demonstrational Interfaces: A Step Beyond Direct Manipulation," *IEEE Computer*. August, 1992. vol. 25, no. 8. pp. 61-73.

Exhibit A

66. Brad A. Myers and Brad Vander Zanden. "Environment for Rapid Creation of Interactive Design Tools," *The Visual Computer; International Journal of Computer Graphics*. vol. 8, no. 2, February, 1992. pp. 94-116.

67. Brad A. Myers. "A New Model for Handling Input," *ACM Transactions on Information Systems*. vol. 8, no. 3. July, 1990. pp. 289-320.

68. Brad A. Myers, Dario A. Giuse, Roger B. Dannenberg, Brad Vander Zanden, David S. Kosbie, Ed Pervin, Andrew Mickish, and Philippe Marchal. "Garnet: Comprehensive Support for Graphical, Highly-Interactive User Interfaces," *IEEE Computer*. vol. 23, no. 11. November, 1990. pp. 71-85. Translated into Japanese and reprinted in *Nikkei Electronics*, No. 522, March 18, 1991, pp. 187-205. Also reprinted in: R.Baecker, J.Grudin, W.Buxton, and S. Greenberg, eds. *Readings in Human-Computer Interaction: Toward the Year 2000*. Second Edition. San Francisco: Morgan Kaufmann Publishers, Inc., 1995. pp. 357-372. pdf

69. Brad Vander Zanden and Brad A. Myers. "A Constraints Primer," *IEEE Computer*. vol. 23, no. 11. November, 1990. pp. 74-75.

70. Brad A. Myers. "Creating User Interfaces Using Programming-by-Example, Visual Programming, and Constraints," *ACM Transactions on Programming Languages and Systems*. vol. 12, no. 2, April, 1990. pp. 143-177.

71. Brad A. Myers. "Taxonomies of Visual Programming and Program Visualization," *Journal of Visual Languages and Computing*. vol. 1, no. 1. March, 1990. pp. 97-123. *(A draft version is available in pdf format)*

72. Brad A. Myers. "User Interface Tools: Introduction and Survey," *IEEE Software*, vol. 6, no. 1, Jan, 1989. pp. 15-23. Reprinted in *Milestones in Software Evolution*, Paul W. Oman and Ted G. Lewis, ed. Los Alamitos, CA: IEEE Computer Society Press, 1990. pp. 261-269.

73. Brad A. Myers. "A Taxonomy of User Interfaces for Window Managers," *IEEE Computer Graphics and Applications*, vol. 8, no. 5, Sept, 1988. pp. 65-84.

74. Brad A. Myers. "Creating Interaction Techniques by Demonstration," *IEEE Computer Graphics and Applications*, vol. 7, no. 9, Sept, 1987. pp. 51-60. Reprinted in *Visual Programming Environments: Paradigms and Systems*, Ephraim P. Glinert, ed. Los Alamitos, CA: IEEE Computer Society Press, 1990. pp. 378-387.

75. John R. Dance, Tamar E. Granor, Ralph D. Hill, Scott E. Hudson, Jon Meads, Brad A. Myers, and Andrew Schulert. "The Run-time Structure of UIMS-Supported Applications," *Computer Graphics*. vol. 21, no. 2, April, 1987. pp. 97-101. Reprinted in *The Separable User Interface*, Ernest Edmonds, ed. Academic Press, 1992. pp. 213-225.

76. Brad A. Myers. "A Complete and Efficient Implementation of Covered Windows," *IEEE Computer*. vol. 19, no. 9. Sept, 1986. pp. 57-67.

77. Brad A. Myers. "The User Interface for Sapphire," *IEEE Computer Graphics and Applications*. vol. 4, no. 12, Dec, 1984. pp. 13-23.

## Major Refereed Conference Papers:

78. Jeffrey Stylos, Brad A. Myers. "The Implications of Method Placement on API Learnability," *Sixteenth ACM SIGSOFT Symposium on Foundations of Software Engineering (FSE 2008)*. Atlanta, GA, November 9-14, 2008. To appear.

79. Jack Beaton, Sae Young Jeong, Yingyu Xie, Jeffrey Stylos, Brad A. Myers. "Usability Challenges for Enterprise Service-Oriented Architecture APIs," *2008 IEEE Symposium on Visual Languages and Human-Centric Computing, VL/HCC'08*. Sept 15-18, 2008, Herrsching am Ammersee, Germany. To appear.

80. Brad Myers, Sunyoung Park, Yoko Nakano, Greg Mueller, Andrew Ko, "How Designers Design and Program Interactive Behaviors," *2008 IEEE Symposium on Visual Languages and Human-Centric Computing, VL/HCC'08*. Sept 15-18, 2008, Herrsching am Ammersee, Germany. To appear.

Exhibit A

81. Sunyoung Park, Brad Myers, Andrew Ko. "Designers' Natural Descriptions of Interactive Behaviors," *2008 IEEE Symposium on Visual Languages and Human-Centric Computing, VL/HCC'08*. Sept 15-18, 2008, Herrsching am Ammersee, Germany. To appear.

82. Michael Freed, Jaime Carbonell, Geoff Gordon, Brad Myers, Dan Siewiorek, Steve Smith, Aaron Steinfeld, Anthony Tomasic. "RADAR: A Personal Assistant that Learns to Reduce Email Overload", *Twenty-Third AAAI Conference on Artificial Intelligence: AAAI-08* Integrated Intelligence Track. Chicago, Illinois, July 13-17, 2008. To appear.

83. Christopher Scaffidi, Brad Myers, Mary Shaw, "Topes: Reusable Abstractions for Validating Data." *ICSE'2008: 30th International Conference on Software Engineering*, Leipzig, Germany, 10 - 18 May 2008. pp. 1-10.

84. Andrew J. Ko and Brad A. Myers, "Debugging, Reinvented: Asking and Answering Why and Why Not Questions about Program Behavior" *ICSE'2008: 30th International Conference on Software Engineering*, Leipzig, Germany, 10 - 18 May 2008. pp. 301-310. **Winner, Distinguished Paper Award.**

85. Duen Horng Chau and Brad Myers. "What to Do When Search Fails: Finding Information by Association," *Proceedings CHI'2008: Human Factors in Computing Systems*. Florence, Italy, April 5-10, 2008. pp. 999-1008. pdf

86. Andrew Faulring, Ken Mohnkern, Aaron Steinfeld, Brad A. Myers, "Successful User Interfaces for Radar," *CHI'2008 workshop on Usable Artificial Intelligence*, April 5-6, 2008, Florence, Italy. pdf

87. Jeffrey Stylos and Brad Myers, "Mapping the Space of API Design Decisions," *2007 IEEE Symposium on Visual Languages and Human-Centric Computing, VL/HCC'07*. Sept 23-27, 2007, Coeur d'Alene, Idaho. pp. 50-57.

88. Christopher Scaffidi, Allen Cypher, Sebastian Elbaum, Andhy Koesnandar, Brad Myers. "Scenario-Based Requirements for Web Macro Tools" *2007 IEEE Symposium on Visual Languages and Human-Centric Computing, VL/HCC'07*. Sept 23-27, 2007, Coeur d'Alene, Idaho. pp. 197-204.

89. Thomas D. LaToza, David Garlan, James D. Herbsleb, Brad A. Myers, "Program comprehension as fact finding", *ESEC/FSE 2007: ACM SIGSOFT Symposium on the Foundations of Software Engineering*, Dubrovnik, Croatia, September 3-7, 2007, pp. 361-370. pdf

90. Ivan E. Gonzalez, Jacob O. Wobbrock, Duen Horng Chau, Andrew Faulring, and Brad A. Myers, "Eyes on the Road, Hands on the Wheel: Thumb-based Interaction Techniques for Input on Steering Wheels" *Graphics Interface 2007*, May 28-30, 2007, Montreal, Canada. pp. 95-102. pdf

91. Jeffrey Nichols, Duen Horng Chau, Brad A. Myers, "Demonstrating the Viability of Automatically Generated User Interfaces" *Proceedings CHI'2007: Human Factors in Computing Systems*. San Jose, CA, April 28 - May 3, 2007. pp. 1283-1292. pdf

92. Jacob O. Wobbrock, Duen Horng Chau and Brad A. Myers, "An Alternative to Push, Press, and Tap-tap-tap: Gesturing on an Isometric Joystick for Mobile Phone Text Entry" *Proceedings CHI'2007: Human Factors in Computing Systems*. San Jose, CA, April 28 - May 3, 2007. pp. 667-667. pdf

93. Brian Ellis, Jeffrey Stylos, and Brad Myers. "The Factory Pattern in API Design: A Usability Evaluation". *International Conference on Software Engineering (ICSE'2007)*. May 20-26, 2007. Minneapolis, MN. pp. 302-312.

94. Jacob O. Wobbrock and Brad A. Myers, "From Letters to Words: Efficient Stroke-based Word Completion for Trackball Text Entry", *8th International ACM SIGACCESS Conference on Computers and Accessibility, ASSETS'06*, Portland, OR, Oct. 23-25, 2006. pp. 2-9. pdf

95. Michael J. Coblenz, Andrew J. Ko and Brad A. Myers, "JASPER: An Eclipse Plug-In to Facilitate Software Maintenance Tasks", *Eclipse Technology eXchange (ETX) Workshop at OOPSLA 2006*, Portland, Oregon, October 22-23, 2006. pp. 65-69. pdf and ACM DOI

96. Jacob O. Wobbrock, Brad A. Myers, and Duen Horng Chau, "In-stroke Word Completion". *ACM Symposium on User Interface Software and Technology, UIST'06*, October 15-18, 2006,

Resume for Brad A. Myers                                                          Page 14 of 47

Exhibit A

Montreux, Switzerland. pp. 333-336. pdf

97. Jeffrey Nichols, Brandon Rothrock, Duen Horng Chau, Brad A. Myers. "Huddle: Automatically Generating Interfaces for Systems of Multiple Connected Appliances" *ACM Symposium on User Interface Software and Technology, UIST'06*, October 15-18, 2006, Montreux, Switzerland. pp. 279-288. pdf

98. Andrew J. Ko, Brad A. Myers, and Duen Horng Chau, "A Linguistic Analysis of How People Describe Software Problems" *2006 IEEE Symposium on Visual Languages and Human-Centric Computing, VL/HCC'06*. Sept 4-8, 2006, Brighton, UK. pp. 127-134. pdf

99. Christopher Scaffidi, Andrew Ko, Brad Myers, Mary Shaw, "Dimensions Characterizing the Usage of Programming Features by Information Workers" *2006 IEEE Symposium on Visual Languages and Human-Centric Computing, VL/HCC'06*. Sept 4-8, 2006, Brighton, UK. pp. 59-62. pdf

100. Jeffrey Stylos and Brad A. Myers. "Mica: A Programming Web-Search Aid". *2006 IEEE Symposium on Visual Languages and Human-Centric Computing, VL/HCC'06*. Sept 4-8, 2006, Brighton, UK. pp. 195-202. pdf

101. Brad Myers, David A. Weitzman, Andrew J. Ko, and Duen Horng Chau, "Answering Why and Why Not Questions in User Interfaces," *Proceedings CHI'2006: Human Factors in Computing Systems*. Montreal, Canada, April 22-27, 2006. pp. 397-406. pdf

102. Jacob O. Wobbrock and Brad A. Myers, "Trackball Text Entry for People with Motor Impairments," *Proceedings CHI'2006: Human Factors in Computing Systems*. Montreal, Canada, April 22-27, 2006. pp. 479-488. **Winner, CHI 2006 Best Paper Award.** pdf

103. Andrew J. Ko and Brad A. Myers, "Barista: An Implementation Framework for Enabling New Tools, Interaction Techniques and Views in Code Editors," *Proceedings CHI'2006: Human Factors in Computing Systems*. Montreal, Canada, April 22-27, 2006. pp. 387-396. pdf

104. Jeffrey Nichols, Brad A. Myers, Brandon Rothrock, "UNIFORM: Automatically Generating Consistent Remote Control User Interfaces," *Proceedings CHI'2006: Human Factors in Computing Systems*. Montreal, Canada, April 22-27, 2006. pp. 611-620. pdf

105. Jacob O. Wobbrock, Brad A. Myers and Brandon Rothrock, "Few-key Text Entry Revisited: Mnemonic Gestures on Four Keys," *Proceedings CHI'2006: Human Factors in Computing Systems*. Montreal, Canada, April 22-27, 2006. pp. 489-492. pdf

106. Andrew J. Ko and Brad A. Myers. "Citrus: A Toolkit for Simplifying the Creation of Structured Editors for Code and Data." *ACM Symposium on User Interface Software and Technology, UIST'05*, October 23-26, 2005, Seattle, WA. pp. 3-12. pdf or ACM DL

107. Christopher Scaffidi, Mary Shaw, Brad Myers. "Estimating the Numbers of End Users and End User Programmers," 2005 IEEE Symposium on Visual Languages and Human-Centric Computing (VL/HCC'05), Dallas, Texas, USA, 20-24 September 2005. pp. 207-214. pdf

108. Andrew J. Ko, Htet Htet Aung, and Brad A. Myers. "Eliciting Design Requirements for Maintenance-Oriented IDEs: A Detailed Study of Corrective and Perfective Maintenance Tasks". *27th International Conference on Software Engineering*. St. Louis, MO. 15-21 May, 2005. pp. 126-135. **Winner, Distinguished Paper Award.** pdf

109. Jeffrey Stylos, Brad A. Myers, Andrew Faulring, "Citrine: Providing Intelligent Copy-and-Paste." *ACM Symposium on User Interface Software and Technology, UIST'04*, October 24-27, 2004, Santa Fe, NM. pp. 185-188. pdf

110. Jacob O. Wobbrock, Brad A. Myers, Htet Htet Aung, and Edmund F. LoPresti. "Text Entry from Power Wheelchairs: EdgeWrite for Joysticks and Touchpads." *Proceedings of the ACM SIGACCESS Conference on Computers and Accessibility (ASSETS '04)*. October 18-20, 2004. Atlanta, GA. pp. 110-117. **Winner, Best Paper Award.** pdf

111. Andrew J. Ko, Brad A. Myers, and Htet Htet Aung. "Six Learning Barriers in End-User Programming Systems." *VL/HCC'04: IEEE Symposium on Visual Languages and Human-Centric Computing*, Rome, Italy, September 26-29, 2004. pp. 199-206. pdf

112. Jacob O. Wobbrock, Brad A. Myers, and Htet Htet Aung. "Writing with a Joystick: A Comparison

Exhibit A

of Date Stamp, Selection Keyboard, and EdgeWrite," *Graphics Interface GI'2004*. Canadian Human-Computer Communications Society. May 17-19, 2004, London, Ontario, Canada. pp. 1-8. pdf

113. Andrew Jensen Ko and Brad A. Myers, "Designing the Whyline: A Debugging Interface for Asking Questions about Program Failures," *Proceedings CHI'2004: Human Factors in Computing Systems*. Vienna, Austria, April 24-29, 2004. pp. 151-158. pdf

114. Jeffrey Nichols, Brad A. Myers and Kevin Litwack. "Improving Automatic Interface Generation with Smart Templates," ACM *IUI'04*, Jan. 13-16, 2004, Madeira, Funchal, Portugal. pp. 286-288. pdf

115. Andrew J. Ko and Brad A. Myers. "Development and Evaluation of a Model of Programming Errors". 2003. *IEEE Symposium on End-User and Domain-Specific Programming (EUP'03)*, part of the *IEEE Symposia on Human-Centric Computing Languages and Environments*, (HCC'03). October 28-31, 2003. Auckland, New Zealand. pp. 7-14. pdf. Judged to be one of the two best papers.

116. Jacob O. Wobbrock, Brad A. Myers, and John Kembel. "EdgeWrite: A Stylus-Based Text Entry Method Designed for High Accuracy And Stability of Motion," *CHI Letters: ACM Symposium on User Interface Software and Technology, UIST'03*, Nov. 2-5, 2003, Vancouver, British Columbia, Canada. pp. 61-70. pdf

117. Jeffrey Nichols and Brad A. Myers. "Studying The Use of Handhelds to Control Smart Appliances". *International Workshop on Smart Appliances and Wearable Computing*. IWSAWC 2003. In the Proceedings of the *23rd IEEE Conference on Distributed Computing Systems Workshops (ICDCS'03)*. May 19-22, 2003, Providence, Rhode Island. pp. 274-279. pdf

118. Jacob O. Wobbrock, Brad A. Myers, and Scott E. Hudson. "Exploring Edge-based Input Techniques for Handheld Text Entry". *International Workshop on Smart Appliances and Wearable Computing*. IWSAWC 2003. In the Proceedings of the *23rd IEEE Conference on Distributed Computing Systems Workshops (ICDCS'03)*. May 19-22, 2003, Providence, Rhode Island. pp. 280-282. pdf

119. Brad Myers, Robert Malkin, Michael Bett, Alex Waibel, Ben Bostwick, Robert C. Miller, Jie Yang, Matthias Denecke, Edgar Seemann, Jie Zhu, Choon Hong Peck, Dave Kong, Jeffrey Nichols, Bill Scherlis. "Flexi-modal and Multi-Machine User Interfaces", *IEEE Fourth International Conference on Multimodal Interfaces*, Pittsburgh, PA. October 14-16, 2002. pp. 343-348. pdf

120. Jeffrey Nichols, Brad Myers, Thomas K. Harris, Roni Rosenfeld, Stefanie Shriver, Michael Higgins, Joseph Hughes. "Requirements for Automatically Generating Multi-Modal Interfaces for Complex Appliances," *IEEE Fourth International Conference on Multimodal Interfaces*, Pittsburgh, PA. October 14-16, 2002. pp. 377-382. pdf

121. Jeffrey Nichols, Brad A. Myers, Michael Higgins, Joe Hughes, Thomas K. Harris, Roni Rosenfeld, Mathilde Pignol. "Generating Remote Control Interfaces for Complex Appliances." *CHI Letters: ACM Symposium on User Interface Software and Technology, UIST'02*, 27-30 Oct. 2002, Paris, France. pp. 161-170. pdf

122. Jacob O. Wobbrock, Jodi Forlizzi, Scott E. Hudson, Brad A. Myers, "WebThumb: Interaction Techniques for Small-Screen Browsers," *CHI Letters: ACM Symposium on User Interface Software and Technology, UIST'02*, 27-30 Oct. 2002, Paris, France. pp. 205-208. pdf

123. Brad A. Myers. "Mobile Devices for Control," *The Fourth Symposium on Human-Computer Interaction for Mobile Devices, Mobile HCI'02*. (Keynote speech), September 18-20, 2002, Pisa, Italy. pp. 1-8. http://www.cs.cmu.edu/~pebbles/papers/pebblesMobileHCI2002.pdf

124. J.F. Pane, B.A. Myers, and L.B. Miller, "Using HCI Techniques to Design a More Usable Programming System," *2002 IEEE Symposia on Human Centric Computing Languages and Environments (HCC'02)*. Arlington, VA, September 3-6, 2002. pp. 198-206. http://www.cs.cmu.edu/~pane/handsdesign.html

125. Juan Casares, Brad A. Myers, A. Chris Long, Rishi Bhatnagar, Scott M. Stevens, Laura Dabbish,

Exhibit A

Dan Yocum, and Albert Corbett. "Simplifying Video Editing Using Metadata." In *Proceedings of Designing Interactive Systems (DIS 2002)*, London, UK, June 2002. pp. 157-166. Acrobat (pdf)

126. Brad A. Myers, Jacob O. Wobbrock, Sunny Yang, Brian Yeung, Jeffrey Nichols, and Robert Miller. "Using Handhelds to Help People with Motor Impairments", *Fifth International ACM SIGCAPH Conference on Assistive Technologies; ASSETS 2002*. July 8-10, 2002. Edinburgh, Scotland. pp. 89-96. http://www.cs.cmu.edu/~pebbles/papers/pebbleshandicapped.pdf.

127. Robert C. Miller and Brad A. Myers, "Multiple Selections in a Smart Text Editor". *2002 International Conference on Intelligent User Interfaces: IUI'2002*. San Francisco, CA, January 13-16, 2002. pp. 103 - 110. PDF

128. Brad A. Myers, Rishi Bhatnagar, Jeffrey Nichols, Choon Hong Peck, Dave Kong, Robert Miller, and A. Chris Long. "Interacting At a Distance: Measuring the Performance of Laser Pointers and Other Devices." *Proceedings CHI'2002: Human Factors in Computing Systems*. Minneapolis, Minnesota, April 20-25, 2002. pp. 33-40. http://www.cs.cmu.edu/~pebbles/papers/pebbleslaserexp.pdf.

129. Robert C. Miller and Brad A. Myers. "Outlier Finding: Focusing User Attention on Possible Errors," *CHI Letters: ACM Symposium on User Interface Software and Technology, UIST'01*, November 11-14, 2001. Orlando, Florida. pp. 81-90. Available as HTML and PDF

130. Brad A. Myers, Choon Hong Peck, Jeffrey Nichols, Dave Kong, and Robert Miller, "Interacting At a Distance Using Semantic Snarfing," *UbiComp'2001: Ubiquitous Computing*, G. Abowd, B. Brummit, and S. Shafer, ed. ACM. Springer. Sept 30 - Oct 2, 2001, Atlanta, Georgia. pp. 305-314. pdf.

131. Brad A. Myers, Juan P. Casares, Scott Stevens, Laura Dabbish, Dan Yocum, Albert Corbett, "A Multi-View Intelligent Editor for Digital Video Libraries.", *The First ACM+IEEE Joint Conference on Digital Libraries, JCDL'01*, June 24-28, 2001, Roanoke, VA. pp. 106-115. PDF or Postscript

132. Robert C. Miller and Brad A. Myers. "Interactive Simultaneous Editing of Multiple Text Regions." *USENIX 2001 Annual Technical Conference*, Boston, MA, June 2001. pp. 161-174. html or pdf

133. John Pane and Brad Myers, "Tabular and Textual Methods for Selecting Objects from a Group," *IEEE Symposium on Visual Languages*, VL'2000, Seattle, Washington, September 10-14, 2000. pp. 157-164. http://www.cs.cmu.edu/~pane/study3.html

134. Brad A. Myers, Robert C. Miller, Benjamin Bostwick, and Carl Evankovich, "Extending the Windows Desktop Interface With Connected Handheld Computers," *4th USENIX Windows Systems Symposium*, August 3-4, 2000, Seattle, WA. pp. 79-88. http://www.cs.cmu.edu/~pebbles/papers/pebblesone.ps or http://www.cs.cmu.edu/~pebbles/papers/pebblesone.pdf.

135. Robert C. Miller and Brad A. Myers. "Integrating a Command Shell into a Web Browser." *USENIX 2000 Annual Technical Conference*, San Diego, CA, June 2000. pp 171-182. Tied for "Best Student Paper" award. html, pdf

136. Brad Myers, Kin Pou ("Leo") Lie and Bo-Chieh ("Jerry") Yang, "Two-Handed Input Using a PDA and a Mouse", *Proceedings CHI'2000: Human Factors in Computing Systems*. April 1-6, 2000. The Hague, The Netherlands. pp. 41-48. http://www.cs.cmu.edu/~pebbles/papers/pebbles2handexp.ps or http://www.cs.cmu.edu/~pebbles/papers/pebbles2handexp.pdf.

137. Robert C. Miller and Brad A. Myers, "Synchronizing Clipboards of Multiple Computers," *CHI Letters: ACM Symposium on User Interface Software and Technology, UIST'99*, vol. 1, no. 1. November 7-10, 1999. Asheville, NC. pp. 65-66. pdf.

138. Robert C. Miller, Brad A. Myers, "Lightweight Structured Text Processing." *1999 Usenix Annual Technical Conference*, June 6-11, 1999, Monterey, California. pp 131-144. Winner of "Outstanding Paper Award." html or pdf

139. Richard G. McDaniel and Brad A. Myers, "Getting More Out Of Programming-By-

Exhibit A

Demonstration." *Proceedings CHI'99: Human Factors in Computing Systems*. Pittsburgh, PA, May 15-20, 1999. pp. 442-449. http://www.cs.cmu.edu/~amulet/papers/richmchi99.ps

140. Bernhard Suhm, Brad Myers and Alex Waibel, "Model-based and Empirical Evaluation of Multimodal Interactive Error Correction." *Proceedings CHI'99: Human Factors in Computing Systems*. Pittsburgh, PA, May 15-20, 1999. pp. 584-591.
http://www.cs.cmu.edu/~bsuhm/papers/chi99.ps

141. Brad A. Myers, Herb Stiel, and Robert Gargiulo. "Collaboration Using Multiple PDAs Connected to a PC," *Proceedings CSCW'98: ACM Conference on Computer-Supported Cooperative Work*, November 14-18, 1998, Seattle, WA. pp. 285-294.
http://www.cs.cmu.edu/~pebbles/papers/pebblesCSCW.ps
http://www.cs.cmu.edu/~pebbles/papers/pebblesCSCW.pdf

142. Brad A. Myers. "Scripting Graphical Applications by Demonstration," *Proceedings CHI'98: Human Factors in Computing Systems*. Los Angeles, CA, April 18-23, 1998. pp. 534-541.
http://www.cs.cmu.edu/~amulet/papers/commandsbydemo.pdf
http://www.cs.cmu.edu/~amulet/papers/commandsbydemo.ps

143. Richard G. McDaniel and Brad A. Myers. "Building Applications Using Only Demonstration," *IUI'98: 1998 International Conference On Intelligent User Interfaces*, January 6-9, 1998, San Francisco, CA. pp. 109-116. http://www.cs.cmu.edu/~richm/papers/iui98.ps

144. Brad A. Myers, Robert C. Miller, Rich McDaniel, and Alan Ferrency, "Easily Adding Animations to Interfaces Using Constraints." *ACM Symposium on User Interface Software and Technology, UIST'96*, November 6-8, 1996. Seattle, WA. pp. 119-128.
ftp://ftp.cs.cmu.edu/afs/cs.cmu.edu/project/amulet/www/papers/animate.ps

145. Bernhard Suhm, Brad Myers and Alex Waibel, "Interactive Recovery from Speech Recognition Errors in Speech User Interfaces," *Proceedings of the International Conference on Spoken Language Processing, ICSLP'96*, Philadelphia PA, Oct. 1996, Vol.2, pp. 861-864.
http://www.cs.cmu.edu/~bsuhm/papers/icslp96.ps

146. Brad A. Myers and David Kosbie. "Reusable Hierarchical Command Objects," *Proceedings CHI'96: Human Factors in Computing Systems*. Vancouver, BC, Canada. April 13-18, 1996. pp. 260-267. http://www.acm.org/sigs/sigchi/chi96/proceedings/papers/Myers/bam_com.htm
http://www.cs.cmu.edu/~amulet/papers/commandsCHI.html and
ftp://ftp.cs.cmu.edu/afs/cs.cmu.edu/project/amulet/www/papers/commandsCHI.ps

147. Francesmary Modugno, Albert T. Corbett and Brad A. Myers. "Evaluating Program Representation in a Demonstrational Visual Shell." *Experimental Studies of Programmers Sixth Workshop*. Jan. 5-7, 1996. Alexandria, VA. Wayne Gray and Deboray Boehm-Davis, editors. Ablex Publishing corporation, Norwood, NJ. pp 131-146. Abstract Compressed Postscript

148. James Landay and Brad A. Myers. "Interactive Sketching for the Early Stages of User Interface Design," *Proceedings CHI'95: Human Factors in Computing Systems*. Denver, CO. May, 1995. pp. 43-50.
ftp://ftp.cs.cmu.edu/afs/cs.cmu.edu/user/landay/pub/www/research/publications/SILK_CHI/SILK_

149. Francesmary Modugno and Brad A. Myers. "A State-Based Visual Language for a Demonstrational Visual Shell," *1994 IEEE Workshop on Visual Languages*. St. Louis, MO. pp. 304-311. Abstract Compressed Postscript

150. Francesmary Modugno, T.R.G. Green and Brad A. Myers. "Visual Programming in a Visual Domain: A Case Study of Cognitive Dimension," *Human-Computer Interaction '94, People and Computers*. Glasgow, Scotland, August, 1994. pp. 91-108. Abstract Compressed Postscript

151. Francesmary Modugno and Brad A. Myers. "Exploring Graphical Feedback in a Demonstrational Visual Shell," *The 1994 East-West International Conference on Human-Computer Interaction (EWHCI'94)*. St. Petersburg, Russia, August, 1994. pp. 262-272. An updated version appears in *Lecture Notes in Computer Science 876*. Brad Blumenthal, Juri Gornostaev and Claus Unger, Editors. Springer-Verlag, 1994. Abstract Compressed Postscript

152. David S. Kosbie and Brad A. Myers, "Extending Programming By Demonstration With

Exhibit A

Hierarchical Event Histories," *The 1994 East-West International Conference on Human-Computer Interaction.* St. Petersburg, Russia, August, 1994. pp. 147-157. http://reports-archive.adm.cs.cmu.edu/anon/1994/CMU-CS-94-156.ps Abstract only

153. Brad A. Myers, Jade Goldstein, and Matthew A. Goldberg. "Creating Charts by Demonstration," *Proceedings CHI'94: Human Factors in Computing Systems.* Boston, MA, Apr. 24-28, 1994. pp. 106-111. pdf

154. Brad A. Myers, Richard G. McDaniel, and David S. Kosbie. "Marquise: Creating Complete User Interfaces by Demonstration," *Proceedings INTERCHI'93: Human Factors in Computing Systems.* Amsterdam, The Netherlands, April 24-29, 1993. pp. 293-300. ftp://ftp.cs.cmu.edu/afs/cs/project/garnet/doc/papers/marquiseCHI93.ps

155. Osamu Hashimoto and Brad A. Myers. "Graphical Styles For Building User Interfaces by Demonstration," *ACM Symposium on User Interface Software and Technology: UIST'92,* Monterey, CA, Nov. 16-18, 1992. pp. 117-124.

156. Brad A. Myers, Dario A. Giuse, and Brad Vander Zanden. "Declarative Programming in a Prototype-Instance System: Object-Oriented Programming Without Writing Methods," *Proceedings OOPSLA'92: ACM Conference on Object-Oriented Programming Systems, Languages, and Applications.* October 18-22, 1992. Vancouver, BC, Canada. *SIGPLAN Notices,* vol. 27, no. 10. pp. 184-200.

157. Brad A. Myers and Mary Beth Rosson. "Survey on User Interface Programming," *Proceedings SIGCHI'92: Human Factors in Computing Systems.* Monterrey, CA, May 3-7, 1992. 195-202. ps or pdf

158. Brad A. Myers. "Separating Application Code from Toolkits: Eliminating the Spaghetti of Call-Backs," *ACM Symposium on User Interface Software and Technology: UIST'91,* Hilton Head, SC, Nov. 11-13, 1991. pp. 211-220.

159. Brad Vander Zanden, Brad A. Myers, Dario Giuse and Pedro Szekely. "The Importance of Pointer Variables in Constraint Models," *ACM Symposium on User Interface Software and Technology: UIST'91,* Hilton Head, SC, Nov. 11-13, 1991. pp. 155-164.

160. Keiji Kojima and Brad A. Myers. "Parsing Graphic Function Sequences," *1991 IEEE Workshop on Visual Languages.* Kobe, Japan, October 9-11, 1991. pp. 111-117.

161. Brad A. Myers. "Text Formatting by Demonstration," *Proceedings SIGCHI'91: Human Factors in Computing Systems.* New Orleans, LA. April 28-May 2, 1991. pp. 251-256.

162. Brad A. Myers. "Graphical Techniques in a Spreadsheet for Specifying User Interfaces," *Proceedings SIGCHI'91: Human Factors in Computing Systems.* New Orleans, LA. April 28-May 2, 1991. pp. 243-249.

163. Brad Vander Zanden and Brad A. Myers. "The Lapidary Graphical Interface Design Tool," *Proceedings SIGCHI'91: Human Factors in Computing Systems.* New Orleans, LA. April 28-May 2, 1991. pp. 465-466.

164. Brad A. Myers. "Invisible Programming," *1990 IEEE Workshop on Visual Languages.* Skokie, Ill, October 4-6, 1990. pp. 203-208.

165. Brad Vander Zanden and Brad A. Myers, "Automatic, Look-and-Feel Independent Dialog Creation for Graphical User Interfaces," *Proceedings SIGCHI'90: Human Factors in Computing Systems.* Seattle, WA, April 1-5, 1990. pp. 27-34.

166. Brad A. Myers, Brad Vander Zanden, and Roger B. Dannenberg. "Creating Graphical Interactive Application Objects by Demonstration," *ACM Symposium on User Interface Software and Technology: UIST'89,* Williamsburg, VA, Nov. 13-15, 1989. pp. 95-104.

167. Brad A. Myers. "Encapsulating Interactive Behaviors," *Proceedings SIGCHI'89: Human Factors in Computing Systems.* Austin, Texas, April 30 - May 4, 1989, pp. 319-324.

168. Brad A. Myers, Ravinder Chandhok, and Atul Sareen. "Automatic Data Visualization for Novice Pascal Programmers," *1988 IEEE Workshop on Visual Languages.* Pittsburgh, PA, October 10-12, 1988, pp. 192-198.

169. Pedro Szekely and Brad Myers. "A User Interface Toolkit Based on Graphical Objects and

Exhibit A

Constraints," *OOPSLA '88: Conference on Object-Oriented Programming: Systems, Languages and Applications*, San Diego, CA, September 25-30, 1988. *Sigplan Notices*, vol. 23, no. 11, November, 1988. pp. 36 - 45.

170. Brad A. Myers. "Creating Dynamic Interaction Techniques by Demonstration," *Proceedings SIGCHI+GI '87: Human Factors in Computing Systems*. Toronto, Ont. Apr. 5-9, 1987. pp. 271-278.

171. Brad A. Myers and William Buxton. "Creating Highly Interactive and Graphical User Interfaces by Demonstration," *Computer Graphics: SIGGRAPH '86 Conference Proceedings*. vol. 20, no. 4, August 18-22, 1986. Dallas, Texas. pp. 249-258. Reprinted in R.M. Baecker and W.A.S. Buxton, eds, *Readings in Human-Computer Interaction*, Los Altos, CA: Morgan Kaufmann Publishers, 1987. pp. 595-604.

172. Brad A. Myers. "Visual Programming, Programming by Example, and Program Visualization; A Taxonomy," *Proceedings SIGCHI '86: Human Factors in Computing Systems*. Boston, MA. April 13-17, 1986. pp. 59-66. Reprinted in *Visual Programming Environments: Paradigms and Systems*, Ephraim P. Glinert, ed. Los Alamitos, CA: IEEE Computer Society Press, 1990. pp. 33-40. pdf

173. William Buxton and Brad Myers. "A Study in Two-Handed Input," *Proceedings SIGCHI '86: Human Factors in Computing Systems*. Boston, MA. April 13-17, 1986. pp. 321-326. html and video.

174. Brad A. Myers. "The Importance of Percent-Done Progress Indicators for Computer-Human Interfaces," *Proceedings SIGCHI '85: Human Factors in Computing Systems*. San Francisco, CA. Apr. 14-18, 1985. pp. 11-17. Reprinted as *Datapro Report* no. AS40-300-301, Dec, 1986. pdf

175. Brad A. Myers. "Incense: A System for Displaying Data Structures," *Computer Graphics: SIGGRAPH '83 Conference Proceedings*. vol. 17, no. 3, July, 1983. Detroit, MI. pp. 115-125. pdf

## Minor Refereed Conference Papers:

176. Andrew Faulring, Brad Myers, Ken Mohnkern and Michael Freed. "A Demonstration of the RADAR Personal Assistant". Demonstration at: *Association for the Advancement of Artificial Intelligence*, July 13-18, 2008, Chicago, Ill. To appear. pdf

177. Jack Beaton, Brad A. Myers, Jeffrey Stylos, Sae Young (Sophie) Jeong, Yingyu (Clare) Xie. "Usability Evaluation for Enterprise SOA APIs" *2nd International Workshop on Systems Development in SOA Environments, (SDSOA 2008)*, Co-located with ICSE 2008, Leipzig, Germany. May 12, 2008. pp. 29-34.

178. Brad A. Myers, Andrew Ko, Sun Young Park, Jeffrey Stylos, Thomas D. LaToza, Jack Beaton, "More Natural End-User Software Engineering", *Fourth Workshop on End-User Software Engineering, (WEUSE IV)*, Co-located with ICSE 2008, Leipzig, Germany. May 12, 2008. pp. 30-34.

179. Chris Scaffidi, Allen Cypher, Sebastian Elbaum, Andhy Koesnandar, James Lin, Brad Myers, Mary Shaw. "Using Topes to Validate and Reformat Data in End-User Programming Tools", *Fourth Workshop on End-User Software Engineering, (WEUSE IV)*, Co-located with ICSE 2008, Leipzig, Germany. May 12, 2008. pp. 11-15.

180. Duen Horng Chau, Brad Myers, and Andrew Faulring, "Feldspar: A System for Finding Information by Association," *CHI 2008 Workshop on Personal Information Management: PIM 2008*, April 5-6, 2008, Florence, Italy. pdf

181. Caitlin Kelleher, Brad A. Myers, Daniel P. Siewiorek, Dennis Cosgrove, Jeffrey S. Pierce, Matt Conway, Don Marinelli. "Special Session in Honor of Randy Pausch", *Extended Abstracts, CHI'2008*, Florence, Italy, April 5-10, 2008. pp. 3997-4001.

182. Andrew Ko and Brad Myers. "Source-Level Debugging with the Whyline". *Cooperative and Human Aspects of Software Engineering (CHASE)*, An ICSE 2008 Workshop. May 13, 2008, Leipzig, Germany, pp. 69-72.

Exhibit A

183. Anker Helms Jørgensen, Brad A. Myers, "User Interface History: An Initial Seed", Special Interest Group meeting, *Extended Abstracts, CHI'2008*, Florence, Italy, April 5-10, 2008. pp. 2415-2418.

184. Joerg Beringer, Gerhard Fisher, Piero Mussio, Brad Myers, Fabio Paternò, Boris de Ruyter. "The Next Challenge: from Easy-to-Use to Easy-to-Develop, Are You Ready?" *Extended Abstracts, CHI'2008*, Florence, Italy, April 5-10, 2008. pp. 2257-2260.

185. Brad A. Myers, Margaret M. Burnett, Mary Beth Rosson, Andrew J. Ko, Alan Blackwell. "End User Software Engineering: CHI'2008 Special Interest Group Meeting" *Extended Abstracts, CHI'2008*, Florence, Italy, April 5-10, 2008. pp. 2371-2374.

186. Christopher Scaffidi, Brad Myers, Mary Shaw, "Toped: Enabling End-User Programmers to Validate Data". *Extended Abstracts, CHI'2008*. Florence, Italy, April 5-10, 2008. pp. 3519-3524.

187. Christopher Scaffidi, Brad Myers, Mary Shaw, "Tool Support for Data Validation by End-User Programmers", formal demo at *ICSE'2008: 30th International Conference on Software Engineering*, Leipzig, Germany, 10 - 18 May 2008. pp. 867-870.

188. DeVito Dabbs, Dew, Myers, Hawkins Ren, Begey, McCurry. "A Randomized Controlled Pilot Trial of Pocket PATH vs. Standard Care on Self-Care Behaviors and Health Related Quality of Life in the First 2 Months After Lung Transplant". Abstract in *Meeting of the American Thoracic Society*, Toronto, Canada, May, 2008. To appear.

189. A. DeVito Dabbs, M.A. Dew, B.A. Myers, R.P. Hawkins, D. Ren, A. Begey, R. Zomak, K.L. Lo Coco, K.R. McCurry. "A Randomized Controlled Pilot Trial of PocketPATH on Early Self-Care Behaviors and HRQoL After Lung Transplant," Abstact in Proceedings of *ISHLT: The International Society for Heart & Lung Transplantation*, April 9-12, 2008, Boston, MA. Appears as:

A. DeVito Dabbs, M.A. Dew, B.A. Myers, R.P. Hawkins, D. Ren, A. Begey, R. Zomak, K.L. Lo Coco, K.R. McCurry. (Abstract). "A Randomized Controlled Trial of Pocket PATH Versus Standard Care on Self-Care Behaviors after Lung Transplant." *The Journal of Heart and Lung Transplantation*, 27(2), Supplement 1; 2008; S209. **Winner, Best Research Award, Non-Physician Category**

190. Brad A. Myers, Margaret M. Burnett, Susan Wiedenbeck, and Andrew J. Ko, "End User Software Engineering: CHI'2007 Special Interest Group Meeting," *Extended Abstracts CHI'2007*. San Jose, CA, April 28 - May 3, 2007. pp. 2125-2128.

191. Christopher Scaffidi, Brad Myers, Mary Shaw, "Challenges, Motivations, and Success Factors in the Creation of Hurricane Katrina 'Person Locator' Web Sites". *18th annual Psychology of Programming Workshop: PPIG'06*, Sept 7-8, 2006, Brighton, UK. pdf

192. Andrew J. Ko, Brad A. Myers, Michael J. Coblenz, and Jeffrey Stylos, "End-User Programming Productivity Tools", *The Next Step: From End-User Programming to End-User Software Engineering (WEUSE II)* at CHI'2006, Montreal, Canada, April 23, 2006. pdf.

193. Chris Scaffidi, Mary Shaw, Brad Myers, "Games Programs Play: Obstacles to Data Reuse" *The Next Step: From End-User Programming to End-User Software Engineering (WEUSE II)* at CHI'2006, Montreal, Canada, April 23, 2006.

194. Margaret M. Burnett, Brad Myers, Mary Beth Rosson, Susan Wiedenbeck, "The Next Step: From End-User Programming to End-User Software Engineering" *Extended Abstracts, CHI'2006*. Montreal, Canada, April 22-27, 2006. pp. 1699-1702. pdf.

195. Brad A. Myers, Andrew J. Ko, Margaret M. Burnett, "Invited Research Overview: End-User Programming." *Extended Abstracts, CHI'2006*. Montreal, Canada, April 22-27, 2006. pp. 75-80. pdf. See also the talk slides as a color pdf or a black-and-white pdf

196. Andrew Faulring and Brad A. Myers. "Availability Bars for Calendar Scheduling." *Extended Abstracts, CHI'2006*. Montreal, Canada, April 22-27, 2006. pp. 760-765. pdf

197. Duen Horng Chau, Jacob O. Wobbrock, Brad A. Myers, Brandon Rothrock. "Integrating Isometric Joysticks into Mobile Phones for Text Entry". *Extended Abstracts, CHI'2006*. Montreal, Canada, April 22-27, 2006. pp. 640-645. pdf

Exhibit A

198. Brandon Rothrock, Brad A. Myers, Sophie H. Wang. "Unified Associative Information Storage and Retrieval". *Extended Abstracts, CHI'2006*. Montreal, Canada, April 22-27, 2006. pp. 1271-1276. pdf

199. Annette DeVito Dabbs, Mary Amanda Dew, Kenneth R. McCurry, and Brad A. Myers, "Developing a Consumer-Centric Technology-based Intervention to Promote Self-care after Lung Transplant", *The 18th Annual Scientific Sessions of the Eastern Nursing Research Society, New Momentum for Nursing Research: Multidisciplinary Alliances*, Cherry Hill, NJ, April 20-22, 2006. abstract

200. Ivan E. Gonzalez, Jake Wobbrock, and Brad A. Myers. "Text Entry for Automobiles", *ACM 2005 Richard Tapia Celebration of Diversity in Computing Conference*, Albuquerque, NM, October 19-22, 2005. (Poster presentation, Abstract only).

201. Jacob O. Wobbrock and Brad A. Myers. "Gestural text entry on multiple devices." Demonstration Abstract. *Proceedings of the ACM SIGACCESS Conference on Computers and Accessibility (ASSETS '05)*. Baltimore, Maryland (October 9-12, 2005). pp. 184-185. pdf

202. Michael J. Coblenz, Andrew J. Ko, and Brad A. Myers. "Using Objects of Measurement to Detect Spreadsheet Errors," *2005 IEEE Symposium on Visual Languages and Human-Centric Computing (VL/HCC'05)*, Dallas, Texas, USA, 20-24 September 2005. pp. 314-316. pdf or IEEE DL

203. Brad Myers and Jacob Wobbrock. "Text Input to Handheld Devices for People with Physical Disabilities." 11th International Conference on Human-Computer Interaction (HCI Interactional 2005). July 22-27, 2005. Las Vegas, NV. vol. 4, pp. 1962-1970. pdf

204. Jacob O. Wobbrock and Brad A. Myers. "EdgeWrite: A New Text Entry Technique Designed for Stability." *Proceedings of the 28th Annual Conference of the Rehabilitation Engineering and Assistive Technology Society of North America (RESNA'05)*. Atlanta, Georgia (June 23-27, 2005). pdf

205. Jacob O. Wobbrock and Brad A. Myers. "Accessible Handheld And Desktop Text Entry For People With Motor Impairments," *2005 NISH National Training & Achievement Conference*, New Orleans, May 22-24, 2005. First place Winner, National Scholar Award for Workplace Innovation & Design. pdf

206. Andrew J. Ko and Brad A. Myers, "Human Factors Affecting Dependability in End-User Programming." *1st Workshop on End-User Software Engineering* (WEUSE 2005) at ICSE 05, Saint Louis, MO, May 21st 2005. pp. 62-65.

207. Christopher Scaffidi, Mary Shaw, and Brad A. Myers, "An Approach for Categorizing End User Programmers to Guide Software Engineering Research." *1st Workshop on End-User Software Engineering* (WEUSE 2005) at ICSE 05, Saint Louis, MO, May 21st 2005. pp. 1-5. pdf

208. Brad A. Myers and Andy Ko, "More Natural and Open User Interface Tools," *Workshop on the Future of User Interface Design Tools*, Workshop #17 at ACM CHI'2005.

209. Andrew Faulring and Brad A. Myers, "Enabling Rich Human-Agent Interaction for a Calendar Scheduling Agent" (Interactive Poster). *Extended Abstracts CHI'2005: Human Factors in Computing Systems*. Portland, OR, April 2-7, 2005. pp. 1367-1370. pdf. ACM DL

210. Brad A. Myers, Margaret Burnett and Mary Beth Rosson, "End Users Creating Effective Software." (Special Interest Group). *Extended Abstracts CHI'2005: Human Factors in Computing Systems*. Portland, OR, April 2-7, 2005. pp. 2047-2048. pdf. ACM DL

211. Jacob O. Wobbrock, Htet Htet Aung, Brandon Rothrock and Brad A. Myers. "Maximizing the Guessability of Symbolic Input" (Short Talk). *Extended Abstracts CHI'2005: Human Factors in Computing Systems*. Portland, OR, April 2-7, 2005. pp. 1869-1872. pdf. ACM DL

212. Andrew J. Ko, Htet Htet Aung, and Brad A. Myers. "Design Requirements for More Flexible Structured Editors from a Study of Programmers' Text Editing." (Short Talk). *Extended Abstracts CHI'2005: Human Factors in Computing Systems*. Portland, OR, April 2-7, 2005. pp. 1557-1560. pdf. ACM DL

213. Jeffrey Nichols and Brad A. Myers, "Generating Consistent Interfaces for Appliances," in the *Second Workshop on Multi-User and Ubiquitous User Interfaces* (MU3I) at *Intelligent User*

Exhibit A

*Interfaces IUI'05*. January 9, 2005. San Diego, CA. pp. 9-10. pdf

214. Jeffrey Nichols, Brad A. Myers, Kevin Litwack, Michael Higgins, Joseph Hughes, Thomas K. Harris. "Describing Appliance User Interfaces Abstractly with XML," in *Workshop on Developing User Interfaces with XML: Advances on User Interface Description Languages*, Satellite Workshop at Advanced Visual Interfaces 2004. 25 May, 2004, Gallipoli, Italy. pp, 9-16. pdf

215. Brad A. Myers and Margaret Burnett, "End-Users Creating Effective Software." *Extended Abstract CHI'2004: Human Factors in Computing Systems*. (Special Interest Group Meeting Abstract). Vienna, Austria, April 24-29, 2004. pp. 1592-1593. pdf

216. Jacob O. Wobbrock, Brad A. Myers, and Htet Htet Aung. "Joystick Text Entry Using Date Stamp, Selection Keyboard, and EdgeWrite." *Extended Abstracts CHI'2004: Human Factors in Computing Systems*. (Poster Abstract). Vienna, Austria, April 24-29, 2004. p. 1550. pdf

217. Jeffrey Nichols and Brad A. Myers, "Automatically Generating Interfaces for Multi-Device Environments" *Ubicomp 2003 Workshop on Multi-Device Interfaces for Ubiquitous Peripheral Interaction*. October 12, 2003. Seattle, WA. html.

218. Brad Myers and Andrew Ko. "Studying Development and Debugging To Help Create a Better Programming Environment". *CHI 2003 Workshop on Perspectives in End User Development*. April 6, 2003. pp. 65-68. pdf

219. A. Chris Long, Juan Casares, Brad A. Myers, Rishi Bhatnagar, Scott M. Stevens, Laura Dabbish, Dan Yocum, and Albert Corbett. "SILVER: Simplifying Video Editing With Metadata," *Extended Abstract CHI'2003: Human Factors in Computing Systems*. (Demonstration Abstract). Fort Lauderdale, Florida, April 5-10, 2003. pp. 628-629. pdf

220. Jeffrey Nichols, Brad A. Myers, Michael Higgins, Joseph Hughes, Thomas K. Harris, Roni Rosenfeld, Kevin Litwack. "Personal Universal Controllers: Controlling Complex Appliances With GUIs and Speech," *Extended Abstract CHI'2003: Human Factors in Computing Systems*. (Demonstration Abstract). Fort Lauderdale, Florida, April 5-10, 2003. pp. 624-625. pdf

221. Brad A. Myers, Jeffrey Nichols, Jacob O. Wobbrock, Kevin Litwack, Michael Higgins, Joe Hughes, Thomas K. Harris, Roni Rosenfeld, Mathilde Pignol. "Handheld Devices for Control". *Human-Computer Interaction Consortium (HCIC'2003)*, Winter Park, CO, Feb 5-9, 2003. pdf

222. J.F. Pane and B.A. Myers, "The Impact of Human-Centered Features on the Usability of a Programming System for Children." *Extended Abstract CHI'2002: Human Factors in Computing Systems*. (Interactive Poster Abstract). Minneapolis, Minnesota, April 20-25, 2002. pp. 684-685.

223. Juan Casares, A. Chris Long, Brad A. Myers, Scott M. Stevens, Albert Corbett, "Simplifying Video Editing with Silver." *Extended Abstract CHI'2002: Human Factors in Computing Systems*. (Interactive Poster Abstract). Minneapolis, Minnesota, April 20-25, 2002. pp. 672-673. PDF

224. Robert C. Miller and Brad A. Myers. "LAPIS: Smart Editing With Text Structure." *Extended Abstract CHI'2002: Human Factors in Computing Systems*. (Demonstration Abstract). Minneapolis, Minnesota, April 20-25, 2002. pp. 496-497.

225. Brad A. Myers, Jeff Nichols, Rob Miller. "User Interfaces that Span Hand-Held and Fixed Devices" Workshop on Distributed and Disappearing User Interfaces in Ubiquitous Computing at CHI'2001, Seattle, WA. Albrecht Schmidt, Peter Ljundgstrand, and Anind Dey, editors. University of Karlsruhe Faculty of Information Technical Report 2001-6. ISSN 1432-7864. http://www.cs.cmu.edu/~pebbles/papers/chi2001workshop4.html

226. Jeffrey Nichols, Brad A. Myers, Rob Miller. "Personal Interfaces in Ubiquitous Environments". Workshop on Building the Ubiquitous Computing User Experience at CHI'2001, Seattle, WA. http://www.cs.cmu.edu/~pebbles/papers/chi2001workshop10.html

227. Brad A. Myers. "Collaboration Using Multiple PDAs Connected to a PC," Workshop on Shared Environments to Support Face-to-Face Collaboration at CSCW'2000, Philadelphia, PA. http://www.cs.cmu.edu/~pebbles/papers/cscw2000workshop/

228. John Pane and Brad Myers, "The Influence of the Psychology of Programming on a Language Design: Project Status Report." *12th Annual Workshop of the Psychology of Programming*

Exhibit A

*Interest Group, PPIG 2000*, Corigliano Calabro, Italy. Apr. 10-13, 2000. pp. 193-205.
http://www.cs.cmu.edu/~pane/PoPInfluence.html

229.  Brad Myers. "Past, Present and Future of User Interface Software Tools", (extended abstract). *Proceedings of the IEA 2000/ HFES 2000 Congress*, July 29 - August 4, 2000, San Diego, CA. p. 1-315.

230.  John F. Pane and Brad A. Myers, B. A. "Improving User Performance on Boolean Queries." *Adjunct Proceedings CHI'2000: Human Factors in Computing Systems*. April 1-6, 2000. The Hague, The Netherlands. pp. 269-270. http://www.cs.cmu.edu/~pane/BooleanQueries.html.

231.  Brad Myers, "The Pebbles Project: Using PCs and Hand-held Computers Together; Demonstration Extended Abstract." *Adjunct Proceedings CHI'2000: Human Factors in Computing Systems*. April 1-6, 2000. The Hague, The Netherlands. pp. 14-15.

232.  Brad A. Myers, "Authoring Interactive Behaviors for Multimedia," *Proceedings of the 9th NEC Research Symposium: The Human-Centric Multimedia Community*, edited by T. Ishiguro. Aug 30-Sep 1, 1998, Nara, Japan. (CD Rom proceedings).

233.  Brad A. Myers, "The Amulet User Interface Development Environment," (Special Interest Group Meeting), *CHI'97 Conference Companion: Human Factors in Computing Systems*. Atlanta, GA. March 22-27, 1997. p. 134.

234.  Brad A. Myers, Richard G. McDaniel, Robert C. Miller, Alan Ferrency, Ellen Borison, Andrew Faulring, Andy Mickish, Patrick Doane, and Alex Klimovitski, "The Amulet User Interface Development Environment," (Video abstract), *CHI'97 Conference Companion: Human Factors in Computing Systems*. Atlanta, GA. March 22-27, 1997. pp. 214-215.

235.  James A. Landay and Brad A. Myers. "Sketching Storyboards to Illustrate Interface Behaviors," *CHI'96 Conference Companion: Human Factors in Computing Systems*. Vancouver, British Columbia, Canada. April 13-18, 1996. pp. 193-194.

236.  Brad A. Myers. "The Amulet User Interface Development Environment," *CHI'96 Conference Companion: Human Factors in Computing Systems*. Vancouver, British Columbia, Canada. April 13-18, 1996. p. 327.

237.  Brad A. Myers, Francesmary Modugno, Rich McDaniel, David Kosbie, Andrew Werth, Robert C. Miller, John Pane, James Landay, Jade Goldstein, and Matthew A. Goldberg, "The Demonstrational Interfaces Project at CMU," *1996 AAAI Spring Symposium on Acquisition, Learning and Demonstration: Automating Tasks for Users*. March 25-27, 1996, Stanford, CA. Technical Report SS-96-02, pp. 85-91. ftp://ftp.cs.cmu.edu/afs/cs/project/garnet/www/pbd-group/papers/aaai96workshop.ps.Z

238.  Francesmary Modugno, Albert T. Corbett, and Brad A. Myers. "Evaluating Program Representations in a Demonstrational Visual Shell," *CHI'95 Conference Companion: Human Factors in Computing Systems*. Denver, CO. May, 1995. pp. 234-235.

239.  Brad A. Myers. "The Garnet and Amulet User Interface Development Environments," *CHI'95 Conference Companion: Human Factors in Computing Systems*. Denver, CO. May, 1995. p. 334.

240.  Noi Sukaviriya, Srdjan Kovacevic, James D. Foley, Brad A. Myers, Dan R. Olsen, Jr., and Matthias Schneider-Hufschmidt, "Model-based User Interfaces: What are They and Why Should We Care?" *ACM Symposium on User Interface Software and Technology, UIST'94*, November, 1994. Los Angeles, CA. pp. 133-135.

241.  Brad A. Myers. "The Garnet User Interface Development Environment: Demonstration Abstract," *CHI'94 Conference Companion*. Boston, MA, Apr. 24-28, 1994. pp. 25-26.

242.  Brad A. Myers and Dan R. Olsen, Jr. "User Interface Tools: Tutorial Description" *CHI'94 Conference Companion*. Boston, MA, Apr. 24-28, 1994. pp. 421-422.

243.  Francesmary Modugno and Brad A. Myers. "Pursuit: Graphically Representing Programs in a Demonstrational Visual Shell," *CHI'94 Conference Companion*. Boston, MA, Apr. 24-28, 1994. pp. 455-456.

244.  Brad A. Myers, Dario Giuse, Andrew Mickish, Brad Vander Zanden, David Kosbie, Richard McDaniel, James Landay, Matthew Goldberg, and Rajan Parthasarathy. "The Garnet User

# EXHIBIT B
## Part 2
## b

Exhibit A

Interface Development Environment: Video Abstract," *CHI'94 Conference Companion*. Boston, MA, Apr. 24-28, 1994. pp. 455-456.

245. Gurminder Singh, Mark Linton, Brad A. Myers, and Marti Szczur. "From Research Prototypes to Usable, Useful Systems: Lessons Learned in the Trenches," *Proceedings ACM Symposium on User Interface Software and Technology: UIST'93*. Atlanta, GA, Nov 3-5, 1993. pp. 139-143.

246. Brad A. Myers, Richard Wolf, Kathy Potosnak, and Chris Graham. "Heuristics in Real User Interfaces," *Proceedings INTERCHI'93: Human Factors in Computing Systems*. Amsterdam, The Netherlands, April 24-29, 1993. pp. 304-307.

247. Andrew J. Werth and Brad A. Myers. "Tourmaline: Macrostyles by Example," *Proceedings INTERCHI'93: Human Factors in Computing Systems*. Amsterdam, The Netherlands, April 24-29, 1993. p. 532.

248. James A. Landay and Brad A. Myers. "Extending an Existing User Interface Toolkit to Support Gesture Recognition," *Adjunct Proceedings of INTERCHI'93*. Amsterdam, The Netherlands, April 24-29, 1993. pp. 91-92.

249. Brad A. Myers. "The Garnet Gilt Interface Builder: Graphical Styles and Tabs and Techniques for Reducing Call-Back Procedures," Application Builder Session, *Seventh Annual X Technical Conference*, Boston, Massachusetts, January 18, 1993.

250. Brad A. Myers, Allen Cypher, David Maulsby, David C. Smith, and Ben Shneiderman. "Demonstrational Interfaces: Coming Soon?" *Proceedings SIGCHI'91: Human Factors in Computing Systems*. New Orleans, LA. April 28-May 2, 1991. pp. 393-396.

251. Brad A. Myers. "An Object-Oriented, Constraint-Based, User Interface Development Environment for X in CommonLisp," *Fourth Annual X Technical Conference*, Boston, Massachusetts, January 15-17, 1990.

252. Charles Wiecha, Stephen Boies, Mark Green, Scott Hudson, and Brad Myers. "Direct Manipulation or Programming: How Should We Design Interfaces?" *ACM Symposium on User Interface Software and Technology: UIST'89*, Williamsburg, VA, Nov. 13-15, 1989. pp. 124-126.

253. Brad A. Myers. "AI In Demonstrational User Interfaces," *A New Generation of Intelligent Interfaces: IJCAI-89 Workshop*, Detroit, MI. August 22, 1989. pp. 84-91.

254. Brad A. Myers. "Using AI Techniques to Create User Interfaces by Example," *Proceedings, AAAI Workshop on Architectures for Intelligent Interfaces*. March 29-April 1, 1988. Monterey, CA. pp. 305-321.

255. Brad A. Myers. "The State of the Art in Visual Programming and Program Visualization," *Proceedings; Graphics Tools for Software Engineering: Visual Programming & Program Visualization*. London, England. March 16, 1988. The British Computer Society Computer Graphics and Displays Group, International State of the Art Symposium. Reprinted in Alistair Kilgour and Rae Earnshaw, eds, *Graphics Tools for Software Engineers*. Cambridge, UK: Cambridge University Press, 1989. pp. 3-26.

256. Dan R. Olsen, David J. Kasik, Peter Tanner, Brad Myers, and Jim Rhyne. "Software Tools for User Interface Management," *Computer Graphics: SIGGRAPH '87 Conference Proceedings*. vol. 21, no. 4, July 27-31, 1987. Anaheim, CA. pp. 337-338.

257. Brad A. Myers. "Gaining General Acceptance for UIMSs," *ACM SIGGRAPH Workshop on Software Tools for User Interface Development*. November 17-19, 1986. Seattle, Washington. Reprinted in *Computer Graphics*. vol. 21, no. 2, April, 1987. pp. 130-134.

258. Brad A. Myers. "What are Visual Programming, Programming by Example, and Program Visualization?" *Proceedings Graphics Interface '86*. Vancouver, British Columbia, Canada. May 26-30, 1986. pp. 62-65.

259. Brad A. Myers. "Using Percent-Done Progress Indicators to Enhance User Interfaces," *Proceedings Graphics Interface '85*. Montreal, Quebec, Canada. May 27-31, 1985. pp. 167-170.

260. Brad A. Myers. "Strategies for Creating an Easy to Use Window Manager with Icons," *Proceedings Graphics Interface '84*. Ottawa, Ontario, Canada. May 28-June 1, 1984. pp. 227-233.

Exhibit A

## Refereed Published Videotapes:

261. Michel Beaudouin-Lafon and Wendy Mackay, "UIST 2.0 Interviews - Brad Myers", *UIST 20th Anniversary*, Newport, RI, October, 2007. interview.

262. Brad Myers, David A. Weitzman, Andrew J. Ko, and Duen Horng Chau, "The Crystal Framework and Editor for Answering Why and Why Not Questions". Video Figure (3:48 min). CHI'06.

263. Brad A. Myers, Jeffery Stylos, Andrew Faulring. "The Citrine Intelligent Copy and Paste System." 4:44 minute video. quicktime format (57 megabytes). *ACM Symposium on User Interface Software and Technology, UIST'04*, October 24-27, 2004, Santa Fe, NM.

264. Brad A. Myers, Richard G. McDaniel, Robert C. Miller, Alan Ferrency, Ellen Borison, Andrew Faulring, Andy Mickish, Patrick Doane, and Alex Klimovitski, *The Amulet User Interface Development Environment*. 8 minute video. Technical Video Program of the CHI'97 conference. ACM, 0-89791-876-2. OpenVideo version

265. Brad A. Myers, Dario Giuse, Andrew Mickish, Brad Vander Zanden, David Kosbie, Richard McDaniel, James Landay, Matthew Goldberg, and Rajan Parthasarathy. *The Garnet User Interface Development Environment*. Technical Video Program of the CHI'94 conference. *SIGGRAPH Video Review*, Issue 97, no. 13. ACM, ISBN 0-89791-940-8.

266. Francesmary Modugno and Brad A. Myers. "Pursuit: A Demonstrational Visual Shell," Technical Video Program of the CHI'94 conference. *SIGGRAPH Video Review*, Issue 97, no. 12.

267. Andrew J. Werth and Brad A. Myers. "Tourmaline: Macrostyles by Example," Technical Video Program of the INTERCHI'93 conference. Amsterdam, The Netherlands, April 24-29, 1993. *SIGGRAPH Video Review*, Issue 89, no. 17.

268. Brad A. Myers, Andrew Mickish and Osamu Hashimoto. "The Garnet Gilt Interface Builder: Graphical Styles and Tabs and Techniques for Reducing Call-Back Procedures," Application Builder Video Session, *Seventh Annual X Technical Conference*, Boston, Massachusetts, January 18, 1993. 10 minutes.

269. Brad Vander Zanden and Brad A. Myers. *Creating Graphical Interactive Application Objects by Demonstration: The Lapidary Interface Design Tool*. 12 minute videotape. Technical Video Program of the SIGCHI'91 conference, New Orleans, LA. April 28-May 2, 1991. *SIGGRAPH Video Review*, Issue 64, no. 1.

270. Brad A. Myers. *Some of the Widgets*. 17 minute videotape. Technical Video Program of Interact'90. Cambridge, England. August 27-31, 1990.

271. Brad A. Myers. *All the Widgets*. 2 hour videotape. Technical Video Program of the SIGCHI'90 conference, Seattle, WA. April 1-4, 1990. *SIGGRAPH Video Review*, Issue 57. ISBN 0-89791-930-0. ACM Order Number 608903. For sale from ACM Press

272. Brad A. Myers, editor. *CHI'90 Formal Video Program*. Technical Video Program of the SIGCHI'90 conference, Seattle, WA. April 1-4, 1990. *SIGGRAPH Video Review*, Issues 55-56. ISBN 0-89791-928-9.

273. Brad A. Myers, editor. *SIGGRAPH Video Review*, Issues 58-59.

274. Brad A. Myers. *Creating User Interfaces by Demonstration: The Peridot UIMS*. Technical Video Program of the SIGCHI'88 Conference, Washington, D.C., May 15-19, 1988. *and* IFIP Interact '87 Conference on Human-Computer Interaction. Stuttgart, West Germany. Sept. 1-4, 1987. *SIGGRAPH Video Review*, Issue 59, no. 2. 18 minutes.

275. Brad A. Myers. *Percent-Done Progress Indicators in Practice and Experiments*, Videotape shown at SIGCHI '85. San Francisco, CA. Apr. 14-18, 1985. *SIGGRAPH Video Review*, Issue 19, no. 6.

276. Brad A. Myers. "The User Interface for Sapphire," Videotape. *Human Factors in Computing Systems; SIGCHI '85 Videotape Review*. San Francisco, CA. Apr 14-18, 1985. Also shown at the Annual Meeting of the American Society for Information Science. Las Vegas, Nev. October 20-24, 1985. *SIGGRAPH Video Review*, Issue 19, no. 5.

## Technical Reports:

Exhibit A

277. Christopher Scaffidi, Brad Myers, and Mary Shaw. "An Editor and Parser for Data Formats in End-User Programming". CMU-ISRI-07-104 and CMU-HCII-07-100. Carnegie Mellon University School of Computer Science, May, 2007. pdf

278. Margaret Burnett, Brad Myers, Mary Beth Rosson, Susan Wiedenbeck, and Adam Leibel. "Workshop Report: From End-User Programming to End-User Software Engineering (a CHI'06 Workshop)". Oregon State University School of Electrical Engineering and Computer Science Technical Report TR CS07-60-04, April, 2007. abstract and pdf

279. Chris Scaffidi, Allen Cypher, Sebastian Elbaum, Andhy Koesnandar, Brad Myers. "The EUSES Web Macro Scenario Corpus, Version 1.0". November 2006, CMU-HCII-06-105. pdf

280. Anthony Tomasic, R. Martin McGuire, and Brad Myers. "Workflow by example: Automating database interactions via induction." Technical report CMU-ISRI-06-103, Carnegie Mellon University, March 2006. pdf

281. Christopher Scaffidi, Andrew Ko, Brad Myers, Mary Shaw, "Identifying Types of End Users: Hints from an Informal Survey". Carnegie Mellon University ISRI Technical Report, no. CMU-HCII-05-101 and Human Computer Interaction Institute Technical Report CMU-ISRI-05-110. April, 2005.

282. Christopher Scaffidi, Mary Shaw, Brad Myers. "The "55M End-User Programmers" Estimate Revisited". Carnegie Mellon University ISRI Technical Report, no. CMU-ISRI-05-100 and Human Computer Interaction Institute Technical Report CMU-HCII-05-100. February, 2005. pdf

283. Franklin Chen, Brad Myers and David Yaron, *Using Handheld Devices for Tests in Classes*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-00-152 and Human Computer Interaction Institute Technical Report CMU-HCII-00-101. July, 2000. http://www.cs.cmu.edu/~pebbles/papers/CMU-CS-00-152.pdf or http://www.cs.cmu.edu/~pebbles/papers/CMU-CS-00-152.ps

284. Brad A. Myers. *An Implementation Architecture to Support Single-Display Groupware.* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-99-139 and Human Computer Interaction Institute Technical Report CMU-HCII-99-101. May, 1999. http://www.cs.cmu.edu/~pebbles/papers/pebblesarchtr.ps http://www.cs.cmu.edu/~pebbles/papers/pebblesarchtr.pdf

285. John F. Pane, Chotirat "Ann" Ratanamahatana, and Brad A. Myers. *Analysis of the Language and Structure in Non-Programmers' Solutions to Programming Problems*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-98-160 and Human Computer Interaction Institute Technical Report CMU-HCII-98-102. September, 1998.

286. Brad A. Myers. *The Case for an Open Data Model*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-98-153 and Human Computer Interaction Institute Technical Report CMU-HCII-98-101. August, 1998. http://reports-archive.adm.cs.cmu.edu/anon/1998/CMU-CS-98-153.ps http://reports-archive.adm.cs.cmu.edu/anon/1998/CMU-CS-98-153.pdf

287. Brad A. Myers. *Natural Programming: Project Overview and Proposal*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-98-101 and Human Computer Interaction Institute Technical Report CMU-HCII-98-100. January, 1998. html or pdf

288. Robert C. Miller, Brad A. Myers. *Creating Dynamic World Wide Web Pages by Demonstration*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-97-131 and Human Computer Interaction Institute Technical Report CMU-HCII-97-101. May, 1997. postscript

289. Brad A. Myers, Ellen Borison, Alan Ferrency, Rich McDaniel, Robert C. Miller, Andrew Faulring, Bruce D. Kyle, Patrick Doane, Andy Mickish, and Alex Klimovitski. *The Amulet V3.0 Reference Manual*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-95-166-R2 and Human Computer Interaction Institute Technical Report CMU-HCII-95-102-R2. March, 1997. HTML version

290. Richard G. McDaniel and Brad A. Myers, *Improving Demonstration Using Better Interaction*

Exhibit A

*Techniques.* Carnegie Mellon University School of Computer Science Technical Report CMU-CS-97-103 and Human Computer Interaction Institute Technical Report CMU-HCII-97-100, January, 1997. http://reports-archive.adm.cs.cmu.edu/anon/1997/CMU-CS-97-103.ps

291. Brad A. Myers. *A Brief History of Human Computer Interaction Technology.* Carnegie Mellon University School of Computer Science Technical Report CMU-CS-96-163 and Human Computer Interaction Institute Technical Report CMU-HCII-96-103, December, 1996. http://www.cs.cmu.edu/~amulet/papers/uihistory.tr.html http://www.cs.cmu.edu/~amulet/papers/uihistory.ps http://reports-archive.adm.cs.cmu.edu/anon/1996/CMU-CS-96-163.ps

292. Brad A. Myers, Rich McDaniel, Rob Miller, Alan Ferrency, Patrick Doane, Andrew Faulring, Ellen Borison, Andy Mickish, and Alex Klimovitski *The Amulet Environment: New Models for Effective User Interface Software Development.* Carnegie Mellon University School of Computer Science Technical Report CMU-CS-96-189 and Human Computer Interaction Institute Technical Report CMU-HCII-96-104, November, 1996. http://reports-archive.adm.cs.cmu.edu/anon/1996/CMU-CS-96-189.ps http://www.cs.cmu.edu/~amulet/papers/amuletca.ps abstract only: http://www.cs.cmu.edu/~amulet/papers/amuletca.abs.html

293. John Pane and Brad Myers. *Usability Issues in the Design of Novice Programming Systems,* Carnegie Mellon University School of Computer Science Technical Report CMU-CS-96-132. and Human Computer Interaction Institute Technical Report CMU-HCII-96-101, August, 1996. http://www.cs.cmu.edu/~pane/cmu-cs-96-132.html http://reports-archive.adm.cs.cmu.edu/anon/1996/CMU-CS-96-132.ps

294. Brad A. Myers, Alan Ferrency, Rich McDaniel, Robert C. Miller, Patrick Doane, Andy Mickish, Alex Klimovitski. *The Amulet V2.0 Reference Manual.* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-95-166-R1 and Human Computer Interaction Institute Technical Report CMU-HCII-95-102-R1. February, 1996. html

295. James A. Landay and Brad A. Myers. *Just Draw It! Programming by Sketching Storyboards.* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-95-199 and Human Computer Interaction Institute Technical Report CMU-HCII-95-106. November, 1995. http://reports-archive.adm.cs.cmu.edu/anon/1995/CMU-CS-95-199.ps http://www.cs.cmu.edu/afs/cs.cmu.edu/user/landay/pub/www/research/publications/storyboard-tr/storyboard.html

296. Rich McDaniel and Brad A. Myers. *A Dynamic And Flexible Prototype-Instance Object And Constraint System In C++.* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-95-176 and Human Computer Interaction Institute Technical Report CMU-HCII-95-104. July, 1995. http://reports-archive.adm.cs.cmu.edu/anon/1995/CMU-CS-95-176.ps

297. Brad A. Myers, Rich McDaniel, Alan Ferrency, Andy Mickish, Alex Klimovitski, and Amy McGovern. *The Amulet Reference Manuals.* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-95-166 and Human Computer Interaction Institute Technical Report CMU-HCII-95-102. June, 1995. postscript

298. Nobuhisa Yoda and Brad A. Myers. *An Architectural Design of A Toolkit for Synchronous Groupware Applications.* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-94-226 and Human Computer Interaction Institute Technical Report CMU-HCII-94-109. December 1994.

299. Brad A. Myers. *User Interface Software Tools.* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-94-182 and Human Computer Interaction Institute Technical Report CMU-HCII-94-107. August 1994. http://reports-archive.adm.cs.cmu.edu/anon/1994/CMU-CS-94-182.ps

300. James A. Landay and Brad A. Myers. *Interactive Sketching for the Early Stages of User Interface Design.* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-94-176 and Human Computer Interaction Institute Technical Report CMU-HCII-94-104. July

Exhibit A

1994.

301. David S. Kosbie and Brad A. Myers. *Extending Programming by Demonstration with Hierarchical Event Histories*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-94-156 and Human Computer Interaction Institute Technical Report CMU-HCII-94-102. May 1994. http://reports-archive.adm.cs.cmu.edu/anon/1994/CMU-CS-94-156.ps

302. Brad A. Myers, Dario A. Giuse, Andrew Mickish, and David S. Kosbie. *Making Structured Graphics and Constraints Practical for Large-Scale Applications*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-94-150 and Human Computer Interaction Institute Technical Report CMU-HCII-94-100. May 1994. http://reports-archive.adm.cs.cmu.edu/anon/1994/CMU-CS-94-150.ps

303. Francesmary Modugno and Brad A. Myers. *Pursuit: Visual Programming in a Visual Domain*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-94-109. January 1994.

304. Brad A. Myers. *Why are Human-Computer Interfaces Difficult to Design and Implement?* Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-93-183 July 1993. http://reports-archive.adm.cs.cmu.edu/anon/1993/CMU-CS-93-183.ps

305. Francesmary Modugno and Brad A. Myers. *Visual Representations as Feedback in a Programmable Visual Shell*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-93-133. March 1993.

306. Francesmary Modugno and Brad A. Myers. *Typed Output and Programming in the Interface*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-93-134. March 1993.

307. Brad A. Myers, editor. *The Second Garnet Compendium: Collected Papers, 1990-1992*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-93-108, February, 1993. 135 pages.

308. Bonnie E. John, Philip L. Miller, Brad A. Myers, Christine M. Neuwirth, and Steven A. Shafer, eds. *Human-Computer Interaction in the School of Computer Science*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-92-193, October, 1992.

309. Brad A. Myers. *State of the Art in User Interface Software Tools*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-92-114, February, 1992.

310. Brad A. Myers and Mary Beth Rosson. *Survey on User Interface Programming*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-92-113, February, 1992. Also published as IBM Research Report RC17624.

311. Brad A. Myers. *Demonstrational Interfaces: A Step Beyond Direct Manipulation*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-90-162, August, 1990.

312. Brad A. Myers, editor. *The Garnet Compendium: Collected Papers, 1989-1990*. Carnegie Mellon University School of Computer Science Technical Report, no. CMU-CS-90-154, August, 1990.

313. Brad A. Myers, Dario Giuse, Andrew Mickish, Brad Vander Zanden, David Kosbie, James A. Landay, Richard McDaniel, Rajan Parthasarathy, Matthew Goldberg, Roger B. Dannenberg, Philippe Marchal, Ed Pervin. *The Garnet Reference Manuals*. Carnegie Mellon University Computer Science Department Technical Report, no. CMU-CS-90-117-R5, Sep. 1994. Revised from CMU-CS-90-117-R4, Oct. 1993, CMU-CS-90-117-R3, Nov. 1992, CMU-CS-90-117-R2, May 1992, CMU-CS-90-117-R, June 1991, CMU-CS-90-117, March, 1990, and CMU-CS-89-196, Nov. 1989.

314. Brad A. Myers. *The Garnet User Interface Development Environment; A Proposal*. Carnegie Mellon University Computer Science Department Technical Report, no. CMU-CS-88-153, Sept, 1988.

315. Brad A. Myers. "The State of the Art in Visual Programming and Program Visualization," Carnegie Mellon University Computer Science Department Technical Report, no. CMU-CS-88-114, Feb, 1988.

Exhibit A

316. Brad A. Myers, editor. *Speculations on The Personal Computer of the Year 2000*. Carnegie Mellon University Computer Science Department Technical Report, no. CMU-CS-88-115, Feb, 1988.

317. Brad A. Myers. *Tools for Creating User Interfaces: An Introduction and Survey,* Carnegie Mellon University Computer Science Department Technical Report, no. CMU-CS-88-107, Jan, 1988.

318. Brad A. Myers. *Creating User Interfaces by Demonstration*. PhD Thesis. May, 1987. Technical Report CSRI-196, Computer Systems Research Institute, University of Toronto, Toronto, Ontario, Canada, M5S 1A1.

319. Brad A. Myers. "Position Paper for the SIGCHI Workshop on Classification of Dialog Techniques," *Report of the ACM SIGCHI+GI '87 Workshop on Classification of Dialog Techniques*, Toronto, Canada, April 6, 1987. Jacob Nielsen, ed. Technical Report ID-TR-1987-25, Department of Computer Science, Technical University of Denmark, Bldg. 344, DK-2800 Lyngby Copenhagen, Denmark, 1987. pp. 49-51. Summary of workshop appears in *SIGCHI Bulletin*, vol. 19, no. 2, Oct, 1987, pp. 30-35.

320. J.E. Ball, B. Bruegge, H. Mauersberg, and B.A. Myers. *Spice Symbols: Accessing Type Information in High Level Languages*. Technical Report, Corporate Technology and Research, Siemens Corporation. Nov, 1981.

321. Brad A. Myers. *Displaying Data Structures for Interactive Debugging*. XEROX Palo Alto Research Center Technical Report CSL-80-7. June, 1980. 97 pages. http://www.cs.cmu.edu/~bam/MyersCSL-80-7.pdf

## Other Publications:

322. Andrew Sears, Vicki L. Hanson, Brad Myers, "Introduction to the Special Issue on Computers and Accessibility", *ACM Transactions on Computer Human Interaction*, Vol. 14, no. 3, Sep, 2007, pp. 11-1 - 11-3.

323. M. H. Burnett, G. Engels, B. A. Myers, G. Rothermel (Eds.), *End-User Software Engineering*, Dagstuhl Seminar Proceedings 07081, 18.02. - 23.02.2007, ISSN 1862 - 4405. html or *Creativity Support Tools*, Report of a Workshop sponsored by the National Science Foundation. (75 pages). pdf.

324. Mitch Resnick, Brad Myers, and Randy Pausch, Kumiyo Nakakoji, Ben Shneiderman, Randy Pausch, Ted Selker, and Mike Eisenberg, "Design Principles for Tools to Support Creative Thinking," in *Creativity Support Tools*. pp. 25-36. pdf, or html

325. Brad A. Myers and Michael Beigl, "Handheld Computing" (Guest Editors' Introduction), *IEEE Computer*, September, 2003, vol. 36, no. 9, pp. 27-29. pdf

326. Brad Myers, "Towards More Natural Functional Programming Languages," (invited keynote talk abstract). *The Seventh ACM SIGPLAN International Conference on Functional Programming, ICFP 2002*. October 4-6, 2002, Pittsburgh, PA. p. 1.

327. Brad A. Myers and Jeffrey Nichols, "Communication Ubiquity Enables Ubiquitous Control," 'Boaster' for *Human-Computer Interaction Consortium (HCIC'2002)*, Winter Park, CO, Feb 1, 2002. html

328. Bernhard Suhm, Brad Myers and Alex Waibel, "Multi-Modal Error Correction for Speech User Interfaces; Research Alert," *ACM Interactions*. vol. 8, no. 1. jan+feb, 2001. pp. 16-17.

329. Brad Myers, Scott E. Hudson, and Randy Pausch, "Past, Present and Future of User Interface Software Tools; Research Alert," *ACM Interactions*. vol. 7, no. 6. nov+dec, 2000. pp. 15-16.

330. Brad A. Myers. Review of Jon O'Brien, Tom Rodden, Mark Rouncefield, and John Hughes, "At Home with the Technology: An Ethnographic Study of a Set-Top-Box Trial", *ACM Computing Reviews*, April, 2000. p. 216.

331. Brad A. Myers. Review of Jakob Nielsen, "User Interface Directions for the Web," *ACM Computing Reviews*, June, 1999. p. 313.

332. Brad A. Myers. Review of Andruid Kerne, "Cultural Representation in Interface Ecosystems:

Exhibit A

Amendments to the ACM/Interactions Design Awards Criteria." *ACM Computing Reviews*, December, 1998. p. 624.

333. Brad A. Myers. Review of Benjamin Watson, Neff Walker, Larry Hodges, and Aileen Worden, "Managing Level of Detail through Peripheral Degradation: Effects on Search Performance in a Head-Mounted Display." *ACM Computing Reviews*, August, 1998. p. 427.

334. Brad A. Myers. "Programmability and Heuristics in the User Interface" *ACM Computing Surveys*, vol. 28A(4), December 1996, http://www.cs.cmu.edu/~bam/nsfworkshop/mystatement.html

335. Brad A. Myers. Review of Saul Greenberg, "Teaching human computer interaction to programmers." *ACM Computing Reviews*, July, 1997. vol. 38, no. 7. p. 361.

336. Brad A. Myers. Review of Jeff A. Johnson, "Creating Presentation Slides: a Study of User Preferences for Task-Specific versus Generic Software." *ACM Computing Reviews*, Oct, 1996. vol. 37, no. 10. p. 539.

337. Brad A. Myers. Review of Y.K. Leung and M.D. Apperley, "A Review and Taxonomy of Distortion-Oriented Presentation Techniques." *ACM Computing Reviews*, Vol. 3, no. 4, April, 1995. p. 217.

338. Shannon Ford and Brad A. Myers, eds. *The Human-Computer Interaction Institute*. Carnegie Mellon University. April, 1995. 81 pages.

339. Brad Myers. "The Design for the Amulet User Interface Toolkit," Human-Computer Interaction Consortium, Winter Park, CO. February 15-19, 1995. 8 pages. Available as: ftp://ftp.cs.cmu.edu/afs/cs/project/amulet/www/amulethcic.ps

340. Brad Myers. *Guide for New Faculty in the School of Computer Science*. May, 1994 (revised from version of August 30, 1993.) Memorandum circulated to the CMU CS and RI faculty.

341. Bill Hefley, John Rheinfrank, and Brad A. Myers. "Interactions: A New ACM User Interface Magazine" *SIGCHI Bulletin*, vol. 25, no. 2, April, 1993. pp. 15-19.

342. Brad A. Myers, "Report on the CHI'91 Workshop on Languages for Developing User Interfaces," *SIGCHI Bulletin*, vol. 25, no. 2, April, 1993. pp. 20-23.

343. Brad A. Myers, "Report on the CHI'91 Workshop on Languages for Developing User Interfaces," *SIGPLAN Notices*, vol. 27, no. 12, Dec, 1992. pp. 8-12.

344. Tyson R. Henry, Scott E. Hudson, Andrey K. Yeatts, Brad A. Myers, and Steven Feiner. "A Nose Gesture Interface Device: Extending Virtual Realities," *ACM Symposium on User Interface Software and Technology*, Hilton Head, SC, Nov. 11-13, 1991. pp. 65-68. Reprinted in *Presence*, MIT Press Journals, vol. 1, no. 2, April, 1992. PDF

345. Brad A. Myers and Mary Beth Rosson, "User Interface Programming Survey" *SIGCHI Bulletin*. vol. 23, no. 2. April, 1991. pp. 27-30. also in *SIGPLAN Notices*, vol. 26, no. 8, Aug, 1991. pp. 19-22.

346. Brad A. Myers, "Status Report on the User Interface Magazine" *SIGCHI Bulletin*. vol. 23, no. 2. April, 1991. pp. 10-12.

347. Brad A. Myers. "Making it Easy to Create Highly-Interactive, Graphical Applications in Lisp," *XNextEvent: The Official Newsletter of XUG, the X User's Group*. vol. 3, no. 1. May, 1990. pp. 1, 16-22.

348. Brad A. Myers, "A New Magazine on Computer-Human Interaction?" *SIGCHI Bulletin*. April, 1990. pp. 8-11.

349. Brad A. Myers, Andrew Schulert, Smokey Wallace, Owen Densmore, and David Goldsmith, "User Interface Toolkits: Present and Future," *SIGGRAPH '88 Panels Proceedings*, Atlanta, GA, August 1-5, 1988.

350. Bill Heil, Brad A. Myers and Larry S. Rosenstein. "Software for a Versatile Message Display System," *IEEE 1979-1980 Student Papers*, TT0114-9. pp. 5-12.

## Patents:

351. "A Debugging Interface For Asking Questions about Program Failures." Andrew J. Ko and Brad

Exhibit A

A. Myers. Filed October 8, 2004.

352.  "Using Edges and Corners for Character Input." Jacob O. Wobbrock and Brad A. Myers. Filed April 4, 2003. Application serial no. 10/811,761. (20040196256) html

353.  Creating Charts and Visualizations by Demonstration. Brad A. Myers, Jade Goldstein, and Matthew A. Goldberg. Patent Number 5,581,677. Filed April 22, 1994. pdf

## Submitted for Publication:

354.  Chris Scaffidi, Chris Bogart, Margaret Burnett, Allen Cypher, Brad Myers, Mary Shaw. "Characterizing Reusability of End-User Web Macro Scripts".

355.  Andrew J. Ko, Robin Abraham, Laura Beckwith, Alan Blackwell, Margaret Burnett, Martin Erwig, Joseph Lawrance, Henry Lieberman, Brad Myers, Mary Beth Rosson, Gregg Rothermel, Chris Scaffidi, Mary Shaw, Susan Wiedenbeck. "The State of the Art in End-User Software Engineering".

356.  Michael Freed, Jaime Carbonell, Geoff Gordon, Jordan Hayes, Brad Myers, Daniel Siewiorek, Stephen Smith, Aaron Steinfeld and Anthony Tomasic. "RADAR: A Personal Assistant that Learns to Reduce Email Overload"

357.  Thomas D. LaToza, Brad A. Myers, "How Developers Reason about Update Paths"

358.  Andrew Faulring, Brad Myers, Ken Mohnkern, Bradley Schmerl, John Zimmerman, Aaron Steinfeld, Yiming Yang, Nicholas Sherman, Richard Wang, Shinjae Yoo, and Gabriel Zenarosa. "User Interfaces for Agent-Assisted Task Management"

359.  Annette DeVito Dabbs, Mary Amanda Dew, Brad A. Myers, Alex Begey, Robert P. Hawkins, Jacqueline Dunbar-Jacob, Kenneth R. McCurry. "Involving Patients in the Development and Evaluation of Patient-Centered Technologies: A Review of the Empirical Studies of Pocket PATH, Pocket Personal Assistant for Tracking Health".

360.  Annette DeVito Dabbs, Brad A. Myers, Kenneth R. McCurry, Jacqueline Dunbar-Jacob, Robert P. Hawkins, Alex Begey, Mary Amanda Dew, "User-Centered Design and the Development of an Interactive Health Technology for Patients"

361.  Annette DeVito Dabbs, Mary Amanda Dew, Brad A. Myers, Alex Begey, Robert P. Hawkins, Jacqueline Dunbar-Jacob, Kenneth R. McCurry. "Methods for Involing Patients in the Development of Patient-Centered Health Informatics Technologies"

362.  Andrew Faulring, Ken Mohnkern, John Zimmerman, Aaron Steinfeld, Brad A. Myers, "User Interfaces for Agent-Assisted Task Management and Form Filling"

363.  Christopher Scaffidi, Brad Myers, and Mary Shaw. "An Editor and Parser for Data Formats in End-User Programming".

364.  Andrew Faulring and Brad A. Myers, "Visualizing and Manipulating Complex Calendar Scheduling Information" pdf

## Unpublished

365.  Jeffrey Nichols and Brad Myers. *Report on the INCITS/V2 AIAP-URC Standard*. 2004. pdf

366.  A. Chris Long, Brad A. Myers, Juan Casares, Scott M. Stevens, and Albert Corbett. "Video Editing Using Lenses and Semantic Zooming". 2003. pdf

367.  Brad A. Myers, Yu Shan A. Chuang, Marsha Tjandra, Mon-chu Chen, and Chun-Kwok Lee. "Floor Control in a Highly Collaborative Co-Located Task." 2000. http://www.cs.cmu.edu/~pebbles/papers/pebblesfloorcontrol.pdf or http://www.cs.cmu.edu/~pebbles/papers/pebblesfloorcontrol.ps.

368.  Karen Cross, Adrienne Warmack, and Brad Myers. "Lessons Learned: Using Contextual Inquiry Analysis to Improve PDA Control of Presentations". http://www.cs.cmu.edu/~pebbles/papers/pebblesslideshowci.pdf.

Exhibit A

369. Richard G. McDaniel and Brad A. Myers, "Gamut: Creating Complete Applications Using Only Programming-by-Demonstration." postscript.
370. Brad A. Myers and Kenneth A. Strickland. "Easily Adding Sound Output to Interfaces." 1998. http://www.cs.cmu.edu/~amulet/papers/soundinamulet.pdf http://www.cs.cmu.edu/~amulet/papers/soundinamulet.ps
371. John Huebner and Brad A. Myers. "Easily Programmable Shared Objects For Peer-To-Peer Distributed Applications." 1998. http://www.cs.cmu.edu/~amulet/papers/Submitted-sharedobj.ps http://www.cs.cmu.edu/~amulet/papers/Submitted-sharedobj.pdf http://www.cs.cmu.edu/~amulet/papers/Submitted-sharedobj.html
372. Ilhwan Kwon and Brad A. Myers. "Defining and Editing Constraints Graphically by Treating Constraints as Objects." 1998.
373. Brad A. Myers, Neal Altman, Khalil Amiri, Matthew Centurion, Fay Chang, Chienhao Chen, Herb Derby, John Huebner, Rich Kaylor, Ralph Melton, Robert O'Callahan, Matthew Tarpy, Konur Unyelioglu, Zhenyu Wang, and Randon Warner. "Using Benchmarks to Teach and Evaluate User Interface Tools." 1997. http://www.cs.cmu.edu/~amulet/papers/benchmarks.pdf
374. John Pane and Brad Myers. "Usability Guidelines for the Design of Programming Systems."
375. Brad A. Myers, Alan Ferrency, Rich McDaniel and Roger Dannenberg. "Debugging Interactive Applications." 1996. http://www.cs.cmu.edu/~amulet/papers/debugpaper.pdf

## World Wide Web Pages:

1. Brad Myers home page. Including List of Systems and Their Acronyms and CHI Conference Badges
2. *User Interface Software Tools*. http://www.cs.cmu.edu/~bam/toolnames.html A list of tools for creating user interfaces. (Awarded Editor's Choice, LookSmart Directory, a subsidiary of *The Reader's Digest*, Jan 22, 1997. Links2Go Key Resource award in the GUI topic, 22 Jul 98.)
3. *Computer Almanac - Numbers About Computers* http://www.cs.cmu.edu/~bam/numbers/ Interesting and Useful Numbers about Computers. (Top link on the original The Microsoft Network "Look it Up" page; selected for the "Exclusive Kool Sites" award from Komputer Klinic for June 14, 1996; Awarded four stars by Anbar Electronic Intelligence Computing Cool Sites for the January'98 Computing Milieux; Listed in Mexico's FirstNews: Internet at Home, Computers, Information and Opinion Articles, March'98; Earned the "Duke of URL Classy Site Pick Award," May, 1998; included in Addison Wesley Longman Publishing Company's on-line text books by Neil A. Weiss on Statistics. Featured link in LibrarySpot's Almanac Page, April, 2000.)
4. *Amulet Project Pages* http://www.cs.cmu.edu/~amulet
5. *Natural Programming Project Pages* http://www.cs.cmu.edu/~NatProg
6. *Demonstrational Interfaces Project Pages* http://www.cs.cmu.edu/~bydemo
7. *Garnet Project Pages* http://www.cs.cmu.edu/~garnet
8. *Pebbles Project Pages* http://www.cs.cmu.edu/~pebbles. Featured in the January 6, 2003, Vol. 5, no. 15, issue of the *Innovative Teaching Newsletter* on "PDAs in the Classroom".
9. *Command Post of the Future (CPOF) Project Pages* http://www.cs.cmu.edu/~cpof
10. *Silver Multi-media Editing Project Pages* http://www.cs.cmu.edu/~silver

## Articles by Others Quoting Me or About My Work:

1. Kojo Nnamdi, "The Kojo Nnamdi Show", *Life Lesson's: Randy Pausch*, radio show on WAMU 88.5FM (Washington, DC) and some NPR stations, July 28, 2008, 1:43pm-2:00pm. Also

Exhibit A

available online and my local mp3 copy

2. Chris Douce, "Natural Programming Project," *Psychology of Programming Interest Group (PPIG) Newsletter*, January, 2008. http://www.ppig.org/newsletters/2008-01.html

3. Luca Chittaro, "THE DISAPPEARING DESKTOP. An interview with Jaime Teevan (Microsoft) and William Jones (Univ. Washington)", *Interattivo*, 06/04/08, (discusses Feldspar at the PIM workshop at CHI'2008), html.

4. Olga Kharif, "Google's Orkut: A World of Ambition", BusinessWeek.com, October 8, 2007. Reprinted at MSNBC.

5. Virginia Gold, "ACM Names 34 Fellows for Contributions to Computing and IT", January 10, 2006. html; and *ACM MemberNet*, Volume 4, Issue 6, January 2006. html

6. Ivanhoe Broadcast News, "Hi-Tech Typing", *Discoveries and Breakthroughs in Science*. (1:25 min. video and web story). October, 2005. html

7. Aaron Marcus, "When in Rome, do as the Romans do: HCII 2005 recap", *ACM Interactions*, Volume 12, Issue 6, November + December 2005. pp. 48 - ff. ("why were such luminaries as ... Brad Myers from Carnegie-Mellon University in attendance?") html and pdf

8. Eric Smalley, "View from the High Ground: CMU's Brad Myers", *Technology Review News*, August 22, 2005. html.
   o Summarized by *ACM TechNews*, Volume 7, Issue 833: August 24, 2005. html of the summary.

9. Alan Cohen, "Software Is Too Buggy and Unreliable," part of the special section on "The Ten Biggest Problems in Computing and How We'll Solve Them", *PC Magazine*, August 23, 2005. Vol. 24, no. 14, pp. 86-87. Also on PCMag.com.

10. (TR Staff), "Write Steady", *Technology Review*, vol. 108, no. 8, August, 2005, p. 27. html

11. Anne Watzman, "Ko, Aung and Myers Win Best Paper Award At International Conference on Software Engineering". CMU Press Release. May 23, 2005. html

12. Anne Watzman, "Myers and Wobbrock to Showcase Projects At Microsoft Research Tech Fair 2005". CMU Press Release. April 27, 2005. html and pictures

13. Bongshin Lee, Mary Czerwinski, George Robertson, Benjamin B. Bederson. "Understanding Research Trends in Conferences using PaperLens," *Proceeding of the SIGCHI Conference On Human Factors In Computing Systems: CHI'2005*, Portland, Oregon, April 02 - 07, 2005. pp. 1969-1972. pdf.
   "For example, the most prolific author is Brad Myers who has published 41 papers.... For End User Programming, Brad Myers was the most frequently cited author.... For example, Card and Myers are connected indirectly to each other because they have each co-authored a paper with Shneiderman."

14. "Copy-and-paste goes natural", *Technology Research News*, January 12/19, 2005. html.

15. ACM TechNews, "Taking Handheld Devices to the Next Level", Volume 7, Issue 744: Friday, January 21, 2005. html

16. Christine Tomasino, "A Presenter's Friend" and "Handheld Software for Student Collaboration". *For What It's $$Worth$$*. Friday, January 21, 2005.

17. Byron Spice, "Text with an edge," *Pittsburgh Post-Gazette*, Monday, Nov. 29, 2004. p. A-6. html

18. Aaron Ricadela, "Trying to Make the Pen as Mighty as the Keyboard," The New York Times, November 11, 2004. p. E5. html

19. "Home is where the future is", *The Economist*, Sep 16, 2004. Print edition and on-line

20. The "Knowledge Encapsulation System", a commercial product of Software Theories, specifically references our paper as an influence.

21. Mike Crissey, "Researchers aim to make debugging simpler", Associated Press, July 26, 2004. Appears in Salon.com and MSNBC and CNN and CBSNews.com and Forbes.com and USAToday.com, and Detroit News (August 15, 2004), and Melbourne,Victoria,Australia Herald Sun, and Gadgetopia, and 404 Magazine (in German), etc.

22. Sebastian Rupley, "Debugging for the Masses", *PC Magazine Online*, May 14, 2004. html. Reprinted in Yahoo News

Exhibit A

23. David Hart, "Researchers to Help Exterminate Bugs in Spreadsheets, Web Applications." NSF Press Release NSF PR 04-065 - May 05, 2004. html. *Also reprinted in:*
    o Innovations Report, May 06, 2004
    o Eurekalert, May 5th, 2004
    o Newswise, May 5th, 2004
24. Calvin Leske, "The Pittsburg Pebbles PDA Project" [sic], *The NSDL Scout Report for Math, Engineering, and Technology*. Volume 2, Number 19, September 26, 2003. html
25. Mark Boslet, "THE BIG IDEA: Microsoft Labs Searches For Legacy," *Dow Jones Newswires*, 22 September 2003.
26. Kim Peterson. "Inventions' wonderful world on display at Microsoft fair," *Seattle Times*. Wednesday, July 30, 2003. pp. E-1 and E-3. html
27. Microsoft PressPass Press Release, "It's Academic: Microsoft Research Collaboration Projects Fuel Technology Innovation at Universities". Redmond, Wash., July 28, 2003. html
28. Dan Gillmor, "Designing new handhelds to improve human-computer interaction," *SiliconValley.Com; The San Jose Mercury News*, April 9, 2003. html
29. Kimberly Patch, "Handhelds Gain Space," *Technology Research News*, February 26/March 5, 2003, p. 4. html
30. Walter McKenzie, "PDAs in the Classroom," *Innovative Teaching Newsletter,* Vol. 5, no. 15, January 6, 2003, html
31. Ann Light, "Pebbles Project connects PDAs up Smartly," *UsabilityNews.com*, 17 December 2002. html
32. Michael Yeomans, "CMU Scientists Improving Computers' People Skills," *Pittsburgh Tribune-Review*, Tuesday, October 22, 2002. pages B7, B10. html
33. Mike Crissey, "Designers Work on All-in-One Remote," *Associated Press*, August 27, 2002. html
34. John Zyskowski, "Handhands in a new world order," *Federal Computer Week*, March 18, 2002. html
35. Kimberly Patch, "Correction choices key for speech software," *Technology Research News*, September 5, 2001. html
36. Catherine Zandonella, "How to Snarf with the Geeks," *The New Scientist*, vol. 172, no. 2311, October 6, 2001. p. 24.
37. Anthony Violanti, "Revolution in a Box: How 20 years of Personal Computers changed the world," *Buffalo News*, August 12, 2001. pp. A1, A8.
38. Jennie Borodko Stack, "Palm Pilot Connects Girl with Classroom," *QUEST,* Volume 8, Number 1, February 2001. pp. 48-49. html
39. Paul Beebe, "Software Marketed to trade under CMU brand name," *Pittsburgh Tribune-Review*, vol. 112, no. 285, Nov. 14, 2000.
40. Leander Kahney, "Prettying Up Linux," *Wired News*, Feb. 25, 2000. page 2. html
41. Andrew Wilson. "Computer Conference Set to Make Programming Easier," *Allegheny Business News*, vol. 6, no. 20, Nov 27-Dec 11, 1991. p. A5, A7.
42. "Look before you leap," *Computing*. June 13, 1991. p. 4.
43. Laurent Belsie. "Picture This: Visual Programming," *The Christian Science Monitor*. March 13, 1991. p. 12. also printed as "Researchers simplify computer programming," in *Grand Rapids Press*, MI. May 2, 1991.
44. Tony Durham. "Programming by Example and Interface Without Tears," *Computing*. April 7, 1988. pp. 22-23.

---

# Professional Activities:

Exhibit A

## Chair:

- Corporate Sponsors Co-Chair, UIST'2008, UIST'2007.
- Co-Organizer, "End-User Software Engineering" Dagstuhl Conference, 18.02.07 - 23.02.07, Seminar 07081, Organizers: Margaret M. Burnett, Gregor Engels, Brad A. Myers, Gregg Rothermel
- Corporate Sponsors Chair, UIST'2006, UIST'2005, UIST'2004, UIST'2003, UIST'2002, UIST'2001, UIST'2000 and UIST'1999: the ACM Symposium on User Interface Software and Technology.
- Associate Chair, Product Design and Usability (PDU) Consortium, at Carnegie Mellon University, Pittsburgh, PA.
- Co-organizer, NSF Workshop on Creativity Support Tools, June 13-14, 2005. Radisson Barcelo Hotel in Washington, DC.
- Program Co-Chair (with Jamie Frankel, MERL), Human Computer Interaction Consortium (HCIC'04), Fraser, CO, 2004.
- Co-Chair, Human-Computer Interaction working group at the ACM & NSF Workshop on Strategic Directions in Computing Research, June 14-15, 1996.
- General Conference Chair for UIST'95: the ACM Symposium on User Interface Software and Technology.
- Video Chair, 1990 and 1992 ACM SIGCHI Conferences.
- Organizer, SIGCHI'91 two-day Workshop: Computer Languages for Programming User Interface Software, April 28-29, 1991.
- Displays Chair, 1988 IEEE Workshop on Visual Languages.
- Chair, ACM SIGCHI User Interface Magazine Committee, 1990-1991.

## Editorial:

- Guest co-editor, Special Issue of *ACM Transactions on Computer-Human Interaction (TOCHI)* on Web Accessibility, 2006.
- Associate Editor, ACM *interactions* magazine. 1993 (Founding) - 2007
- Associate Editor, *ACM Transactions on Computer-Human Interaction.* 1993 (Founding) - 2006.
- Computer Sciences Special Editorial Board of *Interacting with Computers.* 1996 - present.
- Associate Editor, *Journal of Visual Languages and Computing*, Academic Press. 1989 (Founding) - present.
- Editorial Board, *Human-Computer Interaction* Journal, 1990-present.
- Guest co-editor, Special issue on Handheld Computing of *IEEE Computer*, September, 2003.
- Editorial Board, *inSight*, Academic Press Daily Science News Service on the Internet, 1998.
- Associate Editor, *ACM Transactions on Information Systems*, 1991-1993.
- Advisory Editor, Jones and Bartlett Publishers, Inc. 1991-1993.
- Guest editor, Special issue on User Interface Software of ACM *Transactions on Information Systems*, July, 1990.

## Program Committees:

- Program Committee, 25th IEEE Symposium on Visual Languages and Human-Centric Computing (VL/HCC'09), Corvallis, Oregon, September 2009.
- Program Committee, Second Symposium on EUD (EUD'2009), March 2-4, 2009. Siegen, Germany.
- Program Committee, The Fourth Workshop on End-User Software Engineering (WEUSE IV), Co-located with ICSE 2008, Leipzig, Germany. May 12, 2008.

http://www.cs.cmu.edu/~bam/resume.html                                        8/14/2008

Exhibit A

- Organizing Committee, Dagstuhl Seminar 07081, "End-User Software Engineering", M. M. Burnett, G. Engels, B. A. Myers, G. Rothermel. Schloss Dagstuhl International Conference And Research Center For Computer Science, Germany. Feb 18, 2007 - Feb 23, 2007.
- Organizing Committee, 2nd Workshop on End-User Software Engineering (WEUSE II) at CHI'2006, Montreal, Canada, April 23, 2006.
- Program Committee, Workshop on The Many Faces of Consistency in Cross-platform Design at CHI'2006, April 23, 2006, Montreal.
- Program Committee, 2005, 2000, 1990, and 1989 ACM Symposiums on User Interface Software and Technology (UIST).
- Program Committee, 1st Workshop on End-User Software Engineering (WEUSE 2005) at ICSE 05, Saint Louis, MO, May 21st 2005.
- Program Committee, Third IEEE Symposium on End-User Programming and Domain Specific Programming, October 28-31, 2003, Auckland, New Zealand.
- Program Committee, MobileHCI'03: Fifth International Symposium on Human Computer Interaction with Mobile Devices and Services, Udine (Italy), 23-26 September 2003
- Program Committee, International Workshop on Visual Languages and Computing, VLC'03, Florida International University, Miami, Florida, September 24-26, 2003.
- Program Committee, CHI'2003 Workshop on Perspectives in End User Development.
- Program Committee, ICMI'2002: International Conference on Multimodal Interfaces.
- Program Committee, IUI'2002: International Conference on Intelligent User Interfaces (IUI), 2002.
- Program Committee, Shared Environments to Support Face-to-Face Collaboration Workshop at CSCW'2000.
- Program Committee, ADL'2000: IEEE Advances in Digital Libraries Conference, May 22-24, 2000, Washington, D.C.
- Program Committee, 4th USENIX Windows Systems Symposium. August 3-4, 2000, Seattle, Washington.
- Program Committee, DSL'99: 2nd Usenix Conference on Domain Specific Languages. Oct 6-9, 1999 in Austin, Texas.
- Doctoral Consortium Committee, 1997 ACM SIGCHI Conference.
- Short Papers & Interactive Posters: CHI'95.
- Videos: ACM CHI'91, and INTERCHI'93 Conferences.
- Papers: ACM SIGCHI+GI'87, CHI'89, CHI'91, and CHI'99 Conferences.
- Program: 1988, 1989 and 1990 IEEE Workshops on Visual Languages.
- Program: First (1990) and Second (1991) EUROGRAPHICS Workshops on Object Oriented Graphics.

## Other Committees:

- Microsoft Consumer Productivity Experiences Group Advisory Council. 2006-present.
- Microsoft Research University Relations Faculty Advisory Board. 2003.
- DARPA HCI Workshop, October 28-29, 1992, Pittsburgh, PA.
- DARPA ISAT Study Group: Gentle Slope Systems. August, 1992, Woods Hole, MA.
- DARPA ISAT Study Group: Intelligent Interfaces. August, 1991, Woods Hole, MA.
- NSF Workshop: An Agenda for Human-Computer Interaction Research: Science and Engineering Serving Human Needs. Washington, D.C. March 4-5, 1991.
- SIGCHI Publications Committee, 1989-1994.
- SIGCHI Committee on Flagship Publications, 1989-1990.

## Reviewer:

Exhibit A

- NSF Panel Reviewer (various programs), 1997, 2000, 2004, 2005, 2007.
- Grant proposals for the National Science Foundation (NSF) of the USA, SBIR program, and National Science and Engineering Research Council (NSERC) of Canada.
- Government of Quebec, Ministere du Conseil executif, Fonds de developpement technologique.
- Book manuscripts for Academic Press, Morgan-Kaufmann, Addison-Wesley, Prentiss-Hall, Benjamin Cummings, etc.
- Papers for: SIGCHI, SIGGRAPH, UIST, TOCHI, HCI, IwC, IEEE CG&A, IEEE Computer, IEEE Software, IEEE Transactions on Software Engineering, ACM TOG, HICSS, IJCAI, TOPLAS, The Visual Computer, Software Practice & Experience, etc.

## Societies:

SIGCHI, SIGGRAPH, IEEE Computer Society, ACM, IEEE (Senior Member), Electronic Frontier Foundation, Computer Professionals for Social Responsibility.

# CMU Activities:

- Organizer for the HCI Seminar Series, 1992-1993, and 1999-present.
- Participant, Interdisciplinary Research Training Opportunities in Assistive Technology at CMU and the University of Pittsburgh (IGERT Program). 2003-present.
- Member, HCII Executive Committee, 2004-present.
- Marshall of the SCS Masters Students, CMU Commencement, May 20, 2007.
- Co-Leader, (with Michael Boninger) of the Human-System Interaction Thrust of the Quality of Life Technology (QoLT) Engineering Research Center, 2005-2007
- Member, href="http://www.qolt.org/">Quality of Life Technology (QoLT) Engineering Research Center, 2005-oresent
- Member, HCII Twelfth Anniversary Committee, 2005-2006.
- Member, General Motors Collaborative Laboratory, 2003-present.
- Member, Center for Wireless and Broadband Networking, 2001-2006.
- Member, MERITS of Pittsburgh: Medical Robotics and Information Technology for Medicine and Surgery, 2001-2005.
- Faculty Judge, CMU first round of the Microsoft Imagine Cup Contest. April, 2004.
- Facilities Advisory Committee for the School of Computer Science, 2002-2003.
- Admissions Committee, HCI Institute's PhD Program, 1999-2003.
- Faculty sponsor for CMU's participation in the "ACM Quest for Windows CE Applications" contest, 1999, which won first place in the "Personal Productivity" team category.
- PhD for HCI Students Committee, 1998-1999.
- Admissions Committee, HCI Institute's Master's Program, 1995-1996.
- Steering Committee of the Human-Computer Interaction Institute, 1994-1997.
- Faculty Senator from Computer Science, May 1994 - June, 1996.
- Developed the *Guide for New Faculty in the School of Computer Science*, August, 1993 and May, 1994.
- CS Committee on Non-Tenured Reappointments and Promotions, 1993.
- CS Faculty Hiring Committee, 1992-1994.
- CS HCI Faculty Recruitment Coordinator, 1992-1994.
- Member, School of Computer Science Policy Committee, 1992-1996.
- Member, Computing Advisory Committee of the Faculty Senate, 1990-1992.
- Organizer for the 1989-90 Programming Systems Seminar Series.

- Faculty sponsor for CMU's participation in Apple Computer's 1987 "PC of the Year 2000" contest.

---

# Teaching:

## Courses

- 05-863/08-763/46-863: Introduction to Human Computer Interaction for Technology Executives. Fall, Mini 2, 2007.
- 08-702, 08-703: Contextual Design, User Interface Design and Testing. For MSIT eBusiness program, Fall, 2007. 27 students.
- 05-671/672: Masters HCI Project. Spring/Summer, 2007.
- 08-702, 08-703: Contextual Design, User Interface Design and Testing. For MSIT eBusiness program, Fall, 2006. 32 students.
- 17-770 / 46-863: Introduction to Human Computer Interaction for Technology Executives. Fall, Mini 1, 2006. 12 students.
- 05-671/672: Masters HCI Project. Spring/Summer, 2006. 29 students.
- 96-766, 96-768: Contextual Design, User Interface Design and Testing. For MSIT eBusiness program, Fall, 2005. 28 students.
- 96-766, 96-768, 96-771: Contextual Design, User Interface Design and Testing. For MSIT eBusiness program, Fall, 2004. 40 students.
- 05-830: Advanced User Interface Software, Fall, 2004. 7 students.
- 20-790: Human-Computer Interaction for eCommerce. Summer Session Two, 2004. (Taught for the UTC Flex-Mode distance-ed program) 19 students.
- 20-790: Human-Computer Interaction for eCommerce. Mini-6, Summer Session Two, 2004. 31 students.
- 05-630 / 05-430: Programming Usable Interfaces, Spring, 2004. 18 grad, 18 undergrad students.
- 05-830: Advanced User Interface Software, Spring, 2003. 5 students.
- 96-766: CMU West Campus - Information Technology Masters of eBusiness Technology, Contextual Design, User Interface Design and Testing, Fall, 2002 and Spring 2003. 6 students.
- 20-790: Human-Computer Interaction for eCommerce. Spring, first mini, 2003. 12 students. (Taught for the UTC Flex-Mode distance-ed program)
- 20-790: Human-Computer Interaction for eCommerce. Fall, second mini, 2002. 25 students.
- Human-Computer Interaction in eCommerce. June 26 - August 9, 2002. 34 students.
- 20-790: Human-Computer Interaction for eCommerce. Fall, second mini, 2001. 32 students.
- 05-631 Software Architecture for User Interfaces, Fall, 2001. 13 students.
- Human-Computer Interaction in eCommerce. June 25 - August 10, 2001. 45 students.
- 05-830, Advanced User Interface Software, Spring, 2001. Enrollment: 15 (8 PhD, 4 MS, 3 undergrad)
- 05-830, User Interface Software, Spring, 2000. Enrollment: 8 (5 MS, 1 PhD, 2 undergrad)
- 05-689, Evaluating Usability of Pebbles (Independent Study), Summer, 1999. Enrollment: 4 MS HCII.
- 05-830, User Interface Software, Spring, 1999. Enrollment: 12 (3 MS, 2 PhD, 6 undergrad, 1 staff)
- 05-830, User Interface Software, Spring, 1998. Enrollment: 9 (4 MS, 1 PhD, 3 undergrad, 1 staff)
- 05-830, User Interface Software, Spring, 1997. Enrollment: 14 (5 MS, 5 PhD, 1 undergrad, 1 special)
- 15-621 and 15-499(A), Intro to User Interface Programming, taught with Dan Olsen, Fall, 1996.

Exhibit A

Enrollment: 20 (10 HCII MS, 10 undergrad).
- HCI2: HCI Software Tools, A one day short course in the Carnegie Mellon Summer School of Computer Science, June, 1996.
- 15-820 (B) Advanced Topics in HCI: User Interface Software, Spring, 1996. Enrollment: 12 (1 undergrad, 4 PhD, 4 MSE, and 3 INI MS).
- 17-698B and 15-499A, Introduction to User Interface Programming, taught with Jim Morris, Fall, 1995. Enrollment: about 15 undergrad, 3 HCII MS.
- 15-820(C) and 15-499(B), Advanced Topics in HCI: User Interface Software. Spring, 1994. Enrollment: about 18 undergrad and 2 MS.
- 15-810A: Topics in User Interface Software, Spring, 1989. Enrollment: about 20, none for credit.

## Independent Study

- *Creating a Simulator for a General Motors Navigation System*, Pegeen Shen, Fall, 2003.
- *New Features for Pebbles PocketPC*, Yuhua Li, Fall, 2003.
- *Implementing USB in Pebbles*, Dave Kong, Spring, 2002.
- *Evaluating HANDS*, Luis J. Cota, Fall, 2001.
- *Evaluating the Silver Video Editor*, Rishi Bhatnagar, Summer, 2001.
- *Evaluating the use of handhelds for the handicapped*, Sunny Ya-Ting Yang and Brian Yeung, Spring, 2001.
- *Evaluating the Usability of the Hands Language*, Leah Miller, Spring, 2001.
- *Using Laser Pointers in Meetings*, Choon Hong Peck, Fall, 2000 and Spring, 2001.
- *Personal Universal Controller*, Marc Khadpe, Summer, 2000.
- *Design for the Hands Language for Children*, Ruben Carbonell and Joonhwan Lee, Spring, 2000.
- *Evaluating Floor Control for Small Groups with Palms*, Yu Shan Chuang and Marsha Tjandra, Spring, 2000.
- *Evaluation Natural Expression of Algorithms*, Aristiwidya B. Hardjanto ("IKA"), Spring, 1999.
- *Using the PalmPilot in Meetings*. Herbert Stiel, Fall, 1997, Undergrad CS.
- *Networking in Amulet*. John Huebner, Summer and Fall, 1997, MSE.
- *Interactive Specification of Constraints*. Ilhwan Kwon, Spring and Summer, 1997. Undergrad ECE.
- *The Design of the Atacama Desert Trek Interface*. Jennifer Gutwacks and Clark Slater, Spring, 1997. MS HCI.
- *Natural Programming*. John Chang, Spring, 1997. Undergrad CS.
- *Interface Builder for Amulet*. William Moher, Spring, 1996. Undergrad CS.
- *Interpreting Football Plays Sketched by Demonstration*, Patrick Rogan, Spring, 1996. Undergrad Psychology.
- *Creating Macintosh Games by Example*, Andrew Tepper, Spring, 1989, Undergrad CS.

---

# Students:

## PhD Students

- Thomas LaToza
- Jeffrey Stylos
- Andrew Ko. PhD, May, 2008, *Asking and Answering Questions about the Causes of Software Behavior*. pdf.
- Jeff Nichols. PhD, December, 2006, *Automatically Generating High-Quality User Interfaces for*

Exhibit A

*Appliances*. pdf. Currently, Research Staff Member at IBM's Almaden Research Center.

- Jake Wobbrock. PhD, August, 2006, *EdgeWrite: A Versatile Design for Text Entry and Control*. Abstract and PDF. Winner, 2007 SCS Dissertation Award. Currently, Assistant Professor at University of Washington.
- Rob Miller. PhD, May, 2002, *Lightweight Structure in Text*. PDF. Thesis won SCS Doctoral Dissertation Award for 2002 and ACM Doctoral Dissertation Award Honorable Mention. Currently, Associate Professor at MIT.
- John Pane. PhD, May, 2002. *A Programming System for Children that is Designed for Usability*. Currently working for Rand Corporation.
- Rich McDaniel. PhD, May, 1999, *Building Whole Applications Using Only Demonstration*. Currently, at Siemens Corporate Research, Princeton, NJ.
- James Landay. PhD, Dec. 1996, *Interactive Sketching for the Early Stages of User Interface Design*. Currently, Associate Professor at Univ. Washington.
- Francesmary Modugno. PhD, May, 1995, *Extending End-User Programming in a Visual Shell With Programming by Demonstration and Graphical Language Techniques*. Currently, Assistant Professor, Department of Epidemiology, University of Pittsburgh

## Masters Students

- Michael Coblenz, MS in CS, August, 2006, *JASPER: Facilitating Software Maintenance Activities With Explicit Task Representations*. Abstract, pdf.
- Andrew Faulring , MS in CS, December, 2005.
- Rajesh Seenichamy, MS in INI, August, 2003, *Communicating With X-10 And Vehicle Functions To Enable Two-Way Remote Control*.
- Juan Casares, MS in HCI, May 2002.
- Nobuhisa Yoda, MS in CMU's Information Networking Institute, Dec, 1994: *An Architectural Design of A Toolkit for Synchronous Groupware Applications*.
- David Kosbie. MS CSD.
- Andrew Werth, MS in INI, Oct. 1992, *Tourmaline: Formatting Document Headings by Example*.

## CSD BS Thesis Students

- Ivan Gonzalez, BS, May, 2006. *Thumb Based Interaction Techniques for Input on a Steering Wheel*
- Michael Coblenz, BS, May, 2005. *Using Objects of Measurement to Detect Spreadsheet Errors*. CMU-CS-05-150, CMU-HCII-05-102. Abstract, pdf.
- Andrew Faulring, BS, May, 1999. *Gold: Charting by Demonstration*
- Chotirat ("Ann") Ratanamahatana, BS, May, 1998. *A Textual Programming Language and Environment for Beginners*
- Rajan Parthasarathy, BS, May, 1994, *Garnette: An Interactive User Interface Tool*.

## CMU SCS PhD Thesis committee

- Chris Scaffidi (ISR PhD candidate)
- Marwan Abi-Antoun (ISR PhD candidate)
- Uri Dekel (ISR PhD candidate)
- Michael Gleicher (PhD CSD, 1994)
- Dean Rubine (PhD CSD, 1991)
- Tom Lane (PhD CSD, 1990)

Exhibit A

**External member, Thesis committee**

- Ashwini Bhide, (PhD in Architecture, Carnegie Mellon University, in progress)
- Peter Tandler, (PhD in Computer Science, Darmstadt University of Technology, Germany, 2004)
- Jan Reinhardt, (PhD in Civil and Environmental Engineering, Carnegie Mellon University, 2003)
- Sailesh Panchang, (MS, 2002, Dept. of Rehabilitation Science and Technology, University of Pittsburgh)
- Linda McIver, (PhD, 2001, in Computer Science, School of Computer Science and Software Engineering, Monash University, Australia)
- Bernhard Suhm (PhD, 1998, University of Karlsruhe, Germany)
- T. Paul McCartney (PhD, 1996, Washington University in St. Louis, Computer Science Department)
- Martin R. Frank (PhD, 1995, Georgia Institute of Technology, College of Computing).
- David Maulsby (PhD, 1994, University of Calgary, Department of Computer Science)
- David Kurlander (PhD, 1993, Columbia University, Computer Science Department)

**Visitors Supervised:**

- A. Chris Long, Postdoc, 2001-2002.
- Prof. Yoshihiro Tsujino, Department of Information and Computer Sciences, Osaka University, May, 1996 to March, 1997.
- Alex Klimovitski, November, 1994 to April, 1995.
- Keiji Kojima, Hitachi, October, 1990 to June, 1991.
- Osamu Hashimoto, NEC Corporation, July, 1990 to August, 1991.
- Brad Vander Zanden, Postdoc, August, 1988 to July, 1990.
- Philippe Marchal, 1987 to 1988

# Invited Presentations:

## Keynote Talks:

1. Dinner keynote speaker, Accel 2008, Vocollect's Global Conference on Voice in the Supply Chain. Pittsburgh, PA, April 14-16, 2008. "User Interfaces of the Future"
2. Keynote speaker, AAAI 2007 Spring Symposium on Interaction Challenges for Intelligent Assistants, 26-28 March 2007, Stanford University, CA. "A User Acceptance Equation for Intelligent Assistants". Abstract and pdf of PowerPoint slides.
3. Invited Research Overview, "End-User Programming". CHI 2006, April 22-27, 2006, Montreal, Canada.
4. Keynote speaker, Third International Conference On Mobile And Ubiquitous Multimedia, MUM2004. October 27 - 29, 2004, College Park, Maryland. "Mobile Devices for Control of Ubiquitous Multimedia".
5. Keynote speaker, The Seventh ACM SIGPLAN International Conference on Functional Programming, ICFP 2002. October 4-6, 2002, in Pittsburgh, PA. "Towards More Natural Functional Programming Languages."
6. Keynote speaker, The Fourth Symposium on Human-Computer Interaction for Mobile Devices, Mobile HCI'02. September (18-20) in Pisa, Italy. "Mobile Devices for Control."
7. Keynote speaker, IEEE Symposium on Visual Languages, VL'2000, Seattle, Washington, September 10-14, 2000. "Creating More Natural Programming Languages."

8. Keynote speaker, 14th Triennial Congress of the International Ergonomics Association, in conjunction with the 44th Annual Meeting of the Human Factors and Ergonomics Society. July 30 - August 4, 2000, San Diego, CA. "Past, Present and Future of User Interface Software Tools"
9. Keynote speaker, DSL'99: 2nd Usenix Conference on Domain Specific Languages, Austin, TX, October 3-6, 1999. "Towards More Natural Domain-Specific Languages."
10. Keynote speaker, ACM Multimedia 97 conference. Nov 11-13, 1997 in Seattle, WA. "Authoring Interactive Behaviors."
11. Keynote speaker, HCI '91: The British Computer Society Specialist Group in HCI Annual Conference, Aug 21, 1991, Edinburgh, UK.
12. Keynote speaker, 1990 IEEE Conference on Visual Languages, Chicago, Ill, October 6, 1990.
13. Keynote speaker, "The State of the Art in Visual Programming and Program Visualization," The British Computer Society Computer Graphics and Displays Group, International State of the Art Symposium on *Graphics Tools for Software Engineering: Visual Programming & Program Visualization*. London, England. March 16, 1988.

## Other Talks and Colloquia:

1. Invited speaker, DGPis40: Scientific Workshop & 40th Anniversary Reunion, University of Toronto, May 28-30, 2008.
2. Invited speaker, Fourth Workshop on End-User Software Engineering (WEUSE IV) In conjunction with ICSE 2008, "End-User Tools for Creating Dependable Software", May 12, 2008, Leipzig, Germany
3. CS547: Stanford University Human-Computer Interaction Seminar on People, Computers, and Design, September 28, 2007, Palo Alto, CA. "More Natural Programming Through User Studies". Talk announcement and streaming video of the full talk (1hr24min).
4. Google Technical Seminar, "Update on the Natural Programming Project", September 26, 2007, Mountain View, CA. Google Video (1 hr)
5. Invited speaker, with Larry Masinter, at the Adobe Principal Scientist Council Briefing: "Survey: Past and Current Art of Making Programming Easier." San Francisco, CA. June 26, 2007.
6. Invited speaker, SAP Academic Symposium, June 7, 2007, Mountain View, CA, "API Usability"
7. Distinguished Lecture Series, Department of Computer Science, University of Illinois at Urbana-Champaign, "More Natural Programming Through User Studies", April 9, 2007.
8. Celebrity Judge, at "Usability Game Show - Pittsburgh" as part of World Usability Day, November 14, 2006.
9. Colloquium, Brown University Department of Computer Science, "More Natural Programming Through User Studies", November 2, 2006.
10. EUSES Consortium Workshop: End Users Shaping Effective Software, "Report of the CMU Natural Programming Group". Lincoln, Nebraska, October 25-27, 2006 and October 5-7, 2005.
11. Accenture. "More Natural Programming Through User Studies", September 8, 2006. Chicago, IL.
12. Google Technical Seminar, "More Natural Programming Through User Studies", October 27, 2005, Mountain View, CA.
13. Carnegie Mellon West, "Great Product Innovations" Speaker Series, "How the Human Interface Can Make or Break Great Product Innovations," October 27, 2005, Moffet Field, CA.
14. Microsoft Research Faculty Summit 2005, "Visions of Mobile Devices Beyond Their Current Role" in the session on "Enhanced Computing with Mobile Devices". July 19, 2005.
15. "Overview of Computer Science Support for Creativity" (with Randy Pausch) at NSF Workshop on Creativity Support Tools, June 13-14, 2005. Radisson Barcelo Hotel in Washington, DC.
16. Microsoft Research Seminar, June 2, 2005. Redmond, WA. "More Natural Programming Through User Studies".
17. "End Users in End-User Sofware Engineering: Where HCI Cross Cuts SE", at the 1st Workshop on End-User Software Engineering (WEUSE 2005) at ICSE 05, Saint Louis, MO, May 21, 2005.

Resume for Brad A. Myers

Exhibit A

18. "University Relations--Mobile Computing and User Interface Research," at the Microsoft Research Tech Fair, April 27, 2005, Library of Congress, Washington, D.C. (some pictures with Congressmen)
19. EUSES Consortium Workshop: End Users Shaping Effective Software, "Project Marlalade". Pittsburgh, PA September 8-10, 2004.
20. Microsoft Research Seminar, August 4, 2004. Redmond, WA. "Review of Recent Research: Citrine Smart Clipboard, WhyLine Interrogative Debugging, EdgeWrite Text Entry, and Pebbles PocketPC Software".
21. HCIL Seminar Series, University of Maryland, College Park, MD. October 21, 2003. "Mobile Devices for Control."
22. University of New Orleans, LA, September 12, 2003. "Mobile Devices for Control."
23. Microsoft Research Seminar, July 30, 2003. Redmond, WA. "An Update on the Pebbles Project: PocketPCs, Smartphones and TabletPCs for Universal Remote Control and A New Input Method for Small Devices".
24. Microsoft Research Faculty Summit 2003, Innovation Excellence Plenary Session, July 28, 2003, and DemoFest session, July 29, 2003, "Mobility: Handhelds for Universal Remote Control".
25. MIT AI Lab, HCI Seminar Series, May 9, 2003, "Mobile Devices for Control"
26. Mitsubishi Electric Research Laboratory, May 8, 2003, Cambridge, MA. "Mobile Devices for Control."
27. CS547: Stanford University Human-Computer Interaction Seminar on People, Computers, and Design, November 22, 2002, Palo Alto, CA. "Mobile Devices for Control". Talk announcement and streaming video of the full talk (1hr26min). *(Warning: video link crashes Netscape 4.7)*
28. CMU Tech Bytes Seminar, Sheraton Palo Alto, Palo Alto, CA. Nov. 21, 2002. "Mobile Devices for Control".
29. Invited Speaker, Workshop on End-User Development of the European Community Network of Excellence. Sept. 23, 2002. Pisa, Italy. "Making Programming Easier by Making it More Natural."
30. Microsoft Research Seminar, July 31, 2002. Redmond, WA. "PocketPCs as Controllers for Computers and Appliances; Update on The Pebbles Project"
31. Invited speaker, InterNational Committee for Information Technology Standards (INCITS) Technical Committee V2 Meeting, June 27, 2002, Minneapolis, MN. "Pebbles PUC Automatic UI Generation Project."
32. Invited speaker, State University of New York Technical Conference 2002. Educational Technology Officers Assiciation. June 17 - 19, 2002. Hudson Valley Resort Convention Center in Kerhonkson, NY. "The Pebbles Project General Overview: Using Hand-Held Computers and PCs Together" and "Using Handhelds to Enhance Classrooms and to Help the Handicapped"
33. Computer Science Colloquium Series, Kent State University, Kent, OH. February 20, 2002. "The Pebbles Project: Using Hand-Held Computers and PCs Together"
34. Guest speaker, Pittsburgh Pocket PC User Group, February 6, 2002. Pittsburgh, PA. "The Pebbles Project: Using Hand-Held Computers and PCs Together"
35. Guest speaker, Ohio State University Dept. of Computer and Info. Science, Columbus, Ohio, August, 7, 2001, "The Pebbles Project: Using Hand-Held Computers and PCs Together."
36. Invited speaker, Grid on the Go, May 20-22, 2001, NCSA, University of Illinois at Urbana-Champaign. "Using Wireless Handheld Devices in the Classroom, Office and Home."
37. Microsoft Research Seminar, April 6, 2000. Redmond, WA. "Update on The Pebbles Project: Using a Handheld as a Personal Universal Controller and to Augment a Laser Pointer in Meetings"
38. HCI Seminar Series, Carnegie Mellon University, 2/07/01, "Using Hand-Held Computers and PCs Together: The Pebbles Project"
39. Symbol Technologies, Inc. lunchtime presentation, August 25, 2000. Pittsburgh, PA. "The Pebbles Project: Using Hand-Held Computers and PCs Together"
40. Microsoft Research Seminar, August 2, 2000. Redmond, WA. "Using Windows CE Computers in

Exhibit A

Classrooms; and Public-Private Data Sharing Using a PC and PocketPCs; Update on The Pebbles Project"

41. Microsoft Research Seminar, December 7, 1999. Redmond, WA. "Towards More Natural Programming Languages".

42. HCI Seminar Series, Carnegie Mellon University, 11-17-99, "Using Handheld Computers and PCs Together". Click here to see a video of this talk.

43. Computer Science Colloquium, Brown University, Nov. 4, 1999. "Using Hand-Held Computers and PCs Together."

44. Invited speaker, IFIP Working Group 2.7/13.4 (User Interface Engineering), May 13, 1999, Pittsburgh, PA. "The Architectural Issues in Amulet."

45. Invited speaker, Human Computer Interaction Consortium (HCIC'99), Fraser, CO, Feb 3-9, 1999, "Prospects and Visions for User Interface Software Tools."

46. Invited speaker, The Ninth Annual NEC Research Symposium: Human Centric Multimedia Community, Nara, Japan, Aug. 30-Sept. 1, 1998.

47. Boeing Shared Services, Seattle, WA. June 17, 1998, "Amulet: Comprehensive Support for Graphical, Highly-Interactive User Interfaces"

48. Microsoft Research, Redmond, WA. June 15, 1998, "Collaboration Using Multiple PDAs Connected to a PC"

49. Invited speaker, CHI-Squared, The Chicago CHI Local Group, Chicago, IL, June 9, 1998.

50. Colloquium speaker, Lucent Labs, Naperville, IL, June 9, 1998. "Using PalmPilots Synchronously in Meetings."

51. Invited speaker, Human Computer Interaction Consortium (HCIC'98), Fraser, CO, March 4-8, 1998. "Natural Programming for Knowledge Management."

52. Colloquium speaker, IBM Thomas J. Watson Research Center, Hawthorne, NY, February 13, 1998. "Using PalmPilots Synchronously in Meetings."

53. Distinguished Lecture Series, University of Tennessee, Knoxville, TN, Nov. 3, 1997.

54. Colloquium speaker, Electric Boat Division of General Dynamics, Groton, Conn, May 1, 1997.

55. Invited speaker at the AAAI Spring Symposium on "Acquistion, Learning and Demonstation: Automating Tasks for Users," presented overview of "Demonstrational Interfaces." Stanford, CA, March 25-27, 1996.

56. Computer Science Colloquium, Washington University in St. Louis, MO, January 19, 1996.

57. Distinguished Lecture Series, University of Maryland, College Park, MD, February 28, 1995.

58. Invited Speaker, Software Engineering Tools and Techniques Conference, Los Angeles, CA, February 24 1995.

59. Distinguished Lecture Series, University of Toronto, Toronto, Canada, December 6, 1994.

60. Colloquium speaker, Toronto Computer Human Interaction (TORCHI) society, Toronto, Canada, December 5, 1994.

61. Distinguished Lecture Series, University of York, Toronto, Canada, February 11, 1994.

62. ARPA Workshop on HCI Architecture and Toolkits, 11-14 January, 1994, San Diego, CA.

63. Colloquium speaker, Georgia Tech, Atlanta, GA. July 28, 1993.

64. Colloquium speaker, University of Virginia, Charlottesville, VA. February 24, 1992.

65. Invited Speaker, "Workshop on Programming by Example," sponsored by Apple Computer Inc., March 11-12, 1992. Cupertino, CA.

66. Lecturer, "Extending Direct Manipulation: Demonstrational Interfaces and User Interface Development Environments," User Interfaces Strategies'92, A live Satellite TV Broadcast, from the University of Maryland, December 12, 1991.

67. Colloquium speaker, Xerox Palo Alto Research Center, Palo Alto, CA. June 20, 1991.

68. Colloquium speaker, Adobe Systems, Inc., Mountain View, CA. June 20, 1991.

69. Colloquium speaker, Hewlett Packard Software Engineering Systems. Sunnyvale, CA. January 29, 1991.

70. Colloquium speaker, Apple Computer, Inc. Cupertino, CA. January 28, 1991.

Exhibit A

71. Colloquium speaker, Waterloo University, Waterloo, Ontario, Canada, November 14, 1990.
72. Colloquium speaker, Lotus Corporation, Cambridge, MA, November 7, 1990.
73. Colloquium speaker, Siemens Corporate Research, Princeton, New Jersey, May 14, 1990.
74. Visiting Distinguished Engineer under the IBM Visiting Scholar Program, Northeastern University, Department of Industrial Engineering and Information Systems, April 19, 1990.
75. Colloquium speaker, University of Toronto, Toronto, Ontario, Canada, August 8, 1989.
76. Colloquium speaker, Boeing Corporation, Seattle, WA, July 17-18, 1989.
77. Colloquium speaker, Microsoft Corporation, Seattle, WA, Dec. 5-6, 1988.
78. Invited speaker, The Toronto Exxperience; A Conference Celebrating Twenty Years of Computer Science Research at the University of Toronto. Toronto, Canada. May 9-13, 1988.
79. Invited speaker, AAAI Workshop on Architectures for Intelligent Interfaces. March 29-April 1, 1988. Monterey, CA.
80. Colloquium speaker, Department of Computer Science, York University, York, England. March 18, 1988.
81. Colloquium speaker, Department of Computer Science, University of Glasgow, Glasgow, Scotland, Great Britain. March 17, 1988.
82. Colloquium speaker, Department of Computer Science, Queen Mary College, London, England. March 17, 1988.
83. Colloquium speaker, Department of Computer Science, Rensellaer Polytechnic Institute, Albany, New York. January 28, 1988.
84. Colloquium speaker, Department of Electrical Engineering and Computer Science, The George Washington University, Washington, D.C. October 14, 1987.
85. Invited speaker, *ACM SIGGRAPH Workshop on Software Tools for User Interface Development*. Seattle, Washington. November 17-19, 1986.
86. Invited speaker, *Alvey MMI Workshop on Window Management*. Abingdon, Oxfordshire, England. April 29-May 1, 1985.

**Tutorials:**

- "User Interface Tools," tutorial #36 presented at *CHI'94*. Boston, MA. April 24-28, 1994.
- "User Interface Tools," tutorial #27 presented at *INTERCHI'93*. Amsterdam, The Netherlands. April 24-29, 1993.
- "The State of the Art in User Interface Development Environments," tutorial presented at HCI '91: The British Computer Society Specialist Group in HCI Annual Conference, Aug 20, 1991, Edinburgh, UK.
- "Visual Computing Environments," tutorial #23 presented at *SIGCHI '90*. Seattle, WA, April 1-5, 1990.
- "User Interface Design and Implementation," March 26, 1990 at Carnegie Group, Inc., Pittsburgh, PA.
- "Visual Computing Environments," tutorial #17 presented at *SIGGRAPH '89*. Boston, MA, July 31-August 4, 1989.
- "Visual Computing Environments," tutorial #14 presented at *SIGCHI '89*. Austin, Texas, April 30-May 4, 1989.
- "Human-Computer Interaction Technologies and Techniques," tutorial #11 presented at *SIGCHI '88*. Washington, D.C. May 15-19, 1988.
- "Workshop on Visual Programming" at Xerox EuroPARC, supported by Rank Xerox and Apple Computer in association with the British Computer Society Displays and HCI Specialist Groups. Cambridge, England. March 15, 1987.
- "Human-Computer Interaction: Selected Theories, Technologies and Techniques," tutorial #21 at *SIGGRAPH '87*. Anaheim, CA. July 27-31, 1987.

Resume for Brad A. Myers

Exhibit A

## Panels:

- Invited panelist, "The Role of Interactive Systems in Universal Access," NSF Interactive Systems Grantees Workshop: ISGW '97, August 17-19, 1997, Stevenson, Washington.
- Panelist, "Model-based User Interfaces: What is it and why should I care?" *ACM Symposium on User Interface Software and Technology, UIST'94*, November, 1994. Los Angeles, CA.
- Panelist, "From Research Prototypes to Usable, Useful Systems: Lessons Learned in the Trenches," *ACM Symposium on User Interface Software and Technology, UIST'93*, November 3-5, 1993. Atlanta, GA.
- Organizer and Panelist, "Heuristics in Real User Interfaces," *INTERCHI'93*, Amsterdam, The Netherlands. April 24-29, 1993.
- Organizer and Panelist, "User Interface Design Tools," *1991 Lisp Users and Vendors Conference*, Gaithersburg, MD, Oct 28-Nov 1, 1991.
- Panelist, "HCI: Past and Future," *HCI '91: The British Computer Society Specialist Group in HCI Annual Conference*, Aug 23, 1991, Edinburgh, UK.
- Moderator and Panelist, "Demonstrational Interfaces, Coming Soon?" *SIGCHI'91*, New Orleans, LA. April 28-May 2, 1991.
- Panelist, "Direct Manipulation or Programming: How Should We Design Interfaces?" *ACM Symposium on User Interface Software and Technology, UIST'89*, Williamsburg, VA, Nov. 13-15, 1989.
- Moderator and Panelist, "User Interface Toolkits: Present and Future," *SIGGRAPH '88*, Atlanta, GA, August 1-5, 1988.
- Panelist, "Software Tools for User Interface Management," *SIGGRAPH '87*. Anaheim, CA. July 27-31, 1987.
- Panelist, "The Future of Window Systems," *SIGGRAPH '86*. Dallas, Texas. August 18-22, 1986.
- Panelist, "User Interface Management Systems," *Graphics Interface '84*. Ottawa, Ontario. May 28-June 1, 1984.

## Participation in Workshops:

*(when not a speaker or organizer)*

Invited participant, Second North American SAP Academic Research Conference: Academic Innovation and Enterprise Applications, August 25, 2008, Mountain View, California

Invited participant, CHASE 2008: Cooperative and Human Aspects of Software Engineering, Workshop at ICSE'2008. Tuesday, 13 May 2008. Leipzig, Germany

Invited participant, "Adobe Education Designer and Developer Conference", March 2-4, 2008. San Francisco, CA

- Invited participant, "2007 Summer Institute on the Human Side of Software Development," co-sponsored by the University of Washington and Microsoft Research. August 12-17, 2007, Skamania Lodge, Stevenson, WA.
- Invited participant, "NSF Human-Centered Computing (HCC) Workshop", Arlington, Virginia, September 18-19, 2006
- Invited participant, "User Interfaces that Span Hand-Held and Fixed Devices," CHI'2001 Workshop on Distributed and Disappearing User Interfaces in Ubiquitous Computing, Seattle, WA, March 31-April 1, 2000.
- Invited participant, "Future Mobile Device User Interfaces" at CHI'2000, April 1, 2000. The Hague, The Netherlands. Matthias Schneider-Hufschmidt, organizer.
- Invited participant, "Handheld CSCW Workshop at CSCW'98," Seattle,

Exhibit A

November 14. Hans Gellersen and Albrecht Schmidt, organizers.
http://www.teco.edu/hcscw/
- Invited participant, "CHI 98 Workshop On Learner-Centered Design," April 20, 1998. Sherry Hsi and Elliot Soloway, organizers.

## Discussant:

- "Automated Selection of Remote Control User Interfaces in Pervasive Smart Spaces," by Nirali Desai, Khomkrit Kaowthumrong, John Lebsack, Nishant Shah, Richard Han. Human Computer Interaction Consortium (HCIC'02), Fraser, CO, Jan 30-Feb 3, 2002.
- "The Next Generation of Ubiquitous Computing," by Gregory Abowd and Elizabeth Mynatt. Human Computer Interaction Consortium (HCIC'99), Fraser, CO, Feb 3-9, 1999.
- "Tools and Environments for U.I. Design," SIGCHI'89. Austin, Texas. May 4, 1989.
- "Input," SIGCHI+GI'87. Toronto, Ontario, Canada. April 8, 1987.

# EXHIBIT B
# Part 3

Myers Dec.

EXH. B

**Exhibit B:  List of Trial, Hearing and Deposition Testimony for Brad A. Myers**

Listing of when I have testified as an expert at trial or in a deposition within the last four years, as of August 15, 2008:

*Xybernaut Corporation v. Viewsonic Corporation,* U.S. District Court for the Eastern District of Virginia Alexandria Division, Civil Action No. 03-1549-A. Worked for Viewsonic through the law firm of Cooley Godward LLP.
- Deposition testimony, 2004

*GTECH Corporation, v. Scientific Games International, Inc., Scientific Games Holdings Corporation, Scientific Games Finance Corporation, And Scientific Games Corporation,* In The United States District Court For The District Of Delaware, Civil Action No. 04-138-JJF. Worked for SGI through the law firm of Morris, Nichols, Arsht & Tunnell.
- Deposition testimony, 2005

*Certain Digital Image Storage and Retrieval Devices, Ampex Corporation vs. Eastman Kodak Company and Altek Corporation.* in the United States International Trade Commission, Washington, D.C. before the Honorable Robert L. Barton, Jr. Worked for Kodak through the law firm of Wilmer Cutler Pickering Hale and Dorr LLP.
- Deposition testimony, 2005

*Ampex Corporation v. Eastman Kodak Company, Altek Corporation, and Chinon Industries, Inc. in the United States District Court for the District Of Delaware, Civil Action No. 04-1373(KAJ).* Worked for Kodak through the law firm of Wilmer Cutler Pickering Hale and Dorr LLP.
- Deposition testimony, 2006

*Wireless Agents, L.L.C. v. Sony Ericsson Mobile Communications AB, and Sony Ericsson Mobile Communications (USA) Inc.,* in the United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:05-CV-289-D. Worked for Sony Ericsson through the law firm of Thompson & Knight L.L.P.
- Deposition testimony, 2005 and 2006

*Wireless Agents v. AMOI Electronics et al. including Kyocera Wireless Corp. and Amp'd Mobile, Inc. et. al.,* in The United States District Court For The Western District Of Texas, Austin Division, Civil Action No. A-06-CA-492-SS. Worked for Kyocera and Amp'd through the law firm of McKool Smith, P.C.
- Deposition testimony, 2006

*Microsoft Corporation v. Lucent Technologies Inc., Alcatel-Lucent, and the Multimedia Patent Trust.* in the United States District Court, Southern District Of California, Case No. 06-CV-0684 H (CAB). Worked for Microsoft through the law firm of Fish & Richardson P.C.
- Deposition and Jury Trial testimony, 2008

*Girafa.com, INC., v. Amazon Web Services LLC, Amazon.COM, INC., Alexa Internet, Inc., IAc Search & Media, Inc., Snap Technologies, Inc., Yahoo! Inc., Smartdevil Inc., Exalead, Inc., and Exalead S.A..* In The United States District Court For The District Of Delaware, Case No. 07-787-SLR. Working for Girafa through the law firm of Sughrue Mion, PLLC.
- Deposition testimony, 2008

Myers Dec.

EXH. C



SCANNED

6570 US
08/8801

65705 U.S

6282508

5282508

| UTILITY SERIAL NUMBER | PATENT DATE AUG 2 8 2001 | PATENT NUMBER |
|---|---|---|

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| | 10/18/97 | 707 | 10* | 2777 | |

APPLICANTS

MICHAEL B. BURNER, HALF MOON BAY, CA; BRUCE O. GILLIAT, ALAMEDA, CA; ERIC N. JAQUITH, SAN FRANCISCO, CA; DAVID L. MARVIT, SAN FRANCISCO, CA; BALWAIER KAHLE, SEATTLE, WA; NIALL O'DRISCOLL, SAN FRANCISCO, CA; Z E. SMITH, SAN FRANCISCO, CA; RONNA C. TANENBAUM, SAN FRANCISCO, CA.

**CONTINUING DATA**********************
VERIFIED

**FOREIGN APPLICATIONS************
VERIFIED

GPA

FOREIGN FILING LICENSE GRANTED 11/18/97     *****SMALL ENTITY*****

| Foreign priority claimed 35 USC 119 conditions met | ☐ yes ☑ no ☐ yes ☐ no | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| Verified and Acknowledged Examiner's Initials | | ➡ | CA | 23 | 32 | 3 | $517.00 | 39214.00001 |

ADDRESS

GRAHAM & JAMES
600 HANSEN WA
PALO ALTO CA 9304-1043

Laura N. Williams, Esq
Perkins Colwell LLP
P. Palo Alto Sq.
Palo Alto, CA 94306

TITLE

METHOD AND APPARATUS FOR PRESENTING A WEB PAGE WITH METADATA.
AUTOMATICALLY GENERATE AND DISPLAYING METADATA AS SUPPLEMENTAL INFORMATION CONCURRENTLY WITH THE WEB PAGE, THERE BEING NO LINK BETWEEN WEB PAGE AND METADATA.

U.S. DEPT. OF COMM./ PAT. & TM—PTO-436L (Rev.12-94)

| PARTS OF APPLICATION FILED SEPARATELY | Applications Examiner |
|---|---|

| NOTICE OF ALLOWANCE MAILED | CLAIMS ALLOWED | |
|---|---|---|
| 4-9-01 12-16-99 | Total Claims 847 | Print Claim |

SRIRAMA CHANNAVAJJALA
Assistant Examiner

| ISSUE FEE | | DRAWING | | |
|---|---|---|---|---|
| Amount Due | Date Paid | Sheets Drwg. 24 | Figs. Drwg. 36 | Print Fig. 3 |
| 605 | 5-7-01 | | | |

ANTON W. FETTING
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2100 Primary Examiner

| ISSUE BATCH NUMBER | E70 172 |

Label Area

PREPARED FOR ISSUE

WARNING:  The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368.  Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436A

SCAN'6  DWD

Formal Drawings

Issue Fee in File

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

08/14/1997 JWASHING 00000040 DAW:050150   08880117
01 FC:201       385.00 CH
02 FC:203       132.00 CH

PTO-1556
(5/87)

**C-2**

| PATENT APPLICATION TRANSMITTAL LETTER<br>(Small Entity) | Docket No.<br>39214.00001 |
|---|---|

### TO THE ASSISTANT COMMISSIONER FOR PATENTS

Transmitted herewith for filing under 35 U.S.C. 111 and 37 C.F.R. 1.53 is the patent application of:

Michael G. Burner et al.

For:

METHOD AND APPARATUS FOR AUGMENTING A WEB PAGE WITH METADATA

Enclosed are:

- ☒ Certificate of Mailing with Express Mail Mailing Label No.      EM303714865US
- ☒ . Twenty-three (23)     sheets of drawings.
- ☐ A certified copy of a                          application.
- ☒ Declaration    ☒ Signed.    ☐ Unsigned.
- ☐ Power of Attorney
- ☒ Information Disclosure Statement
- ☐ ·Preliminary Amendment
- ☒ Alexa Internet      Verified Statement(s) to Establish Small Entity Status Under 37 C.F.R. 1.9 and 1.27.
- ☒ Other:   Assignment Recordation Cover Sheet, Assignment (signed) and $40.00 check for recordation fee

### CLAIMS AS FILED

| For | #Filed | #Allowed | #Extra | | Rate | | Fee |
|---|---|---|---|---|---|---|---|
| Total Claims | 32 | - 20 = | 12 | x | $11.00 | | $132.00 |
| Indep. Claims | 3 | - 3 = | 0 | x | $40.00 | | $0.00 |
| Multiple Dependent Claims (check if applicable)   ☐ | | | | | | | $0.00 |
| | | | | | | BASIC FEE | $385.00 |
| | | | | | | TOTAL FILING FEE | $517.00 |

- ☐ A check in the amount of                          to cover the filing fee is enclosed.
- ☒ The Commissioner is hereby authorized to charge and credit Deposit Account No.      05-0150
  as described below.  A duplicate copy of this sheet is enclosed.
  - ☒ Charge the amount of    $517.00      as filing fee.
  - ☒ Credit any overpayment.
  - ☒ Charge any additional filing fees required under 37 C.F.R. 1.16 and 1.17.
  - ☐ Charge the issue fee set in 37 C.F.R. 1.18 at the mailing of the Notice of Allowance,
    pursuant to 37 C.F.R. 1.311(b).

Dated:    06/21/97

*Laura Majerus*
_____
/Signature

Laura A. Majerus, Esq.
Reg. No. 33,417
GRAHAM & JAMES LLP
600 Hansen Way
Palo Alto, CA 94070
(415) 856-6500

cc:

Copyright 1994-96 Legalsoft                                                P01SMALL/REV05

**C-3**



α 15
202-5
203-6

**IN THE**

**UNITED STATES PATENT AND TRADEMARK OFFICE**

RECEIVED
MAY 13 1999
Group 2700

| | |
|---|---|
| APPLICANTS: | Burner, Gilliat, Jaquith, Marvit, Kahle, O'Driscoll, Smith, and Tanenbaum |
| SERIAL NO.: | 08/880,117 |
| FILING DATE: | June 21, 1997 |
| TITLE: | METHOD AND APPARATUS FOR AUGMENTING A WEB PAGE WITH METADATA |
| EXAMINER: | S. Channavajjala |
| GROUP ART UNIT: | 2776 |
| ATTY. DKT. NO.: | 3827 |

**CERTIFICATE OF MAILING**

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Assistant Commissioner For Patents, Washington, DC. 20231, on the date printed below:

Dated: _May 04, 1999_     By: _Laura Majerus_

Laura A. Majerus, Reg. No. 33,417

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

**AMENDMENT A**

Sir:

The following amendments and remarks are submitted in response to the Official Action dated January 13, 1999, which set a shortened statutory period for response which expired on April 13, 1999. A fee for the one month extension of time is included herewith.

Please amend this application as follows:

1

**C-4**

In the Claims:

Please amend claims 3, 8, and 30 as follows. Please add new claims 33-42. Please cancel claims 26-29 without prejudice.

3. (Once Amended)  The method of claim 1, wherein the web page is displayed in a first window by the browser, and wherein the displaying step includes the step of displaying at least some of the metadata [on a visible on the same display as] in the window provided by the browser [window].

8. (Once Amended)  The method of claim 1, wherein the displaying step includes the step of displaying an advertisement targeted [users] at users who request any URL in a group of URLs to which the URL of the web page belongs.

30. (Once Amended) A method of directing a user to at least one web page related to a web page displayed on a display device by a browser, comprising the steps, performed by a data processing system, of:

receiving information describing the contents of the displayed web page;

sending, to a metadata server, a request for an identification of the related web page in accordance with the contents of the displayed web page; and

displaying, on the same display device as the web page and concurrently with the web page, metadata about the web page including at least one link directing a user to a web page related to the web page being displayed, the metadata received in response to the request.



C-5

Kindly add the following new claims:

-- 33. (New) A computer program product, on a computer readable medium, which presents information augmenting the information on a web page being displayed on a display device by a browser, the computer program product comprising:

      program code for receiving information identifying the web page to be displayed;

      program code for sending, to a metadata server, a request for metadata in accordance with the received information; and

      program code for displaying, on the same display device as the web page and concurrently with the web page, metadata received in response to the request.

32. 34. (New) The computer program product of claim 33, wherein the program code for sending includes program code for sending the request automatically when the web page is displayed by the browser.

35. (New) The computer program product of claim 33 , wherein the program code for displaying includes program code for displaying an advertisement targeted at users who request an URL of the web page.

36. (New) A computer program product on a computer readable medium which directs a user to at least one web page related to a web page displayed on a display device by a browser, the computer program product comprising:

      program code for receiving information describing the contents of the displayed web page;

C-6

program code for sending, to a metadata server, a request for an identification of the related web page in accordance with the contents of the displayed web page; and

program code for displaying, on the same display device as the web page and concurrently with the web page, metadata about the web page including at least one link directing a user to a web page related to the web page being displayed, the metadata received in response to the request.

37. (New)  An apparatus for augmenting the information on a web page being displayed on a display device by a browser, the apparatus comprising:

a software portion configured to receive information identifying the web page to be displayed;

a software portion configured to send, to a metadata server, a request for metadata in accordance with the received information; and

a software portion configured to display, on the same display device as the web page and concurrently with the web page, metadata received in response to the request.

38. (New)  The apparatus of claim 37, including a software portion for opening a popup menu containing at least one link to another web page.

39. (New)  An apparatus for directing a user to at least one web page related to a web page displayed on a display device by a browser, the apparatus comprising:

a software portion for receiving information describing the contents of the displayed web page;



4

C-7

a software portion for sending, to a metadata server, a request for an identification of the related web page in accordance with the contents of the displayed web page; and

a software portion for program code for displaying, on the same display device as the web page and concurrently with the web page, metadata about the web page including at least one link directing a user to a web page related to the web page being displayed, the metadata received in response to the request.

40. (New) A method of presenting information augmenting the information on a web page being displayed on a display device by a browser, comprising the steps, performed by a data processing system, of:

determining the address of the web page currently being displayed;

sending, to a metadata server the address of the web page currently being displayed, and a request for metadata describing the web page currently being displayed; and

displaying, on the same display device as the web page and concurrently with the web page, metadata received in response to the request.

30. 41. (New) The method of claim 30, wherein at least one web page to which the user is directed is not referenced by the web page currently being displayed.

42. (New) A method for determining metadata about a web page in a web site hierarchy, the method comprising:

examining all parent web pages above the web page in the web site hierarchy; and

classifying metadata of a parent of the web page as also being metadata of the web page. --



C-8

## REMARKS

Claims 1-32 were presented for examination and rejected. Claims 3, 8, and 30 are amended herein to more distinctly claim the subject matter of the Applicants' invention. New claims 33-42 are added. Claims 26-29 are canceled. Reconsideration of this application and allowance of claims 1-25 and 30-42 are respectfully solicited.

The Examiner is respectfully requested to consider the documents submitted with the Information Disclosure Statement filed on September 4, 1997, and to indicate his consideration by initialing the 1449 form attached thereto.

Claims 1-23 and 30-32 were rejected under 35 U.S.C. § 102(e) as being anticipated by U.S. Patent No. 5,706,507 to Schloss (Schloss). This rejection is respectfully traversed.

Claim 1 recites a method that augments the information being displayed on a web page, the method including "displaying, on the same display device as the web page and concurrently with the web page, metadata." Metadata is supplemental information about the web page being displayed. By displaying supplemental information concurrently with the web page, the claimed invention provides a user with relevant knowledge which would be unavailable from looking at the displayed web page by itself. The claimed invention concurrently presents this information on the same display device as the web page, thereby allowing the user to view the web page and the supplemental information simultaneously.

The claimed invention is neither disclosed nor suggested by Schloss. Schloss does not display metadata about a web page concurrently with a web page. Instead, Schloss prevents the display of web pages that it determines would be offensive to a user based on various criteria. *See* Schloss at col. 2, lines 65-68. The only information Schloss displays about a web page is a warning message indicating that a web page which has been requested by a user is offensive. Such a warning message is not displayed concurrently with the web page which is the object of the warning. The offensive web page is not displayed at all, because Schloss has detected that it is offensive and has prevented it from being loaded. The very purpose of Schloss is to screen out and not display offensive web pages. It would be absurd for Schloss to display a concurrent



6

**C-9**

warning that the web page being viewed is offensive to the user viewing it. Indeed, Schloss does no such thing.

The Examiner contends that Schloss, at col. 6, lines 1-5, discloses a system which includes displaying information about a web page on the same display device as the web page. In fact, col. 6, lines 1-5 describes displaying a warning message about a web page, and preventing the display of the web page itself, as described above. The Examiner further contends that Schloss, at col. 10, lines 8-36, discloses a system that includes displaying information about a web page concurrently with the web page. Schloss, at col. 10, lines 8-36, describes displaying a warning message that a link is to an offensive web page. This occurs under Schloss when a user is viewing a non-offensive web page (web page A), which contains a link to an offensive web page (web page B). Schloss then displays a warning that web page B is offensive. This message is not displayed concurrently with web page B, as web page B is not being displayed at all. The purpose of the warning message is to alert the user that web page B is offensive, so that the user does not attempt to access it. Of course, the message does not describe the web page being displayed, web page A, which is not offensive.

Schloss also describes buttons on the screen which indicate which types of material the user has requested be blocked by the screening processes. This is not information about a web page being displayed, but information about the criteria to be used to determine which web pages are offensive. As explained above, the web pages that are categorized as offensive are not displayed by Schloss.

The claimed invention is advantageous because, unlike Schloss, it provides a user with additional information about the current web page. Because of the vast amount of varied information on the Internet, users often desire more information about a web page than is readily discernible from viewing the page itself. The present invention allows a user to simultaneously view supplemental information, such as how the current page relates to other similar pages, what organization created the page, and in what ways others users have utilized it. The claimed invention, by providing metadata, educates the users, and thereby empowers them to better utilize the tremendous potential of the Internet.



7

Dependent claims 2-23 and 31-32 depend from claim 1, and therefore are allowable for at least the same reasons as claim 1. In addition, certain ones of the dependent claims are patentable because they recite additional patentable subject matter. Exemplary ones of the dependent claims are discussed below.

The Examiner contends that Schloss, at col. 10, lines 8-13, details the method of claim 2 for sending a request for metadata automatically when a web page is displayed by a browser. Schloss describes no such thing. Although Schloss does request data about web pages, it requests this information before a web page is displayed by the browser. As described above, Schloss only requests data about web pages that have not yet been displayed, in order to determine if the pages are offensive and should be blocked.

Independent claim 30 recites a method for directing a user to at least one web page related to the web page being displayed. By displaying links to related web pages concurrently with the web page being displayed, the claimed invention informs a user about other web pages that the user might want to view. The claimed invention presents the directives to related web pages as a form of supplemental information about the web page being displayed. The related web pages need not be referenced by the web page being displayed, but may nonetheless be of interest to the user.

The method of claim 30 is neither disclosed nor suggested by Schloss. Schloss does not direct a user to web pages related to the web page being displayed. Schloss does provide messages concerning the potential offensiveness of web pages referenced by the web page being displayed. (*see* Schloss at col. 10, lines 15-34), but this is distinct from the claimed invention. Schloss does not determine which web pages are related to the web page being displayed, nor does Schloss present links to other web pages as metadata about the web page being displayed. Although Schloss provides advisory messages about links to other pages, the links are provided not by Schloss, but by the web page being displayed. When Schloss prints a message warning a user that a displayed link would lead to an offensive page, Schloss is not providing the link to the other page as information about the page being displayed, but is instead providing information about the undisplayed page to which the link pertains.



**C-11**

The Examiner fails to address the directing to related page aspect of claim 30 in his rejection thereof, instead treating claim 30 identically to independent claim 1, which does not recite directing a user to related web pages. Dependent claims 4-6, 16, and 31-32 all recite displaying links to other web pages. The Examiner does address these dependent claims, and equates the links about which Schloss displays advisory messages to the directing of a user to related web pages in the claimed invention. As shown above, equating Schloss' advisory messages with the directing a user to related web pages of the claimed invention is erroneous. For the reasons discussed above, the claimed invention's method of displaying directions to web pages that are related to the current page as supplemental information about the web page being displayed is neither disclosed nor suggested by Schloss.

Claims 24-25 were rejected under 35 U.S.C. § 103(a) as being unpatentable over Schloss in view of U.S. Patent Number 5,727,129 to Barrett et al (Barrett). This rejection is respectfully traversed.

Dependent claims 24-25 recite various features which, in combination with the subject matter of their parent claim 1, are neither disclosed nor suggested by the cited references. Neither Schloss nor Barrett , either alone or in combination, discloses the claimed invention. As shown above, Schloss neither discloses nor suggests a method for displaying supplemental information about a web page concurrently with the web page being displayed, as claimed. Nor does Barrett so disclose or suggest. Barrett is a system for selecting web sites in which a user may be interested, based upon the user's past behavior. *See* Barrett at col. 5, lines 1-7. The fact that Barrett keeps records of a user's past visitation of various web sites in no way discloses or suggests a method or system for augmenting a web page by concurrently displaying supplemental data, as claimed. Although Barrett attempts to select web sites in which a user may be interested based upon the web sites that the user has visited in the past, Barrett does not display information about a web page concurrently with a web page.

Nor is there any suggestion or incentive in the cited references for combing these references in any manner that would yield the claimed invention. Combining that which is disclosed and suggested by Schloss and Barrett would, at best, only suggest a system for screening potentially offensive web content, based upon past web behavior of a user. The resultant



9

**C-12**

combination would not suggest a method to augment a web pages by concurrently displaying supplemental data, as in the claimed invention.

Accordingly, it is respectfully submitted that claims 1-25 and 30-42 are patentable to the Applicants over the cited references.

Claims 26-28 were rejected under 35 U.S.C. § 102(e) as being anticipated by U.S. Patent No. 5,764,906 to Edelstein et al (Edelstein). This rejection is moot because claims 26-28 are canceled.

Claim 29 was rejected under 35 U.S.C. § 103(a) as being unpatentable over Edelstein. This rejection is moot because claim 29 is canceled.

If the Examiner believes there are any issues remaining prior to allowing the application, he is invited to contact the undersigned attorney at the number below.

Favorable action is hereby solicited.

Respectfully submitted,
NIALL O'DRISCROLL

By: _Laura Majerus_

Laura A. Majerus, Registration No. 33,417
Fenwick & West LLP
Two Palo Alto Square
Palo Alto, CA 94306
(650) 858-7152



10

C-13



IN THE

UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANTS:     Burner, Gilliat, Jaquith, Marvit, Kahle, O'Driscoll, Smith, and
                Tanenbaum

SERIAL NO.:     Continuing Prosecution Application of 08/880,117

FILING DATE:    June 21, 1997

C.P.A. FILING DATE   Not Yet Known

TITLE:          METHOD AND APPARATUS FOR AUGMENTING A WEB PAGE WITH
                METADATA

EXAMINER:       S. Channavajjala

GROUP ART UNIT: 2776

ATTY. DKT. NO.: 3827

---

**CERTIFICATE OF MAILING**

I hereby certify that this correspondence is being deposited with the United States Postal
Service via Express Mail Label No. EL444653069US addressed to:  Assistant Commissioner
For Patents, Washington, DC.  20231, on the date printed below:

Dated: _Nov 8_            By: _Laura Majerus_
                              Laura A. Majerus, Reg. No. 33,417

---

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

**PRELIMINARY AMENDMENT**

Sir:

    Please amend this application as follows:

In the Claims:

    Please amend claims 1, 3-10, 14-23, 30-33, 35-40, and 42 as follows.



21821/03827/DOCS/943229.1



1

**C-14**

SUB P1

1.  (Once Amended)  A method of presenting information that augments the information on

2  a web page being displayed on a display device by a browser, comprising the steps, performed by

3  a data processing system, of:

4      receiving information identifying the web page to be displayed;

5      sending, to a metadata server, a request for metadata, the metadata being supplemental

6          information about the web page to be displayed, the supplemental

7          information not being provided by the web page [in accordance with the

8          received information], the metadata server being different from the server

9          providing the web page; and

10      displaying, on the same display device as the web page and concurrently with the web

11          page, metadata received from the metadata server in response to the request.


1.      3.  (Twice Amended)  The method of claim 1, wherein the web page is displayed in a first

2  window by the browser, and wherein the displaying step includes the step of displaying at least

3  some of the metadata, the metadata being supplemental information about the web page being

4  displayed in the window provided by the browser.


1      4.  (Once Amended)  The method of claim 1, wherein the displaying step includes the step

2  of opening a popup menu containing at least one link to another web page, the link being provided

3  by the metadata server, not by the web page.


1      5.  (Once Amended)  The method of claim 1, wherein the displaying step includes the step

2  of opening a popup menu containing supplemental information about a group to which the web




3    page belongs, <u>the supplemental information being provided by the metadata server, not by the web</u>

4    <u>page.</u>

1        6. (Once Amended)  The method of claim 1, wherein the displaying step includes the step

2    of opening a popup menu listing a cluster of URLS to which the web page belongs, <u>the listing</u>

3    <u>being provided by the metadata server, not by the web page.</u>

1        7. (Once Amended)  The method of claim 1, wherein the displaying step includes the step

2    of displaying, <u>to supplement the web page being displayed,</u> an advertisement targeted at users who

3    request a[n] URL of the web page, <u>the advertisement being provided by the metadata server, not</u>

4    <u>by the web page.</u>

1        8. (Twice Amended)  The method of claim 1 , wherein the displaying step includes the

2    step of displaying, <u>to supplement the web page being displayed,</u> an advertisement targeted at users

3    who request any URL in a group of URLs to which the URL of the web page belongs<u>; the</u>

4    <u>advertisement being provided by the metadata server, not by the web page.</u>

1        9. (Once Amended)  The method of claim 1, wherein the displaying step includes the step

2    of displaying, <u>to supplement the web page being displayed,</u> an advertisement targeted at users who

3    request any URL that is in a predetermined group, <u>the advertisement being provided by the</u>

4    <u>metadata server, not by the web page.</u>

1        10. (Once Amended)  The method of claim 1, wherein the steps of receiving, sending, and

2    displaying are all performed via a single browser window, where the browser has been altered to





**C-16**

3    allow it to simultaneously connect to both the web site selected by the user and the metadata

4    server, <u>the metadata server being distinct from the web site</u>.

1    14.  (Once Amended)  The method of claim 1,

2    wherein the receiving step is performed by a first instance window of the browser

3         connected with the web site,

4    wherein the sending step is performed by a second instance window of the browser, and

5    wherein the displaying step is performed by the second instance window of the browser

6         communicating with the metadata server, <u>the metadata server being distinct</u>

7         <u>from the web site</u>.

1    15.  (Once Amended)  The method of claim 1, wherein the displaying step includes the

2    step of displaying, <u>to supplement the web page being displayed</u>, "Where you are" metadata, [in

3    accordance with the received information.], <u>the "Where you are" metadata not being provided by</u>

4    <u>the web page</u>.

1    16.  (Once Amended)  The method of claim 1, wherein the displaying step includes the

2    step of displaying <u>, to supplement the web page being displayed</u>, "Where to go next" metadata, [in

3    accordance with the received information], [wherein] the "Where to go next" metadata [is] <u>being</u>

4    based on usage trails in the world wide web<u>, and not being provided by the web page</u>.

1    17.  (Once Amended)  The method of claim 1, wherein the displaying step includes the

2    step of displaying metadata <u>about the web page being displayed</u> obtained from a third party in

3    addition to [data contained in the displayed web page] <u>metadata about the web page being</u>

4    <u>displayed obtained from the metadata server</u>.



**C-17**

1        18.  The method of claim 1, wherein the requesting step includes the steps of:

2        receiving a[n] URL of a web page of metadata for the displayed page, the web page of

3               metadata being distinct from the web page being displayed;

4        requesting the web page of metadata for the displayed page,

5        receiving a web page of metadata for the displayed page, and

6        wherein the displaying step includes the step of displaying the web page of metadata via

7               the browser.

1        19.  (Once Amended)  The method of claim 1, wherein the metadata is based on data

2   mining operations performed prior to the requesting step, the metadata being provided by the

3   metadata server, not by the web page.

1        20.  (Once Amended)  The method of claim 1, wherein the metadata identifies at least one

2   web page that points to the displayed web page, the metadata not being provided by the displayed

3   web page, and not being provided by the pointing web page.

1        21.  (Once Amended)  The method of claim 1, wherein the metadata includes a number of

2   web pages that point to the displayed web page, the metadata not being provided by the displayed

3   web page, and not being provided by the pointing web pages.

1        22.  (Once Amended)  The method of claim 1, wherein the metadata identifies at least one

2   web page to which the displayed web page points, the metadata not being provided by the

3   displayed web page, and not being provided by the web page to which the displayed web page

4   points:

21821/03827/DOCS/943229.1

5


**C-18**

1    23. (Once Amended)  The method of claim 1, wherein the metadata includes a number of

2    web pages to which the displayed web page points, <u>the metadata not being provided by the</u>

3    <u>displayed web page, and not being provided by the web page to which the displayed web page</u>

4    <u>points.</u>

1    29. 30.  (Twice Amended)  A method of directing a user to at least one web page related to a

2    web page displayed on a display device by a browser, comprising the steps, performed by a data

3    processing system, of:

4        receiving information describing the contents of the displayed web page;

5        sending, to a metadata server, a request for an identification of the related web page in

6            accordance with the contents of the displayed web page, <u>the metadata server</u>

7            <u>being different from the server providing the displayed web page;</u> and

8        displaying, on the same display device as the web page and concurrently with the web

9            page, metadata about the web page including at least one link directing a

10           user to a web page related to the web page being displayed, the metadata

11           <u>being supplemental information about the web page, the supplemental</u>

12           <u>information not being provided by the web page but instead received from</u>

13           <u>the metadata server</u> in response to the request.

1    24. 31.  (Once Amended)  The method of claim 1, wherein the displaying step includes the

2    step of displaying "Where to go next" metadata, in accordance with the received information,

3    wherein the "Where to go next" metadata is based on analysis of the content of pages in the world

4    wide web <u>and is not provided by the web page.</u>



6



1    21. 32. (Once Amended)  The method of claim 1, wherein the displaying step includes the

2    step of displaying "Where to go next" metadata, in accordance with the received information,

3    wherein the "Where to go next" metadata is based on information relating to the organization or

4    individuals associated with the displayed web page and is not provided by the web page.

SUB 33    31. 33. (Once Amended)  A computer program product, on a computer readable medium,

2    which presents information augmenting the information on a web page being displayed on a

3    display device by a browser, the computer program product comprising:

4        program code for receiving information identifying the web page to be displayed;

5        program code for sending, to a metadata server, a request for metadata, the metadata being

6            supplemental information about the web page to be displayed, the

7            supplemental information not being provided by the web page [in

8            accordance with the received information], the metadata server being

9            different from the server providing the web page; and

10        program code for displaying, on the same display device as the web page and concurrently

11            with the web page, metadata received from the metadata server in response

12            to the request.

1    33. 35. (Once Amended)  The computer program product of claim 33, wherein the program

2    code for displaying includes program code for displaying, to supplement the web page being

3    displayed, an advertisement targeted at users who request a[n] URL of the web page, the

4    advertisement being provided by the metadata server, not by the web page.





C-20

SUB.④

36. (Once Amended)  A computer program product on a computer readable medium

2   which directs a user to at least one web page related to a web page displayed on a display device

3   by a browser, the computer program product comprising:

4        program code for receiving information describing the contents of the displayed web page;

5        program code for sending, to a metadata server, a request for an identification of the related

6              web page in accordance with the contents of the displayed web page, the

7              metadata server being different from the server providing the displayed web

8              page; and

9        program code for displaying, on the same display device as the web page and concurrently

10              with the web page, metadata about the web page including at least one link

11              directing a user to a web page related to the web page being displayed, the

12              metadata being supplemental information about the web page, the

13              supplemental information not being provided by the web page but instead

14              received from the metadata server in response to the request.


1     3A  3?. (Once Amended)  An apparatus for augmenting the information on a web page being

2   displayed on a display device by a browser, the apparatus comprising:

3        a software portion configured to receive information identifying the web page to be

4              displayed;

5        a software portion configured to send, to a metadata server, a request for metadata, the

6              metadata being supplemental information about the web page to be

7              displayed, the supplemental information not being provided by the web

8

**C-21**

8                           page [in accordance with the received information], the metadata server

9                           being different from the server providing the web page; and

10           a software portion configured to display, on the same display device as the web page and

11                           concurrently with the web page, metadata received from the metadata server

12                           in response to the request.

1        35. 38. (Once Amended)  The apparatus of claim 37, 34 including a software portion for opening

2     a popup menu containing at least one link to another web page, the link being provided by the

3     metadata server, not by the web page.

1        51. 39. (Once Amended)  An apparatus for directing a user to at least one web page related to

2     a web page displayed on a display device by a browser, the apparatus comprising:

3          a software portion for receiving information describing the contents of the displayed web

4                     page;

5          a software portion for sending, to a metadata server, a request for an identification of the

6                     related web page in accordance with the contents of the displayed web page,

7                     the metadata server being different from the server providing the displayed

8                     web page; and

9          a software portion for [program code for] displaying, on the same display device as the

10                     web page and concurrently with the web page, metadata about the web page

11                     including at least one link directing a user to a web page related to the web

12                     page being displayed, the metadata being supplemental information about

13                     the web page, the supplemental information not being provided by the web

47



SUBD?

**C-22**

14      page but instead received from the metadata server in response to the

15      request.

1     38  A0.  (Once Amended)  A method of presenting information augmenting the information on

2     a web page being displayed on a display device by a browser, comprising the steps, performed by

3     a data processing system, of:

4           determining the address of the web page currently being displayed;

5           sending, to a metadata server the address of the web page currently being displayed, and a

6                 request for metadata describing the web page currently being displayed the

7                 metadata being supplemental information about the web page being

8                 displayed, the supplemental information not being provided by the web

9                 page, the metadata server being different from the server providing the web

10                page; and

11          displaying, on the same display device as the web page and concurrently with the web

12                page, metadata received from the metadata server in response to the request.

1     28  A2.  (Once Amended)  The method of claim 1 [A method for determining metadata about a

2     web page in a web site hierarchy, the method] further comprising:

3           examining, by the metadata server, all parent web pages above the web page in the web site

4                 hierarchy; and

5           classifying metadata of a parent of the web page as also being metadata of the web page.

## REMARKS

On September 21, 1999, Applicants conducted a telephone interview with Examiner Srirama Channavajjala and Primary Examiner Jack Choles. Applicants thank Examiner Channavajjala and Examiner Choles, and submit the amendments as per the telephone interview.

Applicants respectfully request that the Examiner consider the documents submitted with the Information Disclosure Statement filed on September 4, 1997, and indicate his consideration by initialing the PTO-1449 enclosed therewith.

Claims 1-25 and 30-42 were presented for examination and rejected. Claims 1, 3-10, 14-23, 30-33, 35-40, and 42 are amended herein to more distinctly claim the subject matter of the Applicants' invention.

The claimed invention supplements a web page by displaying metadata concurrently with the web page. Metadata is supplemental information about the web page being displayed, not about the target pages of links on the web page being displayed. Metadata is provided by a metadata server, not by the web page being displayed. Thus, links that are a part of a web page do not comprise metadata about the web page because they are provided by the web page, not by a metadata server. A metadata server is distinct from the server that provides the web page. By displaying supplemental information concurrently with the web page, the claimed invention provides a user with relevant knowledge which would be unavailable from looking at the displayed web page by itself. The claimed invention concurrently presents this information on the same display device as the web page, thereby allowing the user to view the web page and the supplemental information simultaneously.

Reconsideration of this application and allowance of claims 1-25 and 30-42 are respectfully solicited.

If the Examiner believes there are any issues remaining prior to allowing the application, he is invited to contact the undersigned attorney at the number below.



21821/03827/DOCS/943229.1

**C-24**

Favorable action is hereby solicited.

Respectfully submitted,

NIALL O'DRISCROLL

By: _Laura Majerus_

Laura A. Majerus, Registration No. 33,417
Fenwick & West LLP
Two Palo Alto Square
Palo Alto, CA 94306
(650) 858-7152

21821/03827/DOCS/943229.1

**C-25**

# EXHIBIT B
# Part 4

Myers Dec.

EXH. D

US005706507A

# United States Patent [19]

## Schloss

[11] **Patent Number:** **5,706,507**

[45] **Date of Patent:** **Jan. 6, 1998**

[54] **SYSTEM AND METHOD FOR CONTROLLING ACCESS TO DATA LOCATED ON A CONTENT SERVER**

[75] Inventor: **Robert Jeffrey Schloss**, Briarcliff Manor, N.Y.

[73] Assignee: **International Business Machines Corporation**, Armonk, N.Y.

[21] Appl. No.: **503,658**

[22] Filed: **Jul. 5, 1995**

[51] Int. Cl.[6] ................................................... C06F 17/30

[52] U.S. Cl. .......................... 395/615; 395/604; 395/609; 395/610; 395/333; 395/326; 395/327

[58] Field of Search ............................ 395/600, 200.09, 395/604, 609, 615, 610, 333, 326, 327; 364/514

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,347,623 | 9/1994 | Takano et al. | 395/157 |
| 5,394,526 | 2/1995 | Crouse et al. | 395/200 |
| 5,408,600 | 4/1995 | Garfinkel et al. | 395/153 |
| 5,410,691 | 4/1995 | Taylor | 395/600 |
| 5,493,677 | 2/1996 | Balogh et al. | 395/600 |
| 5,499,046 | 3/1996 | Schiller et al. | 348/6 |
| 5,544,320 | 8/1996 | Konrad | 395/200.09 |
| 5,553,221 | 9/1996 | Reimer et al. | 395/154 |
| 5,557,541 | 9/1996 | Schulof et al. | 364/514 |
| 5,559,933 | 9/1996 | Boswell | 395/114 |
| 5,596,705 | 1/1997 | Reimer et al. | 395/326 |
| 5,597,307 | 1/1997 | Redford et al. | 434/118 |

### OTHER PUBLICATIONS

Katia Obraczka et al., "Internet Resource Discovery Services", University of Southern California, No. 9, pp. 8–22, Sep. 26, 1993.

Michael Caplinger, "An Information System Based on Distributed Objects", Object–Oriented Programming Systems, Languages and Applications, vol. 22, No. 12, Dec. 1987.

Hokimoto et al., "An Approach for Constructing Mobile Applications Using Service Proxies", IEEE, pp. 726–733, 1996.

Teresa Lau, "Building a Hypermedia Information System on the Internet", IEEE, pp. 192–197, 1994.

Eric Bina et al., "Secure Access to Data Ofver the Internet", IEEE, pp. 99–102, Mar. 1994.

Vetter et al., "Mosaic and the World–Wide Web", IEEE, pp. 49–57, May 1994.

Uffe Kock Wiil, "Issues in the Design of EHTS: A Multiuser Hypertext System for Collaboration", IEEE, pp. 629–639, Jul. 1992.

"Sample Screenshots from ComMentor" http://www–diglib/stanford.edu/rms/tr/shots, no date.

"Surfwatch" Current Press Releases http://www/surfwatch-.com/ May 15, 1995.

Intenet–Draft Internet Engineering Task Force KidCode Jun. 1995.

"Beyond Browsing: Shared Comments, Soaps, Trails, and On–line Communities", M. Roscheisen et al., Computer Networks ISDN Systems (Netherlands), vol. 27, No. 6, pp. 739–749, Apr. 1995.

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—Cheryl Lewis
*Attorney, Agent, or Firm*—Whitham, Curtis, Whitham & McGinn; Kevin J. Jordan, Esq.

[57] **ABSTRACT**

The content of free speech over distributed networks, such as the Internet, is often inappropriate for minors as well as offensive to some adults. The invention comprises an advisory server operated by, for example, a third party watchdog group, which rates the content of data downloaded from a content server to a client in order to block or censor unwanted material. In operation, each time data (e.g., a web page) is downloaded from a content server to the client, prior to display, the client sends a request signal to the advisory server asking that it advise the client on the content of the web page. The advisory server rates the page and sends a classification rating back to the client. The client thereafter displays or does not display the web page according to the classification rating based on the client's selected preferences. The advisory server may also assign a rating to any links contained on the web page or may also be asked by the client to block any pages which require a fee. In this manner parents are effectively empowered control the content of data disseminated in their homes.

**36 Claims, 20 Drawing Sheets**



Exhibit D



FIG.1
(PRIOR ART)

FIG.2

Exhibit D



FIG.3A



FIG.3B



FIG.4



FIG.5A



FIG.5B



FIG.5C

**U.S. Patent**      Jan. 6, 1998      Sheet 7 of 20      5,706,507



FIG.6

U.S. Patent        Jan. 6, 1998        Sheet 8 of 20        5,706,507



FIG.7



FIG.8A



FIG.8B

**U.S. Patent**        Jan. 6, 1998        Sheet 10 of 20        **5,706,507**



FIG.9A

FIG.9B



FIG.10



FIG.11



FIG.12A

**U.S. Patent**          Jan. 6, 1998          **Sheet 15 of 20**          **5,706,507**



FIG.12B



FIG.12C

U.S. Patent          Jan. 6, 1998          Sheet 17 of 20          5,706,507



FIG.12D



FIG.12E



**OVERUSE DETECTION TABLE**

| USER ID | TIME OF DAY OF LAST n00 REQUESTS FROM THIS USER |
|---------|-----------------------------------------------|
| JONES | 12:14:01:00,12:14:01:01,12:14:01:02,...12:16:43:07,12:16:43:08 |
| BUTRICO | 12:11:00:38 |
| | |
| | |

1301

**FIG.13A**

**BLOCKING TABLE**

| USER ID | DATE/TIME OF DAY BLOCKED | DATE/TIME TOLD OF BLOCKED |
|---------|--------------------------|---------------------------|
| RAVIN | 1995/06/13  11:22:31 | 1995/06/13  11:22:32 |
| PRAGER | 1995/06/13  12:01:00 | |
| | | |
| | | |

1303

**FIG.13B**

Exhibit D



FIG.14

5,706,507

**1**

## SYSTEM AND METHOD FOR CONTROLLING ACCESS TO DATA LOCATED ON A CONTENT SERVER

### FIELD OF THE INVENTION

The present invention is related to distributed data communication system, and more particularly, to controlling access, or providing meta-information about, data located on content servers in distributed data communication systems.

### BACKGROUND OF THE INVENTION

Electronic online information services that contain documents (as opposed to structured databases and transaction systems) emerged in the 1960s. These first generation services held all content on one server (such as DIALOG). Therefore, users normally understood the characteristics of the documents based on which service they used. Distributed online information services began with networked bulletin board systems such as UUCP, USENET, FIDOnet. However, these services were used by a tiny section of the population and did not contain data that was used to make important personal or business decisions. A third generation of online information emerged at the end of the 1980s as the Internet became common on college campuses, businesses and government agencies. The World Wide Web was developed under the leadership of Tim Berners-Lee of CERN, as a method of fetching information from any cooperating computer on the Internet by simply clicking on a reference to that information. With the release of the first high-function Web browser program, Mosaic, by the National Center for Supercomputer Applications in early 1994, millions of users began to have access to millions of documents through the World Wide Web. These documents contain text, graphics, audio, video, etc.

The World Wide Web contains information that is updated regularly, and therefore is in many ways superior to consulting books or CD-ROMs. However, users may have trouble contextualizing the retrieved information: was it accurate when posted (made available), is it still accurate now, etc. The challenge of editorial assessment of a huge body of constantly changing and growing information, with no central depository site, forces users to depend upon independent assessments of the retrieved data. Users are familiar with doing this in other domains, such as "the Good Housekeeping Seal of Approval" for household goods.

It was recognized by the W3 Consortium and other voluntary standards groups for the World Wide Web that some automated mechanism of delivering assessments to users was needed. The urgent need for these items, ironically, is not being driven by business or other decision making based on Web information, but by a need to have filtering of adult-only material from young people who access the Web. Because it is easy to click from one document to another (which the one document points to) to another in seconds, this "traveling browsing" has become known as surfing the Web. In surfing the Web, children may have easy access to inappropriate videos, graphical data and other related information.

To address this issue, several mechanisms have been proposed and/or implemented. For example, the application WATCHDOG by Surfwatch allows a supervisor (i.e. a parent) to block particular content from being retrieved when browsing the World Wide Web. On a subscription basis, users periodically receive disks that contain a data base of blocked sites. The user then executes a utility program that updates the existing data base of blocked sites

**2**

with the updated data base of blocked sites in the disks. When the user browses on the Web, the application cross-references the data base and selectively blocks the loading of data from blocked sites identified in the data base.

Web Track from Webster Network strategies will block access to particular primary content sites, in 15 specific categories. Like Surfwatch, Webtrack stores a list of blocked sites in a data base, and when the user browse the Web, the application cross-references the data base and selectively blocks the loading of data from blocked sites identified in the data base. However, in this case, the data base is not created and updated on a subscription basis, but may be created and updated by the supervisor.

KidsCode is an Internet Draft proposal which uses a naming convention to indicating ratings, and requires voluntary compliance by primary publisher of the content data.

It is therefore an object of the present invention to provide a system and method to characterize content loaded (or available to be loaded) by a client from a content server via a protocol between the client and any number of independent non-co-located or combined advisory servers that maintain "ratings" knowledge bases, and to control filtering of the content data according to the characterization.

Another object of the present invention is to provide a method and system wherein an advisory server indicates if the user will incur charges for accessing one or both of the content server and the advisory server.

Another object of the present invention is to provide one or more user profiles stored in a memory associated with the client that are utilized by the client to control the filtering of the requested content data and to generate information related to the requested content data.

Additional objects and advantages of the present invention will be set forth in the description which follows, and in part will be obvious from the description, or may be learned by practicing the invention.

### SUMMARY OF THE INVENTION

To achieve the objects in accordance with the purposes of the present invention, as embodied and described herein, a distributed data communication system comprises a content requestor and a content server. Communication between the content requestor and the content server occurs over a first communication link. The content requestor under control of user input communicates a data request signal to the content server over the first communication link. The content server, upon receiving the data request signal, communicates content data to the content requestor according to the data request signal. The content data is filtered by:

setting the content requestor in an advisory mode wherein the content requestor communicates portions of said data request signal to an advisory server over a second communication link different from the first communication link, and wherein the first advisory server is remote from said first content server;

upon receipt of the portions of said data request signal, controlling the advisory server to retrieve characterization data from a data base coupled to the first advisory server, wherein the characterization data is linked to the portions of the data request signal, and to communicate the characterization data to said content requestor over the second communication link; and

wherein the content requestor, in the advisory mode, inhibits loading of at least a portion of the content data according to the characterization data.

5,706,507

**3**

In addition, the content data may include a pointer identifying additional content data. In this case, the characterization generated by the advisory server may be related to the additional content data, and the content requestor, in the advisory mode, inhibits loading of at least a portion of the additional content data according to the characterization data.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a pictorial representation of the Internet World Wide Web wherein a Client running a Web Browser request content data from a Content Server.

FIG. 2 is a pictorial representation of the World Wide Web including a client and one or more advisory servers according to the present invention;

FIGS.3(A) and 3(B) are flow charts illustrating operation of the advisory servers and clients running a Web Browser according to the present invention;

FIG. 4 illustrates all example of the data exchanged between the advisory server anti the client running a Web Browser according to the present invention;

FIG. 5(A) illustrates a format of the advisory request signal transmitted from the client running the Web Browser to the advisory server according to the present invention; FIGS. 5(B) and (C) illustrate a format of the characterization data transmitted from the advisory server to the client running the Web Browser according the present invention;

FIG. 6 is a flow chart that illustrates the operation of the advisory server in responding to an advisory request signal according to present invention;

FIG. 7 is a flow chart illustrating operation of the client running a Web Browser when the user moves pointer over an anchor in the current page;

FIGS. 8(A) and (B) illustrate a format of an Administration Query signal and associated response communicated between the client running a Web Browser and the advisory server according to the present invention;

FIGS. 9(A) and (B) illustrate a dialog box in accordance with the present invention wherein a user specifies and/or activates a particular advisory server; server;

FIG. 10 illustrates a dialog box in accordance with the present invention wherein a user may construct groups of advisory services that can be activated and/or deactivated together;

FIG. 11 illustrates a dialog box in accordance with the present invention wherein a user specifies precisely which ratings are to be considered acceptable and/or unacceptable;

FIGS. 12(A)–(E) illustrate features of the present invention enabling users to be made aware of ratings in an efficient and user-friendly manner;

FIGS. 13(A)–(B) and 14 illustrate a data structure and operation of the advisory servers in detecting an overuse attack by a client according to the present invention.

### DETAILED DESCRIPTION OF THE PRESENT INVENTION

FIG. 1 is a pictorial representation of the Internet World Wide Web, commonly called the Web. The present invention as described below is embodied in the World Wide Web, but the invention is not limited in this respect, and may be embodied in any data communication system wherein a content requesting system request data from a content server, including but not limited to on-line information services, telephone networks, and television networks.

**4**

As shown in FIG. 1, the Web 2 includes a plurality of clients 4 (three shown) that interface to a plurality of content servers 6 (three shown) over the Internet 8. The content servers retrieve and/or generate content data from information stored in a data base 7 associated with the content server 6. Typically, the data base resides on a hard disk associated with the content server. A gateway 10 may be utilized to interface more than one client 4 to the Internet 8 as shown. Typically, the gateway 10 functions as a proxy server to cache the most recently requested content data, to control access to the Interact 8 to only specified clients 4, and for billing the clients 4 for access to the Internet 8. In addition, a gateway 12 may be utilized to interface more than one content servers 6 to the Internet 8 as shown. In this case, the gateway 12 typically functions as a firewall to control access to the content servers to authorized users, and for centralized billing of access to the content servers, if appropriate. Note that one or more clients 4 may be linked to one or more content servers over a local area network. In this case, the functions or the gateway 10 and 12 may be integrated into a single gateway that interfaces to the local area network.

Users utilize a client system running a Web Browser, such as those sold under the trademarks NETSCAPE NAVIGATOR, IBM WEB EXPLORER and NSCA MOSAIC, to load content located on the content servers 6. The content may be in one of several standardized formats, with hyperlink anchors in one "page"\of content pointing to other content that may be on the same server or on another remote server.

More specifically, a client system running a Web Browser request content from a content server 6 using a Hypertext Transfer Protocol (HTTP) request and receiving the content in a HTTP response. HTTP requests and responses occur over TCP/IP sockets that are communicated over the communication link between the client 4 and the content server 6. Much World Wide Web content consists of readable pages encoded using the Hypertext Markup language (HTML,). Thus, the word "page" and the word "content" are used interchangeably below. The user may generate the content request by explicitly asking for content stored on the content server 6 or by clicking on a hyperlink anchor 132 which points to content stored on content server 6. Upon receipt, the browser loads that content using an HTTP session. A more detailed description of HHTP may be found in Berners-Lee et al., "Hypertext Transfer Protocol—HTTP/ 1.0", draft-ieft-http-v10-spec-0.0 txt, 1995 Mar. 8 (Internet Draft), herein incorporated by reference in its entirety. A more detailed description of HTML, may be found in Berners-Lee, T. "Hypertext Markup Language (HTML,)", draft ieft.iiir-html-01, Jun. 1993 (expired working draft), herein incorporated by reference in its entirety. And a more detailed description of TCP/IP sockets and communication on the Internet may be found in W. Richard Stevens, "TCP/IP Illustrated, Volume 1—The Protocols", Addison-Wesley, 1994, pp. 1–20, 229–262, herein incorporated by reference in its entirety.

According to the present invention, one or more advisory servers 20 (three shown) are interfaced to the Internet 8 as illustrated in FIG. 2. The advisory servers maintain one or more knowledge bases 22 that characterize the content generated by one or more of the content servers 6. In addition, the system includes one or more clients 25 (three shown) running a Web Browser that when set in an advisory mode, for each content request to the content servers 6, requests characterization data from one or more of the advisor servers 20. The advisory servers 20 generate the appropriate characterization data based upon the informa-

5,706,507

5

tion stored in the knowledge base 22, and transmit the characterization data to the client 25. Upon receiving the characterization data, the client 25 utilizes the characterization data to determine whether to filter the content data transmitted by the content server 6. In addition, the client may utilize the characterization data to generate additional information. The advisory servers, when active, are preferably placed on an active list that identifies each active advisory server, for example by storing the URL of the advisory server 20. A more detailed description of URLs may be found in Berners-Lee et al., "Uniform Resource locators (URL)", RFC 1738, December 1994, herein incorporated by reference in its entirety.

Note that it is possible for the functions of the advisory server 20 to be integrated with the functions of the content server 6, but typically this will not be the case. Preferably, HTTP is used to communicate between the client 25 running the Web Browser and The advisory server 20. Note that more than one advisory server 20 may be interfaced to the Internet 8 by a gateway 24. The gateway 24 may function as a firewall to control access to the advisory server 20 to authorized users, and for centralized billing to access to the advisory servers, if appropriate.

FIGS. 3(A) and (B) illustrate in more detail the operation of the advisory servers 20 and the clients 25 running a Web Browser that includes an advisory mode according to the present invention. Specifically, at step 205 a client 25 generates and sends a content request to a content server 6 for information contained in knowledge base 7. In step 210, the client 25 may inhibit loading of content data associated with the content request at least until the characterization data is received from an active advisory server 20 and acted upon. In step 215, an advisory request for characterization data associated with the content request is generated to each active advisory server 20 concurrent with the aforementioned content request. As mentioned previously the characterization data may indicate that loading of the requested content data should be inhibited by the client 25. In step 220, the advisory request is generated to each active advisory server 20. In step 225, each active advisory server 20 receives and decodes the advisory request transmitted from the client 25. In step 230 each active advisory server 20 retrieves from its knowledge base 22 any stored characterization data associated with the advisory request. A more detailed description of the method and system utilized by the advisory server 20 to identify and store connections between tags identifying content (such as URLs) and associated meta-data (such as numeric rating codes or strings) may be found in Dockter et. al., U.S. patent application Ser. No. 08/267,022, entitled "Facility for the Storage and Management of Connections (Connection Server), filed Jun. 21, 1994, herein incorporated by reference in its entirety.

In step 235 the characterization data is transmitted to the requesting client 25. In step 240 a decision is made whether to deactivate this advisory server-client subscription (at step 245) or to continue to receive and decode advisory requests (at step 225). In step 250 the client 25 receives and decodes the characterization data transmitted from the advisory server 20 in step 235. Referring now to FIG. 3b, in step 255 the client may inhibit loading of or load the content data associated the contour request as a function of the received characterization data. For example, if the characterization data indicates the advisory server 20 has no relevant information related to the requested content data, the client 25 may load the content data associated with the content request; yet, if the character data returned from the advisory server indicates the data is offensive to minors, the client 25

6

may inhibit loading of the content data. In step 260, the client 25 may generate additional information related to the content request. The addition information may be an additional content request or any other meta-data related to, or contrasted with, the requested content data. In step 265, the client 25 may display the additional information to the user.

FIG. 4 illustrates an example of the data exchanges between an advisory server 20 and the client 25 according to the present invention. The advisory request signal is identified "AdviseOnURLIncludingLinks" and the characterization data includes three response sets as shown.

FIG. 5(A) illustrates a format of the advisory request signal transmitted by the client 25 running a Web Browser to the advisory server 20 according to the present invention. As shown, the advisory request signal includes a header field 301 and a URL field 303. The header field 301 includes a command verb that identifies the type of request. For example, the command verb may be "AdviseOnURL" or "AdviseOnURLIncludingLinks". The command verb "AdviseOnURL" requests that the characterization data returned by the advisory server 20 pertain to only the particular page of content data requested from the content server 6. On the other hand, the command verb "AdviseOnURLIncludingLinks" requests that the characterization data returned by the advisory server 20 that pertains to the particular page of content data requested from the content server 6 plus any content linked to the particular page, for example, by a hypertext anchor within the page. In this case, the command verb indicates whether the request encoded within the advisory request signal is a "AdviseOnURL" request or an "AdviseOnURLIncludingLinks" request. The command verb may be represented by an encoded text string or an integer. The URL field 303 identifies the content data that has been requested from the content server 6. In the context of the Web, the URL field 303 is preferably the URL of the requested page.

As shown in FIG. 5(A), the advisory request signal may also include a protocol_ID field 305 and an additional data field 307. The protocol_ID field 305 identifies the particular version of the protocol embodied by the advisory request signal. The additional data field 307 may be used to communicate additional data.

FIG. 5(B) illustrates the format of the characterization data transmitted by the advisory server 20 to the client 25 running the Web Browser according to the present invention. As shown, the characterization data includes a header field 321. The header field 321 may include a protocol identifier that identifies the particular version of the protocol embodied by the characterization data and a return code that characterizes the content data identified by the URL field 303 of the advisory request signal. For example, the return code may indicate that the advisory server 20 does not have an information related to the content data identified by the URL field 303 of the advisory request signal. A more exhaustive list of possible return codes is found in Appendix A of the patent application.

The characterization data may also include one or more response sets 323 (two shown) that pertain to the content data identified by the URL field 303 of the advisory request signal. In this case, the header field 321 also includes data that identifies The number of response sets following. For example, FIG. 4 shows three response sets. The first is related to URL1, which is the particular page of content data identified by the URL field 303 of the advisory request signal. The second and third are related to URL2 and URL3, respectively, which are additional pages linked by hypertext anchors in the page identified by URL1.

5,706,507

**7**

As shown in FIG. 5(C), each response set 323 may include a URL field 410, a return code 420, a short string field 430, a long string field 440, and an associated URL field 450. The URL field 410 identifies the content data associated with the response set. The return code 420 characterizes the content data identified by the URL field 450. For example, the return code may indicate that the URL contains sexually explicit material not suitable for minors. A more exhaustive list of the possible return codes is found in Appendix A of the patent application. The short string and long string fields 420 and 430 include text information that are related to The content data identified by the URL field 410. The associated URL field 450 identifies content data associated with the content data identified by the URL field 410. Upon receiving and decoding the response sets, the client 2 may display to the user the string information encoded within the string fields 430 and 440 and/or the associated content data identified by the associated URL field 450. A more detailed description of the operation of the client 25 in displaying the string information and/or associative content data is described below with respect to FIGS. 7 and 12(A)–(E). Moreover, depending upon the return code 420, the string fields 420 and 430 and associated URL field 450 may be omitted. For many return codes 420, the associated URL field 450 may or may not be sent.

FIG. 6 is a flow-chart that illustrates operation of the advisory server 25 in responding to an advisory request signal according to the present invention. For illustrative purposes only, FIG. 6 shows the operation of the advisory server 25 in responding to a particular advisory requested signal, the "AdviseOnURLIncludingLinks" signal, which requests that characterization data be returned that relates not only to the current page, but to those pages which have an anchor in the current page. In step 710, the advisory server 20 receives the advisory request signal transmitted by the client 25 running the Web Browser. In step 715, the advisory server 20 compares the URL field 303 of the AdviseOnURLIncludingLinks signal with the entries stored in the advisories knowledge base 22 to determine if one or more matching entries are present. An exact match to the URL field 303 may be required. In the alternative a fuzzy match may be utilized wherein if an exact match is not found, the entry having the longest matching prefix will be considered a match.

In step 720, if a match is not found, the operation of the advisory server 25 continues to step 750 to check if advisory requests related to the specific URL should be ignored. Step 750 may be accomplished by comparing the URL field 303 to entries stored in an Ignore list as shown in Table 11 of Appendix B. In step 755, if the URL field 303, or a prefix of the URL field 303, is not on the Ignore list, in step 760 the URL is added To Be Reviewed—URL list as shown in Table 14 of Appendix B, and operation continues to step 770). However, if the URL field 303, or a prefix of the URL field 303, is on the Ignore list in step 755, operation continues to step 770. In step 770, the advisory server 20 returns to the client 25 characterization data that indicates no information related to the URL is available. This may be accomplished by inserting a return code "000" into the header field 321 of the characterization data.

In step 720, when one or more matching entries exist in the knowledge base 22, the response set 323 corresponding to each matching entry is generated. More specifically, in step 725, the URL field 410, return code 420, short string 430, long string 440, and associated URL 450 corresponding to the URL field 303 are read from a URL Return code and phrase table, shown as Table 8 of Appendix B. In step 730,

**8**

for each anchor included in the page identified by the URL field 303, the URL field 410, return code 420, short string 430, long string 440, and associated URL 450 corresponding to the anchor are read from the URL Return code and phrase table. The anchors included in the page may be read from a 'URL included in page' Table, shown as Table 10 in Appendix B. After all anchors have been processed in step 740, the advisory server 25, in step 775, may check whether the user should be charged for the advisory information and, if so, in step 780 records the the usage for billing purposes. Finally, in step 745, the characterization data including the response sets is returned to the client 25 in step 740.

FIG. 7 is a flow chart illustrating operation of the client 25 running the Web Browser of the present invention when a user moves a pointer, such as a mouse arrow, over an anchor in a page. The client 25 must determine whether to display balloon help that includes the text information encoded within the short string field 430 of one or more response sets, and whether to block the activation of an anchor within the current page. This figure handles the case where the characterization data has been returned from each active advisory server 20, and where the user has not specified a preference for graphics over phrases. A balloon text variable is emptied in step 605, a flag controlling inhibition of anchor selection is reset to "no inhibit" in step 610. A loop is performed in steps 615 to 660 with a pass for each active advisory server. In step 620, if a short string field 430 was returned for the URL field 410 that matches the URL of an anchor, then the Advisory Server name followed by a colon, The short string, and a line-end is added to the working balloon text in step 625, and operation continues to step 630. For example, the balloon text may appear as "Family Values: X-Rated". If, in step 620 a short string field 430 was not returned for the URL field 410 that matches the URL of an anchor, then operation continues to step 630. In step 630, if an associated URL 450 was returned for the URL field 410, a page symbol icon is displayed in step 635, and operation continues to step 640. If, in step 630, an associated URL 650 was not returned for the URL field 410, operation continues to step 640. In step 640, if the return code indicated that the anchor leads to information that is charged for upon load, and the user specified that this was to be blocked, the "load inhibited" flag is set in step 645, otherwise operation continues to step 650. In step 650, if the return code indicated that the anchor leads to information that is offensive, and the user specified that this was to be blocked, the "load inhibited" flag is set in step 655, otherwise operation continues to step 615 for the next active advisory server until all active advisory servers have been processed in which operation continues to step 665. The load inhibited flag is checked if the user clicks on an anchor. In step 665, after all active server responses have been analyzed, if any items were put in balloon text (by steps 625, 635 or 665), the balloon 505 and the text 508 are displayed in step 670.

In another aspect of the present invention, when the user first activates a particular advisory server, an Administrative Query message may be sent from the client 25 running the Web Browser to the advisory server 20, preferably using a TCP/IP socket connection. The Administrative Query (AdminQuery) message seeks information pertaining to the status of the particular advisory server, for example, whether the advisory server is free, charges for advisories, pays the user for advisories, and what protocol version the server responds to. As shown in FIG. 8(A), the AdminQuery message preferably includes a header field 801, a protocol identification field 803, and additional data 805 if needed. The header field 801 includes a command verb that identifies

5,706,507

**9**

the message as an AdminQuery message. The protocol identification field 803 identifies the protocol embedded in the message.

Upon receiving the AdminQuery message, the advisory server 20 generates a response and transmits the response to the client 25. As shown in FIG. 8(B), the response preferably includes a header 811, a protocol list field 813, a delay field 815, a min_cost field 817, a max_cost field 819, a name field 821, and additional data 823 if needed. The header 811 include data that identifies the protocol embedded in the response. The protocol list field 813 lists the protocols supported by the advisory server 20. The delay field 815 identifies the maximum delay likely based on advisory server load in 10ths of a second. The min_cost and max_cost fields 817 and 819 are pricing information that identify the minimum and maximum charge per advisory. If both are 0, the advisory service is free. This pricing information may be displayed to the user when the response to the Admin-Query message is received by the client 25. The name field 821 is text information identifying the name of the advisory server 25.

FIGS. 9(A) and 9(B) illustrate a dialog box in accordance with the present invention wherein a user specifies and/or activates a particular advisor server 25 by direct entry or by selection from a Quicklist 910. The user has the opportunity to indicate how they will pay if the server charges for advisories 920, as well as an opportunity to indicate if loading of content that costs money 930 or that is offensive 940 should be prevented. There are also other controls, such as: whether the user's ID should be sent 950 (an option for some free advisory servers); whether tones should be used when advisories are received 960; and whether clicking on the associated URL. icon causes a split screen 970. Importantly, the user may activate/deactivate the particular advisor server by clicking on activate box 980. When activated, the advisory service protocol described above with respect to FIGS. 1–8 is triggered for the particular advisory server. FIG. 9(B) shows a specific example of the dialog box shown in FIG.9(A) with a specific advisory server name 985 and URL. 990 filled in, and text information 995 related to pricing displayed. The text information 995 may be part of the response data transmitted by the advisory server 20, or may be generated by the client 25 according to the min_cost and max_cost fields 817 and 819 of the response to the AdminQuery message.

FIG. 10 illustrates a dialog box in accordance with the present invention wherein a user may construct groups of advisory services that can be activated or deactivated together. Two groups are shown, group 1005 and group 1055. Each group has a group name 1010 and 1060, and each group consists of a list of advisory services. The services that are part of group 1005 are 1015, 1020, 1025, 1030. The services that are part of group 1055 are 1065, 1070. Checkboxes 1035 and 1075 may be used to activate or deactivate all services in a group. This figure shows one group activated (1035 is checked) and one deactivated (1075 is not checked). A list of all advisory services ever used 1080 is provided for the convenience of the user.

FIG. 11 illustrates a dialog box in accordance with the present invention wherein a user can specify precisely which ratings are to be considered unacceptable. This is a sample dialog box page (tabs for other pages of the user setup dialog box are shown at the bottom). Multiple lists 1105 (two shown) may be created. The lists may be associated with particular users, or may be associated with the client system 25 as a whole. For a given active list (indicated in bold), the user divides the space of all ratings into a "not considered

**10**

offensive" group 1115 and a "include in offensive" group 1120. Moving a rating from one to another is as simple as selecting it, and pressing the Shift Selected button 1125.

FIGS. 12(A)–(E) illustrate features of the present invention enabling users to be made aware of ratings in a way which is not distracting and which can synthesize ratings from many knowledge bases at the client, or at a server. Specifically, FIG. 12(A) shows an embodiment in accordance with the present invention of a Web browser screen for a user who has 2 Web Advisory services activated: Family Values 501 and Consumer Rpts. 502. The names of the active services appear above labelled buttons 506, which in this figure are blank, because the content being viewed, Westchester Photography Club home page 500, was not rated or was rated as acceptable. Family Values 501 returned an Advisory for the link anchor 504 shown as "Click here for our violent photo of the month". The short string 430 returned from the Advisory server was "X-Rated", the long string 440 returned was "Not appropriate for minors—violent", and an associated URL 450 was supplied. FIG. 12(A) also shows that a balloon 505 may be displayed when the mouse is moved to the anchor 504, and it includes the short string 430 If the user freezes the balloon 505 (e.g. by pressing the space bar), the user can use the mouse pointer to click on the small box 507 in the balloon 505 to load the associated URL 450, or can move the mouse 503 to the text 508 and see the long string 440 in a second balloon 508. FIG. 12(B) shows how the advisory for a link may be shown by changing the pointer icon. This is best for services that return general advisories (positive, neutral, negative). In this example, Family Values advisory server 501 returned response code 0008 (positive), when the mouse is pointing to the link 504', the pointer may change from a plain arrow 503 to a positive arrow 503'. FIG. 12(C) shows how the advisory returned for a link may be shown at the bottom of the screen when the mouse is over a link 504". The MSAdv (Morgan Stanley Advisory Service) is active, and has returned an advisory for the URL that would be loaded if "Click here for our new policy on derivatives" 504" was clicked. The short string 430 returned was "Executives Only" and an associated URL 450 was supplied. The advisory is itself a link to this associated URL, which is why it is underlined like a link. FIG. 12(D) shows how the advisory 508 may be added into the content of the page 500 in place. The name of the service and the short string appear in smaller print 508 just above the link anchor 504. FIG. 12(E) shows the contents of the balloon 1240 when more than one Advisory service returned an advisory for the same URL. This is best for services that return precise advisories.

In another aspect of the present invention, the advisory server 25 may check for an overuse attack by a client 25. An overuse attack occurs when a particular client has exceeded a predetermined number of requests within a given period of time, potentiahy degrading response times from the advisory server to queries from other clients. More specifically, the time of day of each user request is placed in the overuse detection table 1301 as shown in FIG. 13(A). Each entry of the overuse detection table 1301 includes the time of day of the last N requests from a user, and the users identification tag. The table 1301 is periodically purged of user entries where no request has been received in a predetermined number of minutes.

Generally, to detect an overuse attack, the advisory server 20 tracks the number of requests from each user over time. Users who have more than a predetermined number of requests for a given period of time will be presumed to be overusing the service. These users ids and the time of

5,706,507

**11**

blocking will be placed in a Blocking Table **1303** as shown in FIG. **13**(B), and their next request will receive a return code indicating they are blocked.

For example, the overuse detection table **1301** of FIG. **13**(A) shows shows that user jones has been sending queries every one hundredth of a second. User 'butrico' has only sent one query. In addition, the blocking table **1303** of FIG. **13**(B) indicates that user 'prager' had overuse detected at 12:01, and has not yet sent another request (the date/time told field is blank). When the next request is received, an 'overuse attack detected' return code will be sent and the date and time recorded in the date/time told field. User 'ravin' was detected as overusing at 11:22:31 and received a single response to their request of 11:22:32 indicating that their requests would now be ignored.

FIG. **14** illustrates the operation of the advisory server in utilizing the overuse detection table **1301** and blocking table **1303** of FIGS. **13**(A) and (B) to detect an overuse attack. Only servers that require IDs with requests may use this approach to detecting overuse attacks. For when each advisory request signal received in step **1401**, the advisory server **20** in step **1403** checks whether the user's ID is included in the advisory request signal. If there is not a user ID in the signal, in step **1403** operation continues to step **1405** wherein the request is ignored and the socket is closed. Otherwise, operation continues to steps **1407** and **1408** to check if an entry corresponding to the user ID is in the blocking table **1303**. If so, operation continues to step **1409** to check if the user has previously been notified that his/her id is blocked. If so, operation continues to step **1405** as described above. If, in step **1409** it is determined that the user has not been previously notified that his/her id has been blocked, in step **1411** the current time is stored in the date/time told field of the entry corresponding to the user in the blocking table **1303**, and in step **1413**, the advisory server **20** notifies the user that an overuse attack has been detected.

If in step **1408** it is determined that the user ID is not in the blocking table **1303**, operation continues to step **1417**. In step **1417**, the advisory server **20** checks whether an entry corresponding to the user is stored in the overuse detection table **1301**. If not, in step **1419**, a new entry that includes the user's ID and current time is added to the overuse detection table **1301**. Otherwise, the current time as added to the corresponding entry in step **1421**. In step **1423**, the advisory server processes the updated entry to detect an overuse attack. More specifically, the advisory server **20** checks whether the number of requests stored in the entry exceeds a given threshold. If so, the particular user and current time is added as an entry to the blocking table **1303**, to thereby block the next request received from the paticular user.

In addition to detecting overuse, the advisory server **20** may check for overloading. In this case, the advisory server checks whether the processing time to service a particular access exceeds a given threshold. If so, an overload has occurred. In response to the overload condition, users may be notified and requests ignored until the overloading condition ceases.

As described above, the invention is embodied in a client running a Web Browser adapted to communicate with one or more advisory servers. According to a second embodiment of the present invention, certain inventive aspects of the client running a Web Browser may be embodied in a proxy server. According to the second embodiment, the proxy server, when set in an advisory mode, for each content request to the content servers **6**, requests characterization data from one or more of the advisory servers **20**. The advisory servers **20** generate the appropriate characterization data based upon the information stored in the knowledge base **22**, and transmit the characterization data to the

**12**

proxy server. Upon receiving the characterization data, the proxy server utilizes the characterization data to determine whether to filter the content data transmitted by the content server **6**. The details of the operation of the proxy server in filtering the content data are apparent from the description above with respect to FIGS. **2–14**.

Other embodiments of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. It is intended that the specification and examples be considered as examples only, with the true scope of the invention being indicated by the claims.

I claim:

1. In a distributed data communication system wherein communication between a content requestor and a first content server occurs over a first communication link, wherein said content requestor under control of user input communicates a data request signal to said first content server over said first communication link, and wherein said first content server, upon receiving said data request signal, communicates content data to said content requestor according to said data request signal, a method of filtering said content data comprising the steps of:

setting said content requestor in an advisory mode wherein said content requestor communicates portions of said data request signal to a first advisory server over a second communication link, and wherein said first advisory server is remote from said first content server;

controlling said first advisory server upon receipt of said portions of said request signal to retrieve characterization data from a data base coupled to said first advisory server and to communicate said characterization data to said content requestor over said second communication link; and

inhibiting loading of at least a portion of said content data according to said characterization data.

2. The method of claim 1, further comprising the step of: attaching a pointer identifying addtional content data to said characterization data; and

controlling said content requestor to retrieve said additional content data identified by said pointer.

3. The method of claim 2, wherein said additional content is stored in said data base coupled to said first advisory server.

4. The method of claim 2, wherein said additional content data is stored in a database coupled to said first content server.

5. The method of claim 2, wherein said additional content data is stored in a database coupled to a second content server, wherein said content requestor communicates with second server over a third communication link.

6. The method of claim 1, wherein diad content data includes a plurality of multimedia objects, further comprising the step of:

inhibiting loading of a portion of said multimedia objects of said content data according to said characterization data.

7. The method of claim 1, wherein said characterization data comprises a return code, a short string field, and a long string field,

wherein said said step of inhibiting loading of a portion of said content data is carried out according to said return code, and

wherein said content requestor displays portions of at least one of said short string field and said long string field.

8. The method of claim 1, further comprising the step of: storing user profile data in a memory associated with said content requestor, wherein said step of inhibiting load-

5,706,507

**13**

ing of at least a portion of said content data is carried out according to said characterization data and said user profile data.

9. The method of claim 8, wherein said content data includes a pointer to additional content data, and wherein said step of inhibiting loading of at least a portion of said additional content data is carried out according to said characterization data and said user profile data.

10. The method of claim 8, wherein said content requestor generates information related to said characterization data and said user profile data.

11. The method of claim 10, wherein said information related to said content data includes a portion of said characterization data.

12. The method of claim 10, wherein said information related to said content data includes a portion of said user profile data.

13. The method of claim 10, wherein said content requestor displays said information related to said content data.

14. The method of claim 8, wherein said information related to said content data includes a pointer for identifying additional content data, said method further comprising the step of:

controlling said content requestor to retrieve said additional content data identified by said pointer.

15. The method of claim 14, wherein said additional content data is stored in said data base coupled to said first advisory server.

16. The method of claim 14, wherein said additional content data is stored in a data base coupled to said first content server.

17. The method of claim 14, wherein said additional content data is stored in a database coupled to a second content server, wherein said content requestor communicates with said second content server over a third communications link.

18. The method of claim 1, wherein said characterization data characterizes said content data according to a predetermined standard.

19. The method of claim 18, wherein said predetermined standard indicates whether said content data is suitable for review by minors.

20. The method of claim 1, wherein said characterization data characterizes said first content server.

21. The method of claim 20, wherein said characterization data indicates whether a monetary charge is incurred by users who access said first content server.

22. The method of claim 1, further comprising the steps of:

controlling said content requestor to generate a billing status request signal related to said first advisory server;

communicating said billing status request signal to a second advisory server over a third communication link; and

controlling, upon receipt of said billing status request signal, said second advisory server to retrieve billing status data from a data base coupled to said second advisory server, wherein said billing status data indicates whether a monetary charge is incurred by users who access said first advisory server, and to communicate said billing status data to said content requestor over said third communication link.

23. The method of claim 22, wherein said content requestor disables said advisory mode according to said billing status data.

**14**

24. The method of claim 22, wherein said content requestor displays a billing status associated with said first advisory server according to said billing status data.

25. The method of claim 22, wherein said first and second advisory servers are identical servers, and wherein said second and third communication links are identical communication links.

26. The method of claim 22, wherein said first and second advisory servers are remote from one another.

27. The method of claim 1, wherein said content requestor inhibits loading of said content data communicated from said content server at least until said characterization data is received from said first advisory server.

28. The method of claim 1, further comprising the steps of:

controlling said first advisory server to monitor a number of data request signals received from said content requestor to detect an overuse condition; and

upon detecting said overuse condition, controlling said first advisory server to inhibit generation of said content data and communication of said content data to said content requestor, and controlling said first advisory server to communicate a message to said content requestor indicating said overuse condition.

29. The method of claim 1, wherein said content requestor includes a client coupled to a proxy server, wherein said proxy server interfaces to said first content server over said first communication link and to said first advisory server over said second communication link.

30. A system for censoring downloaded data from a content server to a client, comprising:

a remote advisory server connected to a content server and to a client through a distributed network; and

a database associated with said advisory server for storing a plurality of characterization data, wherein said remote advisory server, upon receipt of a request signal from the client, rates a downloaded data from the content server with an appropriate characterization data from said database and forwards said characterization data to said client, said client censoring said downloaded data based on said characterization data.

31. A system for censoring downloaded data from a content server to a client as recited in claim 30, wherein said characterization data in said database is generated by an independent third party.

32. A system for censoring downloaded data from a content server to a client as recited in claim 31 wherein said characterization data characterizes data according to appropriateness for minors.

33. A system for censoring downloaded data from a content server to a client as recited in claim 30 wherein said client, prior to displaying the downloaded data, waits for said characterization data from said advisory server.

34. A system for censoring downloaded data from a content server to a client as recited in claim 30 wherein said distributed network comprises the Internet.

35. A system for censoring downloaded data from a content server to a client as recited in claim 34 wherein said downloaded data comprises a web page.

36. A system for censoring downloaded data from a content server to a client as recited in claim 35 wherein said advisory server rates said web page and rates all links on said web page.

* * * * *

Myers Dec.

EXH. E

**Exhibit E-1**
(Figure 8 from US patent 6,282,548)



**Figure 8**

**Exhibit E-2**
(Figure 12A from US Patent 5,706,507 to Scloss)



**FIG.12A**

**Exhibit E-3**
(The Girafa Toolbar provides thumbnail images for the Google search results.
Screen shot captured on August 11, 2008)



**Exhibit E-4**

(Images on <u>http://www.girafa.com/product2.acr#q2</u> showing the Girafa Thumbnail Service)

 

**Exhibit E-5**
(Web page I made using the Girafa Thumbnail Service.
Screen shot captured on August 14, 2008)



# EXHIBIT C
# FILED UNDER SEAL

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GIRAFA.COM, INC.,                                )
                                                 )
                        Plaintiff,               )
                                                 )
        v.                                       )        C.A. No. _____ 0 7 - 7 8 7 _____
                                                 )
AMAZON WEB SERVICES LLC,                          )
AMAZON.COM, INC.,                                )        DEMAND FOR JURY TRIAL
ALEXA INTERNET, INC.,                            )
IAC SEARCH & MEDIA, INC.,                        )
SNAP TECHNOLOGIES, INC.,                         )
YAHOO! INC.,                                     )
SMARTDEVIL INC.,                                 )
EXALEAD, INC.,                                   )
        and                                      )
EXALEAD S.A.,                                    )
                                                 )
                        Defendants.              )

## COMPLAINT FOR PATENT INFRINGEMENT

1.      Plaintiff Girafa.com, Inc. ("Girafa" or "Plaintiff"), by and through its attorneys,

brings this action seeking monetary damages and injunctive relief against Defendants Amazon

Web Services LLC ("AWS"), Amazon.com, Inc. (Amazon), Alexa Internet, Inc., ("Alexa"), IAC

Search & Media, Inc. ("IAC"), Snap Technologies, Inc., ("Snap"), Yahoo! Inc., ("Yahoo"),

Smartdevil Inc., ("Smartdevil"), Exalead, Inc., ("Exalead, Inc."), and Exalead S.A., (Exalead,

S.A.) (collectively "Defendants"), to remedy Defendants' infringement of United States Patent

No. 6,864,904 ("the '904 patent"), in violation of the Patent Act of the United States, 35

U.S.C. §§ 1 et seq., and the harm caused thereby.

For its Complaint against Defendants, Girafa alleges as follows:

**PARTIES**

2.      Plaintiff Girafa is a corporation organized and existing under the laws of Delaware, having its principal place of business at 1313 N. Market Street, Suite 5100, Wilmington, Delaware 19801.

3.      Plaintiff Girafa owns the entire right, title, and interest in United States Patent No. 6,864,904, described below, for a framework for providing visual context to WWW hyperlinks.

4.      On information and belief, Defendant AWS is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 1200 12th Avenue South, Seattle, Washington 98144-2734.

5.      Defendant Amazon is a corporation organized and existing under the laws of Delaware, with a principal place of business at 1200 12th Avenue South, Suite 1200, Seattle, Washington 98144-2734.

6.      Defendant Alexa is a corporation organized and existing under the laws of California, with a principal place of business at Presidio of San Francisco, Building 37, P.O. Box 29141, San Francisco, CA 94129.

7.      Defendant IAC is a corporation organized and existing under the laws of Delaware, with a principal place of business at 555 12th Street, Suite 500, Oakland, CA 94607.

8.      Defendant Snap is a corporation organized and existing under the laws of Delaware, with a principal place of business at 130 West Union Street, Pasadena, CA 91103.

9.      Defendant Yahoo is a corporation organized and existing under the laws of Delaware, with a principal place of business at 701 First Avenue, Sunnyvale, CA 94089.

2

10.    Defendant Smartdevil is a corporation organized and existing under the laws of Canada, with a principal place of business at 2156 Rousseau, Montreal QC H8N 1K7 Canada.

11.    Defendant Exalead, Inc. is a corporation organized and existing under the laws of Delaware, with a principal place of business at 90 Park Avenue, New York, NY 10016.

12.    Defendant Exalead, S.A. is a corporation organized and existing under the laws of France, with a principal place of business at 10, place de la Madeleine, Paris, France 75008.

**JURISDICTION AND VENUE**

13.    This is an action arising under the patent laws of the United States.

14.    This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1338.

15.    AWS, directly and/or through third parties, is doing business in this judicial district by selling, offering to sell, and otherwise making available its products and services, including the "http://developer.amazonwebservices.com" website.

16.    Accordingly, this Court has personal jurisdiction over AWS pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 10 Del. C. § 3104(b) and (c).

17.    Amazon, directly and/or through third parties, is doing business in this judicial district by selling, offering to sell, and otherwise making available its products and services, including the "Amazon.com" website. Amazon is also incorporated in Delaware.

18.    Accordingly, this Court has personal jurisdiction over Amazon pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 10 Del. C. § 3104(b) and (c).

3

19.    Alexa, directly and/or through third parties, is doing business in this judicial district by selling, offering to sell, and otherwise making available its products and services, including the "Alexa.com" website.

20.    Accordingly, this Court has personal jurisdiction over Alexa pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 10 Del. C. § 3104(b) and (c).

21.    IAC, directly and/or through third parties, is doing business in this judicial district by selling, offering to sell, and otherwise making available its products and services, including the "Ask.com" website.  IAC is also incorporated in Delaware.

22.    Accordingly, this Court has personal jurisdiction over IAC pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 10 Del. C. § 3104(b) and (c).

23.    Snap, directly and/or through third parties, is doing business in this judicial district by selling, offering to sell, and otherwise making available its products and services, including the "Snap.com" website, Snap Shots™, and the Snap Shots™ browser add-on.  Snap is also incorporated in Delaware.

24.    Accordingly, this Court has personal jurisdiction over Snap pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 10 Del. C. § 3104(b) and (c).

25.    Yahoo, directly and/or through third parties, is doing business in this judicial district by selling, offering to sell, and otherwise making available its products and services, including Yahoo's www.mybloglog.com website, Yahoo! Bookmarks service, and the "Del.icio.us" website.  Yahoo is also incorporated in Delaware.

4

26.    Accordingly, this Court has personal jurisdiction over Yahoo pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 10 Del. C. § 3104(b) and (c).

27.    Smartdevil, directly and/or through third parties, is doing business in this judicial district by selling, offering to sell, and otherwise making available its products and services, including the "Thumbshots.com" and "thumbshots.org" website.

28.    Accordingly, this Court has personal jurisdiction over Smartdevil pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 10 Del. C. § 3104(b) and (c).

29.    Exalead, Inc. and Exalead S.A., directly and/or through third parties, are doing business in this judicial district by selling, offering to sell, and otherwise making available their products and services, including the "Exalead.com" website and exalead one:search™, one:workgroup™, one:enterprise™, and one:datacenter™.  Exalead Inc is also incorporated in Delaware.

30.    Accordingly, this Court has personal jurisdiction over Exalead Inc. and Exalead S.A. pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 10 Del. C. § 3104(b) and (c).

31.    Girafa is a Delaware corporation.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b) for at least the reasons that the Defendants reside in Delaware and/or each have committed acts within this judicial district giving rise to this action and do business in this district at least by providing website services to users in this district.

**BACKGROUND**

32.    On December 9, 1999, Girafa filed provisional application 60/169,328 for a United States Patent.

5

33.     On November 8, 2000, Girafa filed non-provisional application 09/708,191 for a United States Patent claiming priority based on provisional application 60/169,328.

34.     On March 8, 2005, the patent application mentioned in paragraph 33 was duly and legally issued, by the United States Patent and Trademark Office, as United States Patent No. 6,864,904 B1 ("the '904 patent"), entitled "Framework for Providing Visual Context to WWW Hyperlinks."

35.     A true and correct copy of the '904 patent is attached hereto as Exhibit A.

36.     On information and belief, Defendants have offered and continue to offer products and services which infringe the '904 patent.

**PATENT INFRINGEMENT**

37.     Girafa incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth at length.

38.     Plaintiff Girafa owns all right, title, and interest in the '904 patent, including the right to sue thereon and the right to recover for infringement thereof.

39.     On information and belief, Defendants make, use, import, offer to sell, market, provide, and/or sell, directly or through third parties, computer and computer-related products and services, including thumbnail images of websites and websites displaying thumbnail images of other websites, in the United States and worldwide.

40.     On information and belief, Defendants, through the activities and products listed and described in the paragraphs above, have infringed and are directly infringing the '904 patent, and are also aiding, abetting, and contributing to, and actively inducing infringement of the '904

6

patent by non-parties, in the United States and countries foreign thereto, in violation of 35
U.S.C. § 271.

    41.    By reason of Defendants' infringing activities, Girafa has suffered, and will
continue to suffer, substantial damages in an amount yet to be determined.

    42.    Defendants' acts complained of herein have damaged and will continue to
damage Girafa irreparably. Girafa has no adequate remedy at law for these wrongs and injuries.
Girafa is therefore entitled to a preliminary and permanent injunction restraining and enjoining
Defendants and their agents, servants, and employees, and all persons and entities acting on
behalf thereof or in concert therewith, from infringing the claims of the '904 patent.

    43.    Defendants are not licensed or otherwise authorized to make, use, import, offer to
sell, market, provide, or sell any product or method claimed in the '904 patent, and Defendants'
infringing conduct is, in every instance, without Girafa's consent.

    44.    On information and belief, Defendants' infringement has been and continues to be
willful.

**PRAYER FOR RELIEF**

**WHEREFORE**, Girafa respectfully requests that the Court grant the following relief:

    a)    enter judgment that Defendants infringe and have infringed the '904 patent;

    b)    declare that Defendants' infringement of the '904 patent has been willful;

    c)    enter a preliminary and permanent injunction enjoining Defendants, their officers,
agents, servants, employees, and attorneys, and those persons and entities in active concert or
participation with them, from further infringement of the '904 patent;

d)    enter judgment awarding Girafa damages from Defendants adequate to compensate for Defendants' infringement, including interest and costs;

e)    enter judgment awarding Girafa treble damages based on Defendants' copying and willful infringement of the '904 patent;

f)    declare this case to be exceptional and enter judgment awarding Girafa increased damages under 35 U.S.C. § 284 and its reasonable attorney fees and costs under 35 U.S.C. § 285; and

g)    award Girafa such further relief as this court deems just and proper.

## DEMAND FOR JURY TRIAL

Girafa respectfully requests a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Girafa.com, Inc.*

8

*Of Counsel:*

William H. Mandir
John F. Rabena
SUGHRUE MION, PLLC
2100 Pennsylvania Ave., N.W.
Washington D.C.  20037
(202) 293-7060

Dated: December 5, 2007
186418.1

9



US006864904B1

(12) **United States Patent**
Ran et al.

(10) Patent No.: **US 6,864,904 B1**
(45) Date of Patent: **Mar. 8, 2005**

(54) **FRAMEWORK FOR PROVIDING VISUAL CONTEXT TO WWW HYPERLINKS**

(75) Inventors: **Shirli Ran**, Savion (IL); **Eldad Barnoon**, Tel Aviv (IL); **Yuval Yarom**, Ra'anana (IL)

(73) Assignee: **Girafa.com Inc.**, Wilmington, DE (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 224 days.

(21) Appl. No.: 09/708,191

(22) Filed: Nov. 8, 2000

**Related U.S. Application Data**

(60) Provisional application No. 60/169,328, filed on Dec. 6, 1999.

(51) Int. Cl.7 .................................................. G09G 5/00
(52) U.S. Cl. ...................... 345/760; 345/744; 345/763; 345/838
(58) Field of Search .................................. 345/744, 760, 345/763, 838; 715/501.1, 526, 513

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,940,075 | A | * 8/1999 | Mutschler et al. | .......... 345/760 |
| 5,963,964 | A | * 10/1999 | Nielsen | ................... 715/501.1 |
| 6,073,168 | A | * 6/2000 | Mighdoll et al. | ......... 709/217 |
| 6,119,135 | A | * 9/2000 | Helfman | ................ 715/513 |
| 6,144,962 | A | * 11/2000 | Weinberg et al. | ........... 707/10 |
| 6,154,771 | A | 11/2000 | Rangan et al. | |
| 6,181,342 | B1 | * 1/2001 | Niblack | ...................... 345/635 |
| 6,182,097 | B1 | * 1/2001 | Hansen et al. | ............. 715/526 |
| 6,184,886 | B1 | * 2/2001 | Bates et al. | ................ 345/760 |
| 6,199,081 | B1 | * 3/2001 | Meyerzon et al. | ......... 715/513 |
| 6,230,321 | B1 | 5/2001 | Kim | |
| 6,262,708 | B1 | * 7/2001 | Chu | ........................... 345/667 |
| 6,273,857 | B1 | * 8/2001 | Aden | ..................... 600/437 |
| 6,300,947 | B1 | 10/2001 | Kanevsky | |
| 6,310,601 | B1 | * 10/2001 | Moore et al. | .............. 345/660 |

| | | | | |
|---|---|---|---|---|
| 6,356,908 | B1 | * 3/2002 | Brown et al. | ................. 707/10 |
| 6,369,811 | B1 | * 4/2002 | Graham et al. | ............. 345/764 |
| 6,374,273 | B1 | 4/2002 | Webster | |
| 6,401,118 | B1 | * 6/2002 | Thomas | ....................... 709/224 |
| 6,421,070 | B1 | * 7/2002 | Ramos et al. | ............... 345/763 |
| 6,456,307 | B1 | * 9/2002 | Bates et al. | ................ 345/838 |
| 6,486,895 | B1 | * 11/2002 | Robertson et al. | ......... 345/776 |
| 6,526,424 | B2 | * 2/2003 | Kanno et al. | ................ 715/512 |
| 6,578,078 | B1 | * 6/2003 | Smith et al. | ................ 709/224 |
| 6,613,100 | B2 | * 9/2003 | Miller | ........................ 715/526 |
| 6,665,838 | B1 | * 12/2003 | Brown et al. | ............. 715/501.1 |

OTHER PUBLICATIONS

Andy Cockburn, et al, "Issues of page representation and organization in web browser's revisitation tools", proceedings of the OZCHI'99 Australian Conf. of Human Computer Interaction, Nov. 28–30, Wagga Wagga Australia.

Benjamin B. Bederson, et al, "A zooming web browser", published in 1996 in the 9th Annual ACM Simposium on user–interface software and technology.

George Robertson, et al, "Data mountain: using spatial memory for document management", published in 1998 in the 9th Annual ACM Simposium on user–interface software and technology.

Mary Czerwinski, et al, "Visualizing implicit queries for information management and retrieval", published in May 1999, in the proceedings of the ACM Conference on human factors in computing systems.

* cited by examiner

Primary Examiner—Matthew C. Bella
Assistant Examiner—Po Wei Chen
(74) Attorney, Agent, or Firm—Ladas & Parry

(57) **ABSTRACT**

A method and a system for presenting Internet information to a user including providing to a user a visual image of a web page containing at least one hyperlink, and at least partially concurrently providing a visual image of another web page of at least one web site which is represented by the at least one hyperlink.

**56 Claims, 11 Drawing Sheets**



Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com



FIG. 1

Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com



FIG. 2

FIG. 3



FIG. 4



FIG. 5



Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com



FIG. 6

## FIG. 7



FIG. 8



U.S. Patent        Mar. 8, 2005        Sheet 9 of 11        US 6,864,904 B1

FIG. 9



U.S. Patent    Mar. 8, 2005    Sheet 10 of 11    US 6,864,904 B1



FIG. 10

Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com

# FIG. 11



US 6,864,904 B1

1

# FRAMEWORK FOR PROVIDING VISUAL CONTEXT TO WWW HYPERLINKS

## PRIORITY CLAIM

This application claims priority from Provisional Application Ser. No. 60/169,328, filed Dec. 6, 1999.

The material on the compact discs labeled COPY 1 and COPY 2 is incorporated by reference. The compact discs are identified in the LIST OF APPENDICES below.

## FIELD OF THE INVENTION

The present invention relates to Internet methodologies and systems generally and more particularly to systems and methodologies for displaying information received over the Internet.

## BACKGROUND OF THE INVENTION

The following U.S. patents are believed to represent the current state of the art: U.S. Pat. Nos. 6,101,510; 6,016,494; 6,011,537; 5,973,692.

The following disclosures are also believed to be relevant to the subject matter of the present invention:

R. J. Yarger, G. Reese, and T. King "MySQL & mSQL," O'REILLY & Associates Inc, 1999, ISBN 1-56592-434-7;

B. Laurie, and P. Laurie "Apache the Definitive Guide, 2nd edition," O'REILLY & Associates Inc. 1999, ISBN 1-56592-528-9;

C. Musciano, and B. Kennedy "HTML the Definitive Guide, 3rd edition," O'REILLY & Associates Inc, 1998, ISBN 1-56592-492-4;

Libwww http://www.w3.org/Library;

T. Berners-Lee, R. Fielding, and L. Masinter "Uniform Resource Identifiers (URI): Generic Syntax", RFC 2396, August 1998.

## SUMMARY OF THE INVENTION

The present invention seeks to provide a particularly beneficial methodology and system for displaying information received over the Internet.

There is thus provided in accordance with a preferred embodiment of the present invention a method for presenting Internet information to a user. The method includes providing to a user a visual image of a web page containing at least one hyperlink, and at least partially concurrently providing a visual image of another web page of at least one web site which is represented by said at least one hyperlink.

Further in accordance with a preferred embodiment of the present invention the visual image of said another web page is displayed alongside the visual image of said web page.

Preferably the visual image of another web page appears hovering over said hyperlink.

Still further in accordance with a preferred embodiment of the present invention the visual image of said another web page is displayed within the visual image of said web page. The visual image of another web page appears hovering over said hyperlink.

Additionally in accordance with a preferred embodiment of the present invention the visual images of a plurality of other web pages represented by at least one hyperlink are displayed simultaneously along with said visual image of a web page containing at least one hyperlink.

Furthermore in accordance with a preferred embodiment of the present invention the web page comprises an HTML page.

2

Moreover in accordance with a preferred embodiment of the present invention, the method also includes providing a visual image of another web page includes employing a web browser including visualization functionality which interfaces via the Internet with an image server.

Preferably the visualization functionality is operative to download via the image server from an image database images of web pages which are referenced in hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page.

Additionally or alternatively the annotated web page includes the web page having alongside it images of homepages linked with the web page.

Further in accordance with a preferred embodiment of the present invention, the method includes providing a visual image of another web page and includes employing a web browser which interfaces via the Internet with a web server including visualization functionality.

Preferably the visualization functionality operates to embed commands to the web browser to download, via an image server, images of web pages which are referenced in hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page.

Additionally the annotated web page may include the web page having within it images of homepages linked with the web page.

Additionally in accordance with a preferred embodiment of the present invention the visualization functionality includes generation of a list of hyperlinks from a web page, elimination of links which refer back to a web server sending said web page, determination of whether redirection links are present and if so, visualizing an ultimate destination thereof and visualizing remaining hyperlinks.

Further in accordance with a preferred embodiment of the present invention the visualization functionality may also include receiving a list of hyperlinks, splitting a URL of each hyperlink into URL components including at least a path component and a host component, trimming a path component based on the consideration of finding the most representative image of a given web page and constructing a new URL including a trimmed path component.

There is also thus provided in accordance with a preferred embodiment of the present invention a method for generating a web page image database. The method includes receiving a list of URLs corresponding to web pages, the images of which it is desired to download into an image database, operating a multiplicity of downloaders simultaneously by supplying to each downloader one URL at a time, causing each downloader to retrieve from the Internet, a web page and embedded objects corresponding to the URL supplied to it, causing a thumbnail generator to render the web page and causing said thumbnail generator to shrink said rendered image of the web page and supply it to the downloader.

Further in accordance with a preferred embodiment of the present invention the method also includes deleting executable content from the web page.

Still further in accordance with a preferred embodiment of the present invention the method includes causing each downloader to retrieve from the Internet, a web page and embedded objects corresponding to the URL supplied to it and causing a thumbnail generator to operate a corresponding web browser to render the web page employ a locally stored copy of said web page and said embedded objects.

Additionally in accordance with a preferred embodiment of the present invention the method includes employing a

US 6,864,904 B1

3

web server for providing said locally stored copy of said web page and of said embedded objects to said web browser.

Furthermore in accordance with a preferred embodiment of the present invention the visual image of another web page appears hovering over said hyperlink.

There is further provided in accordance with another preferred embodiment of the present invention a system for presenting Internet information to a user including a first functionality providing to a user a visual image of a web page containing at least one hyperlink and a second functionality operative at least partially concurrently with said first functionality for providing a visual image of another web page of at least one web site which is represented by said at least one hyperlink.

Further in accordance with a preferred embodiment of the present invention the visual image of said another web page is displayed alongside the visual image of said web page.

Still further in accordance with a preferred embodiment of the present invention the visual images of said another web page is displayed within the visual image of said web page.

Furthermore in accordance with a preferred embodiment of the present invention the visual images of a plurality of other web pages represented by at least one hyperlink are displayed simultaneously along with said visual image of a web page containing at least one hyperlink.

Additionally in accordance with a preferred embodiment of the present invention the web page comprises an HTML page.

Further in accordance with a preferred embodiment of the present invention the second functionality comprises third functionality employing a web browser including visualization functionality which interfaces via the Internet with an image server.

Preferably the visualization functionality is operative to download via the image server from an image database images of web pages which are referenced in hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page. Additionally or alternatively the annotated web page includes the web page having alongside it images of homepages linked with the web page.

Further in accordance with a preferred embodiment of the present invention the second functionality comprises fourth functionality employing a web browser which interfaces via the Internet with a web server including visualization functionality.

Preferably the visualization functionality is operative to embed commands to the web browser to download, via an image server, images of web pages which are referenced in hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page. Additionally or alternatively the annotated web page includes the web page having within it images of homepages linked with the web page.

Further in accordance with a preferred embodiment of the present invention the visualization functionality includes the generation of a list of hyperlinks from a web page, the elimination of links which refer back to a web server sending said web page, the determination of whether redirection links are present and if so, visualizing an ultimate destination thereof and the visualizing remaining hyperlinks.

Still further in accordance with a preferred embodiment of the present invention the visualization functionality includes receiving a list of hyperlinks, splitting a URL of each hyperlink into URL components including at least a path

4

component and a host component, trimming a path component based on the consideration of finding the most representative image of a given web page and constructing a new URL including a trimmed path component.

Furthermore in accordance with a preferred embodiment of the present invention the visual image of another web page appears hovering over said hyperlink.

Additionally in accordance with a preferred embodiment of the present invention the visual image of another web page appears hovering over said hyperlink.

Additionally or alternatively the visual image of another web page appears hovering over said hyperlink. Preferably the visual image of another web page appears hovering over said hyperlink.

Furthermore the visual image of another web page may appear to hover over said hyperlink.

Still further in accordance with a preferred embodiment of the present invention the visual image of another web page appears hovering over said hyperlink.

There is provided in accordance with yet another preferred embodiment of the present invention a system for generating a web page image database, the system includes at least one downloader receiving one URL at a time and retrieving from the Internet a web page and embedded objects corresponding to the URL received by it and at least one thumbnail generator operative to render the web page, shrink said rendered image of the web page and supply said rendered image to the downloader.

Further in accordance with a preferred embodiment of the present invention the at least one downloader is operative to delete executable content from the web page.

Still further in accordance with a preferred embodiment of the present invention each downloader retrieves from the Internet, a web page and embedded objects corresponding to the URL received by it and locally stores a copy of said web page and said embedded objects and causes said thumbnail generator to render the web page by employing said locally stored copy of said web page and said embedded objects.

Preferably the system also includes a web server providing said locally stored copy of said web page and of said embedded objects.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be understood and appreciated more fully from the following detailed description, taken in conjunction with the drawings in which:

FIG. 1 is a simplified partially pictorial, partially block diagram illustration of a system and methodology for displaying information received over the Internet in accordance with a preferred embodiment of the present invention;

FIG. 2 is a simplified partially pictorial, partially block diagram illustration of a system and methodology for displaying information received over the Internet in accordance with another preferred embodiment of the present invention;

FIG. 3 is a simplified flow chart of part of visualization functionality employed in the system and methodology of FIG. 1;

FIG. 4 is a simplified flow chart of visualization functionality employed in accordance with a preferred embodiment of the present invention;

FIG. 5 is a simplified flow chart of path component trimming functionality employed in the embodiment of FIG. 3;

FIG. 6 is a simplified block diagram illustration of a system for generating an image database useful in the system and methodology of FIGS. 1 and 2;

Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com

US 6,864,904 B1

5

FIG. 7 is a flow chart illustrating operation of a controller forming part of the system of FIG. 6;

FIG. 8 is a floss chart illustrating operation of a downloader forming part of the system of FIG. 6;

FIG. 9 is a flow chart illustrating operation of a process HTML algorithm employed in the downloader of FIG. 8;

FIG. 10 is a flow chart illustrating operation of a thumbnail generator forming part of the system of FIG. 6; and

FIG. 11 is a flow chart illustrating operation of a broker forming part of the system of FIG. 6.

LIST OF APPENDICES

Appendix A is a software listing in hexadecimal form of software suitable for providing the visualization functionality of FIG. 1 when installed in accordance with installation instructions set forth hereinbelow;

Appendix B is a software listing in hexadecimal form of software suitable for providing the functionality of FIG. 6 when installed in accordance with installation instructions set forth hereinbelow;

Appendix C is a software listing in hexadecimal form of software suitable for providing the functionality of an image server of FIG. 1 and FIG. 2 when installed in accordance with installation instructions set forth hereinbelow.

The foregoing software listings are protected by copyright in the USA and in all other jurisdictions.

Appendix A. Appendix B and Appendix C are included on Copy 1 and Copy 2 of the CD-Rs attached herewith to the present application. Each CD-R includes the files GIRAFA-.hex (Appendix A) of Nov. 7, 2000 and of length 3,052,711 bytes; ARANHA.hex (Appendix B) of Nov. 7, 2000 and of length 5,498.984 bytes and IMAGE.hex (Appendix C) of Nov. 7, 2000 and of length 217,154 bytes.

DESCRIPTION OF PREFERRED
EMBODIMENTS

Reference is now made to FIG. 1, which is a simplified partially pictorial, partially block diagram illustration of a system and methodology for displaying information received over the Internet in accordance with a preferred embodiment of the present invention. As seen in FIG. 1, a web browser 100, such as Microsoft Internet Explorer 5.5, typically resident on a PC, such as a Dell Dimension L733 running Microsoft Windows 98, receives a web page 101, such as an HTML page, over the Internet from a web server 102. The web browser 100 preferably includes visualization functionality 103 which interfaces, typically via the Internet, with an image server 104, such as a Dell Power Edge 2450 running Apache 1.3.12 on an OpenBSD 2.7 operating system.

The image server 104 interfaces with an image database 106, which is preferably a Dell Power Edge 2450 running MySQL 3.23.25 on an OpenBSD 2.7 operating system which is preferably loaded by using functionality of the type described hereinbelow with reference to FIG. 7.

The visualization functionality 103 is operative to download via the image server 104 from the image database 106 images of web pages which are referenced in hyperlinks contained in the web page 101 and to provide to a user, via the web browser 100, an annotated web page 110, which preferably includes the web page 101 having alongside it images 112 of homepages linked with web page 101.

Reference is now made to FIG. 2, which is a simplified partially pictorial, partially block diagram illustration of a

6

system and methodology for displaying information received over the Internet in accordance with another preferred embodiment of the present invention. As seen in FIG. 2, a web browser 200, typically resident on a PC, such as a Dell Dimension L733 running Microsoft Windows 98, interfaces, typically via the Internet, with a web server 202, such as a Dell Power Edge 2450 running Apache 1.3.12 on an OpenBSD 2.7 operating system.

The web server 202 interfaces with a dynamic page generator 204, such as a P.H.P. 4.0.2, in which is preferably installed a visualization functionality 206, which is described hereinbelow in greater detail. The dynamic page generator 204 interfaces with a database 208, such as a Dell Power Edge 2450 running MySQL 3.23.25 on an OpenBSD 2.7 operating system.

The web browser 200 preferably interfaces with an image server 210, such as a Dell Power Edge 2450 running Apache 1.3.12 on an OpenBSD 2.7 operating system. The image server 210 interfaces with an image database 212, which is preferably a Dell Power Edge 2450 running MySQL 3.23.25 on an OpenBSD 2.7 operating system, which is preferably loaded by using functionality of the type described hereinbelow with reference to FIG. 7.

The visualization functionality 206 is operative to embed within a dynamically generated web page, such as an HTML page, commands to the web browser 200 to download via the image server 210 from the image database 212 images of web pages which are referenced in hyperlinks contained in a web page 213 and to provide to a user, via the web browser 200, the web page 213 annotated to include therewithin images 216 of homepages linked therewith.

It is appreciated that either or both of the embodiments of FIGS. 1 and 2 may provide images of web pages which are referenced in hyperlinks contained in a web pave either alongside or within that web page. It is also appreciated that either or both of the embodiments FIGS. 1 and 2 may provide images of web pages which are referenced in hyperlinks contained in a web page, which images hover either over or alongside the hyperlinks. It is appreciated that the visual image of another web page may function as a hyperlink.

Reference is now made to FIG. 3, which is a simplified flow chart of part of visualization functionality employed in the system and methodology of FIG. 1. The flow chart of FIG. 3 illustrates generation of a list of hyperlinks from a web page, such as web page 101 in the embodiment of FIG. 1 received from a web server 102.

As each link is extracted from web page 101, an examination is made in order to eliminate links which refer back to web server 102 and to determine whether redirection links are present. This is typically done by searching for the presence of a string "http://" encoded in the URL, which characterizes a redirection link. In the case of links, which appear to be redirection links, only the ultimate destination is listed In the case of links which do not appear to be redirection links, the links themselves are listed. The resulting list is employed as an input to the functionality of FIG. 4.

In the illustrated embodiment of FIG. 3, all of the hyperlinks are processed. Alternatively, not all of the hyperlinks need be processed. In such a case, a user may decide which hyperlinks to process.

Reference is now made to FIG. 4, which is a simplified flow chart of visualization functionality employed in accordance with a preferred embodiment of the present invention. As seen in FIG. 4, a list of hyperlinks is received. This list

Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com

US 6,864,904 B1

7

may be derived from a web page such as web page 101 in the embodiment of FIG. 1 using the functionality of FIG. 3 or may be provided by dynamic page generator 204 and obtained via database 208 in the embodiment of FIG. 2.

If hyperlinks are present, the URL of each hyperlink is split into URL components. For example, if the URL of a hyperlink appears as follows:
http://www.microsoft.com:80/windows2000/upgrade/
    compat/search/computers.asp?page=2&send=1&Order=
    Sort+by+Company&CN=Dell&PN=&PT=
The components thereof include the following:
Scheme: http
Host: www.microsoft.com
Port: 80
Path: /windows2000/upgrade/compat/search/computers.asp
Query:  page=2&send=1&Order=Sort+by+Company&CN=
    Dell&PN=&PT=

The path component may be trimmed based on the consideration of finding the most representative image of a given web page. A flow chart illustrating a preferred algorithm for making this determination appears in FIG. 5 and is described hereinbelow.

Thus, in the above example, the trimmed path component appears as follows:
/windows2000/upgrade
Following any trimming of the path component, a new URL is constructed from the scheme, host, port and trimmed path components. This URL is employed for outputting an http query to an image server, such as image server 104 in the embodiment of FIG. 1 or 210 in the embodiment of FIG. 2.

A preferred form of http query in the above example appears as follows:
http://wb1.girafa.com/srv/i?
    u=http://
    www.microsoft.com%2fwindows2000%2fupgrade
Reference is now made to FIG. 5, which is a simplified flow chart of path component trimming functionality employed in the embodiment of FIG. 4. As seen in FIG. 5, the path component trimming functionality comprises receipt of the URL components after splitting thereof, as described hereinabove with reference to the flowchart of FIG. 4. Information from the host component of the URL is employed in trimming of the path component of the URL. Each path component comprises a plurality of path segments.

If the last path segment in a path component is a file name, this path segment is removed. Determination whether a path component is a file name is typically carried out by examining the suffix thereof to determine whether it is a known suffix representing a file name.

If the first path segment starts with a "~", which typically designates a home directory in a Unix system, the path component is trimmed after that first path segment.

If the host is not www.geocities.com, the path component is trimmed after the second path segment.

If the host is www.geocities.com and any of the first three path segments consists of 4 digits, the path component is trimmed after the first segment that consists of 4 digits.

If the host is % www.geocities.com and none of the first three path segments consists of 4 digits, the path component is trimmed after the second segment.

Reference is now made to FIG. 6, which is a simplified block diagram illustration of a system for generating an image database useful in the system and methodology of FIGS. 1 and 2. As seen in FIG. 6, a controller 600 receives a list 602 of homepages, the images of which it is desired to

8

download into an image database 604, such as image database 106 in the embodiment of FIG. 1 or image database 212 in the embodiment of FIG. 2.

The controller 600 operates a multiplicity of downloaders 606 simultaneously by supplying to each downloader one URL at a time. Each downloader 606 retrieves from the Internet, the homepage and the embedded objects corresponding to the URL supplied to it by the controller 600 and deletes therefrom executable block content. The resulting output of the downloaders 606 is supplied to a web server 608 via a database 610.

Each downloader 606 establishes a connection with one of a plurality of thumbnail generators 612 via a broker 614. Once this connection has been established, a URL of a locally stored copy of a downloaded homepage, which is stored in database 610, is sent to the thumbnail generator 612 with which the connection has been established.

Each thumbnail generator 612 operates a corresponding web browser 616 to download via web server 608 the locally stored copy of the homepage, which is stored in database 610. The thumbnail generators 612 each receive a rendered image of the homepage from a corresponding web browser 616 and shrink it and supply it to the downloader 606 with which the connection has been established.

It is appreciated that normally the number of downloaders exceeds the number of thumbnail generators by at least an order of magnitude. The broker 614 coordinates interaction between a thumbnail generator and a downloader.

Reference is now made to FIG. 7, which is a flow chart illustrating operation of a controller forming part of the system of FIG. 6. A list of homepages is received from database 602 (FIG. 6). Each homepage is taken from the list and downloaded by a downloader 606 (FIG. 6). The functionality of FIG. 7 ensures that a predetermined number of downloaders operate simultaneously, so long as the list of undownloaded homepages is sufficiently long.

Reference is now made to FIG. 8, which is a flow chart illustrating operation of a downloader forming part of the system of FIG. 6. As seen in FIG. 8, each downloader maintains a download queue for the homepage which the downloader is currently downloading. The download queue includes a list of URLs of objects in the homepage as well as the homepage object that require downloading in order to provide a local copy of the homepage.

For each URL in the download queue, an inquiry is made whether a local copy of the object corresponding thereto already exists. If so, a link to that local copy is created. If not, an attempt is made to download the object. If upon attempting to download the object, the downloader is informed that the object is located on another URL. i.e. by the receipt of redirection reply, that URL is placed in the download queue.

If, the download is successful, the downloaded object is stored in database 610 (FIG. 6) as a local copy. If the downloaded object is an HTML page, then the HTML page is processed, preferably by an algorithm of the type described hereinbelow in FIG. 9.

When the download queue is empty, a connection is established with thumbnail generator 612 (FIG. 6) via broker 614 (FIG. 6). The URL of the local copy of the homepage object is sent to the thumbnail generator 612 and a thumbnail image of the homepage is generated thereby. This thumbnail image is stored in image database 604 (FIG. 6).

Reference is now made to FIG. 9, which is a flow chart illustrating operation of a process HTML algorithm employed in the downloader of FIG. 8. The HTML object

Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com

US 6,864,904 B1

9

which is downloaded is scanned; the executable content thereof is eliminated and embedded objects therein are recognized.

For each embedded object a decision is made whether to download it. This decision is made based on the nature of the embedded object and the nature of the reference thereto. Generally, images and HTML objects are downloaded.

URLs of objects to be downloaded are placed in the download queue referred to hereinabove in connection with FIG. 8 and the HTML object is modified to refer to the local copies of the objects to be downloaded. References to objects not to be downloaded are eliminated from the HTML object.

Reference is now made to FIG. 10, which is a flow chart illustrating operation of a thumbnail generator, such as thumbnail generator 612, forming part of the system of FIG. 6. Initially, the thumbnail generator initializes a web browser functionality 616 (FIG. 6). When a connection is established to the thumbnail generator 612 from a downloader 606 (FIG. 6) via a broker 614 (FIG. 6), the thumbnail generator 612 receives the URL of the local copy of the homepage.

The web browser navigates to that URL and renders the homepage. A snapshot of the homepage is taken, typically in bitmap form. This snapshot is resized to a desired thumbnail size and is then transmitted via the downloader 606 for storage in image database 604.

Reference is now made to FIG. 11, which is a flow chart illustrating operation of a broker, such as broker 614, forming part of the system of FIG. 6. The broker receives connection requests from both thumbnail generators 612 (FIG. 6) and downloaders 606 (FIG. 6). When simultaneous requests are pending from both a thumbnail generator and a downloader, the broker establishes a direct connection therebetween. When there exists a surplus of connection requests from either thumbnail generators 612 or downloaders 606, queues of such connection requests may be maintained by the broker.

A preferred method for constructing A Framework For Providing Visual Context To WWW Hyperlinks in accordance with a preferred embodiment of the present invention includes the following steps:

1. Generate Binary file GIRAFA.hex from the computer listing of Appendix A.
2. Decode GIRAFA.hex using a MIME compliant decoder, creating Girafa-1-45.exe.

The method for starting the visualization functionality of FIG. 1 with the program in Appendix A includes the following steps:

1. Provide a computer terminal such as an Intel-based Pentium III 800 MHz computer, configured with Microsoft Windows 98 operating system, and Internet Explorer 5.5 Web Browser.
2. Load the file Girafa-1-45.exe to a temporary directory in the computer terminal provided in step 1, Execute the file Girafa-1-45.exe, and follow the installation instructions. When asked to register, press 'cancel'.
3. Edit the file Girafa.ini in the installation directory, replacing every occurrence of the string 'aranha.girafa.com' with the hostname of the image server, and every occurrence of the number 8080 with the number 80.
4. Start the Internet Explorer browser.
5. In the Internet Explorer Window select the View Menu, in it select the Explorer Bars sub-menu, and in it choose GirafaBar.
6. Follow the registration procedure.

A further preferred method for constructing A Framework For Providing Visual Context To WWW Hyperlinks in

10

accordance with a preferred embodiment of the present invention includes the following steps:

1. Generate Binary file ARANHA.hex from the computer listing of Appendix B.
2. Decode ARANHA.hex using a MIME compliant decoder, creating aranha.tgz.

The method for providing the functionality of FIG. 6 with the program in Appendix B includes the following steps:

1. Provide a computer server such as a Dell PowerEdge 2450, with at least 1 GB of main memory, configured with OpenBSD 2.7 operating system, and MySQL 3.23.25 database, and connected to the Internet.
2. Create the directory /var/www/httpd/collect.
3. Create the directory /data1.
4. In /data1 extract the file aranha.tgz by using the command 'tar xvfz aranha.tgz', creating /data1/aranha/aranha.conf, /data1/aranha/capture.zip, /data1/aranha/db.def, /data1/aranha/mod_asis.so, /data1/aranha/bin, /data1/aranha/bin/broker, /data1/aranha/bin/controller, /data1/aranha/bin/downloader, /data1/aranha/bin/downloader.real, and a skeleton image directory /data1/aranha/images.
5. Edit the file /data1/aranha/aranha.conf, replacing the string <SERVER_IP_ADRESS> with the server's IP address, the string <DBUSER> with a MySQL username that have full access to database named DATA, and the string <DBPASSWORD> with the password of that user.
6. Create the MySQL database, and initialize it by running the MySQL script /data1/aranha/db.def.
7. Set the environment variable ARANHA_CONF to /data1/aranha/aranha.conf.
8. Execute, in the background, the program /data1/aranha/bin/broker.
9. Install the apache module mod_asis.so by changing directory to /data1/aranha, and executing the command 'apxs -a -i mod_asis.so'.
10. Set the handle_asis as the Apache web server handler for files with suffix '.y'.
11. Start the Apache web server.
12. Provide a computer server such as a Dell PowerEdge 2450, with a display adapter capable of displaying a resolution of 1600x1280x32, such as an ATI ALL-IN-WONDER 128 32MB PCI, and an ethernet adapter such as a Netgear FA310TX, configured with Windows NT Workstation 4.0 SP4, connected via Ethernet to the computer server provided in step 1.
13. Transfer the file data1/aranha/capture.zip to the computer server provided in step 12.
14. Extract capture.zip using a WinZip 7.0 compliant decoder, to the directory c:\appl, creating c:\appl\_1Source.dll, c:\app\CapturWeb.exe, c:\appl\CaptureWeb.ini, c:\app\Mfc42d.dll, c:\app\Mfcn42d.dll, c:\app\Mfco42d.dll, c:\app\Msvcrtd.dll, c:\app\runCaptureWeb.exe.
15. Edit the file c:app\CaptureWeb.ini replacing the string <SERVER_IP_ADDRESS> with the IP address of the OpenBSD server as provided in step 1.
16. Execute the application c:\app\CaptureWeb.exe.
17. Create a list of hostnames the thumbnail of their home pages is to be created, and store in the file /tmp/list.
18. Execute the application /data1/aranha/bin/controller to download the thumbnail images of hosts listed in /tmp/list by running the command '/data1/aranha/bin/controller/tmp/list'.

Another preferred method for constructing A Framework For Providing Visual Context To WWW Hyperlinks in accordance with a preferred embodiment of the present invention includes the following steps:

US 6,864,904 B1

11

1. Generate Binary file IMAGE.hex from the computer listing of Appendix C.
2. Decode IMAGE.hex using a MIME compliant decoder, creating image_server.tgz.

The method for providing providing the functionality of an image server of FIGS. 1 and 2 includes the following steps:

1. Provide a computer server such as a Dell PowerEdge 2450, with at least 1 GB of main memory, configured with OpenBSD 2.7 operating system. MySQL 3.23.25 database, and an image database created by the software provided in Appendix B, and Connected to the Internet.
2. Extract the binary file of Appendix C using the command 'tar xvfz image_server.tgz', creating the directories image_server and image_server/errs, and the files image_server/aranha.conf, image_server/mod_girafa.so, image_server/errs/empty, and image_servers/errs/notFL.gif
3. Change directory to image_server
4. Install the apache module mod_girafa.so by executing the command 'apxs -a -i mod_girafa.so'
5. copy the file aranha.conf to /data1/aranha/aranha.conf
6. Create the directory /var/www/htdocs/errs
7. Copy the files errs/empty and errs/notFL.gif to /var/www/htdocs/errs
8. Start the apache web server.

It will be appreciated by persons skilled in the art that the present invention is not limited by what has been particularly shown and described hereinabove. Rather the scope of the present invention includes both combinations and sub-combinations of the various features described hereinabove as well as variations and modifications which would occur to persons skilled in the art upon reading the specification and which are not in the prior art.

What is claimed is:

1. A method for presenting Internet information to a user comprising:

providing to a user a visual image of a web page containing at least one hyperlink; and at least partially concurrently

providing a thumbnail visual image of the home page of at least one web site which is represented by said at least one hyperlink via the Internet by employing an image server that stores and provides said thumbnail visual image.

2. A method according to claim 1 and wherein said thumbnail visual image is displayed alongside the visual image of said web page.

3. A method according to claim 2 and wherein said thumbnail visual image appears hovering over said hyperlink.

4. A method according to claim 1 and wherein said thumbnail visual image is displayed within the visual image of said web page.

5. A method according to claim 4 and wherein said thumbnail visual image appears hovering over said hyperlink.

6. A method according to claim 1 and wherein a plurality of thumbnail visual images represented by at least one hyperlink are displayed simultaneously along with said visual image of a web page containing at least one hyperlink.

7. A method according to claim 1 and wherein said web page comprises an HTML page.

8. A method according to claim 1 and wherein said providing a-thumbnail visual image comprises:

employing a web browser which interfaces via the Internet with said image server.

12

9. A method according to claim 8 and wherein said visualization functionality is operative to download via the image server from an image database images of web pages which represent hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page.

10. A method according to claim 8 and wherein said visualization functionality comprises:

generation of a list of hyperlinks from a web page;

elimination of links which refer back to a web server sending said web page;

determination of whether redirection links are present and if so, providing thumbnail visual images of ultimate destinations thereof; and

providing thumbnail visual images of remaining hyperlinks.

11. A method according to claim 8 and wherein said visualization functionality comprises:

receiving a list of hyperlinks;

splitting a URL of each hyperlink into URL components including at least a path component and a host component;

trimming a path component based on the consideration of finding the most representative image of a given web page; and

constructing a new URL including a trimmed path component.

12. A method according to claim 1 and wherein said providing a-thumbnail visual image comprises:

employing a web browser which interfaces via the Internet with a web server including visualization functionality.

13. A method according to claim 12 and wherein said visualization functionality is operative to embed commands to the web browser to download, via said image server, thumbnail visual images of web pages which represent hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page.

14. A method according to claim 13 and wherein said annotated web page includes the web page having within it thumbnail visual images of homepages of web sites referenced by hyperlinks contained in the web page.

15. A method according to claim 1 and wherein said thumbnail visual image appears hovering over said hyperlink.

16. A method for generating an image server database of thumbnail visual images of web pages, the method comprising:

receiving a list of URLs corresponding to said web pages, the thumbnail visual images of which it is desired to supply to said image server database;

operating a multiplicity of downloaders simultaneously to retrieve from the Internet, web pages and embedded objects corresponding to URLs from said list;

causing a thumbnail generator to render retrieved web pages retrieved simultaneously by said multiplicity of downloaders; and

causing said thumbnail generator to shrink said rendered images of said retrieved web pages and supply them to said image server database.

17. A method according to claim 16 also comprising deleting executable content from said retrieved web pages.

18. A system for presenting Internet information to a user comprising:

first functionality providing to a user a visual image of a web page containing at least one hyperlink; and

Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com

US 6,864,904 B1

13

second functionality operative at least partially concurrently with said first functionality for providing a thumbnail visual image of the home page of at least one web site which is represented by said at least one hyperlink via the Internet by employing an image server that stores and provides said thumbnail visual image.

19. A system according to claim 18 and wherein said thumbnail visual image is displayed alongside the visual image of said web page.

20. A system according to claim 19 and wherein said thumbnail visual image appears hovering over said hyperlink.

21. A system according to claim 18 and wherein said thumbnail visual image is displayed within the visual image of said web page.

22. A system according to claim 21 and wherein said thumbnail visual image appears hovering over said hyperlink.

23. A system according to claim 18 and wherein a plurality of thumbnail visual images represented by at least one hyperlink are displayed simultaneously along with said visual image of a web page containing at least one hyperlink.

24. A system according to claim 18 and wherein said web page comprises an HTML page.

25. A system according to claim 18 and wherein said second functionality comprises third functionality employing a web browser including visualization functionality which interfaces via the Internet with said image server.

26. A system according to claim 25 and wherein said visualization functionality is operative to download via the image server from an image database images of web pages which represent hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page.

27. A system according to claim 25 and wherein said visualization functionality comprises:

generation of a list of hyperlinks from a web page;

elimination of links which refer back to a web server sending said web page;

determination of whether redirection links are present and if so, providing thumbnail visual images of ultimate destinations thereof; and

providing thumbnail visual images of remaining hyperlinks.

28. A system according to claim 25 and wherein said visualization functionality comprises:

receiving a list of hyperlinks;

splitting a URL of each hyperlink into URL components including at least a path component and a host component;

trimming a path component based on the consideration of finding the most representative image of a given web page; and

constructing a new URL including a trimmed path component.

29. A system according to claim 18 and wherein said second functionality comprises fourth functionality employing a web browser which interfaces via the Internet with a web server including visualization functionality.

30. A system according to claim 29 and wherein said visualization functionality is operative to embed commands to the web browser to download, via said image server, thumbnail visual images of web pages which represent hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page.

14

31. A system according to claim 30 and wherein said annotated web page includes the web page having within it thumbnail visual images of homepages of web sites referenced by hyperlinks contained in the web page.

32. A system according to claim 18 and wherein said thumbnail visual image appears hovering over said hyperlink.

33. A system for generating an image server database of thumbnail visual images of web pages, the system comprising:

a multiplicity of downloaders, each receiving at least one URL from a list of URLs corresponding to said web pages, the thumbnail visual images of which it is desired to supply to said image server database, and simultaneously retrieving from the Internet web pages and embedded objects corresponding to said at least one URL; and

at least one thumbnail generator operative to render the web pages, shrink said rendered images of the web pages and supply said rendered images to said image server database.

34. A system according to claim 33 and wherein said multiplicity of downloaders are operative to delete executable content from the web pages.

35. A method for presenting Internet information to a user comprising:

providing to a user a visual image of a web page containing at least one hyperlink; and at least partially concurrently

providing a thumbnail visual image of another web page of at least one web site which is represented by said at least one hyperlink via the Internet by employing an image server that stores and provides said thumbnail visual image,

said providing a thumbnail visual image comprising employing a web browser which interfaces via the Internet with a web server, separated from said image server, including visualization functionality, said visualization functionality being operative to embed commands to the web browser to download, via said image server, thumbnail visual images of web pages which represent hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page.

36. A method according to claim 35 and wherein said thumbnail visual image is displayed alongside the visual image of said web page.

37. A method according to claim 36 and wherein said thumbnail visual image appears hovering over said hyperlink.

38. A method according to claim 35 and wherein said thumbnail visual image is displayed within the visual image of said web page.

39. A method according to claim 38 and wherein said thumbnail visual image appears hovering over said hyperlink.

40. A method according to claim 35 and wherein a plurality of thumbnail visual images represented by at least one hyperlink are displayed simultaneously along with said visual image of a web page containing at least one hyperlink.

41. A method according to claim 35 and wherein said web page comprises an HTML page.

42. A method according to claim 35 and wherein said annotated web page includes the web page having within it thumbnail visual images of homepages of web sites referenced by hyperlinks contained in the web page.

US 6,864,904 B1

15

**43.** A method according to claim **35** and wherein said visualization functionality comprises:

generation of a list of hyperlinks from a web page;

elimination of links which refer back to a web server sending said web page;

determination of whether redirection links are present and if so, providing thumbnail visual images of ultimate destinations thereof; and

providing thumbnail visual images of remaining hyperlinks.

**44.** A method according to claim **35** and wherein said visualization functionality comprises:

receiving a list of hyperlinks;

splitting a URL of each hyperlink into URL components including at least a path component and a host component;

trimming a path component based on the consideration of finding the most representative image of a given web page; and

constructing a new URL including a trimmed path component.

**45.** A method according to claim **35** and wherein said thumbnail visual image appears hovering over said hyperlink.

**46.** A system for presenting Internet information to a user comprising:

first functionality providing to a user a visual image of a web page containing at least one hyperlink; and

second functionality operative at least partially concurrently with said first functionality for providing a thumbnail visual image of another web page of at least one web site which is represented by said at least one hyperlink via the Internet by employing an image server that stores and provides said thumbnail visual image, said second functionality comprising third functionality employing a web browser which interfaces via the Internet with a web server, separated from said image server, including visualization functionality,

said visualization functionality being operative to embed commands to the web browser to download, via said image server, thumbnail visual images of web pages which represent hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page.

**47.** A system according to claim **46** and wherein said thumbnail visual image is displayed alongside the visual image of said web page.

16

**48.** A system according to claim **47** and wherein said thumbnail visual image appears hovering over said hyperlink.

**49.** A system according to claim **46** and wherein said thumbnail visual image is displayed within the visual image of said web page.

**50.** A system according to claim **49** and wherein said thumbnail visual image appears hovering over said hyperlink.

**51.** A system according to claim **46** and wherein a plurality of thumbnail visual images represented by at least one hyperlink are displayed simultaneously along with said visual image of a web page containing at least one hyperlink.

**52.** A system according to claim **46** and wherein said web page comprises an HTML page.

**53.** A system according to claim **46** and wherein said annotated web page includes the web page having within it thumbnail visual images of homepages of web sites referenced by hyperlinks contained in the web page.

**54.** A system according to claim **46** and wherein said visualization functionality comprises:

generation of a list of hyperlinks from a web page;

elimination of links which refer back to a web server sending said web page;

determination of whether redirection links are present and if so, providing thumbnail visual images of ultimate destinations thereof; and

providing thumbnail visual images of remaining hyperlinks.

**55.** A system according to claim **46** and wherein said visualization functionality comprises:

receiving a list of hyperlinks;

splitting a URL of each hyperlink into URL components including at least a path component and a host component;

trimming a path component based on the consideration of finding the most representative image of a given web page; and

constructing a new URL including a trimmed path component.

**56.** A system according to claim **46** and wherein said thumbnail visual image appears hovering over said hyperlink.

* * * * *

Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

0 7 - 7 8 7

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

GIRAFA.COM, INC.

**DEFENDANTS**  AMAZON WEB SERVICES LLC., AMAZON.COM, INC., ALEXA INTERNET, INC., IAC SEARCH & MEDIA, INC., SNAP TECHNOLOGIES, INC., YAHOO! INC., SMARTDEVIL INC., EXALEAD, INC., and EXALEAD SA.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

John G. Day
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801  (302) 654-1888

Attorneys (If Known)

unknown

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury— Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☒ 830 Patent | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Title 35 U.S. Code.  This is an action arising under the patent laws of the United States.

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ ____  CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):  JUDGE ____  DOCKET NUMBER ____

DATE  December 5, 2007

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # ____  AMOUNT ____  APPLYING IFP ____  JUDGE ____  MAG. JUDGE ____

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| Alexa Internet, Inc. <br>      Plaintiff, <br><br>      v. <br><br> Girafa.com, Inc. <br>      Defendant. | NO.  2:08-cv-121 <br><br> **JURY DEMANDED** |

<u>**PLAINTIFF ALEXA'S PATENT INFRINGEMENT COMPLAINT**</u>

Plaintiff Alexa Internet, Inc. ("Alexa"), by its attorneys, for its Complaint against Defendant Girafa.com, Inc. ("Girafa"), alleges as follows:

**NATURE OF ACTION**

1.     This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code, Sections 100 *et seq.* and, more particularly, 35 U.S.C. §§ 271 and 281.  This action relates to the Defendant's infringement of a patent assigned to Alexa.

**PARTIES**

2.     Plaintiff Alexa is a corporation organized and existing under the laws of California, having its principal place of business at Presidio of San Francisco, Building 37, P.O. Box 29141, San Francisco, California 94129.

3.     Defendant Girafa is a corporation organized and existing under the laws of Delaware, having its principal place of business at 1313 North Market Street, Suite 5100, Wilmington, Delaware 19801.

1

## JURISDICTION AND VENUE

4.    Plaintiff's claims are made pursuant to the patent laws of the United States, Title 35 U.S.C. §§ 1 *et seq.* This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.    Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b) and/or (c), and 1400(b), as Girafa resides and/or conducts substantial business in this district and has committed, and is continuing to commit, acts of infringement in this district.

6.    Girafa is subject to personal jurisdiction in this judicial district because it is doing business in this judicial district, directly and/or through third parties, by selling, offering to sell, and otherwise making available its products and services, including at the "http://www.girafa.com" web page.

## GENERAL ALLEGATIONS

7.    United States Patent No. 6,282,548 ("the '548 patent"), entitled "Automatically Generate and Displaying Metadata as Supplemental Information Concurrently with the Web Page, There Being No Link Between Web Page and Metadata" was duly and legally issued by the United States Patent and Trademark Office to inventors Michael G. Burner *et al.* on August 28, 2001. A true and correct copy of the '548 patent is attached hereto as Exhibit A.

8.    The '548 patent has been assigned to Alexa who is its current owner with sole rights to sue and recover damages and otherwise enforce the '548 patent.

9.    Girafa makes, uses, sells, offers for sale in the United States, and/or imports into the United States, directly or through third parties, computer-related products and services, including without limitation, its Girafa Toolbar and Girafa Thumbnail Service, that infringe the '548 patent.

2

## FIRST CAUSE OF ACTION
## <u>INFRINGEMENT OF THE '548 PATENT</u>

10.     Plaintiff refers to and incorporates paragraphs 1 through 9, as though fully set forth herein.

11.     Girafa has been and is still is infringing literally and/or under the doctrine of equivalents one or more claims of the '548 patent pursuant to 35 U.S.C. § 271(a) by making, using, selling, offering to sell in the United States, and/or importing into the United States, directly or through third parties, computer-related products and services, including without limitation, its Girafa Toolbar and Girafa Thumbnail Service, that infringe the '548 patent.

12.     By reason of Girafa's acts alleged herein, Plaintiff has suffered, is suffering, and, unless such acts are enjoined by the Court, will continue to suffer injury to its business and property rights, for which it is entitled to damages pursuant to 35 U.S.C. § 284 in an amount to be proved at trial.

13.     By reason of Girafa's acts alleged herein, Plaintiff has suffered, is suffering, and, unless such acts are enjoined by the Court, will continue to suffer irreparable harm for which there is no adequate remedy at law, and for which Plaintiff is entitled to preliminary and/or permanent injunctive relief pursuant to 35 U.S.C. § 283.

## SECOND CAUSE OF ACTION
## <u>INDUCED INFRINGEMENT OF THE '548 PATENT</u>

14.     Plaintiff refers to and incorporates paragraphs 1 through 13 as though fully set forth herein.

15.     Plaintiff is informed and believes and thereon alleges that Girafa has been and still is inducing others to infringe one or more claims of the '548 patent pursuant to 35 U.S.C. §

3

271(b) and/or (f) by making, using, selling, offering to sell in the United States, and/or importing

into the United States, directly or through third parties, computer-related products and services,

including without limitation, its Girafa Toolbar and Girafa Thumbnail Service, that infringe the

'548 patent.

16.    Plaintiff has suffered, is suffering, and, unless such acts are enjoined by the Court,

will continue to suffer injury to its business and property rights, for which it is entitled to

damages pursuant to 35 U.S.C. § 284 in an amount to be proved at trial.

17.    By reason of Girafa's acts alleged herein, Plaintiff has suffered, is suffering, and,

unless such acts are enjoined by the Court, will continue to suffer irreparable harm for which

there is no adequate remedy at law, and for which Plaintiff is entitled to preliminary and/or

permanent injunctive relief pursuant to 35 U.S.C. § 283.

### THIRD CAUSE OF ACTION
### CONTRIBUTORY INFRINGEMENT OF THE '548 PATENT

18.    Plaintiff refers to and incorporates paragraphs 1 through 17 as though fully set

forth herein.

19.    Girafa has been and is still contributorily infringing one or more claims of the

'548 patent pursuant to 35 U.S.C. § 271(c) by making, using, selling, offering to sell in the

United States, and/or importing into the United States, directly or through third parties,

computer-related products and services, including without limitation, its Girafa Toolbar and

Girafa Thumbnail Service, that infringe the '548 patent.

20.    By reason of Girafa's acts alleged herein, Plaintiff has suffered, is suffering, and,

unless such acts are enjoined by the Court, will continue to suffer injury to its business and

4

property rights, for which it is entitled to damages pursuant to 35 U.S.C. § 284 in an amount to be proved at trial.

21.    By reason of Girafa's acts alleged herein, Plaintiff has suffered, is suffering, and, unless such acts are enjoined by the Court, will continue to suffer irreparable harm for which there is no adequate remedy at law, and for which Plaintiff is entitled to preliminary and/or permanent injunctive relief pursuant to 35 U.S.C. § 283.

## RESERVATION OF RIGHTS

22.    Alexa reserves its right to amend its Complaint to include additional facts and claims, including, but not limited to, Girafa's willful infringement, should facts learned during discovery support any such additional facts and claims.

## PRAYER

WHEREFORE, Alexa respectfully request the following relief:

(a)    That Plaintiff be adjudged the owner of the '548 patent and entitled to all rights of recovery thereunder, and that such patent is valid and enforceable;

(b)    That Girafa be adjudged to have infringed, induced infringement, and/or contributed to infringement of the '548 patent;

(c)    That Girafa, its officers, principals, agents, attorneys, servants, and employees, and all others acting under their direction and authority, and their successors and assigns, be enjoined by preliminary and permanent injunctions from infringement, inducement of infringement, and contributory infringement of the '548 patent;

(d)     That Plaintiff be awarded all damages adequate to compensate it for Girafa's infringement of the '548 patent, such damages to be determined by a jury, including pre-judgment and post-judgment interest;

(e)     That this case be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that Plaintiff be awarded the attorney fees, costs, and expenses that it incurs prosecuting this action; and

(f)     That Plaintiff be given such other and further relief as this Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Alexa respectfully requests that all issues triable be tried by and before a jury.

Dated: March 21, 2008                         Respectfully Submitted,

                                              /s/ Charles Ainsworth
                                              Charles Ainsworth
                                              Parker Bunt & Ainsworth, P.C
                                              100 E Ferguson, Suite 1114
                                              Tyler, TX 75702
                                              (903) 531-3535 (Telephone)
                                              (903) 533-9687 (Fax)
                                              Email: charley@pbatyler.com

                                              Thomas G. Pasternak – PHV pending
                                              R. David Donoghue – PHV pending
                                              DLA Piper US LLP
                                              203 N. LaSalle Street, Suite 1900
                                              Chicago, Illinois 60601
                                              312) 368-4000 (Telephone)
                                              (312) 236-7516 (Fax)
                                              thomas.pasternak@dlapiper.com
                                              david.donoghue@dlapiper.com

                                              M. Elizabeth Day – PHV pending
                                              Gregory J. Lundell – PHV pending
                                              DLA Piper US LLP
                                              2000 University Avenue
                                              East Palo Alto, CA 94303 2248
                                              (650) 833-2000 (Telephone)
                                              (650) 833-2001 (Fax)
                                              elizabeth.day@dlapiper.com
                                              greg.lundell@dlapiper.com

                                              *Attorneys for Alexa Internet, Inc.*

7

# EXHIBIT F

Amazon.com: Alexa Site Thumbnail FAQs: Amazon Web Services

-- CONTENT GOES HERE (simple)--
-- CONTENT GOES HERE (simple)--
-- CONTENT GOES HERE (simple)--
-- CONTENT GOES HERE (simple)--



**amazon.com**
**webservices**™

Make Money

Learn About AWS

AWS Home
Why Use AWS?
What's New in AWS?
Upcoming Events
Success Stories
Solutions Catalog
Create an Account
Contact Us
Careers at AWS
FAQs

**Browse Web Services**

Amazon Associates Web
Service
Amazon Elastic Compute
Cloud (Beta)
Amazon Flexible Payments
Service (Beta)
Amazon Mechanical Turk
(Beta)
Amazon SimpleDB (Beta)
Amazon Simple Storage
Service
Amazon Simple Queue
Service
Alexa Web Services
Browse All Web Services

Hello, Brad Myers. We have recommendations for you. (Not Brad Myers?)

Brad Amazon.com
Amazon.com
Search

program overview    marketplace    associates    advantage    web services    WebStore by Amazon

Welcome, Brad Myers.
(Not you? Click here.)

Your Web Services Account

Your Account
Help
Your Lists
Cart
on-demand publishing

paid placements

Today's Deals    Gifts & Wish Lists    Gift Cards

Alexa Site Thumbnail FAQs

- What is the Alexa Site Thumbnail web service?
- For which web sites are thumbnail images available?
- How often are thumbnail images updated?
- How can I request that a thumbnail image be generated for a site?
- Why do some web sites have no thumbnail images?
- How long are the returned URLs linking to the images valid?
- How can I prevent a thumbnail from being generated for my site?
- How will I be charged and billed for my use of Alexa Site Thumbnail?
- How can I quickly incorporate the thumbnail images into my web site?
- Can I cache the thumbnail images on my server?
- What should I do if my personal web site (or blog) is not being recognized by Alexa as a separate site and therefore no thumbnail is being generated?
- How can I report an incorrect site thumbnail image?
- I do not have access to the server code for my web site. Can I add thumbnail images?

**Q:What is the Alexa Site Thumbnail web service?**

The Alexa Site Thumbnail web service provides developers with programmatic access to thumbnail images for the home pages of web sites. It offers access to Alexa s large and growing collection of images, gathered from its comprehensive web crawl.

This web service enables developers to enhance web sites, search results, web directories, blog entries, and other web real estate with Alexa thumbnails images. Including web site thumbnails improves user experience by allowing end users to preview sites before clicking on the thumbnail s associated link.

**Q: For which web site home pages are thumbnail images available?**

Thumbnails are available and can be requested for the home pages of web sites, including all of the top sites on the Internet, all of the web sites in the DMOZ directory, with more becoming available daily. The service also creates thumbnails for sites identified as personal home pages or blogs.

**Q: How often are thumbnail images updated?**

All thumbnails are updated about once every two months. The thumbnail images of more popular sites are updated more

8

**Use Amazon to Bill Your Customers**
Amazon DevPay (Beta)

**Developer Connection**
Resource Center
Forums
Blog
Newsletter
User Groups

frequently.

**Q: How can I request that a thumbnail image be generated for a site?**

You can make a request to the AlexaSiteThumbnail service passing in the URL of the site to be updated. If the thumbnail does not exist, you will not be charged. The site's URL will be placed into a queue to be generated within 24 hours.

**Q: Why do some web sites have no thumbnail images?**

Some web site owners have asked that we do not display thumbnail images of their sites. In addition, it is not always possible for the thumbnailing process to generate a thumbnail image of a web site.

**Q: How long are the returned URLs linking to the images valid?**

The URLs linking to the thumbnail images are only valid for 10 seconds. If more than 10 seconds have passed, you must request a new URL from the AlexaSiteThumbnail service using the get_thumbnail_link function, or by calling the web services API directly.

**Q: How can I prevent a thumbnail from being generated for my site?**

If you are a web site owner and do not wish a thumbnail to be generated for your site, please submit a request via the contact form. We will verify that you are the site owner before removing the image and blocking further thumbnail generation. Please use the subject line: "AlexaSiteThumbnail: Block thumbnailing of [www.somesite.com]".

**Q: How will I be charged and billed for my use of Alexa Site Thumbnail?**

There is no minimum fee, and no start-up cost. You will be charged $0.0002 / thumbnail URL returned (i.e. $0.20 per 1,000 thumbnail URLs), and there is no charge if the thumbnail does not exist. You will be billed at the beginning of each month for your use of the service during the previous month.

**Q: How can I quickly incorporate the thumbnail images into my web site?**

After signing up for the web service on the Alexa Site Thumbnail detail page, see the Alexa Site Thumbnail Utility Packages in the languages of your choice. Where ever you want to include a thumbnail image, simply call the get_thumbnail_link function in the code that is generating your web page, passing in your access keys and the url of the web site.

For example, in PHP:

```
<?php echo get_thumbnail_link('[Your Access Key Id]','[Your Secret Access Key]', 'Large', 'http://yoursite.com/noimage.jpg', 'somesite.com')
```

Sample code exists for many languages.

**Q: Can I cache the thumbnail images on my server?**

Yes, you may cache the thumbnail images and serve them from your servers for up to 24 hours, in accordance with the Amazon Web Services license agreement.

**Q: What should I do if my personal web site (or blog) is not being recognized by Alexa as a separate site and therefore no thumbnail is being generated?**

If your site is not recognized as a separate site, please submit a request via the contact form, noting the URL of your personal site or blog We will examine the URL and add rules to identify it as a separate site, if appropriate. This process may take several weeks. Once your web site is recognized as being separate from the hosting company's, a thumbnail can be generated for it.

**Q: How can I report an incorrect site thumbnail image?**

9

Amazon.com: Alexa Site Thumbnail FAQs: Amazon Web Services

To report an incorrect thumbnail image, please use the contact form with the subject line: "AlexaSiteThumbnail: Incorrect image for [www.somesite.com]".

**Q: I do not have access to the server code for my web site. Can I add thumbnail images?**

No. For authentication purposes, you must sign your requests to the AlexaSiteThumbnail services using a signature generated by your Amazon access keys and other parameters. In order to sign requests, you must be able to modify the server code that is generating the web pages.

Conditions of Use | Privacy Notice © 1996-2008, Amazon.com, Inc. or its affiliates

10

http://www.amazon.com/b/ref=sc_fe_c_0_236156011_4?ie=UTF8&node=237118011&no=236156011&me=A3dL94ZTS2JA2A (3 of 3) [2/4/2008 5:09:33 PM]

Amazon.com: Alexa Site Thumbnail: Amazon Web Services



**amazon**.com
**webservices**™

**Learn About AWS**

AWS Home
Why Use AWS?
What's New in AWS?
Upcoming Events
Success Stories
Solutions Catalog
Create an Account
Contact Us
Careers at AWS
FAQs

**Browse Web Services**

Amazon Associates Web
Service
Amazon Elastic Compute
Cloud (Beta)
Amazon Flexible Payments
Service (Beta)
Amazon Mechanical Turk
(Beta)
Amazon SimpleDB (Beta)
Amazon Simple Storage
Service
Amazon Simple Queue
Service
Alexa Web Services

Browse All Web Services

-- CONTENT GOES HERE (simple) --
-- CONTENT GOES HERE (simple) --
-- CONTENT GOES HERE (simple) --
-- CONTENT GOES HERE (simple) --

Make Money

Hello, Brad Myers.  We have recommendations for you. (Not Brad Myers?)

Brad's Amazon.com | Today's Deals ☑ | Gifts & Wish Lists ☑ | Gift Cards ☑

Search | Amazon.com

program overview    marketplace    associates    advantage    **web services**    WebStore by Amazon    paid placements

Hit G... | 🛒 Cart | Your Lists

Your Account |
Help

on-demand publishing

Welcome, Brad Myers.
(Not you? Click here.)
( Your Web Services Account | ▶ )
🔒 Sign Up For This Web Service

## Alexa Site Thumbnail

The Alexa Site Thumbnail web service provides developers with programmatic access to thumbnail images for the home pages of web sites. It offers access to Alexa's large and growing collection of images, gathered from its comprehensive web crawl.

This web service enables developers to enhance web sites, search results, web directories, blog entries, and other web real estate with Alexa thumbnail images. Including web site thumbnails improves user experience by allowing end users to preview sites before clicking on the thumbnail's associated link.

### Service Highlights

- **Ease of use** - Retrieve up to twenty thumbnail images at once by adding a single line of code to your web pages
- **Broad and expanding image collection** - retrieve thumbnails for home pages of web sites including all of the top sites on the Internet, all of the web sites in the DMOZ directory, with more becoming available daily.
- **Responsive** - If a requested thumbnail image does not yet exist, it will be automatically generated within 24 hours.
- **Multi-size access** - Thumbnail images are available in large (147x201 pixels) and small (82x111 pixels) sizes.

### Resources

- Resource Center
  ▹ Technical documentation
  ▹ Code samples
  ▹ Articles, and other resources for building on Alexa Site Thumbnail
- WSDL
- Developer Forums
- FAQs

### Pricing

- Pay only for what you use. There is no minimum fee, and no start-up cost.
- $0.0002 / thumbnail returned (i.e. $0.20 per 1,000 thumbnails)
- No charge if the thumbnail does not exist

*(Alexa Site Thumbnail is sold by Amazon Web Services LLC.)*

### Detailed Description

All thumbnail images are accessible via web services, using SOAP or REST. In addition, developers can quickly and easily add thumbnail images to web pages using the Alexa Site Thumbnail Utility Package in their language of choice.

Amazon.com: Alexa Site Thumbnail: Amazon Web Services

**Use Amazon to Bill Your Customers**

Amazon DevPay (Beta)

**Developer Connection**

Resource Center
Forums
Blog
Newsletter
User Groups

**Alexa Site Thumbnail Utility Package**

This Utility allows developers to pass the URL of a web site, along with their Amazon Web Services identifiers, and the desired image size, into the provided get_thumbnail_link utility function and print the returned HTML directly into their web pages. For example, to display a "Large" thumbnail image for "somesite.com", developers would use:

get_thumbnail_link([ Your Access Key ID], [ Your Secret Access Key], "Large", "", "somesite.com")

To retrieve up to 20 thumbnail images at a time, developers can call the get_thumbnail_links function passing in an array of web sites:

get_thumbnail_links([ Your Access Key ID], [ Your Secret Access Key], "Small", "http://yoursite.com/no-thumbnail.jpg", [An array of site urls] )

**Getting Started**
After signing up for this web service using the button above, developers can refer to the Getting Started Guide, which will guide them through downloading the "Alexa Site Thumbnail Utility Package" for the language of choice, and adding function calls wherever they would like a thumbnail image to appear on a web page. To start using the API directly using SOAP or REST, developers can refer to the Alexa Site Thumbnail Developer Guide.

**Intended Usage and Restrictions**

· Your use of this service is subject to the Amazon Web Services Customer Agreement.

**Top**

12

Conditions of Use | Privacy Notice © 1996-2008, Amazon.com, Inc. or its affiliates

# EXHIBIT G

LEXSEE 2005 U.S. DIST. LEXIS 37009

**In re: ACACIA MEDIA TECHNOLOGIES CORPORATION.**

**NO. C 05-01114 JW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, SAN JOSE DIVISION**

*2005 U.S. Dist. LEXIS 37009*

**July 19, 2005, Decided
July 19, 2005, Filed**

**SUBSEQUENT HISTORY:** Patent interpreted by *Acacia Media Techs. Corp. v. New Destiny Internet Group, 405 F. Supp. 2d 1127, 2005 U.S. Dist. LEXIS 38810 (N.D. Cal., Dec. 7, 2005)*

**COUNSEL:** [*1] For Acacia Media Technologies Corp., Plaintiff: Alan P. Block, Hennigan Bennett & Dorman LLP, Los Angeles, CA; David P. Pearson, Winthrop & Weinstine, PA, Minneapolis, MN; Jay R. Campbell, Renner Otto Boisselle & Sklar LLP, Cleveland, OH; Kevin I. Shenkman, Hennigan Bennett & Dorman LLP, Los Angeles, CA; Mark Anchor Albert, Hennigan Bennett & Dorman LLP, Los Angeles, Ca; Mark C. Johnson, Renner Otto Boisselle & Sklar, Cleveland, OH; Roderick G. Dorman, Hennigan Bennett & Dorman LLP, Los Angeles, CA; Todd R. Tucker, Renner Otto Boisselle & Sklar LLP, Cleveland, OH.

For Mediacom Communications Corporation, Defendant: Jan J. Klohonatz, Taylor & Company Law Offices, San Francisco, CA; Stephen E. Taylor, Taylor & Company Law Offices, Inc., San Francisco, CA; Jeffrey D. Sullivan, Baker Botts LLP, New York, NY; Michael J. McNamara, Baker Botts LLP, New York, NY; Mitchell D. Lukin, Baker Botts LLP, Houston, TX.

For Hospitality Network, Inc, Coxcom Inc, Defendants: J. Timothy Nardell, Richard R. Patch, Coblentz, Patch, Duffy & Bass LLP, San Francisco, CA; Annamarie A. Daley, Emmett J. McMahon, Stephen P. Safranski, Robins Kaplan Miller & Ciresi LLP, Minneapolis, MN.

For Charter [*2] Communications, Inc, Defendant: Morgan William Tovey, William R. Overend, Reed Smith LLP, San Francisco, CA; Bradford P. Lyerla, Jeffrey H. Dean, Kevin D. Hogg, Marshall Gerstein & Borun LLP, Chicago, IL.

For The Directv Group, Inc., Defendant: Maria K. Nelson, Marsha Ellen Mullin, Victor George Savikas, Kevin G. McBride, JONES DAY, Los Angeles, CA.

For Echostar Satellite LLC, Echostar Technologies Corporation, Defendants: Harold J. McElhinny, Jason A. Crotty, Matthew I. Kreeger, Rachel Krevans, Morrison & Foerster LLP, San Francisco, CA.

For Echostar Technologies Corporation, Defendant: Paul A. Friedman, Morrison & Foerster, San Francisco, CA; David C. Doyle, Morrison & Foerster LLP, San Diego, Ca.

For Mid-Continent Media, Inc., US Cable Holdings LP, Sjoberg's Cablevision, Inc., Savage Communications Inc., Loretel Cablevision, Cannon Valley Communications Inc., Arvig Communication Systems, Defendants: Albert L. Underhill, John C. Reich, Rebecca A. Bortolotti, Merchant & Gould, Minneapolis, MN; Bradford P. Lyerla, Jeffrey H. Dean, Kevin D. Hogg, Marshall Gerstein & Borun LLP, Chicago, IL.

For COMCAST CABLE COMMUNICATIONS LLC, Defendant: Daralyn [*3] J. Durie, David J. Silbert, Keker & Van Nest LLP, San Francisco, CA.

For Armstrong Group, Wide Open West LLC, East Cleveland Cable TV and Communications LLC, Massillon Cable TV Inc., Consol Defendants: Bradford P. Lyerla, Carl E. Myers, Jeffrey H. Dean, Kevin D. Hogg, Marshall Gerstein & Borun LLP, Chicago, IL; Christopher B. Fagan, Fay Sharpe Fagan Minnich & McKee, Cleveland, OH.

For Block Communications Inc doing business as Buckeye Cable, Consol Defendant: Fritz Byers, Toledo, OH.

For Game Link Inc, Consol Defendant: Christopher S. Marchese, Fish & Richardson, San Diego, Ca; Jonathan E. Singer, Fish & Richardson, P. C., P.A., Minneapolis, MN; Juanita R. Brooks, Todd Glen Miller, Fish & Richardson P.C., San Diego, CA; William R. Woodford, Fish & Richardson P.C., Minneapolis, MN.

For CJ Inc, Consol Defendant: Juanita R. Brooks, Fish & Richardson P.C., San Diego, CA.

For Club Jenna Inc. ACMP LLC, Cybernet Ventures Inc., Global AVS Inc, National A-1 Advertising Inc a Pennsylvania Corporation, Lightspeedcash Erroneously sued as lightspeed Media Corp., Consol Defendants: Jonathan E. Singer, Fish & Richardson, P. C., P.A., Minneapolis, MN; Juanita R. Brooks, Fish [*4] & Richardson P.C., San Diego, CA; Todd Glen Miller, Fish & Richardson P.C., San Diego, CA; William R. Woodford, Fish & Richardson P.C., Minneapolis, MN.

For AP Net Marketing Inc., ICS Inc, Consol Defendant: Adam Robert Alper, David A. York, Latham and Watkins, Menlo Park, Ca.

For AEBN Inc, Ademia Multimedia LLC, Audio Communications Inc, Cyber Trend Inc, Innovative Ideas International, Lightspeed Media Group Inc, VS Media Inc, Consol Defendants: Todd Glen Miller, Fish & Richardson P.C., San Diego, CA; William R. Woodford, Fish & Richardson P.C., Minneapolis, MN.

For ASKCS.com Inc, Consol Defendant: Alfredo A. Bismonte, Daniel Harlan Fingerman, Bobby T. Shih, Mount & Stoelker, San Jose, CA; Douglas W. Sprinkle, Mark D. Schneider, Gifford Krass Groh Sprinkle Anderson & Citkowski, P.C., Troy, MI.

For New Destiny Internet Group LLC, Adult Revenue Services, Consol Defendants: Juanita R. Brooks, Fish & Richardson P.C., San Diego, CA; Todd Glen Miller, Fish & Richardson P.C., San Diego, CA.

For Offendale Commercial Limited BV, Consol Defendant: James Michael Slominski, Los Angeles, Ca.

For International Web Innovations Inc, Consol Defendant: Victor de Gyarfas, [*5] William J. Robinson, Foley & Lardner LLP, Los Angeles, CA.

For Cable America Corp, Consol Defendant: Robert F. Copple, Sean David Garrison, Lewis & Roca LLP, Phoenix, AZ.

For Cable One Inc, Consol Defendant: C Mark Kittredge, Perkins Coie Brown & Bain PA, Phoenix, AZ; Mitchell D. Lukin, Baker Botts LLP, Houston, TX.

For NPG Cable Inc, Consol Defendant: Patrick J. Whalen, Spencer Fane Britt & Browne LLP, Kansas City, MO.

For Cebridge Connections, Consol Defendant: Jan J. Klohonatz, Taylor & Company Law Offices, San Francisco, CA.

**JUDGES:** JAMES WARE, United States District Judge.

**OPINION BY:** JAMESWARE

**OPINION**

**ORDER DENYING ACACIA'S MOTION TO DISMISS NEW DESTINY'S EIGHTH COUNTERCLAIM AND GRANTING ACACIA'S MOTION TO DISMISS NEW DESTINY'S NINTH COUNTERCLAIM**

**I. INTRODUCTION**

This is a patent infringement lawsuit in which Plaintiff Acacia Media Technologies Corporation ("Acacia") claims that various internet-based adult entertainment providers infringe *U.S. Patents Nos. 5,132,992* and *6,144,702*, which Acacia owns. In response, Defendant New Destiny Internet Group, LLC ("New Destiny") asserts nine counterclaims against Acacia. Presently before this Court is Acacia's Motion [*6] to Dismiss New Destiny's Eighth and Ninth Counterclaims for Failure to State a Claim. (See Acacia's Motion to Dismiss Defendants' Eighth and Ninth Counterclaims for Failure to State a Claim, hereinafter "Acacia's Motion," Docket Item No. 43 in Central District of California Case No. SA CV 02-1040.) [1] Based upon the arguments advanced by the parties, and for the reasons set forth below, this Court GRANTS Acacia's Motion in part and DENIES it in part.

> 1  Acacia's Motion purports to "move[] to dismiss Defendant Game Link's . . . Eighth . . . and Ninth Counterclaim[s] . . . for failure to state a claim under *Rule 12(b)(6)*." (Acacia's Motion at 1:3-6.) Acacia purports to attach Game Link's Answer and Counter-Claim as Exhibit 1 to its Motion. In fact, Exhibit 1 is Defendant New Destiny's Answer and Counter Claim. (Acacia's Motion Ex. 1.) Accordingly, this Court treats Acacia's Motion as a Motion to Dismiss New Destiny's (not Game Link's) Eighth and Ninth Counterclaims.

## II. BACKGROUND

New Destiny alleges, [*7] inter alia, that Acacia is and has been "threaten[ing], harass[ing], and intimidat[ing] [New Destiny] and other companies in [New Destiny's] industry into paying [Acacia] for license[s] to patents [that] it and they have not infringed and do not infringe." (New Destiny's Opposition to Acacia's Motion, hereinafter "New Destiny's Opposition," Docket Item No. 188 in Central District of California Case No. SA CV 02-1040, Ex. 1 at 42:12-14.) According to New Destiny, Acacia perceived New Destiny and others in New Destiny's industry as unsophisticated, and so "create[d] an atmosphere of fear so as to force [New Destiny] and other companies in [New Destiny's] industry . . . to pay royalties rather than defend against objectively baseless patent infringement suits." (New Destiny's Opposition Ex. 1 at 42:14-20.) As part of its campaign to "create an atmosphere of fear," Acacia allegedly

> mailed documents to [New Destiny] and others in [New Destiny's] industry, falsely stating that Acacia had patent claims covering content delivery methods such as video on demand, audio on demand, and video streaming.' Acacia made no mention in this correspondence that the [*8] scope of its patent claims was very narrow and covered only very specific systems and methods. Instead Acacia stated, incorrectly and without investigation, that [New Destiny's] systems and methods used Acacia's patented systems and methods.

(New Destiny's Opposition Ex. 1 at 43:2-8.) Furthermore, New Destiny alleges, Acacia repeatedly and publicly overstated the breadth of its patents. (New Destiny's Opposition Ex. 1 at 43:9-13 ("Acacia . . . continued to falsely state that its patents covered all methods and systems for transmitting audio and/or video information in press releases, interviews, and in pleadings to this Court[,] [but] [t]hese public statements all ignored the narrow scope of the claims that were obtained by the named inventors of the patents now allegedly owned by Acacia"); see also New Destiny's Opposition Ex. 1 at 44:8-26, 47:1-15, 47:20-48:7.) "Had Acacia, in fact, conducted . . . analyses [of prior art and other validity issues]," New Destiny alleges, "[Acacia] would have been fully aware of the prosecution histories of its patents and that its patent claims could not be given the broad scope they later urged in their media campaign." (New [*9] Destiny's Opposition Ex. 1 at 43:24-26.) "As such," New Destiny concludes,

those later claims were knowingly false and intended to intimidate, harass, and instill fear in those companies in [New Destiny's] industry, with the intent of interfering with the business relationships between [New Destiny] and its existing and prospective customers, and to further intimidate companies in [New Destiny's] industry to entering into unnecessary patent royalty agreements.

(New Destiny's Opposition Ex. 1 at 43:26-44:3.) New Destiny claims that Acacia's posturing was part and parcel of its business plan to "'secure a revenue stream of some $ 200 million a year, without writing a single line of code.'" (New Destiny's Opposition Ex. 1 at 45:1-2.) To support its claim, New Destiny quotes an article from technologymarketing.com, which allegedly states that:

> [Acacia CEO Paul] Ryan and his team of executives decided it would be better for the firm if they could get other companies to pay up more quickly if it looked as if everyone else were [*10] jumping on the bandwagon. Ryan launched a rollout plan that involved convincing a host of smaller firms to sign up, and the subsequent publicizing of those signings in order to create a sense of momentum for Acacia's claims. . . . By selecting fragmented markets rather than going after big players like MSN or AOL, Acacia hoped to avoid getting embroiled in a debilitating legal battle. My approach is to get some deals done and get some goodwill,' says Rob Berman, Acacia's senior vp [sic] of business development. I don't want to end up in the bowels of legal hell.' . . . Acacia hoped that the adult entertainment industry would be low-hanging fruit. After all, online adult entertainment is a fragmented and apparently incoherent set of companies, full of business amateurs who, Acacia hoped, would probably rather pay a percentage than get hailed into court.

(New Destiny's Opposition Ex. 1 at 45:3-17.)

On July 14, 2003, in a separate patent infringement lawsuit, Acacia Media Technologies Corporation v. Wild Ventures, LLC, No. SACV 02-1053 AHS (MLGx),

which involved the same patents at issue in this lawsuit, Judge Alicemarie Stotler granted Acacia a default judgment and an [*11] injunction against Defendant Wild Ventures, LLC ("Wild Ventures"). (New Destiny's Opposition Ex. 1 at 45:18-26.) [2] According to New Destiny, "Similar default injunctions were entered against Extreme Productions (SACV 02-CV-1062), Go Entertainment (SACV 03-CV-204), Lace Productions (SACV 02-CV-1047), and WebZotic LLC (SACV 02-CV-1065)." (New Destiny's Opposition Ex. 1 at 45:26-46:2.) Thereafter, Acacia allegedly embarked upon a media campaign that misrepresented the nature of the default injunctions. Although the default injunctions were entered because the defendants failed to respond to Acacia's lawsuit, Acacia allegedly told the media that "these rulings vindicated Acacia's claims regarding the allegedly broad scope of its patents." (New Destiny's Opposition Ex. 1 at 46:14-15.) New Destiny cites an article in CNET news.com as an illustration. In it, the author explains that,

> The company [Acacia] has won a preliminary injunction against five adult entertainment Web sties, barring them from using on-demand digital video or audio online, or providing advertising links to any other such sites. The ruling was a default decision, after the five companies declined to respond [*12] to a lawsuit, but does mark the first court *validation* of sweeping patent claims that could ultimately encompass virtually every site offering online multimedia content. Acacia owns patents on the process of transmitting compressed audio or video, which is one of the most fundamental multimedia technologies used on the Internet. We will not allow for the unauthorized use of our technology,' said Rob Berman, Acacia's general counsel. Although not our preference, we are willing to use the power of the court where necessary to stop unauthorized use.'

(New Destiny's Opposition Ex. 1 at 46:16-27 (first emphasis added).) On July 18, 2003, Rob Berman allegedly told Wired News that "Acacia's patents cover just about every form of digital audio and video distribution . . . [sic] these [sic] kinds of activities violate Acacia's intellectual property rights: pushing MP3s from peer-to-peer groups, streaming newscasts from Internet radio sites and delivering movies through cable networks.'" (New Destiny's Opposition Ex. 1 at 47:1-5.) Furthermore, on September 12, 2003, and again on September 15, 2003, Aca-

cia allegedly issued press releases, in which it stated "that its DMT [*13] technology, which is covered by pioneering patents, relates to audio and video transmission and receiving systems, commonly known as audio on-demand, video on-demand, and audio/video streaming, and is used for distributing content via several means including Internet, cable television, direct broadcast satellite, and wireless systems.'" (New Destiny's Opposition Ex. 1 at 47:20-25.)

> 2    Later, on November 21, 2003, pursuant to stipulation, this Court set aside the default judgment entered against Wild Ventures.

New Destiny argues that Acacia's patent infringement and business tort claims against New Destiny are "objectively baseless." (New Destiny's Opposition Ex. 1 at 41:26-42:5, 47:26-27, 48:16-18, 49:4-7.) New Destiny also argues that Acacia's statements to the press are "false, misleading, and intimidating" and "were made . . . with the intent to make others reluctant to engage in . . . business with Defendant, to intimidate others in Defendant's industry into paying Acacia for patent licenses that they did [*14] not need to enter but entered to avoid further harassment and potential baseless infringement litigation." (New Destiny's Opposition Ex. 1 at 47:26-48:6.) Acacia's conduct, Defendant counterclaims, constitutes Violation of *CAL. BUS. & PROF. CODE § 17200* (Eighth Counterclaim) and Abuse of Process (Ninth Counterclaim). (New Destiny's Opposition Ex. 1 at 41:14-49:19.) Acacia here moves to dismiss these counterclaims.

### III. STANDARDS

A *Rule 12(b)(6)* motion to dismiss tests the legal sufficiency of the claims stated in a complaint. In ruling on a motion to dismiss, the court must accept as true all allegations of material fact and must construe said allegations in the light most favorable to the non-moving party. *Western Reserve Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985)*. Any existing ambiguities must be resolved in favor of the pleading. *Walling v. Beverly Enterprises, 476 F.2d 393, 396 (9th Cir. 1973)*. *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, sets forth the strict standard for granting a *Rule 12(b)(6)* motion to dismiss. A *Rule 12(b)(6)* motion to dismiss must not be granted "unless it appears [*15] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id. at 45-46*. As the Ninth Circuit has observed, "The [*Rule 12(b)(6)*] motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Gilligan v. Jamco Develop. Corp., 108 F.3d 246, 249 (9th Cir. 1997)*. A motion to dismiss a counterclaim under *Rule 12(b)(6)* is treated the same as a motion

to dismiss a complaint. *Fabricant v. Sears Roebuck, 202 F.R.D. 306, 308 (S.D. Fla. 2001)* (citing *KRW Sales, Inc. v. Kristel Corp., 154 F.R.D. 186, 187 (N.D. Ill. 1994)).*

## IV. DISCUSSION

### A. New Destiny's Eighth Counterclaim: Violation of *CAL. BUS. & PROF. CODE § 17200*

New Destiny's Eight Counterclaim against Acacia is for Violation of *CAL. BUS. & PROF. CODE § 17200*. The purpose of *§ 17200* is to preserve fair business competition. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999)* (quoting *Barquis v. Merchants Collection Ass'n, 7 Cal. 3d 94, 110, 101 Cal. Rptr. 745, 496 P.2d 817 (1972)).* [*16] *Section 17200* prohibits five wrongs: (1) unlawful business acts/practices; (2) unfair business acts/practices; (3) fraudulent business acts/practices; (4) unfair, deceptive, untrue, or misleading advertising; and (5) any act prohibited by *CAL. BUS. & PROF. CODE §§ 17500-17577.5. CAL. BUS. & PROF. CODE § 17200*; WILLIAM L. STERN, *BUS. & PROF. C. § 17200* PRACTICE § 3:13 (2005). Only the first three wrongs are relevant here. (See New Destiny's Opposition at 5:6-6:27 (arguing that New Destiny has alleged that Acacia has engaged in "fraudulent" business acts), 7:1-11:2 (arguing that New Destiny has alleged that Acacia has engaged in "unlawful" business acts), 11:3-13:13 (arguing that New Destiny has alleged that Acacia has engaged in "unfair" business acts).)

At minimum, New Destiny arguably alleges that Acacia engaged in an "unfair" business acts or practices. Generally speaking, the "unfair" standard under *§ 17200* is broad by design. STERN, supra, § 3:113 ("The unfair' standard is intentionally broad, allowing courts maximum discretion to prohibit new schemes to defraud") (citing *Motors, Inc. v. Times Mirror Co., 102 Cal. App. 3d 735, 740, 162 Cal. Rptr. 543 (1980)).* [*17] However, in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999)*, the California Supreme Court changed the test of "unfairness" for commercial cases. Id. § 3:114. In Cel-Tech, the Court held that, in cases between business competitors, "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech, 20 Cal. 4th at 187.* Acacia and New Destiny dispute whether Cel-Tech's narrower test of "unfairness" applies here. (Acacia's Motion at 4:24 ("Defendant does not come close to pleading an antitrust-related cause of action [as required by Cel-Tech]"); New Destiny's Opposition at 12:23-24 ("Defendant need not satisfy Cel-Tech's test for unfair' to state a claim under *section 17200*"); Acacia's Reply Brief Re: Acacia's Motion, hereinafter "Acacia's Reply," Docket Item No. 198 in Central District of California Case No. SA CV 02-1040, at 6:5 ("Defendants therefore cannot escape the standard [*18] set forth in Cel-Tech").) This Court need not determine whether Cel-Tech's narrower test of "unfairness" applies here as a matter of law because, even if it does, New Destiny states a claim under it.

Antitrust law covers patent infringement lawsuits initiated in bad faith. As the Ninth Circuit observed in *Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 993 (9th Cir. 1979)*,

> [Patent] infringement actions initiated and conducted in bad faith contribute nothing to the furtherance of the policies of either the patent law or the antitrust law. The district court was correct in holding, in effect, that such actions may constitute an attempt to monopolize violative of *Section 2 of the antitrust law.*

New Destiny has alleged that Acacia initiated its patent infringement lawsuit against New Destiny in bad faith. In particular, New Destiny alleges that:

> Acacia has (i) made knowingly false and/or misleading statements about the systems and methods covered by its patents; (ii) made knowingly false and misleading statements about the validity of its patents . . .; (iii) made false statements, without investigations, about alleged infringement of [*19] its patents by Defendant and others; (iv) filed and is prosecuting objectively baseless patent infringement lawsuits, without pre-suit investigation against Defendant and others in Defendant's industry; (v) filed and prosecuted objectively baseless patent infringement lawsuits, without pre-suit investigation, against companies which Acacia's executives concede to do not even need to license the patents-in-suit; (vi) filed and is prosecuting objectively baseless claims of unfair competition, interference with business advantage, and trade libel against Defendant and others in Defendant's industry; (vii) sought and obtained default injunction orders against certain companies incorporating knowingly false statement about the scope of its patent claims; and (viii) has touted those default injunction orders in the press to

validate its knowingly false statements about the systems and methods covered by its patents.

(New Destiny's Opposition Ex. 1 at 41:21-42:9.) Construing New Destiny's pleading in the light most favorable to it, this Court concludes that New Destiny has alleged conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit [*20] of one of those laws . . ., or otherwise significantly threatens or harms competition." *Cel-Tech, 20 Cal. 4th at 187*; see also *Lynch v. Magnavox Co., 94 F.2d 883 (9th Cir. 1938)* (holding that plaintiff stated an antitrust claim against defendants when it alleged that defendants attempted to monopolize by initiating 55 patent infringement lawsuits and mailing numerous letters threatening to sue for patent infringement); *Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416 (10th Cir. 1952)* (holding that evidence that patent holders had given wide publicity to the number of patents they held -- many of which had expired -- supported a finding that the patent holders had engaged in monopolistic practices).

Accordingly, this Court DENIES Acacia's Motion to Dismiss New Destiny's Eight Counterclaim for Violation of *CAL. BUS. & PROF. CODE § 17200*.

**B. New Destiny's Ninth Counterclaim: Abuse of Process**

New Destiny's Ninth Counterclaim against Acacia is for Abuse of Process. As far as this Court can tell, New Destiny premises its Abuse of Process counterclaim upon two "abuses" of "process." First, New Destiny [*21] appears to allege that *this* lawsuit, which New Destiny characterizes as "objectively baseless," is abuse of process. (See New Destiny's Opposition Ex. 1 at 49:5-7 ("Acacia has abused the legal process by instituting and maintaining its objectively baseless patent infringement and business tort claims against Defendant . . . to accomplish a purpose for which the legal system is not designed or intended").) Second, New Destiny appears to allege that Acacia's lawsuits against *others* is abuse of process. (See New Destiny's Opposition Ex. 1 at 45:18-46:27, 47:26-48:7, 48:14-15, 48:21-24 (alleging that Acacia, after obtaining default injunctions against other defendants in other cases, embarked upon a media campaign that misrepresented the nature of the default injunction); see also New Destiny's Opposition at 20:19-23 ("Acacia has filed a multitude of dubious lawsuits against defendants it perceived as low-hanging fruit,' then deceptively leveraged publicity generated by those lawsuits to coerce defendants -- and others -- into paying for licenses from Acacia").) Neither of these alleged "abuses" of "process" are a sufficient basis upon which to premise an abuse of [*22] process claim.

First, "[t]he mere filing of a complaint or maintenance of a lawsuit, even for an improper purpose, does not constitute an abuse of process." 6A CAL. JUR. 3D *Assault and Other Willful Torts* § 17 (2003); see also *Loomis v. Murphy, 217 Cal. App. 3d 589, 595, 266 Cal. Rptr. 82 (1990)* ("[I]t is well settled that . . . the mere filing or maintenance of a lawsuit -- even for an improper purpose -- is not a proper basis for an abuse of process action'") (citing *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc., 42 Cal. 3d 1157, 1169, 232 Cal. Rptr. 567, 728 P.2d 1202 (1986)*; *RESTATEMENT (SECOND) OF TORTS § 682 cmt. a* (1977) ("The gravamen of [abuse of process] . . . is not . . . the wrongful initiation of . . . civil proceedings"); 5 B.E. WITKIN, SUMMARY OF CALIFORNIA LAW § 460 (9th ed. 1988) ("Obviously, the mere filing of a lawsuit is not an abuse of process"). Thus, Acacia's initiation of this lawsuit cannot form the basis of New Destiny's abuse of process counterclaim. See *Loomis, 217 Cal. App. 3d at 595* (affirming the dismissal of an abuse of process claim because the pleading "contained no allegations of [*23] misuse of process other than the filing of the complaint"). New Destiny conclusorily argues that its "allegations are extensive and encompass much more than the mere filing or maintenance of a lawsuit.'" (New Destiny's Opposition at 22:6-7.) Notably, however, New Destiny fails to support this argument with specific citations to its pleading.

Second, Acacia's other lawsuits against other defendants -- and the default injunctions obtained therefrom -- cannot form the basis of *New Destiny's* abuse of process counterclaim against Acacia. In every case upon which New Destiny relies, the alleged "process" that the defendants/counterdefendants allegedly "abused" is always directed at the plaintiff/counterclaimant. See *Coleman v. Gulf Ins. Group, 41 Cal. 3d 782, 788, 226 Cal. Rptr. 90, 718 P.2d 77 (1986)* (plaintiff alleged that defendant wrongfully appealed a judgment in plaintiffs favor); *Drum v. Bleau, Fox & Assocs., 107 Cal. App. 4th 1009, 1014, 132 Cal. Rptr. 2d 602 (2003)* (plaintiff alleged that defendant wrongfully levied plaintiffs bank accounts); *Brown v. Kennard, 94 Cal. App. 4th 40, 43-44, 113 Cal. Rptr. 2d 891 (2001)* (plaintiff alleged that defendant wrongfully levied plaintiff's deposit account); *Clark Equip. Co. v. Wheat, 92 Cal. App. 3d 503, 526, 154 Cal. Rptr. 874 (1979)* [*24] (counterclaimant alleged that counterdefendant wrongfully obtained two contempt orders against counterclaimant). Here, Acacia's other lawsuits against other defendants -- and the default injunctions obtained therefrom -- simply are too remote to form the basis of *New Destiny's* abuse of process counterclaim against Acacia.

2005 U.S. Dist. LEXIS 37009, *

As a final matter, Acacia's alleged misrepresentations to the media regarding the scope of the default injunctions is not the type of "process" protected by the abuse of process claim. "For purposes of the tort of abuse of process, the process that is abused must be *judicial* process. The essence of the tort lies in the misuse of the *power of the court.* It is an act done in the name of the court and under its authority for the purpose of perpetrating an injustice." 6A CAL. JUR. 3D *Assault and Other Willful Torts* § 12 (2003) (emphasis added). Statements (or misstatements) to the media, such as those allegedly made by Acacia, do not abuse judicial process.

Accordingly, this Court GRANTS Acacia's Motion to Dismiss New Destiny's Ninth Counterclaim for Abuse of Process.

## V. CONCLUSION

For the reasons set forth above, this Court DENIES Acacia's [*25] Motion to Dismiss New Destiny's Eighth Counterclaim and GRANTS Acacia's Motion to Dismiss New Destiny's Ninth Counterclaim.

Dated: July 19, 2005

JAMES WARE

United States District Judge

# EXHIBIT H

LEXSEE 2007 U.S. DIST. LEXIS 22556

**MONOLITHIC POWER SYSTEMS, INC., a Delaware corporation, Plaintiff, v. O2 MICRO INTERNATIONAL LIMITED, a Cayman Island corporation, Defendant. AND RELATED COUNTERCLAIMS. O2 MICRO INTERNATIONAL LIMITED, a Cayman Island corporation, Plaintiff, v. MONOLITHIC POWER SYSTEMS, INC., a Delaware corporation, et al., Defendants. AND RELATED COUNTERCLAIMS AND CROSS-CLAIMS.**

**No. C 04-2000 CW (consolidated with No. C 06-2929 CW)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 22556*

**March 14, 2007, Decided**
**March 14, 2007, Filed**

**PRIOR HISTORY:** *Monolithic Power Sys. v. O2 Micro Int'l Ltd., 476 F. Supp. 2d 1143, 2007 U.S. Dist. LEXIS 12390 (N.D. Cal., Feb. 8, 2007)*

**COUNSEL:** [*1] For Monolithic Power Systems, Inc., Plaintiff: Elisabeth J. Jaffe, Michael A. Ladra, LEAD ATTORNEYS, Wilson Sonsini Goodrich & Rosati, A Professional Corporation, Palo Alto, CA; Michael Barclay, LEAD ATTORNEY, Wilson Sonsini et al, Palo Alto, CA; Brian E. Mitchell, Thomas J. Friel, Jr., Cooley Godward Kronish LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO; Dean Geoffrey Dunlavey, Latham & Watkins, Costa Mesa, CA; Mark A. Flagel, Robert Steinberg, Latham & Watkins, Los Angeles, CA; Matthew J. Brigham, Cooley Godward Kronish LLP, Palo Alto, CA.

For O2 Micro International Limited, a Cayman Islands Corporation, Consol Plaintiff: Henry C. Bunsow, LEAD ATTORNEY, Korula T. Cherian, Patricia L. Peden, Rick C. Chang, Howrey LLP, San Francisco, CA; Otis W. Carroll, LEAD ATTORNEY, Ireland Carroll & Kelley, P.C., Tyler, TX US; Chia-lin Charlie Chang, Santa Clara, CA US; Duane H. Mathiowetz, Howrey Simon Arnold & White LLP, San Francisco, CA; Frank P. Cote, Howrey LLP, Irvine, CA US; Franklin Jones, Jr., Jones & Jones, Inc., P.C., Marshall, TX US; Henry C. Su, Howrey LLP, East Palo Alto, CA; Qin Shi, Howrey LLP, East Palo Alto, [*2] CA US; S. Calvin Capshaw, Brown McCarroll LLP, Longview, TX US; Terry W. Ahearn, McDermott Will & Emery LLP, Palo Alto, CA; Vinay Vijay Joshi, Esq., Howrey, LLP, Menlo Park, CA.

For O2 Micro International Limited, Defendant: Duane H. Mathiowetz, LEAD ATTORNEY, Howrey Simon Arnold & White LLP, San Francisco, CA; Ronald Steven Wynn, LEAD ATTORNEY, Korula T. Cherian, Rick C. Chang Howrey LLP, San Francisco, CA; James E. Glore, McDermott, Will & Emery, Palo Alto, CA; Jennifer Yokoyama, McDermott, Will & Emery, Irvine, CA; Robert Michael Harkins, O2Micro, Santa Clara, CA; Terry W. Ahearn, McDermott Will & Emery LLP, Palo Alto, CA.

For Monolithic Power Systems, Inc., a California corporation, Consol Defendant: James P. Brogan, LEAD ATTORNEY, Chad T. Nitta, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO; Anita Fern Stork, Esq., Covington & Burling LLP, San Francisco, CA; Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Charles Philip Reichmann, San Francisco, CA; Christopher D. Jensen, Thomas J. Friel, Jr., Cooley Godward Kronish LLP, San Francisco, CA; Dean Geoffrey Dunlavey, Latham & Watkins, Costa Mesa, CA; Eric Hugh Findlay, Ramey & Flock, Tyler, TX; James [*3] A. DiBoise, Wilson Sonsini Goodrich & Rosati, Professional Corporation, Palo Alto, CA; Mark A. Flagel, Robert Steinberg, Latham & Watkins, Los Angeles, CA; Matthew J. Brigham, Timothy S. Teter, Cooley Godward LLP, Palo Alto, CA; Michael Barclay, Wilson Sonsini et al, Palo Alto, CA; Michael B. Levin, Wilson Sonsini Goodrich & Rosati, A Professional Corporation, Palo Alto, CA; Thomas Michael Jeon, CLIFFORD CHANCE US LLP, SAN FRANCISCO, CA; Tracy Crawford, Ramey & Flock, P.C., Tyler, TX.

For Asustek Computer Inc., Michael Hsing, Consol Defendants: James P. Brogan, LEAD ATTORNEY, Chad T. Nitta, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO; Anita Fern Stork, Esq., Covington & Burling LLP, San Francisco, CA; Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Eric Hugh Findlay, Ramey & Flock, Tyler, TX; James A. DiBoise, Wilson Sonsini Goodrich & Rosati, Professional Corporation, Palo Alto, CA; Matthew J. Brigham, Cooley Godward LLP, Palo Alto, CA; Michael Barclay, Wilson Sonsini et al, Palo Alto, CA; Thomas J. Friel, Jr., Cooley Godward Kronish LLP, San Francisco, CA; Thomas Michael Jeon, CLIFFORD CHANCE US LLP, SAN FRANCISCO, CA; Tracy Crawford, Ramey & Flock, P. [*4] C., Tyler, TX.

For Compal Electronics, Inc., a Taiwanese corporation, Compal Information (Kunshan) Co., Ltd., a Chinese corporation, Compal Electronics Technology (Kunshan) Co., Ltd., a Chinese corporation, Consol Defendants: Matthew J. Brigham, LEAD ATTORNEY, Cooley Godward Kronish LLP, Palo Alto, CA; Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; James P. Brogan, Cooley Godward Kronish LLP, Broomfield, CO; Thomas J. Friel, Jr., Cooley Godward Kronish LLP, San Francisco, CA.

For Asustek Computer (Suzhou) Co., Ltd., a Chinese corporation, Asustech (Suzhou) Co., Ltd., a Chinese corporation, Consol Defendants: Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO.

For Advanced Semiconductor Manufacturing Corporation Limited, a Chinese corporation also known as Advanced Semiconductor Manufacturing Corporation of Shanghai, Consol Defendant: Shinyung Oh, LEAD ATTORNEY, Ned N. Isokawa, Paul Hastings Janofsky & Walker LLP, San Francisco, CA; Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, [*5] CO; Eric Hugh Findlay, Ramey & Flock, Tyler, TX; Matthew J. Brigham, Cooley Godward LLP, Palo Alto, CA; Thomas J. Friel, Jr., Cooley Godward Kronish LLP, San Francisco, CA; Thomas Michael Jeon, CLIFFORD CHANCE US LLP, SAN FRANCISCO, CA.

For Monolithic Power Systems, Inc., Consol CounterCla: Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO; Christopher D. Jensen, Covington & Burling LLP, San Francisco, CA.

For Advanced Semiconductor, Manufacturing Corporation Limited, a Chinese corporation, Consol CounterCla: Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO; Thomas J. Friel, Jr., Cooley Godward Kronish LLP, San Francisco, CA.

For Asustek Computer Inc., a Taiwanese corporation, Consol CounterCla: Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO.

For 02 Micro International Limited, a Cayman Islands corporation, Consol CounterDft: Henry C. Su, Howrey LLP, East Palo Alto, CA; Patricia [*6] L. Peden, Rick C. Chang, Howrey LLP, San Francisco, CA; Terry W. Ahearn, McDermott Will & Emery LLP, Palo Alto, CA.

For Delta Electronics, Inc., Consol CounterDft: Randall G. Block, Sedgwick Detert Moran & Arnold LLP, San Francisco, CA.

For Delta Products Corporation, Delta Electronics, Inc., 3rd party defendants: Thomas Allan Connop, LEAD ATTORNEY, Locke Liddell & Sapp, LLP, Dallas, TX.

For Delta Electronics, Inc., Delta Products Corporation, Consol CrossDfts: Randall G. Block, Sedgwick Detert Moran & Arnold LLP, San Francisco, CA.

For Monolithic Power Systems, Inc., Consol CrossDft: Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO.

For Delta Electronics, Inc., Consol 3rd Pty Dft: Thomas Allan Connop, LEAD ATTORNEY, Charles Edward Phipps, Locke Liddell & Sapp LLP, Dallas, TX; Randall G. Block, Sedgwick Detert Moran & Arnold LLP, San Francisco, CA.

For Delta Products Corporation, Consol 3rd Pty Dft: Thomas Allan Connop, LEAD ATTORNEY, Locke Liddell & Sapp, LLP, Dallas, TX; Randall G. Block, Sedgwick Detert Moran & Arnold LLP, San Francisco, CA.

For Monolithic [*7] Power Systems, Inc., a California corporation, Consol 3rd Pty Dft: Brian E. Mitchell, Cooley Godward LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO.

Case 5:08-cv-02745-RMW   Document 43-13   Filed 08/15/2008   Page 4 of 10

Page 3
2007 U.S. Dist. LEXIS 22556, *

For Microsemi Corporation, Non-Party, Miscellaneous: Paul Adam Stewart, LEAD ATTORNEY, Knobbe, Martens, Olson & Bear, LLP, Irvine, CA US.

For 02 Micro International Limited, Counter-claimant: Duane H. Mathiowetz, LEAD ATTORNEY, Howrey Simon Arnold & White LLP, San Francisco, CA; Henry C. Su, Howrey LLP, East Palo Alto, CA; James E. Glore, McDermott, Will & Emery, Palo Alto, CA; Jennifer Yokoyama, McDermott, Will & Emery, Irvine, CA; Korula T. Cherian, Rick C. Chang, Howrey LLP, San Francisco, CA; Terry W. Ahearn, McDermott Will & Emery LLP, Palo Alto, CA.

For Monolithic Power Systems, Inc., Counter-defendant: Brian E. Mitchell, Thomas J. Friel, Jr., Cooley Godward Kronish LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO; Matthew J. Brigham, Cooley Godward Kronish LLP, Palo Alto, CA; Michael Barclay, Wilson Sonsini et al, Palo Alto, CA.

For Advanced Semiconductor Manufacturing Corporation Limited [*8] aka Advanced Semiconductor Manufacturing Corporation of Shanghai, Counter-defendant: Ned N. Isokawa, LEAD ATTORNEY, Shinyung Oh, Paul Hastings Janofsky & Walker LLP, San Francisco, CA; Brian E. Mitchell, Thomas J. Friel, Jr., Cooley Godward Kronish LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO; Louisa Weix, Paul Hastings Janofsky & Walker, San Francisco, CA; Matthew J. Brigham, Cooley Godward Kronish LLP, Palo Alto, CA.

For Advanced Semiconductor Manufacturing Corporation Limited aka Advanced Semiconductor Manufacturing Corporation of Shanghai, Counter-claimant: Brian E. Mitchell, Cooley Godward Kronish LLP, San Francisco, CA; Chad T. Nitta, James P. Brogan, Orion Armon, Cooley Godward Kronish LLP, Broomfield, CO; Matthew J. Brigham, Cooley Godward Kronish LLP, Palo Alto, CA.

For 02 Micro International Limited, Counter-defendant: Brian E. Mitchell, Cooley Godward Kronish LLP, San Francisco, CA; Rick C. Chang, Howrey LLP, San Francisco, CA; Terry W. Ahearn, McDermott Will & Emery LLP, Palo Alto, CA.

**JUDGES:** CLAUDIA WILKEN, United States District Judge.

**OPINION BY:** CLAUDIA WILKEN

**OPINION**

ORDER ON 02 MICRO'S AND MPS' CROSS-MOTIONS [*9] FOR SUMMARY JUDGMENT

02 Micro International Limited moves for summary judgment in its favor on the second, third and fourth counterclaims asserted by Monolithic Power Systems, Inc. (MPS). MPS does not oppose 02 Micro's motion for summary judgment as to its third and fourth counterclaims, but it opposes 02 Micro's motion as to its second counterclaim. MPS and its chief executive officer Michael Hsing move for summary judgment in their favor as to the fourth count of 02 Micro's third amended complaint. 02 Micro opposes this motion and separately cross-moves for a continuance under *Federal Rule of Civil Procedure 56(f)*. MPS and Hsing oppose the motion for a continuance. The matters were heard on February 16, 2007. Having considered the parties' papers, the evidence cited therein and oral argument, the Court grants both motions in part and denies them in part; 02 Micro's request for a continuance is denied.

BACKGROUND

In May, 2004, MPS filed the 04-2000 suit in this district against 02 Micro for a declaratory judgment finding 02 Micro's *U.S. Patent No. 6,396,722* (the *'722 patent*) invalid and not infringed. 02 Micro counterclaimed and added Advanced [*10] Semiconductor Manufacturing Company, Ltd. (ASMC) as a counterdefendant.

Five months after MPS filed suit in this district, 02 Micro filed suit in the Eastern District of Texas, accusing MPS of infringing 02 Micro's *U.S. Patent No. 6,804,129* (the *'129 patent*). 02 Micro later amended its complaint, asserting that ASMC infringed the *'129 patent* and that ASUSTeK Computer, Inc. and Compal Electronics, Inc. infringed the *'129 patent*, the *'722 patent* and 02 Micro's *U.S. Patent No. 6,259,615* (the *'615 patent*). Various cross-claims and counterclaims were filed. The Texas action was transferred to this Court, and assigned Case No. 06-2929. After the case was transferred, the Court found the 06-2929 case to be related to the 04-2000 case.

On July 26, 2006, 02 Micro filed its third amended complaint in the 06-2929 case. Its fourth cause of action is entitled, "Unfair Competition by MPS and Michael Hsing." According to 02 Micro, MPS and Hsing agreed to give stock options to certain employees of MPS' customers to entice them to enter into and maintain a customer relationship with MPS. In addition, MPS and Hsing allegedly sold certain products in Taiwan in violation of Taiwanese court injunctions, [*11] knowing that the products would be used in devices and hardware destined for the United States, solicited one or more companies to serve as second source suppliers of MPS integrated circuits and interfered with 02 Micro's prospective business relationships.

MPS answered O2 Micro's third amended complaint, also bringing a claim under California's Unfair Competition Law. MPS' second counterclaim alleged that O2 Micro violated the Unfair Competition Law; its third and fourth counterclaims were for intentional interference with contractual and current economic relations and intentional inference with prospective economic advantage. These three counterclaims are based on two factual allegations: (1) O2 Micro misappropriated MPS' confidential information and trade secrets relating to CCFL inverters by inducing third parties to breach their non-disclosure agreements with MPS and to disclose MPS' information to O2 Micro, and (2) O2 Micro, in bad faith, asserted and enforced its patents against MPS and its suppliers, customers and distributors of CCFL inverters.

On August 9, 2006, the Court consolidated the 04-2000 and 06-2929 cases. On October 11, 2006, it signed O2 Micro's stipulated dismissal [*12] with prejudice of its infringement claim concerning the *129 patent.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the nonmoving party, the movant is clearly entitled to prevail as a matter of law. *Fed. R. Civ. P. 56*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).*

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex, 477 U.S. at 324*; *Eisenberg, 815 F.2d at 1289.* The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).*

Material facts which would preclude entry of summary [*13] judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).*

The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

*Id.*

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. *Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)*; [*14] *Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).* If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan, 929 F.2d at 1409.*

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. *Nissan, 210 F.3d at 1105.* If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. *Id.*

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. *Id.* This is true even though the non-moving party bears the ultimate burden of persuasion at trial. *Id. at 1107.*

DISCUSSION

I. O2 Micro's Motion for a Continuance

O2 Micro requests that, if the Court is inclined to grant [*15] MPS and Hsing's motion for summary judgment, the Court continue the proceedings pending a decision from Magistrate Judge Laporte on O2 Micro's Motion to Compel Further Deposition Testimony and Related Documents from Defendants.

*Rule 56(f)* provides that:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affi-

davit facts essential to justify the party's opposition, the court may refuse the application for [summary] judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

This rule should be applied with a spirit of liberality to prevent injustice to the party facing summary judgment. *See* 10B Wright & Miller, *Fed. Practice & Proc., § 2740*, p. 402 (West 1998); *First Chicago Int'l v. United Exchange Co., 267 U.S. App. D.C. 27, 836 F.2d 1375, 1380 (D.C. Cir. 1988).* Nonetheless, "the party seeking a continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact. The mere hope that further evidence may develop prior to trial is an insufficient [*16] basis for a continuance under *Fed. R. Civ. P. 56(f)*." *Continental Maritime of San Francisco v. Pacific Coast Metal Trades Dist. Council, Metal Trades Dep't, AFL-CIO, 817 F.2d 1391, 1395 (9th Cir. 1987)* (internal citation omitted). Parties seeking a continuance must show: "(1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *State of California v. Campbell, 138 F.3d 772, 779 (9th Cir. 1998).*

O2 Micro sets forth the specific facts concerning MPS' grant of stock options that it seeks to elicit from further discovery; it makes a compelling case that the facts sought exist. But these sought-after facts are irrelevant to the Court's decision, discussed below, that O2 Micro has provided no evidence that it is entitled to the monetary relief it seeks. Thus, even if O2 Micro's motion to compel is granted, and the facts show that MPS did indeed induce individuals through stock options to buy from MPS and not from O2 Micro, O2 Micro [*17] is still not entitled to the monetary relief it seeks. *See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1151, 131 Cal. Rptr. 2d 29, 63 P.3d 937 (2003).* Therefore, O2 Micro's request for a continuance is denied.

## II. O2 Micro's Motion for Summary Judgment

### A. MPS' Second Counterclaim

O2 Micro raises numerous arguments against MPS' second counterclaim for violation of California's Unfair Competition Law. *See Cal. Bus. & Prof. Code § 17200* (defining "unfair competition" as any "unlawful, unfair or fraudulent business practice"). O2 Micro contends that, to the extent that the claim is based on its assertion and enforcement of its patent rights, MPS fails to proffer

any evidence of bad faith or sham litigation or to show that O2 Micro's patent enforcement activities are not immune from state law tort liability. It further contends that, to the extent that the claim is based on trade secret misappropriation, it is preempted by California's Uniform Trade Secrets Act and, furthermore, that MPS cannot meets its evidentiary burden with respect to the existence of the alleged trade secrets or that O2 Micro used improper means to acquire knowledge of the alleged [*18] trade secrets. Finally, O2 Micro argues that MPS' claim fails as a matter of law because MPS cannot show that it has suffered injury.

### 1. Assertion and Enforcement of Patent Rights

MPS points out that pursuing patent infringement actions in bad faith is conduct that courts have found "unfair" under California's Unfair Competition Law. *In re Acacia Media Techs. Corp., 2005 U.S. Dist. LEXIS 37009, 2005 WL 1683660, *4-5 (N.D. Cal.).* O2 Micro does not dispute this; rather, it asserts that its enforcement of its patent rights, including filing infringement suits and sending pre-litigation letters, constitutes a form of petition activity that is ordinarily immune from antitrust liability under the *Noerr-Pennington* doctrine. While the *Noerr-Pennington* doctrine was formulated in the context of antitrust cases, it has been extended to cases involving other types of civil liability, including state law claims of unfair competition. *Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC, 404 F. Supp. 2d 1214, 1220-23 (E.D. Cal. 2005); Hi-Top Steel Corp. v. Lehrer, 24 Cal. App. 4th 570, 577-78, 29 Cal. Rptr. 2d 646 (1994).* O2 Micro contends that, unless MPS proves that O2 Micro's patent [*19] enforcement activities amount to "sham litigation," it is entitled to *Noerr-Pennington* immunity. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993); Freeman v. Lasky, Haas & Cohler, 410 F.3d 1180 (9th Cir. 2005).* To prove sham litigation, MPS must demonstrate that O2 Micro's lawsuits and patent enforcement activities were (1) objectively baseless, and (2) a concealed attempt to interfere with MPS' business relationships. *Freeman, 410 F.3d at 1184; Professional Real Estate Investors, 508 U.S. at 62* ("sham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief"). O2 Micro argues that MPS cannot.

In addition to immunity under the *Noerr-Pennington* doctrine, O2 Micro contends that it is immune from state law tort litigation under California's litigation privilege. *California Civil Code section 47(b)* provides that communications made in or related to judicial proceedings are absolutely immune from tort liability. The California Supreme Court explains that the [*20] purpose of the privilege is "to afford litigants . . . the utmost freedom of

access to the courts without fear of being harassed sub-sequently by derivative tort actions." *Silberg v. Anderson, 50 Cal. 3d 205, 213, 266 Cal. Rptr. 638, 786 P.2d 365 (1990).* This Court has previously stated, "The litigation privilege applies to any communications (1) made in a judicial proceeding; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; (4) that have some connection or logical relation to the action." *Sharper Image Corp. v. Target Corp., 425 F. Supp. 2d 1056, 1077 (N.D. Cal. 2006)* (citing *Silberg, 50 Cal. 3d at 212).* Courts have broadly applied the privilege to demand letters and other prelitigation communications by attorneys, as long as the party has an "actual good faith contemplation of an imminent, impending resort to the judicial system for the purpose of resolving a dispute." *Id. at 1078.* As noted in a case MPS cites, "The privilege applies 'without regard to malice or evil motives.'" *Hynix Semiconductor Inc. v. Rambus, Inc., 2006 U.S. Dist. LEXIS 48884, 2006 WL 1883353, *2 (N.D. Cal.)* (quoting *Brown v. Kennard, 94 Cal. App. 4th 40, 45, 113 Cal. Rptr. 2d 891 (2001)).* [*21]

MPS argues that O2 Micro asserted the *'615 patent* in bad faith because O2 Micro knew that this Court's prior order, granting summary judgment that MPS did not infringe the patent, would have preclusive effect. It notes that, based on this order, the district court in Eastern Texas ruled that O2 Micro was collaterally estopped from asserting the *'615 patent* against MPS' customer Sumida. As evidence of O2 Micro's bad faith in asserting the *'129 patent* against MPS and its customers, MPS notes that O2 Micro filed claims concerning the *'129 patent* in Texas, but as soon as the case was transferred to this Court, O2 Micro dropped its claims concerning the *'129* against MPS, ASUSTeK and Compal. O2 Micro, however, continues to assert its patent claims against Hon Hai in Eastern Texas. MPS contends that O2 Micro withholding the best mode of practicing the alleged invention, and treating it as a trade secret, provides further evidence of O2 Micro's unfair competition.[1]

> 1 The Court, however, concluded the *'722 patent* is not invalid, as a matter of law, for failure to comply with the best mode disclosure requirement of the Patent Act. *See* February 8, 2007 Order Denying MPS' Motion for Summary Judgment of Invalidity of the *'722 patent.* The *'129 patent* is a continuation of the *'722 patent,* which is a continuation *'615 patent.*

[*22]  MPS proffers some evidence of bad faith; however, it fails to show that O2 Micro had no probable cause to bring its patent infringement actions against MPS and its customers. *See Professional Real Estate Investors, 508 U.S. at 62* ("the existence of probable cause to institute legal proceedings precludes a finding

that an antitrust defendant has engaged in sham litigation"). The United States Supreme Court explains that probable cause requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication. *Id.* As O2 Micro notes, it has already prevailed at trial on the validity and infringement of the *'129 patent;* thus, it had probable cause to bring claims against MPS and others based on that patent. *See id. at 60 n.5* ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."). As to the *'615 patent,* O2 Micro states that it appealed this Court's summary judgment ruling and, thus, while the appeal was pending, it reasonably believed that there was a chance that the Federal Circuit would reverse the Court's judgment. O2 Micro acknowledges that, on November 15, 2006, the [*23] Federal Circuit affirmed this Court's grant of summary judgment. Yet, as MPS notes, O2 Micro continues to pursue its *'615 patent* claims against ASUSTeK, Compal, Hon Hai and Samsung, despite clear collateral estoppel.

MPS further argues that, because O2 Micro allegedly has engaged in baseless litigation and made bad faith threats as part of a pattern and practice of tortious and anti-competitive conduct, the California litigation privilege does not apply. In *Hynix,* the court noted that, to the extent that the plaintiff was contending that the defendant's lawsuits and related communications violated state unfair competition law, "*California Civil Code section 47(b)* bars such claims. However, this does not mean that evidence of such activity cannot be introduced as evidence of an overall course of anti-competitive conduct." *2006 U.S. Dist. LEXIS 48884, 2006 WL 1883353 at *2.* MPS' reliance on *Hynix,* however, is unavailing. Except for O2 Micro's continued efforts to enforce the *'615 patent* after its appeal was denied, MPS provides no evidence that O2 Micro engaged in baseless litigation or made bad faith threats as part of a pattern and practice of anti-competitive conduct. [*24] As discussed above, *Federal Rule of Civil Procedure 56(e)* does not permit an adverse party to rest upon its allegations and denials; instead it must provide evidence, which MPS largely fails to do.

Because MPS cannot show that O2 Micro's patent infringement actions or pre-litigation communications were objectively baseless, these activities are immune and, as a matter of law, cannot be the basis of MPS' unfair competition claim. MPS, however, can show that O2 Micro's continued pursuit of its claims of infringement of the *'615 patent* is objectively baseless and in bad faith and, therefore, this activity is not immune and can be the basis for MPS' unfair competition claim.

2. Misappropriation

MPS contends that O2 Micro's practice of obtaining MPS' proprietary technical information by engaging in "industrial espionage" and inducing MPS' customers to breach confidentiality further supports its unfair competition claim. It points to three O2 Micro internal emails. But none of these emails provides evidence of misappropriation of MPS' confidential information. Two of the emails, Exhibits G and H, concern the total cost of the bill of materials (BOM) [*25] for an inverter module. MPS provides no evidence that this cost information is confidential. And, as O2 Micro notes, this information does not belong to MPS; rather, it belongs to the inverter module manufacturer, such as Sumida or Delta. *See* Su Dec., Ex. J, 140:7-14. The third email states, "I got the MP1010B data sheet from the customer please find it as in the file below." Mitchell Dec., Ex. I. The file, however, is not attached. Again, MPS provides no evidence that the data sheet contained its confidential information. Nor is there any evidence that O2 Micro induced the customer to breach confidentiality.

Further, even if the third email were sufficient to establish a triable issue of fact, the Court finds that, to the extent MPS' second counterclaim is based on MPS' confidential information, it is preempted by California's Uniform Trade Secrets Act. *Airdefense, Inc. v. AirTight Networks, Inc., 2006 U.S. Dist. LEXIS 55364, 2006 WL 2092053 (N.D. Cal.).* In *Digital Envoy, Inc. v. Google, Inc., 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005),* a judge of this court held that the Trade Secrets Act preempted the plaintiff's tort and unfair competition claims because those claims [*26] were "based on the same nucleus of facts as the misappropriation of trade secrets claim for relief." MPS attempts to distinguish *Digital Envoy,* arguing that the unfair competition and tort claims in that case were based on facts identical to those alleged in the plaintiff's trade secret misappropriation claim. It contends that is not the case here. The pleadings, however, show otherwise. The allegations that form the predicate facts for MPS' unfair competition claim are based on the same nucleus of facts as the allegations in MPS' pleading asserting a claim of trade secret misappropriation against O2 Micro.

The Court grants summary judgment in favor of O2 Micro to the extent that MPS' unfair competition claim is based on O2 Micro's alleged misappropriation of MPS' confidential information.

3. Injury

O2 Micro argues that MPS' second counterclaim fails as a matter of law because MPS does not proffer "any facts that give rise to the remedies of restitution or disgorgement." *Jensen Enterprises Inc. v. Oldcastle, Inc., 2006 U.S. Dist. LEXIS 68262, 2006 WL 2583681, *8 (N.D. Cal.)* (dismissing unfair competition claim because it alleged only lost sales and profits and not any facts that would give [*27] rise to the remedies of restitution or disgorgement). MPS agrees that it is not entitled to monetary relief on its unfair competition claim. It contends that it is entitled to injunctive relief and that this Court can issue an injunction preventing unfair competition. O2 Micro does not dispute this contention. The Court will not grant summary judgment on this ground.

B. MPS' Third and Fourth Counterclaims

As noted above, MPS does not oppose O2 Micro's motion for summary judgment as to its third and fourth counterclaims. The Court grants summary judgment in O2 Micro's favor as to MPS' third and fourth counterclaims.

III. MPS and Hsing's Motion for Summary Judgment

MPS and Hsing argue that O2 Micro's unfair competition claim fails because California's Unfair Competition Law does not apply to conduct outside California that injures non-residents and because O2 Micro failed to plead its claim for unfair competition with reasonable particularity. [2] In addition, they argue that the Court should grant summary judgment that O2 Micro has no evidence of damages and preclude O2 Micro's damages expert, Walter Bratic, from testifying.

> 2 In its opposition, O2 Micro notes that it is too late to raise this argument, which is essentially a motion for a more definite statement. MPS and Hsing do not address this in their reply, nor do they again argue that O2 Micro's unfair competition claim fails because it is not properly pleaded. The Court will not address MPS and Hsing's argument that O2 Micro failed to plead its claim for unfair competition with reasonable particularity.

[*28] A. California Connection

California's Unfair Competition Law "does not apply to actions occurring outside of California that injure non-residents." *Standfacts Credit Servs., Inc. v. Experian Information Solutions, Inc., 405 F. Supp. 2d 1141, 1148 (C.D. Cal. 2005).* Nonetheless, a claim under *section 17200* may be asserted by a non-resident plaintiff alleging unfair business conduct, if that conduct occurred in or emanated from California. *Norwest Mortgage, Inc. v. Superior Court, 72 Cal. App. 4th 214, 222, 85 Cal. Rptr. 2d 18 (1999); TruePosition, Inc. v. Sunon, Inc., 2006 U.S. Dist. LEXIS 32918 (E.D. Pa.).* It is undisputed that O2 Micro is not a California resident.

O2 Micro responds that MPS and Hsing are judicially estopped from making this argument because, in prior filings with this Court, they characterized O2 Micro

as a "California-based company" with its principal oper-
ating subsidiary, O2 Micro, Inc., headquartered in this
district. The Ninth Circuit explains, "Judicial estoppel
precludes a party from gaining an advantage by asserting
one position, and then later seeking an advantage by tak-
ing a clearly inconsistent position." *Klamath Siskiyou
Wildlands Center v. Boody, 468 F.3d 549, 554 (9th Cir.
2006)* [*29] (quoting *Hamilton v. State Farm Fire &
Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001))*. Here, there
is no inconsistent factual or legal position; MPS never
argued that O2 Micro was a California resident. Equita-
ble estoppel does not apply. *Id.* ("an inconsistent factual
or legal position is a threshold requirement of the doc-
trine").

O2 Micro argues that, as long as a corporation has
significant operations in California, it may bring an un-
fair competition claim under *section 17200* regardless of
where the alleged unfair business practices occurred.
*Ready Transp., Inc. v. AAR Mfg., Inc., 2006 U.S. Dist.
LEXIS 57202, 2006 WL 2131308 (E.D. Cal.)*, however,
does not support this argument. There, although the
plaintiffs were incorporated in States other than Califor-
nia, the court stated that the plaintiffs were California
residents. As stated above, O2 Micro is not.

O2 Micro also argues that MPS' wrongful conduct
did occur in California. O2 Micro provides evidence that
it was in California that MPS and Hsing devised and
managed the alleged stock option scheme, giving stock
to employees of MPS' customers to entice them to enter
into and maintain a customer relationship with MPS. But
O2 [*30] Micro provides no evidence that any of the
other allegedly unfair conduct occurred in California,
specifically, either the alleged conduct concerning Tai-
wanese court injunctions or the second source supplier
agreements.

Therefore, the Court grants summary judgment in
MPS and Hsing's favor that the alleged activities relating
to Taiwanese court injunctions and second source sup-
plier agreements cannot be the basis of MPS' unfair
competition claim.

B. Damages

In *Korea Supply Co.,* the California Supreme Court
addressed "whether disgorgement of profits allegedly
obtained by means of an unfair business practice is an
authorized remedy under the UCL where these profits
are neither money taken from a plaintiff nor funds in
which the plaintiff has an ownership interest." *29 Cal.
4th at 1140.* It concluded "that disgorgement of such
profits is not an authorized remedy in an individual ac-
tion under the UCL." *Id.* In reaching its conclusion, the
court explained that a claim under *section 17200* "is eq-
uitable in nature; damages cannot be recovered." *Id. at*

*1144; see also id. at 1151* ("Compensation for a lost
business opportunity is a measure [*31] of damages and
not restitution to the alleged victims.") (quoting *MAI
Systems Corp. v. UIPS, 856 F. Supp. 538, 542 (N.D. Cal.
1994)).* As recently stated in *Jensen Enterprises Inc.,
2006 U.S. Dist. LEXIS 68262, 2006 WL 2583681 at *8*,
"a UCL claimant cannot request disgorgement of illic-
itly-gained profits unless those funds were previously
owned by the plaintiff."

In O2 Micro's expert report regarding its unfair
competition claims, Mr. Bratic notes that he understands
that the monetary remedy for a violation of the Unfair
Competition Law is strictly equitable in nature. Nonethe-
less, he states that O2 Micro is entitled to recover dam-
ages, as a result of MPS' alleged wrongful conduct under
*section 17200* "in amounts equal to the total monetary
amount that would make O2 Micro whole but-for the
alleged behavior of MPS." Mitchell Dec., Ex. B at 3.
Due to MPS and Hsing's alleged failure to provide neces-
sary documents, however, Mr. Bratic did not perform
any analyses or calculations of the measure of restitu-
tionary damages. Instead, he explained how he would
calculate the amount, namely by identifying those con-
tracts and units of sales that "should rightfully have be-
longed to O2 Micro, [*32] " but which were wrongfully
taken away by MPS and Hsing.

Under the Unfair Competition Law, however, O2
Micro is not entitled to sales that "should rightfully have
belonged to O2 Micro." As in *Korea Supply Co.,* the
remedy sought by O2 Micro in this case "is not restitu-
tionary because plaintiff does not have an ownership
interest in the money it seeks to recover . . . . Any award
that plaintiff would recover from defendants would not
be restitutionary as it would not replace any money or
property that defendants took directly from plaintiff." *29
Cal. 4th at 1149.*

Therefore, the Court concludes that, as a matter of
law, O2 Micro's theory of restitution fails and it is not
entitled to the monetary relief that it seeks. Mr. Bratic's
theory of recovery is contrary to California Supreme
Court's decisions as to what is recoverable under the Un-
fair Competition Law and, if this case goes to trial, shall
not be heard by a jury. *See Fed. R. Evid. 702; Daubert v.
Merrell Dow Pharms., Inc., 509 U.S. 579, 591-94, 113 S.
Ct. 2786, 125 L. Ed. 2d 469 (1993).*

CONCLUSION

For the foregoing reasons, O2 Micro's motion for
summary judgment regarding MPS' second, third [*33]
and fourth counterclaims (Docket No. 664) is
GRANTED IN PART AND DENIED IN PART. O2
Micro's motion for continuance is DENIED. MPS and
Hsing's motion for summary judgment regarding O2
Micro's fourth count (Docket No. 690) is also

GRANTED IN PART AND DENIED IN PART. Specifically, the Court rules that O2 Micro's continued pursuit of its claims of infringement of the *'615 patent* is not immunized and can be the basis for MPS' unfair competition claim; the remaining alleged unfair conduct, however, is immunized or preempted and, thus, cannot be the basis for MPS' unfair competition claim. In addition, the Court grants summary judgment in O2 Micro's favor as to MPS' third counterclaim for intentional inference with contractual relations and fourth counterclaim for intentional interference with prospective economic advantage. As to MPS and Hsing's motion, the Court rules that O2 Micro can bring a claim for unfair conduct based on the stock option activities, which allegedly occurred in California; the allegations relating to Taiwanese court injunctions and second source supplier agreements, however, cannot be the basis of O2 Micro's unfair competition claim. Further, the Court grants summary [*34] judg-

ment that O2 Micro is not entitled to the monetary relief it seeks under the Unfair Competition Law and orders that, if this claim goes to trial, Mr. Bratic is precluded from testifying before the jury concerning any monetary relief O2 Micro may be entitled to based on its unfair competition claim. [3]

> 3  MPS' motion to strike the declaration of William Chu (Docket No. 736) is DENIED as moot. The Court has not relied on any inadmissible evidence in deciding this motion.

IT IS SO ORDERED.

Dated: 3/14/07

CLAUDIA WILKEN

United States District Judge

# EXHIBIT I

LEXSEE 1997 U.S. DIST. LEXIS 7648

**ALLERGAN SALES, INC., Formerly Known As Allergan Medical Optics, a California cororation, and STAAR SURGICAL CO., a Delaware corporation, Plaintiff, vs. PHARMACIA & UPJOHN, INC., a Delaware corporation, Formerly Known As Pharmacia & Upjohn Company, Defendant.**

**CASE NO. 96-CV-1430 H(JFS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

*1997 U.S. Dist. LEXIS 7648*

**March 5, 1997, Decided
March 5, 1997, FILED**

**DISPOSITION:**    [*1]  Plaintiffs' motion to dismiss Defendant's first, second, and third counterclaims denied, the motion to strike the related affirmative defenses denied, and Plaintiffs' motion to stay the counterclaims and related affirmative defenses denied. Defendant's ex parte application denied in part and granted in part by extending the discovery cut-off date to April 14, 1997.

**COUNSEL:** JEFFREY T THOMAS, GIBSON DUNN & CRUTCHER, SAN FRANCISCO, CA, For plaintiff. HALL MARSTON, MARK REIDEL, DICKSON CARLSON & CAMPILLO, SANTA MONICA, CA, For defendant.

DOUGLAS E OLSON, JOHN M BENASSI, LYON & LYON LLP, LA JOLLA, CA, For plaintiff. FRANK FRISENDA, MARK ESTES, FRISENDA QUINTON & NICHOLSON, LOS ANGELES, CA., For plaintiff.

**JUDGES:** MARILYN L. HUFF, JUDGE, UNITED STATES DISTRICT COURT

**OPINION BY:** MARILYN L. HUFF

**OPINION**

**Order Denying Plaintiffs' Motion to Dismiss; Denying Plaintiffs' Motion to Stay (Doc. 121); Granting in Part and Denying in Part Defendant's Ex Parte Application for Modification of Scheduling Order (Doc. 129)**

Plaintiffs/Counterdefendants Allergan Sales, Inc. and Staar Surgical Co. move to dismiss Defendant/Counterclaimant's counterclaims and to strike af-firmative defenses nos. 7 and 9, or in [*2] the alternative, to stay the counterclaims and related affirmative defenses. Defendant opposes the motion. Having fully considered the papers submitted in the matter, the court denies Plaintiffs' motion to dismiss and denies Plaintiffs' motion to stay.

**BACKGROUND**

On January 6, 1997, Plaintiffs filed a second amended complaint for patent infringement. Defendant's answer to the first amended complaint and counterclaims filed November 13, 1996 are deemed responsive to the second amended complaint per stipulation and order filed January 6, 1997. Defendant's counterclaim alleges violations of federal antitrust laws, California antitrust laws, *CAL.BUS. & PROF. CODE § 16700 et seq.*, and California unfair competition laws, *CAL. BUS. & PROF. CODE § 17200 et seq.* Defendant has also asserted affirmative defenses of patent misuse and enforcement of an invalid patent in the seventh and ninth affirmative defenses. Plaintiffs now move to dismiss Defendant's first, second, and third claims, to dismiss or strike Defendant's seventh and ninth affirmative defenses, or in the alternative, to stay the counterclaims and affirmative defenses.

**DISCUSSION**

*Federal Rule of Civil Procedure* [*3]  *12(b)(6)* dismissal is proper only in "extraordinary" cases. *United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).* Courts should grant 12(b)(6) relief only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th*

*Cir. 1990)*. Courts should not dismiss a complaint "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Moore v. City of Costa Mesa, 886 F.2d 260, 262 (9th Cir. 1989)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*, cert. denied, *496 U.S. 906 (1990)*. Finally, courts must construe the complaint in the light most favorable to the plaintiff. *Concha v. London, 62 F.3d 1493, 1500 (9th Cir. 1995)*, cert. dismissed, *116 S. Ct. 1710 (1996)*. Accordingly, courts must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *Holden v. Hagopian, 978 F.2d 1115, 1118 (9th Cir. 1992)*. Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a *Rule 12(b)(6)* [*4] motion. In *Re Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir. 1996)*.

Plaintiffs contend that Defendant's first counterclaim under federal antitrust laws attempts to allege (1) a Handgards [1] claim, (2) a Walker Process claim, [2] and (3) a "tying" claim. They argue that Defendant fails to state a Handgards claim because Plaintiffs are entitled to antitrust immunity under the Noerr-Pennington doctrine and Defendant has failed to establish an exception to such immunity. Defendant argues in response that the claim is not even based on Handgards. (See *Opposition*, at 14). A Handgards claim alleges a violation of section 2 of the Sherman Act for infringement actions initiated and conducted in bad faith. 601 F.2d at 993. Paragraph 32 of the counterclaim alleges that Plaintiffs Staar and Allergan initiated the litigation in bad faith. (*Counterclaim*, P 32.b(2), c). Although such allegations appear to attempt to state a Handgards claim, Defendant disavows attempting to make such a claim. Therefore, the court denies Plaintiffs' motion to dismiss the Handgards claim on the basis that Defendant has stated that such a claim is not being asserted. [*5]

> 1    Handgards, inc. v. *Ethicon, Inc., 601 F.2d 986, 995 (9th Cir. 1979)*, cert. denied, *444 U.S. 1025, 62 L. Ed. 2d 659, 100 S. Ct. 688, 100 S. Ct. 689 (1980)*.
> 2    *Walker Process Equip., Inc. v. Food Mach. and Chem. Corp., 382 U.S. 172, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965)*.

As to Defendant's Walker Process claim, [3] Plaintiffs contend that the Noerr-Pennington doctrine also applies and that Defendants must satisfy the "objectively baseless" standard as set forth in *Professional Real Estate Investors, Inc. v. Columbia Pictures Indust., Inc., 508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993)*, before being permitted to proceed on such a claim. Defendants argue, citing *Hydranautics v. Filmtec Corp., 70*

*F.3d 533 (9th Cir. 1995)*, that the Ninth Circuit has held that Columbia Pictures does not apply to Walker Process claims.

> 3    A Walker Process claim alleges the obtainment of a patent by knowing and willful misrepresentation or fraud and the enforcement of such patent in violation of the antitrust laws. *Walker Process, 382 U.S. at 177-78, 86 S. Ct. at 350-51*.

[*6] In Hydranautics, the court discussed on a *Rule 12(b)(6)* motion to dismiss whether an infringement action based on a fraudulently obtained patent is "objectively baseless" under Columbia Pictures. Contrary to Defendant's reading, the court did not hold that Walker Process claims are an exception to the Noerr-Pennington doctrine or that the "sham" test set forth in Columbia Pictures does not apply to Walker Process claims. Rather, the court noted that the holdings in Columbia Pictures and Liberty Lake [4] left open "the question of whether an infringement action based on a fraudulently obtained patent is 'objectively baseless'." *Hydranautics, 70 F.3d at 538*. The court appears to have answered that question in the affirmative. In distinguishing the case from a parallel case in the Federal Circuit, the court noted that the "[defendant's] alleged fraud would render [the defendant's] patent infringement claim objectively baseless." *Id. 70 F.3d at 538 n.1*. The rationale for holding that such infringement claims are objectively baseless is that the basis for the antitrust immunity, the patent itself, is invalid and a nullity. *70 F.3d at 538*. Therefore, [*7] where an antitrust plaintiff alleges that the defendant's patent infringement suit is attempting to enforce a patent obtained by intentional fraud, the plaintiff sufficiently alleges that the infringement suit is objectively baseless.

> 4    *12 F.3d 155 (9th Cir. 1993)*.

In the present case, Defendant alleges that plaintiffs seek to enforce an invalid patent which it procured through fraud. Taking these allegations as true, as the court must on a *Rule 12(b)(6)* motion, the court finds that such allegations are sufficient to allege that Plaintiffs' infringement suit is objectively baseless. The court therefore denies Plaintiffs' motion to dismiss Defendant's Walker Process claim.

Finally, as to Defendant's tying/leverage claim, Plaintiffs argue that Defendant's theory fails to state a "tying" claim, primarily because manufacturers pay a royalty on the very product they intend to manufacture pursuant to the patent, and thus, there is no tie to a separate product. Defendant responds that the alleged claim is a leveraging [*8] claim, not a typing claim. Having examined Defendant's claim, the court finds that Defendant has sufficiently alleged a leveraging claim under *Zenith*

*Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969)*. Under Zenith Radio, a patentee may not use a patent's leverage to extend the monopoly of the patent to derive a benefit not attributable to use of the patent's teachings. *Id.* at 136, 89 S. Ct. 1583.

In the instant case, Defendant's counterclaim alleges that non-rigid IOLs are staple items which have substantial non-infringing uses, and that Plaintiff is attempting to extend the monopoly to sales of IOLs which will be used for non-infringing purposes. Further, Defendant alleges that Plaintiffs have market and economic power and that a significant amount of commerce has been adversely affected. Whether labeled a "tying" claim or a "leverage" claim, the court finds that Defendant has sufficiently alleged an antitrust claim under Zenith Radio.

Plaintiff also argues that Defendant's state law claims in the second and third counterclaims should be dismissed under *Pacific Gas & Electric Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 270 Cal. Rptr. 1, 791 P.2d 587 (1990)*. In Pacific [*9] Gas, the court noted that the only common law tort claim for instigating or bringing a lawsuit is an action for malicious prosecution, and that such an action requires a legal termination of the underlying action in plaintiff's favor. *Id. at 1131.* Relying upon, inter alia, the Noerr-Pennington doctrine, the court extended such a requirement to a claim for intentional interference with contract or prospective economic advantage. *Id. at 1137.*

Pacific Gas, however, did not address whether statutory claims under California's antitrust Cartwright Act and the Unfair Competition Act may only be brought after resolution in the claimant's favor in the underlying action. Moreover, Defendant alleges that the state law claims arise from the same conduct underlying the federal antitrust claim. As noted above, Defendant's Walker Process claim is not defeated by the Noerr-Pennington doctrine and the Columbia Pictures "objectively baseless" requirement. This indicates that Pacific Gas, and its reliance on Noerr-Pennington, is distinguishable from the facts and claims of the instant action. Therefore, having considered the arguments presented, the court denies [*10] the motion to dismiss Defendant's state law counterclaims.

Having fully considered the parties' arguments, the court denies Plaintiffs' motion to dismiss Defendant's first, second, and third counterclaims. Plaintiffs also seek to strike Defendant's related seventh and ninth affirmative defenses. Under *Federal Rule of Civil Procedure 12(f)*, the court may strike any insufficient defense. Plaintiffs contend the related defenses should be stricken for the same reasons that the federal antitrust claims should be dismissed. The court has denied Plaintiffs'

motion to dismiss, and therefore also denies the motion to strike the affirmative defenses.

In the alternative, Plaintiffs have argued that in the interests of fairness and judicial economy, that if not dismissed, the counterclaims and related defenses should be stayed pending resolution of the infringement action. Having duly considered the arguments raised, the court denies Plaintiffs' request to stay the counterclaims and related defenses without prejudice. The court notes, however, that the antitrust claims involve significant questions separate and apart from those raised in the infringement action, and the court explicitly reserves [*11] the right at the final pretrial conference to sever, stay, bifurcate, or otherwise set the order of proof of the antitrust counterclaims and related affirmative defenses.

Finally, the court is in receipt of Defendant's ex parte application for modification of the scheduling order. Defendant seeks to continue all remaining pretrial dates and the trial date by six months. Plaintiffs oppose the motion. Defendants state that it anticipates conducting approximately 50 depositions, filing various motions, and preparing and deposing approximately 20 experts. The complaint, however, was filed in August 1996 and the original scheduling order set forth in October 1996. Plaintiffs note that Defendant did not take any depositions until February 15, 1997, and as of the date this request for continuance was made, was the only deposition taken. The court finds that good cause for modification of the scheduling order has not been shown, and therefore, the court generally denies Defendant's request without prejudice. At a time closer to the current trial date, Defendant may renew its request for continuance of the scheduling order upon a showing of good cause. However, the court will grant in [*12] part Defendant's request by extending the discovery cut-off date from April 7, 1997 to April 14, 1997. All other dates shall remain the same.

## CONCLUSION

Having fully considered the papers submitted in the matter and the relevant authorities, the court denies Plaintiffs' motion to dismiss Defendant's first, second, and third counterclaims, denies the motion to strike the related affirmative defenses, and denies Plaintiffs' motion to stay the counterclaims and related affirmative defenses. The court also denies in part Defendant's ex parte application and grants in part by extending the discovery cut-off date to April 14, 1997.

IT IS SO ORDERED.

DATED: 3/5/97

MARILYN L. HUFF, JUDGE

UNITED STATES DISTRICT COURT

# EXHIBIT J

Judicial Caseload Profile Report

Page 1 of 1

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **CALIFORNIA NORTHERN** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | | Filings* | 7,970 | 8,683 | 6,362 | 6,727 | 6,919 | 7,887 | U.S. | Circuit |
| | | Terminations | 6,777 | 6,983 | 6,966 | 6,471 | 7,094 | 6,675 | | |
| | | Pending | 9,005 | 8,157 | 6,557 | 7,267 | 7,567 | 7,958 | | |
| | % Change in Total Filings | Over Last Year | | -8.2 | | | | | 79 | 15 |
| | | Over Earlier Years | | | 25.3 | 18.5 | 15.2 | 1.1 | 35 | 5 |
| | Number of Judgeships | | 14 | 14 | 14 | 14 | 14 | 14 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | .0 | 3.1 | 12.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 569 | 620 | 455 | 480 | 494 | 563 | 15 | 4 |
| | | Civil | 505 | 558 | 390 | 413 | 424 | 510 | 8 | 2 |
| | | Criminal Felony | 33 | 37 | 39 | 44 | 47 | 42 | 86 | 14 |
| | | Supervised Release Hearings** | 31 | 25 | 26 | 23 | 23 | 11 | 28 | 10 |
| | Pending Cases | | 643 | 583 | 468 | 519 | 541 | 568 | 12 | 2 |
| | Weighted Filings** | | 624 | 621 | 543 | 581 | 631 | 598 | 8 | 2 |
| | Terminations | | 484 | 499 | 498 | 462 | 507 | 477 | 30 | 7 |
| | Trials Completed | | 8 | 8 | 10 | 10 | 11 | 11 | 92 | 14 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 12.4 | 11.2 | 12.6 | 11.1 | 11.7 | 11.8 | 82 | 14 |
| | | Civil** | 6.7 | 7.4 | 9.8 | 8.2 | 10.6 | 9.5 | 11 | 2 |
| | From Filing to Trial** (Civil Only) | | 24.9 | 25.0 | 28.0 | 22.5 | 30.3 | 23.5 | 46 | 7 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 393 | 528 | 530 | 430 | 377 | 475 | | |
| | | Percentage | 4.7 | 7.3 | 9.5 | 6.9 | 5.7 | 6.7 | 51 | 5 |
| | Average Number of Felony Defendants Filed Per Case | | 1.2 | 1.5 | 1.5 | 1.4 | 1.5 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 53.81 | 59.09 | 55.21 | 61.19 | 65.00 | 66.42 | | |
| | | Percent Not Selected or Challenged | 41.9 | 43.2 | 31.0 | 48.9 | 40.9 | 47.2 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7074 | 122 | 975 | 1610 | 94 | 44 | 534 | 527 | 243 | 533 | 732 | 422 | 1238 |
| Criminal* | 455 | 6 | 72 | 162 | 40 | 64 | 11 | 38 | 5 | 6 | 16 | 15 | 20 |

\*  Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# EXHIBIT K

Judicial Caseload Profile Report

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| TEXAS EASTERN | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | | |
| OVERALL CASELOAD STATISTICS | Filings* | | 3,873 | 3,658 | 3,583 | 3,860 | 4,072 | 3,610 | U.S. | Circuit |
| | Terminations | | 3,572 | 3,623 | 3,538 | 4,243 | 3,487 | 4,458 | | |
| | Pending | | 3,352 | 3,079 | 3,035 | 2,983 | 3,358 | 2,825 | | |
| | % Change in Total Filings | Over Last Year | | 5.9 | | | | | 19 | 2 |
| | | Over Earlier Years | | | 8.1 | .3 | -4.9 | 7.3 | 19 | 3 |
| Number of Judgeships | | | 8 | 8 | 8 | 8 | 8 | 7 | | |
| Vacant Judgeship Months** | | | .0 | .0 | .0 | 9.1 | 4.2 | 19.3 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 484 | 457 | 448 | 483 | 509 | 515 | 31 | 5 |
| | | Civil | 403 | 375 | 376 | 411 | 431 | 444 | 17 | 3 |
| | | Criminal Felony | 81 | 82 | 72 | 71 | 77 | 70 | 36 | 3 |
| | | Supervised Release Hearings** | 0 | 0 | 0 | 1 | 1 | 1 | - | - |
| | Pending Cases | | 419 | 385 | 379 | 373 | 420 | 404 | 30 | 6 |
| | Weighted Filings** | | 674 | 550 | 511 | 518 | 529 | 492 | 5 | 2 |
| | Terminations | | 447 | 453 | 442 | 530 | 436 | 637 | 41 | 7 |
| | Trials Completed | | 18 | 21 | 21 | 21 | 26 | 22 | 55 | 7 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 8.7 | 9.2 | 8.3 | 8.4 | 7.5 | 8.9 | 47 | 5 |
| | | Civil** | 9.0 | 9.0 | 10.3 | 6.5 | 10.9 | 15.0 | 42 | 5 |
| | From Filing to Trial** (Civil Only) | | 18.0 | 17.7 | 15.9 | 15.4 | 17.0 | 14.0 | 14 | 2 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 41 | 80 | 64 | 47 | 41 | 58 | | |
| | | Percentage | 1.5 | 3.2 | 2.6 | 1.9 | 1.4 | 2.4 | 9 | 2 |
| | Average Number of Felony Defendants Filed Per Case | | 1.8 | 1.6 | 1.7 | 1.7 | 1.7 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 40.26 | 36.89 | 34.27 | 33.92 | 32.49 | 32.40 | | |
| | | Percent Not Selected or Challenged | 35.5 | 30.1 | 30.2 | 32.5 | 33.5 | 33.3 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3222 | 128 | 181 | 1379 | 30 | 20 | 75 | 401 | 252 | 409 | 220 | 3 | 124 |
| Criminal* | 648 | 18 | 185 | 55 | 168 | 90 | 24 | 30 | 10 | 25 | 11 | 11 | 21 |

*  Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
** See "Explanation of Selected Terms."

# EXHIBIT L
# FILED UNDER SEAL

# EXHIBIT M

LEXSEE 2001 U.S. DIST. LEXIS 2968

**FORMULA ONE LICENSING, B.V., Plaintiff, v. PURPLE INTERACTIVE LTD., et al., Defendants; FORMULA1.COM LTD., et al., Counterclaim Plaintiffs v. FORMULA ONE LICENSING, B.V., et al., Counterclaim Defendants**

**No. C 00-2222 MMC**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2001 U.S. Dist. LEXIS 2968*

**February 6, 2001, Decided**
**February 6, 2001, Filed**

**DISPOSITION:** [*1] Counter-defendants' motion to dismiss GRANTED and, with the exception of Count Nine of Formula1.com's FAAC, all counterclaims DISMISSED with leave to amend to cure the deficiencies noted.

**COUNSEL:** For FORMULA ONE LICENSING B.V., Plaintiff: David W. Slaby, McDermott Will & Emery, Menlo Park, CA.

For PURPLE INTERACTIVE LIMITED, FORMULA1.COM LTD, PURPLE TRAINING LTD, defendants: Victoria E. Brieant, Coudert Brothers, San Francisco, CA.

For PURPLE INTERACTIVE LIMITED, FORMULA1.COM LTD, PURPLE TRAINING LTD, BRUCE MCDIFFETT, FORMULA 1 INTERNET, defendants: Jeffrey G. Benz, Mark H. Wildasin, Coudert Brothers, San Francisco, CA.

For PURPLE INTERACTIVE LIMITED, FORMULA1.COM LTD, PURPLE TRAINING LTD, Counter-claimants: Victoria E. Brieant, Coudert Brothers, San Francisco, CA.

For PURPLE INTERACTIVE LIMITED, FORMULA1.COM LTD, PURPLE TRAINING LTD, BRUCE MCDIFFETT, FORMULA 1 INTERNET, Counter-claimants: Jeffrey G. Benz, Mark H. Wildasin, Coudert Brothers, San Francisco, CA.

For FORMULA ONE LICENSING B.V., Counter-defendant: David W. Slaby, McDermott Will & Emery, Menlo Park, CA.

**JUDGES:** MAXINE M. CHESNEY, United States District Judge.

**OPINION BY:** MAXINE M. CHESNEY

**OPINION**

**ORDER GRANTING** [*2] **COUNTER-DEFENDANTS' MOTION TO DISMISS; VACATING HEARING**

Before the Court is the motion of plaintiff/counter-defendant Formula One Licensing B.V. ("FOLBV") and counter-defendants Federation Internationale de L'Automobile ("FIA") and Formula One Management Limited ("FOM") (collectively "counter-defendants") to dismiss amended counterclaims pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. Defendants/Counterclaimants Formula1.com Ltd., Purple Training Ltd., Purple Interactive Ltd., Bruce McDiffett, First One Co., and Formula 1 Internet (collectively "counterclaimants") filed opposition, to which counter-defendants replied. The Court deems the matter appropriate for decision on the papers filed in support of and in opposition to the motion, VACATES the hearing scheduled for February 2, 2001, and rules as follows.

**BACKGROUND**

Plaintiff FOLBV, in its First Amended Complaint ("FAC"), alleges that it owns and maintains trademarks and trade names used in connection with the annual FIA Formula One World Championship motor sport race, including F1, F1 Formula 1 and Design, Formula One, Formula 1, and FIA Formula 1 World Championship and Design. FOLBV alleges that defendants [*3] Formula1.com Ltd. and Purple Training Ltd (collectively

"Formula1.com"), [1] defendant Purple Interactive Ltd. ("Purple Interactive"), and defendants Bruce McDiffett, First One Co., and Formula 1 Internet (collectively "McDiffett"), [2] are infringing FOLBV's trademarks.

> 1   In its First Amended Answer and Counter-claims ("FAAC"), Formula1.com Ltd. and Purple Training Ltd. state that they are the same entity. "Purple Training Ltd. was the prior name of the entity currently known as Formula1.com Lim-ited." (Formula1.com's FAAC at P 104.)
>
> 2   According to the FAC and McDiffett's First Amended Answer and Counterclaims ("FAAC"), McDiffett is an individual who does business as First One Co. and as Formula 1 Internet.

Formula1.com's FAAC pleads eight antitrust claims (Counts One through Eight), one trademark cancellation claim (Count Nine), [3] and two state law claims, respec-tively, unfair competition, *Cal. Bus. & Prof. Code § 17200*, (Count Ten) and tortious interference with exist-ing and prospective economic advantage [*4] ("IPEA") (Count Eleven). Formula1.com alleges that it competes with counter-defendants in a market defined as "the mar-ket for sales of FIA Formula One Championship-related motor sport goods and services." (*See* Formula1.com's FAAC at P 121.) Formula1.com alleges that counter-defendants have engaged in the following allegedly anti-competitive activity: (1) filing an allegedly meritless proceeding under the Uniform Domain Name Dispute Resolution Policy ("UDRP") against McDiffett; [4] (2) filing a meritless complaint in this action; (3) publishing knowingly false statements in the marketplace accusing Formula1.com of trademark infringement; (4) refusing to supply photographs relating to the FIA Formula One World Championship to certain websites, including that owned by Formula1.com; (5) excluding Formula1.com from the market by refusing to deal with Formula1.com; and (6) instructing a Ferrari apparel licensee, TSS&P, not to supply Formula1.com with Ferrari merchandise.

> 3   Count Nine is not challenged by the instant motion.
>
> 4   UDRP proceedings are held before the World Intellectual Property Organization ("WIPO") Ar-bitration and Mediation Center. *See PACCAR, Inc. v. TeleScan Technologies, L.L.C., 115 F. Supp. 2d 772, 777 n.4 (E.D. Mich. 2000).* "Oper-ated by the World Intellectual Property Organiza-tion (WIPO), the WIPO Arbitration and Media-tion Center mediates and arbitrates cases involv-ing Internet domain name disputes." *Id.*

[*5] Separate amended counterclaims have been filed by defendants Purple Interactive and McDiffett.

Both of these counterclaimants plead a single IPEA claim, which claims are, in all respects, identical.

## DISCUSSION

### I. Antitrust Claims

#### A. Noerr-Pennington Doctrine

All eight antitrust claims brought by Formula1.com are based, in part, upon FOLBV's filing a complaint in the instant action. To the extent the counterclaims are based on FOLBV's Initiation of the instant action, counter-defendants contend they are immune from liabil-ity under the *Noerr-Pennington* doctrine. Under the *No-err-Pennington* doctrine, "those who petition government for redress are generally immune from antitrust liability." *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, 508 U.S. 49, 56, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993); see also Eastern Railroad Presi-dents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965).* The doctrine applies to "petitions to courts." *See Oregon Natural Resources Council v. Mohla, 944 F.2d 531, 533 (9th Cir. 1991).* [*6]

Where an antitrust plaintiff challenges the filing of a complaint, "immunity from antitrust liability is lost only if a party engages in 'sham' petitioning." *See USS-Posco Industries v. Contra Costa County Building & Construc-tion Trades Council, AFL-CIO, 31 F.3d 800, 810 (9th Cir. 1994).* To state a claim based on the "sham excep-tion," "the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relation-ships." *See Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1060 (9th Cir. 1998).* Such allegations must be pleaded with specificity. *See Boone v. Redevelopment Agency, 841 F.2d 886, 894 (9th Cir. 1988); see, e.g., Oregon Natural Resources Councll, 944 F.2d at 535* (holding dismissal of antitrust claim based on filing law-suit proper where plaintiff "failed to plead with particu-larity that [defendant's lawsuit] was a sham").

Counter-defendants are thus entitled to immunity from antitrust liability based on the filing of the instant action unless Formula1.com pleads with particularity facts to show that it can establish [*7] the "sham excep-tion." *See Kottle, 146 F.3d at 1060, 1063.* The only alle-gation made by Formula1.com specific to such claim is the following: "FOLBV has instigated a meritless trade-mark infringement action against the defendants in this action alleging the infringement of unenforceable, ge-neric marks." (*See* Formula1.com's FAAC at P 123.) Such allegation is insufficient to meet the heightened pleading requirement. Accordingly, to the extent For-mula1.com's eight antitrust claims are based on FOLBV's

filing of the instant complaint, such claims are DISMISSED with leave to amend to state with particularity facts necessary to plead the "sham exception" to the *Noerr-Pennington* doctrine.

### B. Monopolization Claims

Formula1.com alleges in the first six counts that counter-defendants are violating § 2 of the Sherman Act by engaging in monopolization and attempted monopolization. All such claims require Formula1.com to identify a relevant product market. "Without a definition of the market there is no way to measure [the defendant's] ability to lesson or destroy competition." *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)* [*8] (citation omitted) (holding monopolization claims must be appraised in terms of alleged relevant market).

Counter-defendants contend Formula1.com's identification of a relevant product market is deficient in that, *inter alia,* Formula1.com has defined the product market in terms of trademarks. "Product markets are not defined in terms of one trademark or another; trademarks simply identify the origin of a product." *Generac Corp. v. Caterpillar, Inc., 172 F.3d 971, 977 (7th Cir. 1999); see, e.g., Weber v. National Football League, 112 F. Supp. 2d 667, 673-74 (N.D. Ohio 2000)* (holding seller of internet domain names misidentified relevant product market as market for two specific domain names in which defendants held trademarks; actual relevant product market was market for domain names generally). Here, by identifying the allegedly relevant product market as "the market for sales of FIA Formula One Championship-related motor sport goods and services," (*see* Formula1.com's FAAC at P 121), Formula1.com appears to have defined a product market in terms of one or more trademarks. Accordingly, these antitrust claims are DISMISSED with leave to amend [*9] to identify a product market not defined in terms of trademarks. [5]

> 5    Counter-defendants also argue that Formula1.com fails to sufficiently allege that counter-defendants have monopoly power in the relevant product market. As stated above monopoly power allegations must be appraised in light of the relevant product markets. Given the Court's finding that Formula1.com has not sufficiently identified a relevant product market, the Court need not decide whether Formula1.com has adequately alleged monopoly power.

### C. Group Boycott Claims

Formula1.com alleges in Counts Seven and Eight that counter-defendants are violating § 1 of the Sherman Act by conspiring to engage in a group boycott to pre-

vent Formula1.com from competing in the relevant product market. Count Seven is pleaded under a per se theory. Count Eight is pleaded under a rule of reason theory.

"Sherman Act § 1 prohibits agreements that unreasonably restrain trade." *Big Bear Lodging Assoc. v. Snow Summit, Inc., 182 F.3d 1096, 1101 (9th Cir. 1999).* [*10] "Certain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances. An agreement of such a kind is unlawful per se." *Id.* (quoting *NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133, 142 L. Ed. 2d 510, 119 S. Ct. 493 (1998)).* [6] "Other alleged violations are subject to 'rule of reason' analysis to determine 'whether particular concerted conduct unreasonably restrains competition.'" *Id.* (quoting *Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1445 (9th Cir. 1988)).*

> 6    An antitrust plaintiff bringing a claim based upon a per se violation need not identify the relevant product market in which the parties compete. *See id. at 1445-50.*

Where, as here, a claim is based upon an alleged group boycott, a per se analysis is appropriate only if the boycott "involves horizontal agreements among direct competitors. [*11] " *See NYNEX Corp., 525 U.S. at 135; see, e.g., Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 85 L. Ed. 949, 61 S. Ct. 703 (1941)* (finding per se rule applicable to claim that clothing designers, manufacturers, and suppliers agreed not to sell their products to retailers who bought clothes from competing manufacturers and suppliers).

Counter-defendants argue that Count Seven is deficient because Formula1.com does not allege that FOLBV, FOM, and FIA are direct competitors. Formula1.com alleges that FIA controls "the television and other media rights relating to all FIA sanctioned events," (*see* Formula1.com's FAAC at P 100), that FOM's "principal business [] is promotion of the FIA Formula One Championship, including . . . marketing the broadcast rights to the Championship," (*see id. at P 103*), and that FOLBV "claims to own and maintain the 'Formula One family of trademarks and trade names' used in connection with the FIA Formula One World Championship." (*See id. at P 106.*) Such allegations cannot be reasonably interpreted to state that FIA, FOM, and FOLBV are direct competitors. Further, to the extent Formula1.com argues [*12] that its group boycott conspiracy claim is premised upon an agreement between Ferrari apparel licensee TSS&P and FOM, no such agreement is pleaded in the counterclaim, nor is any allegation made that TSS&P is a direct competitor of FOM or any other

counter-defendant. Accordingly, Count Seven is DISMISSED with leave to amend.

In Count Eight, Formula1.com seeks to plead a rule of reason claim. To state such a claim, Formula1.com must sufficiently identify the relevant product markets in which it and counter-defendants compete, and allege facts demonstrating that counter-defendants conduct has an anticompetitive effect on such markets. *See Big Bear Lodging, 182 F.3d at 1101-02, 1105* (holding plaintiff seeking to prove § 1 violation under rule of reason must identify relevant product markets). As stated above, Formula1.com has not sufficiently alleged a relevant product market. Accordingly, Count Eight is DISMISSED with leave to amend.

## II. State Claims

### A. Unfair Competition

In Count Ten of Formula1.com's FAAC, Formula1.com alleges that counter-defendants' actions constitute a violation of *California Business & Professions Code § 17200*. As pleaded, such [*13] claim is derivative of the antitrust claims. As stated above, however, the antitrust claims are deficiently pleaded. Where a plaintiff fails to state an antitrust claim, and where an unfair competition claim is based upon the same allegations, such state claims are properly dismissed. *See Kentmaster Mfg. Co. v. Jarvis Products Corp., 146 F.3d 691, 695 (9th Cir. 1998)*. Accordingly, Formula1.com's unfair competition claim is DISMISSED with leave to amend.

### B. Interference With Prospective Economic Advantage

In Count Eleven, Formula1.com alleges an IPEA claim. In their separate FAACs, Purple Interactive and McDiffett each allege an IPEA claim as well. [7]

> 7    Although Purple Interactive and McDiffett plead no antitrust claims, their IPEA claims are based on much of the same behavior as alleged by Formula1.com, and, in particular, that counter-defendants Interfered by filing the instant action, by instituting an UDRP proceeding with the WIPO Arbitration and Mediation Center, and by falsely accusing counterclaimants of trademark infringement.

[*14]

To state an IPEA claim, a plaintiff must allege "conduct that [is] wrongful by some legal measure other than the fact of interference itself." *See id. at 695* (citation omitted). Although the California courts have not provided a definitive meaning of "wrongful" conduct, in *Bed, Bath & Beyond v. La Jolla Village Square Venture*

*Partners, 52 Cal. App. 4th 867 (Cal. Ct. App. 1997)*, the California Court of Appeal acknowledged that various courts have defined that phrase as follows: (1) conduct that is independently tortious or a restraint of trade; (2) conduct violating a statute, regulation, a recognized rule of common law, or an established standard of a trade or profession, or (3) conduct that is illegal, unfair, or immoral according to common understandings of society. *See id. at 882 n.10*.

Counter-defendants argue that the conduct alleged by counterclaimants is not "wrongful." Counter-defendants further argue that none of the IPEA claims identifies any particular relationship that has been disrupted by counter-defendants.

### 1. Wrongful Conduct

Counter-defendants argue and Formula1.com agrees that the wrongful conduct forming [*15] the basis for Formula1.com's IPEA claim is, in large part, the antitrust activity alleged earlier in the FAAC. Accordingly, each party adopts its arguments made in connection with Formula1.com's antitrust claims. As discussed above, Formula1.com has not sufficiently pleaded an antitrust claim. Consequently, Formula1.com's IPEA claim fails to the extent that claim is derivative of Formula1.com's antitrust claims. *See Kentmaster, 146 F.3d at 695*.

Formula1.com argues, as do Purple Interactive and McDiffett, that they have sufficiently identified "wrongful" conduct by alleging FOLBV's trademark infringement claims are baseless and without merit. Where a plaintiff seeks to base a claim of interference with prospective economic advantage upon the pursuit of litigation, the plaintiff "must allege that the litigation was brought without probable cause and that the litigation concluded in plaintiff's favor." *See Pacific Gas & Elec. Co. v. Bear Stearns, 50 Cal. 3d 1118, 1137, 270 Cal. Rptr. 1, 791 P.2d 587 (Cal. 1990)*. Here, counterclaimants cannot allege the subject action concluded in their favor, as the litigation is on going. Accordingly, to the extent [*16] counterclaimants' IPEA claims are based upon the initiation of the Instant action by FOLBV, such claims are premature. [8]

> 8    Although counterclaimants have alleged that the UDRP proceeding concluded in McDiffett's favor, counterclaimants, for the reasons discussed *infra*, have not sufficiently pleaded a claim based on FOLBV's initiation of that proceeding. For the same reasons, counterclaimants have not sufficiently pleaded an IPEA claim based on the allegation that counter-defendants made false accusations of trademark infringement.

### 2. Disruption of Relationship

The elements of the tort of interference with pro-spective economic advantage include "an economic rela-tionship between the plaintiff and some third party, with the probability of future economic benefit to the plain-tiff," and "actual disruption of the relationship." *See Morton v. Rank America, Inc., 812 F. Supp. 1062, 1075 (C.D. Cal. 1993)* (quoting *Pacific Gas & Elec., 50 Cal. 3d at 1126 n.2*). Here, counterclaimants [*17] allege in the most general terms that their relationships with "cus-tomers" have been disrupted. Counterclaimants fail to identify with any degree of particularity the relationships which form the basis of these claims or the manner in which counter-defendants' actions interfered therewith. As a result, counterclaimants have not provided suffi-cient information to meet even the minimal pleading requirements under the Federal Rules. *See* Fed. R. Civ. P. (a); *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* (holding Rule 8(a) requires statement "that will give the defendant fair notice of what the plain-tiff's claim is and the grounds upon which it rests").

Accordingly, counterclaimants' IPEA claims are DISMISSED with leave to amend.

## CONCLUSION

For the reasons stated, counter-defendants' motion to dismiss is hereby GRANTED and, with the exception of Count Nine of Formula1.com's FAAC, all counterclaims are DISMISSED with leave to amend to cure the defi-ciencies noted. Any such amended counterclaims shall be filed no later than 30 days from the date of this order.

**IT IS SO ORDERED.**

Dated: FEB X 6 2001

MAXINE M. CHESNEY

United [*18] States District Judge

# EXHIBIT N

LEXSEE 2007 U.S. DIST. LEXIS 67168

**COXCOM, INC., Plaintiff, v. HYBRID PATENTS INCORPORATED, Defendant**

**No. C-06-7918 MMC**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 67168*

**August 30, 2007, Decided**
**August 30, 2007, Filed**

**PRIOR HISTORY:** *Coxcom, Inc. v. Hybrid Patents, Inc., 2007 U.S. Dist. LEXIS 51370 (N.D. Cal., July 3, 2007)*

**COUNSEL:** [*1] For Coxcom Inc, Plaintiff: Adam R. Alper, Eric R. Lamison, LEAD ATTORNEYS, Kirkland & Ellis LLP, San Francisco, CA.

For Hybrid Patents Incorporated, Defendant: David A. DeGroot, Neil Arthur Smith, LEAD ATTORNEYS, Sheppard, Mullin, Richter & Hampton LLP, San Francisco, CA; Michael E. Wilson, Slusser Wilson & Partridge LLP, Houston, TX.

**JUDGES:** MAXINE M. CHESNEY, United States District Judge.

**OPINION BY:** MAXINE M. CHESNEY

**OPINION**

**ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER**

Before the Court is defendant Hybrid Patents Incorporated's ("Hybrid") motion, filed June 8, 2007, to transfer the above-titled action to the Eastern District of Texas. Plaintiff CoxCom, Inc. ("CoxCom") has filed opposition, to which Hybrid has replied. Pursuant to the Court's July 3, 2007 order, the parties filed supplemental briefing. Having reviewed the parties' submissions in support of and in opposition to the motion, the Court rules as follows.

**BACKGROUND**

On July 14, 2006, Hybrid filed a complaint in the Eastern District of Texas against four defendants, including Cox Communications Inc. ("Cox Communications"),

alleging infringement of four patents owned by Hybrid. (*See* Wilson Decl., filed June 8, 2007, Ex. 2.) Specifically, with respect to [*2] Cox Communications, Hybrid alleged said defendant infringes by providing "High Speed Internet services to subscribers." (*See id.* Ex. 2 PP 21- 22.) On March 29, 2007, during the course of discovery in the Texas action, Cox Communication's *Rule 30(b)(6)* designee testified that its subsidiary CoxCom had provided "Internet services" in Texas. (*See* Alper Decl., filed June 22, 2007, Ex. E at 26). Subsequently, on May 4, 2007, Hybrid, in light of the testimony of Cox Communications, filed a motion for leave to amend to add CoxCom as a defendant in the Texas action, (*see* Wilson Decl. Ex. 6); on June 25, 2007, the Texas court granted Hybrid's motion and, that same day, Hybrid filed its First Amended Complaint, adding infringement claims against CoxCom and five other newly-added defendants, (*see* Jaasma Decl., filed June 29, 2007, Ex. 1.)

Meanwhile, on December 27, 2006, CoxCom filed the instant action, in which CoxCom seeks declaratory relief pertaining to the same four patents as are at issue in the Texas action; specifically, CoxCom seeks a declaration that CoxCom does not infringe, that the subject patents are invalid, that the subject patents are unenforceable, and that Hybrid does not own [*3] any of the subject patents. Additionally, CoxCom seeks relief under *§ 17200 of the California Business & Professions Code*, based on the same set of facts that underlie CoxCom's allegation that Hybrid's patents are unenforceable and that Hybrid does not own the patents. CoxCom served Hybrid with the instant complaint on March 26, 2007.

**DISCUSSION**

By the instant motion, Hybrid seeks a transfer to the Eastern District of Texas. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or divi-

sion where it might have been brought." *28 U.S.C. § 1404(a).*

Here, the action "might have been brought" in the Eastern District of Texas, specifically, because Hybrid is subject to personal jurisdiction therein. *See 28 U.S.C. § 1391 (c)* (holding, as to action against defendant corporation, venue proper in any district in which defendant is subject to personal jurisdiction); (*see also* Compl. P 3 (alleging Hybrid's principal place of business is in Texas).)

With respect to the issue of convenience, the Court, weighing the applicable factors relevant to such issue, *see Decker Coal Co. v. Commonwealth Edison Co., 805 F. 2d 834, 843 (9th Cir. 1986),* [*4] finds the Eastern District of Texas is a more convenient forum, for the reasons set forth below.

At the outset, the Court finds that although plaintiffs' choice of forum is a factor weighing against transfer, such factor is not entitled to significant weight. First, CoxCom is not a citizen of California. (*See* Compl. P 2 (alleging CoxCom is a Delaware corporation with its principal place of business in Georgia).) Second, Cox-Com appears to have engaged in forum shopping, given the absence of any showing that, at the time CoxCom filed the instant action, Hybrid was even aware CoxCom was engaging in potentially infringing conduct. [1] *See Williams v. Bowman, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001)* (holding "degree to which courts defer to the plaintiffs chosen venue is substantially reduced where the plaintiff does not reside in the venue" or where "there is any indication that the plaintiffs choice of forum is the result of forum shopping"; citing cases).

> [1] CoxCom does not allege or otherwise assert, for example, that CoxCom filed the instant action as a reaction to Hybrid's sending CoxCom a cease-and-desist letter or similar communication indicating Hybrid's intent to sue CoxCom for infringement [*5] if CoxCom did not stop selling the accused products.

With respect to the "feasibility of consolidation," the Court finds such factor weighs heavily in favor of transfer and, given the circumstances present herein, outweighs the deference due plaintiffs' choice of forum. *See A. J. Industries v. United States District Court, 503 F. 2d 384, 389 (9th Cir. 1974)* (holding "feasibility of consolidation" with action in transferee court is "significant factor in a transfer decision"; noting "even the pendency of an action in another district is important because of the positive effects it might have in possible consolidation of discovery and convenience to witnesses and parties"). Each of the claims asserted herein is in the nature of a defense to a claim of infringement, and each has been

raised as a defense in the Texas action by three of the four original defendants. [2] (*See* Wilson Decl. Ex. 3 at 10-38, Ex. 4 at 9-37, Ex. 5 at 10-38.) In short, as a result of the Texas court's order of June 25, 2007, Hybrid's claim of infringement against CoxCom is pending in the Eastern District of Texas, where infringement claims brought by Hybrid against nine other defendants are pending, and the same defenses [*6] raised herein are asserted as defenses therein. Under such circumstances, it is more than simply "feasible" that the Texas action and the instant action could be consolidated if they were pending in the same district; rather, such consolidation is highly likely. [3]

> [2] The fourth original defendant filed a motion to dismiss, in lieu of an answer; CoxCom represents that it has not yet filed a response; and no party has advised this Court as to the status of the responsive pleadings with respect to the other newly-added defendants.
>
> [3] CoxCom argues consolidation is unlikely because CoxCom believes the Texas court is likely to grant a motion CoxCom plans to file, seeking dismissal for lack of personal jurisdiction. Given that CoxCom's parent has testified that CoxCom has sold, in Texas, products alleged by Hybrid to be infringing in nature, the basis for such motion is unclear.

With respect to the convenience of the parties, Cox-Com, as noted, is not a citizen of California, nor has CoxCom asserted that any CoxCom employee who is expected to be a witness resides in California. Hybrid likewise is not a citizen of California, (*see* Compl. P 3), and has not asserted that any Hybrid employee who is [*7] expected to be a witness resides in California. With respect to the convenience of third-party witnesses, often the most significant factor, the Court finds transfer would be substantially more convenient for each such witness, even those who reside in California, because such witnesses would not be required to engage in duplicative litigation or travel to two different forums to attend court proceedings. [4] *See, e.g., Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co., 844 F. Supp. 1163, 1166 (S.D. Texas 1994)* ("It is the convenience of non-party witnesses . . . that is the more important factor and is accorded greater weight [than the convenience of party witnesses].") Consequently, this factor weighs in favor of transfer.

> [4] CoxCom asserts that the inventors of the patents and certain of Hybrid's licensees reside in California. Assuming, as CoxCom asserts, such witnesses could provide testimony helpful to defend against a claim of infringement by Hybrid, such witnesses likely would be called to testify as witnesses in the Texas action, irrespective of

whether the instant action were to go forward in California.

In sum, the relevant factors weigh in favor of the request for transfer [*8] pursuant to *§ 1404(a)*. [5] Moreover, such transfer would serve the multiple objectives of "eliminat[ing] duplication in discovery, avoid[ing] conflicting rulings and schedules, reduc[ing] litigation cost, and sav[ing] time and effort of the parties, the attorneys, the witnesses, and the courts." *Cf.* Manual for Complex Litigation (Fourth) § 20.131 (2004) (discussing objectives of transfer in context of multidistrict litigation).

---

5   In light of this finding, the Court does not address Hybrid's alternative request to transfer under the "first to file rule."

Accordingly, the instant action will be transferred to the Eastern District of Texas.

## CONCLUSION

For the reasons stated, defendant's motion to transfer is hereby GRANTED, and the instant action is hereby TRANSFERRED to the Eastern District of Texas, pursuant to *28 U.S.C. § 1404(a)*.

**IT IS SO ORDERED.**

Dated: August 30, 2007

MAXINE M. CHESNEY

United States District Judge

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GIRAFA.COM, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>AMAZON WEB SERVICES, LLC,<br>AMAZON.COM, INC.,<br>ALEXA INTERNET, INC.,<br>IAC SEARCH & MEDIA, INC.,<br>SNAP TECHNOLOGIES INC.,<br>YAHOO! INC.,<br>SMARTDEVIL INC.,<br>EXALEAD INC., AND<br>EXALEAD SA.,<br><br>  Defendants. | C.A. No. 07-787-SLR |

**PLAINTIFF GIRAFA.COM, INC.'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Girafa.com, Inc. ("Girafa" or "Plaintiff") hereby respectfully moves, pursuant to

35 U.S.C. § 283 and Fed. R. Civ. P. 65, for the entry of a preliminary injunction against

Defendants Smartdevil, Inc. ("Smartdevil"), Snap Technologies, Inc. ("Snap"), Alexa Internet,

Inc. ("Alexa"), Amazon Web Services, LLC. ("AWS") and Amazon.com, Inc. ("Amazon")

(collectively referred to as the "PI Defendants"), all of whom use Girafa's patented technology.[1]

In particular, Girafa requests that this Court enjoin the PI Defendants from directly and

indirectly infringing the '904 patent, and specifically enjoin the PI Defendants from: (1)

providing its customers with access to thumbnails stored on its image servers and the software

---

[1] This motion is limited to only those defendants that directly compete with Girafa in a manner
that erodes Girafa's market share. Thus this motion does not apply to Defendants IAC Search &
Media, Inc., Yahoo! Inc., Exalead Inc., and Exalead SA., because Girafa has no information that
these defendants are currently directly competing in this manner.

{00202033;v1}

code to manage the display of thumbnails; and (2) displaying thumbnail images in an infringing

manner.

Plaintiff's Opening Memorandum, and the supporting declarations of Shirli Ran and Dr.

Brad A. Myers, are filed herewith.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff Girafa.com Inc.*

*Of Counsel:*

William H. Mandir
John F. Rabena
Chandran B. Iyer
SUGHRUE MION, PLLC
2100 Pennsylvania Ave., N.W.
Washington D.C. 20037
(202) 293-7060
wmandir@sughrue.com
jrabena@sughrue.com
cbiyer@sughrue.com

Dated: March 13, 2008

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ALEXA INTERNET, INC.,

      Plaintiff,

v.

v.

GIRAFA.COM, INC.

      Defendant.

Case No.: 2:08-cv-121

DECLARATION OF SHIRLI RAN
IN SUPPORT OF PLAINTIFF GIRAFA.COM, INC.'S
MOTION TO DISMISS OR TRANSFER

I, Shirli Ran, hereby declare as follows:

1.     I am the Chief Operating Officer ("COO") for Girafa.com, Inc. ("Girafa") and have held this position since 1999. As COO of Girafa, I oversee the company's product development, operational and business activities.

2.     I have personal knowledge of the following facts and, if called as a witness, could and would competently testify thereto.

3.     Girafa is a privately-held company incorporated under Delaware law and having places of business only in Delaware and Israel.

4.     Girafa does not hold any business licenses issued by the State of Texas.

5.     Girafa does not have any registered agent in Texas.

6.     Girafa does not have any employees or agents in Texas.

7.    Girafa does not have any bank accounts in Texas.

8.    Girafa does not own any real property in Texas.

9.    Girafa also has not made any sales presentation for the accused system in Texas.

10.    The servers that Girafa uses to provide its thumbnails and associated services are located in Weehawken, New Jersey.

11.    To my knowledge, none of the parties in this litigation or any of the witnesses are located in Texas.

Dated: June 3, 2008                    By: _Shirl R_____

                                        Shirli Ran

# EXHIBIT Q

LEXSEE 2007 U.S. DIST. LEXIS 31753

**INTUITIVE SURGICAL, INC., Plaintiff, v. CALIFORNIA INSTITUTE OF TECHNOLOGY, Defendant.**

**No. C07-0063-CW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 31753*

**April 18, 2007, Decided**
**April 18, 2007, Filed**

**COUNSEL:** [*1] For Intuitive Surgical, Inc., Plaintiff: Philip F. Atkins-Pattenson, LEAD ATTORNEY, Craig A. Pinedo, Sheppard, Mullin, Richter & Hampton, LLP, San Francisco, CA.; Corey J. Manley, Edward C. Donovan, Gregory Corbett, John M. Desmarais, Kirkland & Ellis LLP, Washington, DC, US.

For California Institute of Technology, Defendant: Joseph F. DePumpo, Justin Bryce Kimble, Michael W Shore, Shore Chan Bragalone LLP, Dallas, TX.; Martin C. Fliesler, Fliesler Meyer LLP, San Francisco, CA.

**JUDGES:** CLAUDIA WILKEN, United States District Judge.

**OPINION BY:** CLAUDIA WILKEN

**OPINION**

ORDER GRANTING DEFENDANT'S MOTION TO STAY AND DENYING DEFENDANT'S MOTION TO DISMISS OR TRANSFER

Defendant California Institute of Technology (Caltech) moves to dismiss or stay this action, or in the alternative, to transfer it to the Eastern District of Texas. Plaintiff Intuitive Surgery, Inc. (Intuitive) opposes the motion. The matter was heard on April 13, 2007. Having considered all of the papers filed by the parties and oral argument on the motions, the Court GRANTS the motion to stay and DENIES without prejudice the motion to dismiss or transfer.

BACKGROUND

The parties to this action had a meeting on January 4, 2007. According [*2] to Caltech, the purpose of the meeting was to offer Intuitive an opportunity to license four of Caltech's patents. DePumpo Decl., Ex. 1 (November 17, 2006, letter from DePumpo to Intuitive). According to Intuitive, at the meeting Caltech made allegations of patent infringement and threatened an immediate lawsuit in Texas unless Intuitive consented to jurisdiction in that forum. Guthart Decl. P 8. The meeting was apparently unsuccessful.

That same day, Caltech sued Intuitive in the Eastern District of Texas, Case No. 6:07-CV-4, for allegedly infringing four of its patents which describe and claim robot-assisted microsurgery systems. DePumpo Decl., Ex. 2 (Docket in Case No. 6:07-CV-4). The Texas suit was filed at 3:42 p.m. Central Standard Time (CST) (1:42 p.m. Pacific Standard Time (PST)). *Id.* Caltech asserted that Intuitive infringed its patents by making, using, selling, offering for sale, and/or importing into the United States products that fall within the scope of the claims of its patents. DePumpo Decl., Ex. 3 (Complaint in Case No. 6:07-CV-4).

Later that afternoon, Intuitive filed the present action seeking a declaratory judgment that (1) Intuitive's surgical robotic products [*3] do not infringe the same four patents, and (2) those patents are invalid and/or unenforceable. Compl. P 5. Both parties acknowledge that Intuitive filed suit a few hours after Caltech. Intuitive asserts that it intends to move to transfer the Texas action to this Court, but that it has not done so pending this Court's ruling on Caltech's motion to dismiss, stay or transfer.

DISCUSSION

Caltech argues that the first-to-file rule warrants a dismissal or stay of this action because it filed the Texas suit before Intuitive filed this action, and the parties and issues in both cases are identical. Caltech further argues that any balancing of convenience factors should be done by the court presiding over the first-filed case. In the

alternative, Caltech requests that this action be transferred to the Eastern District of Texas, pursuant to *28 U.S.C. § 1404(a)*.

Intuitive counters that the first-to-file rule should not apply because it filed suit just two hours after Caltech, and that if the first-to-file rule does apply, an exception is warranted because Caltech engaged in forum shopping. Intuitive also contends that transfer is improper both because Intuitive could [*4] not have brought the original action in the Eastern District of Texas, and because the balance of convenience factors favors proceeding in the Northern District of California.

I. First-To-File Rule

"There is a generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 94-5 (9th Cir. 1982)*. This doctrine, known as the first-to-file rule, "gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." *Northwest Airlines, Inc. v. American Airlines, Inc., 989 F.2d 1002, 1006 (8th Cir. 1993)*. The rule "serves the purpose of promoting efficiency well and should not be disregarded lightly." *Church of Scientology of California v. United States Dep't of Army, 611 F.2d 738, 750 (9th Cir. 1979)*. However, "the considerations affecting transfer to or dismissal in favor of another forum do not change simply because [*5] the first-filed action is a declaratory action." *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 938 (Fed. Cir. 1993)*.

In applying the first-to-file rule, a court looks to three threshold factors: "(1) the chronology of the two actions; (2) the similarity of the parties, and (3) the similarity of the issues." *Z-Line Designs, Inc. v. Bell'O Int'l LLC, 218 F.R.D. 663, 665 (N.D. Cal. 2003)*. If the first-to-file rule does apply to a suit, the court in which the second suit was filed may transfer, stay or dismiss the proceeding in order to allow the court in which the first suit was filed to decide whether to try the case. *Alltrade, Inc. v. Uniweld Products, Inc., 946 F.2d 622, 622 (9th Cir. 1991)*. "Circumstances under which an exception to the first-to-file rule typically will be made include bad faith, anticipatory suit and forum shopping." *Id. at 628* (internal citations omitted).

One exception to the first-to-file rule is when "the balance of convenience weighs in favor of the later-filed action." *Ward v. Follett Corp., 158 F.R.D. 645, 648 (N.D. Cal. 1994)*. This is analogous to the "convenience of [*6] parties and witnesses" under a transfer of venue

motion, *28 U.S.C. § 1404(a)*. *Med-Tec Iowa, Inc. v. Nomos Corp., 76 F. Supp. 2d 962, 970 (N.D. Iowa 1999)*; *800-Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128, 133 (S.D.N.Y. 1994)*. The court with the first-filed action should normally weigh the balance of convenience. *Alltrade Inc., 946 F.2d at 628*.

A. Chronology of the Two Actions

The central question is whether the first-to-file rule applies when two actions are filed a few hours apart. Caltech argues that application of the first-to-file rule does not depend on the amount of time between the two filings, and asserts that its attempt to negotiate with Intuitive before filing suit was the only reason the suits were filed nearly simultaneously. Intuitive avers that the first-to-file rule is typically applied when the second-filed action occurs days or weeks later, and that the rule should not be used to reward Caltech's race to the "wrong" courthouse.

The policy rationale behind the first-to-file rule is supported by reasons "just as valid when applied to the situation where one suit precedes [*7] the other by a day as they are in a case where a year intervenes between the suits." *Genentech, 998 F.2d at 938*. Nonetheless, at least one court in this district has held that the first-to-file rule is "not dispositive" when the first-filed action precedes the second-filed action by mere hours. *Nordson Corp. v. Speedline Techs., Inc., 2000 U.S. Dist. LEXIS 15240, at *7 (N.D. Cal. Oct. 10, 2000)*. In that case, the California plaintiff was the patent holder, and the allegedly infringing defendant filed a declaratory judgment action in the District of Massachusetts just three hours before the plaintiff's patent infringement suit was filed in this district. *2000 U.S. Dist. LEXIS 15240, [WL] at *3*. Although the court elected to transfer the case to the first-filed forum, the court found that the close proximity of the filings rendered that fact "not dispositive," and transferred on the basis of convenience to the parties and witnesses. *2000 U.S. Dist. LEXIS 15240, [WL] at *7*.

The Court finds that the first-to-file rule is applicable and requires deference to the first-filed court, notwithstanding the near simultaneous nature of the filings. The Court is persuaded that applying the first-to-file rule in [*8] this case furthers the sound policy rationale underlying it. Not to apply the rule in situations like this one would discourage potential plaintiffs from attempting settlement discussions prior to filing lawsuits out of fear that they might not secure their preferred forum.

As stated above, the court in the first-filed action should decide whether there is an exception to the first-to-file rule. Therefore, this Court will not address Intuitive's arguments that Caltech engaged in forum shopping, or that a balancing of convenience factors weighs in fa-

2007 U.S. Dist. LEXIS 31753, *

vor of litigating in Northern California. The Court defers to the Eastern District of Texas to decide the appropriate forum and whether an exception to the first- to-file rule is applicable. *See Pacesetter, 678 F.2d at 96* (noting that normally the respective convenience of the two courts should be addressed to the court in the first-filed action).

CONCLUSION

For the foregoing reasons, the Court GRANTS Caltech's motion to stay this action and DENIES without prejudice its motion to dismiss or transfer (Docket No. 20) pending the Texas court's ruling on Intuitive's anticipated motion to transfer that litigation to this Court. [*9] [1] If Intuitive does not file a motion to transfer in Texas within ten days, or if the Texas court denies Intuitive's motion to transfer, Caltech may re-file its motion to transfer and the Court will transfer this case to Texas. If the Texas case is transferred to this district, the parties shall file a notice of related cases and this Court will relate and consolidate the cases and apply the scheduling order to the consolidated case.

1  The Court also grants Caltech's motion to file a supplement to its reply (Docket No. 46), and takes judicial notice of the scheduled proceedings in the Eastern District of Texas.

IT IS SO ORDERED.

Dated: 4/18/07

CLAUDIA WILKEN

United States District Judge

# EXHIBIT R

LEXSEE 1996 U.S. DIST. LEXIS 22893

**LONDON AND HULL MARITIME LIMITED; INSURANCE COMPANY LIMITED; YORKSHIRE INSURANCE COMPANY TERRA NOVA INSURANCE COMPANY LIMITED; PHOENIX ASSURANCE -- Plc per THE LONDON ASSURANCE; OCEAN MARINE INSURANCE COMPANY LIMITED; ZURICH Re (UK) LIMITED;C.A.M.A.T.; PRUDENTIAL ASSURANCE COMPANY LIMITED; CORNHILL INSURANCE Plc; GAN MINISTER INSURANCE COMPANY LIMITED; HANSA MARINE INSURANCE COMPANY (UK) LIMITED; PHOENIX ASSURANCE Plc; ASSICURAZIONI GENERALI S. P. A.; SPHERE DRAKE INSURANCE Plc AND LA REUNION FRANCAISE SOC ANON D'ASSURANCES ET DE REASSURANCES, Plaintiffs, v. EAGLE PACIFIC INSURANCE COMPANY and DOES 1-20, inclusive, Defendants.**

No. C 96-01512 CW

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1996 U.S. Dist. LEXIS 22893*

**August 14, 1996, Decided
August 14, 1996, Filed**

**COUNSEL:** [*1] For London and Hull Maritime Insurance Company Limited, The Yorkshire Insurance Co Ltd, Terra Nova Insurance Co, Phoenix Assurance PLC, Ocean Marine Insurance Company Limited, C.A.M.A.T., Prudential Assurance Co Ltd, Cornhill Insurance Plc, Gan Minster Insurance Company Limited, Hansa Marine Ins, Assicurazioni Generali S.P.A., Sphere Drake, La Renunion Francaise Soc Anon D'Assurances Et De Reassurances, Plaintiffs: Ronald S. Bushner, Wilson Elser Moskowitz Edelman & Dicker. San Francisco, CA.

For Eagle Pacific Insurance Company, Defendant: Frank D. Pond, Pond North & Hugo, P.C., San Francisco, CA; James R. Colgan, Robert M Menchini, Tilly & Graves, San Francisco, CA.

**JUDGES:** CLAUDIA WILKEN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CLAUDIA WILKEN

**OPINION**

*ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT WITHOUT PREJUDICE*

Defendant Eagle Pacific Insurance Company ("Eagle Pacific") moves under *28 U.S.C. § 1404(a)* to transfer this action to the United States District Court for the Western District of Washington, at Seattle. Plaintiffs (collectively referred to as the "Excess Underwriters") oppose the motion. The Excess [*2] Underwriters move for summary judgment. Eagle Pacific opposes the motion. The matter was heard on August 9, 1996. Having considered all of the papers filed by the parties and oral argument on the motion, the Court GRANTS Eagle Pacific's motion to transfer and DENIES the Excess Underwriters' motion for summary judgment without prejudice.

BACKGROUND

The Excess Underwriters brought this action for declaratory relief under an insurance contract in the California Superior Court for Contra Costa County. Eagle Pacific removed the case to this Court. Eagle Pacific now moves to transfer the action to the Western District of Washington on the grounds that such a transfer would be more convenient to the parties and witnesses. Eagle Pacific also argues that, because there is a related action pending in the Western District of Washington, a single disposition of both matters would best serve the interests of justice. The Excess Underwriters argue that venue is proper in this Court, and that there are good and valid reasons for this Court to decide the dispute between the parties.

The Excess Underwriters move for summary judgment on the grounds that, under applicable California substantive law, [*3] the language of the insurance policy in dispute is unambiguous, and summary judgment is appropriate. Eagle Pacific opposes the summary judgment motion on the merits and asserts that summary judgment in favor of the Excess Underwriters cannot be granted because an indispensable party to the litigation has not been joined.

*Statement of Facts*

Eagle Pacific, a Washington corporation with its principal place of business in Seattle, Washington, was the primary insurer of Manson Construction and Engineering Company, Inc. ("Manson"), also a Washington corporation with its principal place of business in Seattle, covering a certain construction project located in the Point Loma area in Southern California. Eagle Pacific issued a Workers Compensation and Employers Liability Insurance Policy to Manson (the "Eagle Policy") with a policy limit of $ 500,000. According to Eagle Pacific, the $ 500,000 limit included allocated loss adjustment expenses, such as investigative and defense costs.

Stanley T. Scott & Co., Inc. ("Scott & Co."), an insurance broker with its principal place of business in Seattle, negotiated the Eagle Policy for Manson. Scott & Co. also arranged for excess coverage insurance [*4] (the "Excess Coverage Policy") to be provided to Manson by the Excess Underwriters with a $ 1,000,000 limit. The Excess Coverage Policy required exhaustion of primary coverage before its liability commenced. All negotiations concerning the Excess Coverage Policy took place in Seattle.

On or about June 5, 1993, Steve Robinson, an employee of Manson and/or other companies involved in a joint venture with Manson in connection with the construction in Point Loma, was injured. Mr. Robinson filed suit against Manson and the other companies seeking damages for injuries he sustained while working on the Point Loma project. Manson was defended in this litigation pursuant to the Eagle Policy.

On November 14, 1995, Mr. Robinson's claims were completely settled for $ 550,000. The total cost of the settlement, including amounts paid for wages, maintenance, cure, attorneys' fees, the settlement and interest, was approximately $ 700,000. Because the settlement amount was over the $ 500,000 Eagle Policy limit, the Excess Underwriters were involved in the settlement negotiations. Thereafter, the Excess Underwriters paid $ 74,817.50 which is what they believed to be their liability under the Excess [*5] Coverage Policy. They have refused to pay any additional amounts. Eagle Pacific paid

$ 500,000 and either paid or loaned approximately $ 122,000 to Manson to cover the remaining amount due.

On January 30, 1996, Manson filed suit against the Excess Underwriters in the Western District of Washington in Seattle to recover the additional $ 122,000 needed to complete the settlement with Mr. Robinson. On March 20, 1996, the Excess Underwriters filed suit for declaratory relief against Eagle Pacific in the California Superior Court for Contra Costa County, claiming that the Eagle Policy provides separate coverage for indemnity and defense, and that Eagle Pacific is responsible for paying Manson the $ 121,670.19 now in contention. On May 21, 1996, Manson amended its complaint filed in Washington to include Eagle Pacific as a co-plaintiff.

Eagle Pacific asserts that its policy is a "wasting" policy, so that it is entitled to count against the $ 500,000 limit the cost of defense as well as the payments made towards settlement. The Excess Underwriters maintain that the Eagle Policy contains two separate coverages, one for defense and one to pay damages, and, hence, Eagle Pacific is liable to [*6] Manson for the additional $ 122,000. The Excess Underwriters request that the Court interpret the Eagle Policy and grant summary judgment in their favor.

DISCUSSION

*I. Legal Standards*

Pursuant to *28 U.S.C. § 1404(a)*, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." A district court has broad discretion to adjudicate motions for transfer on a case-by-case basis, considering factors of convenience and fairness. *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988)* (citing *Van Dusen v. Barrack, 376 U.S. 612, 622, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)); and see Sparling v. Hoffman Constr. Co., 864 F.2d 635, 639 (9th Cir. 1988)* (weighing of factors involves subtle considerations best left to the trial court).

The movant bears the burden of establishing a strong argument that an action should be transferred "by showing more than a bare balance of convenience in his favor and that a transfer does more than merely shift the inconvenience." *DMP Corp. v. Fruehauf Corp., 617 F. Supp. 76, 77 (W.D.N.C. 1985)* [*7] (citing 1 *Moore's Federal Practice* P 0.145 [5]). The motion may be denied if the increased convenience to one party is offset by the added inconvenience to the other party. *Id.*

When adjudicating a motion to transfer under *§ 1404(a)*, a district court must balance a number of case-specific factors, including the plaintiff's initial choice of

forum, convenience to the parties and witnesses, access to evidence, and the interests of justice. *See Stewart, 487 U.S. at 29; Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 511, 67 S. Ct. 839, 91 L. Ed. 1055 (1947); Los Angeles Memorial Coliseum Comm'n v. National Football League, 89 F.R.D. 497, 499 (C.D. Cal. 1981).*

The "interests of justice" consideration is the most important factor a court must consider, and may be decisive in a transfer motion even when all other factors point the other way. 15 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3854 (1986); *see also Pratt v. Rowland, 769 F. Supp. 1128, 1133 (N.D. Cal. 1991)* (citing 15 Wright & Miller, *supra*, § 3851). A major consideration is the desire to avoid multiplicity of litigation from a single transaction. [*8] *Id.* In dictum, the Supreme Court has suggested that courts should give great weight to this consideration:

> To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that *§ 1404(a)* was designed to prevent. Moreover, such a situation is conducive to a race of diligence among litigants for a trial in the District Court each prefers.

*Continental Grain Co. v. The FBL-585, 364 U.S. 19, 26, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960).*

II. *Application to the Case at Bar*

Eagle Pacific asserts that, in order to determine who is liable for the outstanding $ 122,000, this Court will have to interpret the Eagle Policy. Similarly, the court in the Western District of Washington will have to interpret the Eagle Policy to determine who is liable for the outstanding balance. The factual and legal issues to be considered in both actions are identical. Furthermore, all the transactions and communications involved in obtaining the Eagle Policy took place in Seattle, Washington. The Eagle Policy was issued in Seattle, the insured is located in Seattle, and virtually all [*9] of the witnesses are in Seattle. The only contact that Eagle Pacific has with this Court is that it has an office in Concord, California. The Concord office has no involvement whatsoever with the Eagle Policy, nor with this dispute. Therefore, Eagle Pacific argues, this case should be transferred to the Western District in the interests of justice and convenience.

The Excess Underwriters counter that California is the proper forum because the accident took place in California, the mediation that led to the settlement of the case took place in California, and other claims were made by California residents who were injured while doing work in California. The Excess Underwriters also argue that this Court is more familiar with California law, which must be applied to interpret the Eagle Policy. Finally, the Excess Underwriters contend that the probability that this dispute will be tried is slim, that the convenience of the witnesses and access to proof arguments made by Eagle Pacific are irrelevant, and that in the interests of justice, this dispute should be decided by this Court.

A. *Application of § 1404(a)*

The first step is to determine whether this case could have originally [*10] been brought in the Western District. A court may not transfer unless, at the time the suit was filed, "venue could have been properly laid in the proposed transferee court and that court could have exercised subject matter jurisdiction over the action and personal jurisdiction over all the defendants." *Continental Airlines, Inc. v. American Airlines, Inc., 805 F. Supp. 1392, 1394 (S.D. Tex. 1992).*

Subject matter jurisdiction exists where there is diversity of citizenship and the amount in controversy exceeds $ 50,000. *28 U.S.C. § 1332*. In this case, Eagle Pacific is a citizen of Washington state, and each of the Excess Underwriters is a citizen of a foreign country. Thus, there is complete diversity. In addition, the amount in controversy, $ 125,000, exceeds the minimum amount. Accordingly, the Western District does have subject matter jurisdiction over this action.

The Western District also has general and personal jurisdiction over Eagle Pacific. Eagle Pacific's activities are "continuing and systematic," making it subject to the court's general jurisdiction. *See Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 445, 72 S. Ct. 413, 96 L. Ed. 485, 63 Ohio Law Abs. 146 (1952).* [*11] In addition, because the Eagle Policy was issued in Seattle, Washington, to Manson, another Seattle business, through an insurance broker also located in Seattle, and because the dispute at issue is over the interpretation of this very policy, the Western District has personal jurisdiction over Eagle Pacific for this case.

Finally, under *28 U.S.C. § 1391(a)*, venue is proper in the Western District. *Section 1391(a)* provides that venue is proper in a judicial district where any defendant resides if all defendants reside in the same state, where a substantial part of the events giving rise to the claim occurred or in which any defendant is subject to personal jurisdiction. Eagle Pacific is a Washington corporation with its principal place of business in Seattle, it has continuous and systematic contacts with Washington, and a substantial part of the events leading up to this action took place in Seattle. *See 28 U.S.C. § 1391(a).*

The next step is to determine the most convenient forum for this action. Although the Excess Underwriters chose the Superior Court in Contra Costa as their forum, they would not likely be inconvenienced by [*12] a transfer to the Western District. None of the Excess Underwriter Plaintiffs are residents of California or Washington, and they are already involved in the related action in the Western District. In addition, the Excess Underwriters point out in their motion for summary judgment that "California and Washington share remarkably similar principles of interpretation of insurance contracts." Pls.' Mot. for Summ. J. at 8 n.1. Thus it would not be difficult for a Washington judge to apply California law. Finally, Eagle Pacific, potential witnesses, including employees of Manson and Scott & Co., and documentation that might be needed to interpret the Eagle Policy, are all located in Seattle. Hence, the Western District of Washington would most likely be a more convenient forum than this Court.

The most important factor to consider is the "interests of justice." 15 Wright & Miller, *supra*, § 3854. As the Supreme Court said in *Continental Grain*, "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that *§ 1404(a)* was designed to prevent." *Id., 364 U.S. at 26.* [*13] In this case, a related case involving the same parties, the same issues, the same witnesses and the same facts, is pending in the Western District of Washington. If this case is not transferred, inconsistent judgments could result, which could work an injustice. For example, this Court could rule that the Excess Underwriters were not responsible for the disputed amount, and the Washington court could rule that Eagle Pacific was not. Under these circumstances, judicial economy mandates that this case be transferred to the United States District Court for the Western District of Washington.

B. *Summary Judgment*

Eagle Pacific asserts that Manson is an indispensable party to this litigation. Manson filed suit against the Excess Underwriters in the Western District of Washing-

ton to recover $ 122,000 that Manson alleges the Excess Underwriters owes under the Excess Coverage Policy. Manson and Eagle Pacific are in agreement that the Eagle Policy limit, inclusive of allocated loss adjustment expenses, is $ 500,000. Opp'n, Ex. 2. Eagle Pacific argues that granting the Excess Underwriters' summary judgment motion would collaterally estop Manson from seeking to enforce its suit in the Western [*14] District of Washington. Hence, a summary judgment ruling on this motion, in a case in which Manson is not a party, would be "inconsistent with equity and good conscience." *Id.*

The Excess Underwriters counter that Manson is neither a necessary nor indispensable party. The Excess Underwriters insist that the issue in this case is whether the payments made to settle the case with the claimant, Mr. Robinson, were properly allocated between Eagle Pacific and the Excess Underwriters. The Excess Underwriters assert that an adverse judgment will not prejudice Manson. Finally, the Excess Underwriters point out that seeking a declaratory judgment in an insurance dispute is a common and appropriate course of action for determining which insurer must pay the insured.

Having already decided to transfer this case to the Western District of Washington, the Court need not determine whether Manson is an indispensable party. This potential problem will be solved by the transfer of this case to a forum where Manson is a party in a related case, where the two cases can be consolidated, and where a single disposition will be in the interests of all the parties.

CONCLUSION

For the foregoing reasons, [*15] the Court grants Defendant's motion to transfer and denies Plaintiffs' motion for summary judgment without prejudice.

IT IS SO ORDERED,

Dated: *August 14, 1996*

CLAUDIA WILKEN

UNITED STATES DISTRICT JUDGE

# EXHIBIT S

LEXSEE 2006 U.S. DIST. LEXIS 28171

**KATHLEEN ELLIS, Plaintiff, v. HOLLISTER, INC., et al., Defendants. BRENDA DIMARO; and HALLIE LAVICK, Plaintiffs, v. HOLLISTER, INC., et al., Defendants.**

**NO. CIV. S-05-559 LKK/GGH, NO. CIV. S-05-1726 LKK/GGH**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*2006 U.S. Dist. LEXIS 28171*

**April 13, 2006, Decided
April 14, 2006, Filed**

**PRIOR HISTORY:** *Ellis v. Hollister, Inc., 2006 U.S. Dist. LEXIS 27611 (E.D. Cal., Apr. 12, 2006)*

**COUNSEL:** [*1] For Kathleen Ellis, Plaintiff: Daniel E Wilcoxen, Wilcoxen, Callahan, Montgomery & Deacon, Sacramento, CA; Martin Niels Jensen, Russell G. Porter, Russell Glenn Porter, Porter, Scott, Weiberg and Delehant, Sacramento, CA; Daniel Lawrence Baxter, Wilke, Fleury, Hoffelt, Gould & Birney, LLP, Sacramento, CA.

For Hollister Inc., Plan Administrator, Firm of John Dickinson Schneider Inc., De Facto Fiduciary, Defendants: L Andrew Brehm, Schuyler Roche and Zwirner, Chicago, IL.Daniel Lawrence Baxter, William A. Gould, Jr, Wilke, Fleury, Hoffelt, Gould & Birney, LLP, Sacramento, CA; Michael B. Roche, Schuyler Roche and Zwirner, Chicago, IL;

For Samuel Brilliant, Plan Trustee, James J. McCormack, Plan Trustee, James A. Karlovsky, Plan Trustee, Richard T. Zwirner, Plan Trustee, Hollister Employee Share Ownership Trust, The EIAP, Allan F. Herbert, Donna J. Matson, Michael C. Winn, Defendants: James D. Adducci, Marshall L. Blankenship, Adducci Dorf Lehner Mitchell and Blankenship, Chicago, IL; Daniel Lawrence Baxter, William A. Gould, Jr, Wilke, Fleury, Hoffelt, Gould & Birney, LLP, Sacramento, CA.

**JUDGES:** LAWRENCE K. KARLTON, SENIOR JUDGE.

**OPINION BY:** LAWRENCE K. KARLTON

**OPINION**

**ORDER**

Defendants [*2] Hollister, Inc., Hollister Employee Share Ownership Trust ("Plan" or "Hollishare"), John Dickinson Schneider, Inc. ("JDS"), Samuel Brilliant, James A. Karlovsky, James McCormack, and Richard Zwirner bring a motion to transfer venue pursuant to *28 U.S.C. § 1404(a)* to the Northern District of Illinois in both Dimaro v. Hollister and Ellis v. Hollister. Plaintiffs, Kathleen Ellis, Brenda Dimaro and Hallie Lavick, oppose the motions. All parties agree that both this district and the Northern District of Illinois are proper venues for the cases.

**I.**

**BACKGROUND**

In both of these cases, plaintiffs allege violations of the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. §§ 1001 et seq.* The allegations in both cases are similar although in Ellis there is an additional issue regarding Qualified Domestic Relations Orders (QDROs) issued by California courts which are unique to the facts in that case. For a detailed discussion of the allegations, see the accompanying order addressing the motions to dismiss that have also been filed in these cases.

**II.**

**STANDARDS**

*Section 1404(a) of Title 28* provides [*3] that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Although Congress drafted *section 1404(a)* in accordance with the doctrine of forum non conveniens, it

was intended to be a revision rather than a codification of the common law. *Piper Aircraft v. Reyno, 454 U.S. 235, 253, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981); Norwood v. Kirkpatrick, 349 U.S. 29, 32, 75 S. Ct. 544, 99 L. Ed. 789 (1955)*. The Supreme Court has noted that *section 1404(a)* transfer is available "upon a lesser showing of inconvenience" than that required for a forum non conveniens dismissal. *Norwood, 349 U.S. at 32*.

The district court has broad discretion "to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness.'" *Jones v. GNC Franchising, Inc., 211 F.3d 495 (9th Cir. 2000)* (quoting *Stewart Org. v. Ricoh Corp., 487 U.S. 22, 30, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988))*; See also *Westinghouse Elec. Corp. v. Weigel, 426 F.2d 1356, 1358 (9th Cir. 1970)*. The burden is upon the moving party, however, [*4] to show that transfer is appropriate. *Commodity Futures Trading Commiss'n v. Savage, 611 F.2d 270, 279 (9th Cir. 1979)*. See also *L.A. Mem'l Coliseum Comm'n v. NFL, 89 F.R.D. 497, 499 (C.D. Cal. 1981)* aff'd, *726 F.2d 1381, 1399 (9th Cir. 1984)*. [1]

> 1   The Ninth Circuit affirmed the lower court's reasoning in denying the motion to transfer venue. "[T]he district court made a thoughtful and *thorough* analysis of the Oakland's contention in its memorandum and order denying the change of venue motion." *Los Angeles Mem'l Coliseum Comm. v. Nat'l Football League, 726 F.2d 1381,1399 (9th Cir. 1984* (emphasis added).

Generally, the court affords plaintiff's choice of forum great weight. *Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987)* cert. denied, *485 U.S. 993, 108 S. Ct. 1302, 99 L. Ed. 2d 512 (1988)*. However, when judging the weight to be given to plaintiff's choice of forum, consideration must be given to the respective [*5] parties' contact with the chosen forum. Id. "If the operative facts have not occurred within the forum and the forum has no interest in the parties or subject matter," plaintiff's choice "is entitled only minimal consideration." Id. Moreover, when a plaintiff brings a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight. Id.

*Section 1404(a)* provides for transfer to a more convenient forum, not to a forum likely to be equally convenient or inconvenient. *Van Dusen v. Barrack, 376 U.S. 612, 646, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)*. As part of this inquiry, the Ninth Circuit has held that even though *section 1404(a)* "partially displaces the common law doctrine of forum non conveniens," nonetheless, forum non conveniens considerations are helpful in deciding a *§ 1404(a)* motion. *Decker Coal Co. v. Commonwealth Edison, 805 F.2d 834, 843 (9th Cir. 1986)*.

With this in mind, the district court should consider both private and public interest factors affecting the convenience of the forum. *Decker, 805 F.2d at 843* (citing *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981))*; See also [*6] *Stewart Org., 487 U.S. at 30*. [2] Private factors include:

> 2   The Supreme Court stated that *[s]ection 1404(a)* directs a district court to "weigh in the balance of the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of the interest of justice.'" *Stewart Org. v. Ricoh Corp., 487 U.S. 22, 30, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988)*.

> "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive."

*Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055, (1947)*. Public factors include:

> "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided [*7] at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty."

*Piper Aircraft, 454 U.S. at 241 n.6* (quoting *Gulf Oil Corp., 330 U.S. at 509*).

In sum, "[t]he basic factors to be considered then, in determining whether, on balance, a transfer to a different forum would allow a case to proceed more conveniently and better serve the interests of justice, are: (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; and (4) the interests of justice." *Los Angeles Mem'l Coliseum Comm., 89 F.R.D. at 499*.

**III.**

## ANALYSIS

### A. MOTION TO TRANSFER VENUE IN ELLIS

The court has previously addressed a nearly identical motion brought by the same defendants in *DeFazio v. Hollister Employee Share Ownership Trust, et. al., 406 F. Supp. 2d 1085*, Order filed Feb. 24, 2005. The plaintiff in *DeFazio* is the former husband [*8] of Kathleen Ellis who acquired a community property share of Ellis' vested benefits with the plan currently in question during divorce proceedings. In a motion to transfer venue brought by the defendants in *DeFazio*, the court found that plaintiff's choice of venue should be given primacy. There is nothing to distinguish the two cases here, the plaintiff in *DeFazio* ultimately derived his connection with this District from his relationship with Ellis. See *Id. at 1089*.

In addition, these cases have now been related and it is clear that there is thus even less reason to transfer this case to Illinois, as doing so may result in inconsistent decisions as the facts and law at issue are very similar. Further highlighting this point is the fact that there is also a third case (discussed below), Dimaro v. Hollister, that has also been related in this district. *2005 U.S. Dist. LEXIS 29361, Case No. Civ. S-05-1726*. Therefore, rather than rehashing explanations already well-known to defendants, the court refers them to the order issued in *DeFazio* which denied their request for a change of venue.

### B. MOTION TO TRANSFER VENUE IN DIMARO

#### 1. Plaintiff's Choice of Forum

Generally, the [*9] Ninth Circuit gives this factor great weight, however certain conditions in a case may militate against such treatment. *Lou v. Belzberg, 834 F.2d at 739*. A plaintiff's choice of forum is also accorded particular deference in ERISA cases. *Jacobson v. Hughes Aircraft Co., 105 F.3d 1288, 1302*, rev'd and remanded on other grounds, *Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)*. This weight, though, may be diminished when the plaintiff "brings a derivative suit, represents a class," or the operative facts do not occur in the chosen forum. Id.

Defendants argue that because the plaintiffs' claim could have been brought by any of the other "Hollishare plan participants in their home state," the plaintiffs' choice "is entitled no deference." Defs.' Mot. at 10. Defendants support their claim by citing *Koster v. American Lumberman's Mutual Casualty Co.*, where the Supreme Court determined the plaintiff's choice of forum carried less weight in a derivative action. *330 U.S. 518,*

*524-25, 67 S. Ct. 828, 91 L. Ed. 1067 (1947)*. In *Koster*, the High Court acknowledged that when there are "hundreds of potential plaintiffs, all equally entitled voluntarily [*10] to invest themselves with the corporation's cause of action. . ." the plaintiff's claim to home forum is weakened. Plaintiffs here are asserting their rights along with those of all other plan participants in that they seek to restore "all accounts to the their proper value" and are seeking to recoup the lost assets and any profits made by JDS for the plan as a whole. Pls.' Compl. at 6-7. *Koster* thus appears to be analogous. However, it is not apparent why the fact that there are persons that could potentially be affected by the outcome of this suit elsewhere means that this suit should be transferred to Illinois. Those other persons have not brought suit and thus it is the present plaintiffs' choice that seems to be relevant. Furthermore, the only other plaintiffs that have brought suit have brought suit in this very district.

It appears that plaintiffs chose this district based on the fact that their attorney practices here. Plaintiffs point out that the residence of the plaintiff is not a relevant factor in determining jurisdiction, but they cannot deny that it plays a role in determining "the convenience of parties and witnesses" as required by *28 U.S.C. § 1404(a)* [*11] . Unlike in Ellis and DeFazio, none of the operative facts in this case occurred in this District.

#### 2. Convenience of the Parties

This case is brought by two plaintiffs, one who lives in Colorado and the other in Georgia against over ten separate defendants, most of which are located in Illinois. Defendants argue that Illinois is a more convenient forum because most of the defendants reside there, JDS and Hollister are Illinois corporations, and the Hollishare plan is administered from the Libertyville headquarters. Plaintiffs respond that their attorney is based in the district and he has considerable knowledge about the facts and circumstances of the case. They claim that the participants would lose their counsel since he is not licenced to practice in Illinois. While Mr. Hubbard may be able to obtain pro hac vice admission to practice in Illinois, a considerable burden will still remain. Transferring this action to Illinois may be burdensome and costly for plaintiffs because it will cause their attorney to have to travel (or possibly may require them to obtain new counsel if possible). "In weighing the convenience of the parties, the court may take into account [*12] the physical condition and the financial strength of each of them." Wright, Miller & Cooper, Federal Practice and Procedure 2d § 3849, at 408; *Jones, 211 F.3d at 499* (courts may look at the costs of litigation in the two forums). From all that appears, defendants have more resources available to defend the case in California than plaintiffs would in Illinois. Moreover, given that defendants are already

litigating two similar cases in this District, the added burden on defending here is only incremental.

From a purely geographical view, Illinois might well be the better forum in terms of the proximity to the largest number of parties, the location of most of the potential witnesses, and the location of most of the relevant documents. The burden that this transfer would have on plaintiffs, however, is considerable. The court concludes that this factor probably is of equal weight.

### 3. Convenience of the Witnesses

The convenience of witnesses is thought to be one of the most important factors in a transfer motion. Wright, Miller & Cooper, Federal Practice and Procedure 2d § 3851, at 415; *Los Angeles Mem'l Coliseum, 89 F.R.D. at 501*. [*13] In assessing this factor, "courts consider the effect of a transfer on the availability of certain witnesses, and their live testimony, at trial." *Los Angeles Mem'l Coliseum, 89 F.R.D. at 501*. If possible, courts prefer live testimony where there are vital issues of fact hinge of credibility. Id.

Defendants claim that many witnesses will be beyond the court's subpoena power if the suit remains in this district. Defendants cite *Federal Rule of Civil Procedure 45* in support of this claim. *Rule 45* states in relevant part that "the court by which a subpoena was issued shall quash or modify the subpoena if it . . . requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides . . . ." *Fed. R. Civ. P. R. 45(c)(3)(A)(ii)*. *Rule 45* does not apply, however, to party witnesses and many of the crucial witnesses named by the defendants are all parties to the suit and would be required to appear to testify regardless of whether a subpoena is issued. Defendants do claim that there are other personnel connected to the Hollishare Trustees that may be called [*14] as witnesses (members of the Hollister human resources and financial staff as well as the Secretary to the Hollishare Trustees) and they might truly be outside the subpoena power of the court. Of course, given their employment, this does not appear to represent a real difficulty. Nonetheless, while most of the key witnesses may be within the subpoena power of the court, it is likely to be inconvenient for virtually all of the witnesses (subpoenable or not) to travel to California to testify in this case. Even though they mistake the scope of *Rule 45*, this factor does weigh in favor of defendants.

### 4. Interest of Justice

Defendants also argue that transferring the case to Illinois would serve the interests of justice. They assert that this transfer is necessary because the Hollishare Plan is a product of Illinois state law and so the Northern District of Illinois is better situated to resolve the state law

claims. This would be a convincing argument if this were a diversity jurisdiction matter, requiring the interpretation and application of unfamiliar substantive state law. Wright, Miller & Cooper, Federal Practice and Procedure 2d § 3854, at 467-68. Under those circumstances, [*15] the interests of justice might suggest transfer to a court sitting in the state affected by an out-of-state court's interpretation of state law. See *Van Dusen, 376 U.S. at 625-26* (when there is a difference in substantive state law, it is "necessary to consider what bearing a change of venue, if accompanied by a change in state law, would have on the interest of justice.'")

The interest of having a state court interpret state law is not at issue when, as here, the dispute requires interpretation of federal law, and when the suit is predicated upon the interpretation of federal statute, ERISA, which preempts any state law. Under ERISA, except as otherwise provided the provisions of ERISA "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) [*29 USCS § 1003(a)*] and not exempt under section 4(b) [*29 USCS § 1003(b)*]." *29 U.S.C. § 1144*.

The fact that this case has now been related to DeFazio and Ellis weighs heavily against defendants' motion. Although plaintiffs' case will vary due to the individual circumstances [*16] of each plaintiff, the general questions raised appear to be the same and will likely involve the same level of discovery, etcetera. Although some of the claims were dismissed in DeFazio, they remain in Ellis.

### 5. Ease of Access to Proof

Once again, the fact that virtually all of the relevant documents and witnesses are located in Illinois seems to weigh in favor of transfer. While plaintiffs argue that there is no reason why documents or records located there could not be copied by "Team-Xerox," that does not obviate the need to have ready access to the originals. The burden, however, will be on plaintiffs to retrieve the documents (or go view them in their home) and/or to pay for their copying and shipment and thus this factor does not have a lot of weight either way. This argument is again less convincing in light of the fact that defendants will be litigating two cases using similar facts and documents here in California.

IV.

### CONCLUSION AND ORDER

Ultimately, the fact that Ellis and DeFazio must be tried here compels this court to deny the motion for Dimaro. Although the nucleus of Dimaro is in Illinois, it just makes more sense [*17] to have all three of these cases heard in the same district by the same judge. Judi-

2006 U.S. Dist. LEXIS 28171, *

cial resources are scarce and there is no need to burden a second district with these cases. Additionally, there is no need to expose the parties to the risk of inconsistent decisions when the facts are so similar. Since the defendants will be litigating the other two cases here, the burden will not be that much greater on them.

The motions to transfer venue are DENIED.

IT IS SO ORDERED.

DATED: April 13, 2006

/s/ Lawrence K. Karlton

SENIOR JUDGE

UNITED STATES DISTRICT COURT

**EXHIBIT T**

| PATENT APPLICATION TRANSMITTAL LETTER<br>(Small Entity) | Docket No.<br>39214.00001 |
|---|---|

### TO THE ASSISTANT COMMISSIONER FOR PATENTS

Transmitted herewith for filing under 35 U.S.C. 111 and 37 C.F.R. 1.53 is the patent application of:

Michael G. Burner et al.

For:

**METHOD AND APPARATUS FOR AUGMENTING A WEB PAGE WITH METADATA**

Enclosed are:

- ☒ Certificate of Mailing with Express Mail Mailing Label No.    EM303714865US
- ☒ Twenty-three (23)    sheets of drawings.
- ☐ A certified copy of a                          application.
- ☒ Declaration    ☒ Signed.    ☐ Unsigned.
- ☐ Power of Attorney
- ☒ Information Disclosure Statement
- ☐ Preliminary Amendment
- ☒ Alexa Internet        Verified Statement(s) to Establish Small Entity Status Under 37 C.F.R. 1.9 and 1.27.
- ☒ Other:    **Assignment Recordation Cover Sheet, Assignment (signed) and $40.00 check for recordation fee**

| CLAIMS AS FILED | | | | | |
|---|---|---|---|---|---|
| **For** | **#Filed** | **#Allowed** | **#Extra** | **Rate** | **Fee** |
| **Total Claims** | 32 | - 20 = | 12 | x $11.00 | $132.00 |
| **Indep. Claims** | 3 | - 3 = | 0 | x $40.00 | $0.00 |
| **Multiple Dependent Claims** (check if applicable) | ☐ | | | | $0.00 |
| | | | | **BASIC FEE** | $385.00 |
| | | | | **TOTAL FILING FEE** | $517.00 |

- ☐ A check in the amount of                 to cover the filing fee is enclosed.
- ☒ The Commissioner is hereby authorized to charge and credit Deposit Account No.    05-0150
  as described below.  A duplicate copy of this sheet is enclosed.
  - ☒ Charge the amount of    $517.00    as filing fee.
  - ☒ Credit any overpayment.
  - ☒ Charge any additional filing fees required under 37 C.F.R. 1.16 and 1.17.
  - ☐ Charge the issue fee set in 37 C.F.R. 1.18 at the mailing of the Notice of Allowance,
    pursuant to 37 C.F.R. 1.311(b).

Dated:    06/21/97

*Laura Majerus*
Signature

Laura A. Majerus, Esq.
Reg. No. 33,417
**GRAHAM & JAMES LLP**
600 Hansen Way
Palo Alto, CA 94070
(415) 856-6500

CC:

Copyright 1994-96 Legalsoft                                                                F01SMALL/REV05

# EXHIBIT U



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
          Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/880,117 | 06/21/97 | BURNER | M | 39214.00001 |

| EXAMINER |
|---|
| CHANNAVAJJALA, S |

LM01/0809

LAURA A. MAJERUS, ESQ.
FENWICK & WEST, LLP
TWO PALO ALTO SQUARE
PALO ALTO CA 94306

| ART UNIT | PAPER NUMBER |
|---|---|
| 2777 | |

DATE MAILED:

08/09/99

Please find below and/or attached an Office communication concerning this application or proceeding.

Commissioner of Patents and Trademarks

# EXHIBIT V



# EXHIBIT W

LEXSEE 2006 U.S. DIST. LEXIS 32823

**DUWARD M. LANGFORD, Plaintiff, v. AMERITANZ, INC., et al., Defendants.**

**CV F 05-1271 AWI DLB**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*2006 U.S. Dist. LEXIS 32823*

**May 12, 2006, Decided
May 13, 2006, Filed**

**COUNSEL:** [*1] For Duward M. Langford, Plaintiff: James C Holland, Law Office of James C Holland, Visalia, CA.

For Ameritanx, Inc., James Arnott, Defendants: Shannon Marie Treynor, Shannon M. Treynor, Attorney At Law, L.L.C., London, OH.

**JUDGES:** Anthony W. Ishii, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Anthony W. Ishii

**OPINION**

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR A TRANSFER OF § 1404(a) (Document # 13)**

In this removed action, Plaintiff Duward M. Langford sues Defendant Ameritanx, Inc., Defendant James Arnott, and Doe Defendants for breach of contract and other state law violations stemming from alleged agreements between Plaintiff and Defendant Arnott concerning the refurbishment and resale of surplus military compress gas cylinders ("cylinders"). The court has jurisdiction pursuant to *28 U.S.C. § 1332* because the parties are citizens of different states and over $ 75,000.00 is in controversy.

**BACKGROUND**

On August 18, 2005, Plaintiff filed a complaint in the Tulare County Superior Court. The first count alleges breach of contract based on the parties' alleged agreement that Plaintiff would withdraw a bid to purchase cylinders from the government [*2] if Defendants would sell Plaintiff some of the cylinders. The second count alleges breach of contract for work performed and common counts for money owed based on the parties' alleged

agreement that Plaintiff would arrange for the shipment of the cylinders. The third count alleges intentional interference with a contract and conversion based on Defendants' delivery of unusable cylinders to Plaintiff's customer, Fire King. The fourth count alleges breach of contract, deceit, conversion, interference with contract, and interference with prospective business advantage based on Defendants' selling of cylinders to Plaintiff's customers without paying Plaintiff the agreed commission.

On October 6, 2005, Defendants removed this action to this court because the Defendants are citizens of Ohio, Plaintiff is a citizen of California, and more than $ 75,000.00 is in controversy.

On October 6, 2005, Defendants filed an answer to the complaint.

On February 10, 2006, Defendants filed a motion to transfer venue pursuant to *28 U.S.C. § 1404(a)* and the doctrine of *forum non conveniens*. Defendants contend that this action could have been brought in Ohio, Ohio is a more [*3] convenient forum for the parties and witnesses, Ohio is most familiar with the governing law, it will be more cost effective to litigate in Ohio, and the prospective witnesses are Defendants' employees, who are outside the compulsory process of this court.

On March 6, 2006, Plaintiff filed an opposition. Plaintiff contends that his choice of forum should not be disturbed. Plaintiff argues that Defendant Arnott's act of telephoning Plaintiff in California, proposing, negotiating, and then reaching agreements over the phone provides sufficient contacts with California. Plaintiff argues that Defendants have not shown that there exists in Ohio witnesses, voluminous documents, or physical evidence that cannot be brought to California. Plaintiff argues that this court is more familiar with the law. Plaintiff states that he is over 80 years old and his counsel is present in California. Plaintiff contends that transferring this action

to Ohio would merely shift the burden from Defendants to Plaintiff.

On March 20, 2006, Defendants filed a reply. Defendants argue that Defendant Arnott made no telephone call to Plaintiff in California to create a contractual relationship. Defendants contend [*4] that all events concerning Defendants' and Plaintiff's agreements occurred in Ohio or Virginia.

## LEGAL STANDARD

*28 U.S.C. § 1404(a)* provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a)*. This statute partially displaces the common law doctrine of forum non conveniens. *Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986); Miskow v. Boeing Co., 664 F.2d 205, 207, (9th Cir. 1981)*. The purpose of *§ 1404(a)* is "to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack, 376 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964); Kawamoto v. CB Richard Ellis, Inc., 225 F. Supp. 2d 1209, 1213 (D. Haw. 2002)*. "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, cases by case consideration of convenience and fairness.'" *Stewart Organization, Inc. v. RICOH Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988)* [*5] (quoting *Van Dusen v. Barrack, 376 U.S. 612, 622, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964))*. A motion for transfer lies within the broad discretion of the district court, and must be determined on an individualized basis. *Jones v. GNC Franchising, Inc., 211 F.3d 495, 498 (9th Cir. 2000) (citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988))*.

In order to transfer a case under *§ 1404(a)*, the "defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker, 805 F.2d at 843*. The district court must weigh numerous factors when deciding whether to transfer a case under *Section 1404(a)*:

> A motion to transfer venue under *§ 1404(a)* requires the court to weigh multiple factors in its determination whether transfer is appropriate in a particular case. For example, the court may consider: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, [*6] (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof. Additionally, the presence of a forum selection clause is a "significant factor" in the court's *§ 1404(a)* analysis . . . [and] the relevant public policy of the forum state, if any, is at least as significant a factor in the *§ 1404(a)* balancing.

*Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000); Warfield v. Gardner, 346 F. Supp. 2d 1033, 1043 (D. Ariz. 2004)*. The Northern District of California utilizes slightly modified factors that include consideration of convenience to parties and witnesses, feasability of consolidation of other claims, local interest in the controversy, and the court congestion of the two forums. See *Williams v. Bowman, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001)*.

## FACTS

### A. Facts Alleged in the Complaint

The complaint alleges that Plaintiff's and Defendant's businesses consist primarily of the purchase and resale of used compress gas cylinders ("cylinders").

[*7] The complaint alleges that both Plaintiff and Defendants bid on a contract offered for sale by the Defense Reutilization Military Organization ("DRMO") to purchase surplus cylinders generated from a Richmond, Virginia military facility. The complaint alleges that the DRMO contract was to sell 15,000 ICC-1800 cylinders over the course of two years, for a total of 30,000 cylinders. The DRMO contract included a term that the government could increase the quantity of cylinders that the purchaser was obligated to purchase by up to 50%. The complaint alleges that Plaintiff was the first place bidder for this contract and Defendants were the second place bidder.

The complaint alleges that Defendants offered to Plaintiff that if Plaintiff withdrew from the DRMC contract bidding, Defendants would sell Plaintiff all cylinders from the DRMO contract that Plaintiff needed at $ 20.00 per ICC-1800 cylinder. The complaint alleges that by referencing the DRMO contract in terms of the quantities of cylinders that would become available, the parties intended that if Plaintiff accepted Defendants offer,

Defendants would be obligated to sell Plaintiff those ICC-1800 cylinders that Plaintiff requested [*8] in the normal course of his business, up to a maximum of 45,000 ICC-1800 cylinders over two years. The complaint alleges that at the time of the offer, Defendants knew and understood that Plaintiff possessed commitments from his downstream purchasers to purchase 1,056 ICC-1800 cylinders at $ 30.00 per cylinder and that Plaintiff stood to earn a $ 10.00 per cylinder profit. The complaint alleges that Plaintiff accepted Defendants' offer by withdrawing his bid on the DRMO contract.

The complaint alleges that Defendants have breached the agreement by failing to sell Plaintiff all of the ICC-1800 cylinders Plaintiff's business reasonably required, up to a maximum of 45,000 cylinders, at $ 20.00 per cylinder. The complaint alleges that as a result of Defendants' conduct, Plaintiff has suffered lost profits.

The complaint also alleges that on or about July 22, 2004, Defendants and Plaintiff agreed that Plaintiff would record the serial numbers of and arrange for the shipment to Defendants in Ohio, a substantial number of surplus cylinders stockpiled in Richmond, Virginia for an agreed-upon price of $ 3.00 per cylinder. Defendants knew that to accomplish this work, Plaintiff would have [*9] to travel from California to the military facility in Richmond, Virginia. The complaint alleges that the parties further agreed that Defendants would pay the $ 3.00 per cylinder price to Plaintiff in the form of a credit against Plaintiff's purchase of cylinders from Defendants, which Defendants had agreed to sell Plaintiff at a price of $ 20.00 per cylinder.

The complaint alleges that Plaintiff fully performed all obligations and duties under this contract by recording the serial numbers and loading and shipping the 18,320 cylinders produced by the DRMO contracting officer. The complaint alleges Plaintiff could not perform his obligations on the last 3,760 cylinders because Defendants refused to take them. The complaint alleges Defendants interfered with and caused the stoppage of Plaintiff's performance of his duties. The complaint alleges that on two occasions Plaintiff and a helper traveled from Virginia to Defendants' facility in Greenfield, Ohio, and performed a days worth of labor to clear the obstacles Defendants had placed or allowed to be placed. The complaint alleges that on another occasion, Defendants intentionally hindered and blocked Plaintiff's performance such that [*10] Plaintiff and his helper were idle for 29 days.

The complaint alleges that Defendants have refused to pay Plaintiff money owed under the terms of this contract. The complaint alleges that Plaintiffs have suffered monetary losses, including the cost of an air conditioner that Plaintiff purchased on Defendants' behalf.

The complaint alleges that, pursuant to the agreement obligating Plaintiff to purchase cylinders from Defendants, Plaintiff had inspected and prepared for delivery to a downstream customer (Fire King) a shipment of 320 cylinders. The complaint alleges that Defendants intentionally substituted a number of the useable 320 cylinders with unuseable cylinders and kept the useable cylinders from themselves. The complaint alleges that as a result, Fire Kind rejected a number of the delivered cylinders and refused to pay part of the invoice.

The complaint alleges that during the course of performing their contractual obligations, Defendants demanded and insisted that shipments of cylinders to Plaintiff's downstream customers be made from Defendants' Greenfield, Ohio facility and be accompanied by purchase orders issued directly from Defendants. This resulted in Plaintiff divulging [*11] the identities and contact information of his downstream customers. The complaint alleges that Defendants have sold cylinders to Plaintiffs' downstream customers for $ 30.00, and Defendants have not paid Plaintiff his $ 10.00 per cylinder profit. The complaint alleges that Defendants have essentially stolen Plaintiff's customer list, which Plaintiff cultivated over more than twenty years in the industry.

**B. Defendant Arnott's Affidavits**

Defendants offer two affidavits from Defendant Arnott in support of their motion to transfer. Defendant Arnott's Affidavits allege that Defendant Arnott is the sole owner and incorporator of Defendant Ameritanx, Inc. Ameritanx Inc. is located in Greenfield, Ohio. There are currently five employees of Ameritanx, Inc., including Steve Carroll and Corey Miller, all of whom are residents of Ohio.

Defendant Arnott's Affidavits allege that Defendant Arnott never placed a telephone call to Plaintiff in California regarding any offer to sell, resell, or withdraw any bids for the July 15, 2004, DRMO No. 31-4020 contract. Defendant Arnott's Affidavits allege that Defendant Arnott was awarded the DRMO contract on July 28, 2004, after Norm Johnson [*12] withdrew his bid. Defendant Arnott's Affidavits allege that Defendant Arnott did not know Norm Johnson nor about any relationship between Plaintiff and Norm Johnson.

Defendant Arnott's Affidavits allege that Defendant Arnott did not ask Plaintiff to travel to Virginia. Defendant Arnott's Affidavits allege that Plaintiff traveled to Virginia to inspect and bid on another DRMO contract, NO-31-4021. Both Defendant Arnott and Plaintiff placed bids on this contract.

Defendant Arnott's Affidavits allege that Plaintiff's Memorandum Contra was signed on August 9, 2004 and September 9, 2004. The Memorandum Contra was re-

quired under governmental regulation to allow Plaintiff to assist Defendants in recording the serial numbers and shipping the cylinders to Ohio.

Defendant Arnott's Affidavits allege that on September 15, 2004, Plaintiff and Defendant Arnott entered into an agreement, which was signed in Greenfield, Ohio. Defendant Arnott's Affidavits allege that this agreement allowed Plaintiff to record and ship cylinders from Richmond, Virginia to Defendant's Ohio facility for the price of $ 2.00 per cylinder. Defendant Arnott's Affidavits allege that Plaintiff was to receive a commission [*13] of $ 10.00 per cylinder for any sales of Defendants' cylinders made to Plaintiff's customers, which included the $ 2.00 per cylinder recording fee. Defendant Arnott's Affidavits allege that Plaintiff began supplying this same service to Queen Cylinder Company for $ 2.75 per cylinder. Defendant Arnott's Affidavits allege that after Plaintiff made his arrangement with Queen Cylinder, he attempted to renegotiate the terms of the agreement with Defendants and demanded more money.

Defendant Arnott's Affidavits allege that Steve Carroll and Cory Miller were present and in the same building with Plaintiff during the five week period Plaintiff was in Ohio at the Ameritanx facility. Defendant Arnott's Affidavits allege that Steve Carroll and Cory Miller are necessary witnesses to this action. Defendant Arnott's Affidavits allege that Defendants still have several hundred cylinders in the Ohio facility that were part of DRMO bid No. 31-4020. Defendant Arnott's Affidavits allege that the allegedly faulty cylinders sent to Fire King were from DRMO bid No. 31-4020.

## C. Plaintiff's Affidavit

Plaintiff offers the Affidavit of Plaintiff in opposition to the motion to transfer. Plaintiff's [*14] Affidavit alleges that Norm Johnson is well-known in the industry to bid for resale to Plaintiff. Plaintiff's Affidavit alleges that Norm Johnson made the high bid on DRMO No. 31-4020. Plaintiff's Affidavit alleges that Defendant Arnott called Plaintiff at his office in California, regarding Norm Johnson's bid. Plaintiff's Affidavit alleges that Defendant Arnott made plain during the conversation that he knew Norm Johnson's first place bid was made anticipating a re-sale to Plaintiff. Plaintiff's Affidavit alleges that during this call, Defendant Arnott proposed that if Plaintiff had the high bid withdrawn, Defendant Arnott would sell Plaintiff all the cylinders Plaintiff could use. Plaintiff's Affidavit alleges that they agreed over the phone. Plaintiff's Affidavit alleges that once they agreed, Defendant Arnott gave Plaintiff his authority to act as Defendants' agent at the Richmond, Virginia facility. Plaintiff's Affidavit alleges that Plaintiff did not embark from California for Richmond, Virginia until he knew that he and Defendant Arnott had an agreement.

Plaintiff's Affidavit alleges that Plaintiff only went to Defendants' Ohio facility after Plaintiff and his helper had shipped [*15] lots of cylinders to Ohio. Plaintiff's Affidavit alleges that Plaintiff went there when Defendant Arnott stopped Plaintiff's performance because Defendants could not handle any more of the cylinders.

Plaintiff's Affidavit alleges that Plaintiff had commitments from some of his downstream buyers to purchase 4,480 cylinders before Plaintiff left California. [1] Plaintiff's Affidavit alleges that Defendant Arnott arranged it so that Defendant Arnott billed Plaintiff's customers directly on Defendant Arnott's invoices, and the customers paid Plaintiff directly, through his California bank.

> 1 Plaintiff's Affidavit in this respect is inconsistent with the complaint. The complaint alleges Plaintiff only had buyers to purchase 1,056 cylinders.

Plaintiff's Affidavit alleges that none of the faulty cylinders that Defendant Arnott substituted into the shipment to Fire King remain in Ohio. Plaintiff's Affidavit alleges that they were all shipped to Fire King in Seattle, Washington.

Plaintiff's Affidavit alleges that Steve [*16] and Cory were never present when Defendant Arnott and Plaintiff had any conversation about the terms of their agreements. Plaintiff's Affidavit alleges that Plaintiff did not discuss the terms of the agreement with Steve or Cory.

Plaintiff's Affidavit alleges that Plaintiff is 86 years old. Plaintiff is an insulin-dependent diabetic, had heart bypass surgery in late 2002, and has other health problems. Plaintiff's Affidavit alleges that traveling long distances is not easy for Plaintiff. Plaintiff's Affidavit alleges that Norm Johnson lives and works in Auburn, California. Plaintiff's Affidavit alleges that Norm Johnson has bad asthma and cannot fly.

## DISCUSSION

Defendants contend that this action should be transferred to Ohio pursuant to 28 U.S.C. § 1404(a). Defendants contend that this action should have been brought in Ohio, and all factors indicate that Ohio is the better forum.

## A. Where the Suit Might Have Been Brought

Transfer under 28 U.S.C. § 1404(a) is limited to courts where the action "might have been brought." The moving party must demonstrate that the proposed transferee court would have subject matter [*17] jurisdiction, personal jurisdiction, and would be a proper venue for

the action. *Hoffman, 363 U.S. 335, 343-44.* Defendants are located in Ohio. As such, the United States District Court for the Southern District of Ohio would have personal jurisdiction and venue over Defendants. See *28 U.S.C. § 1391(c)* (providing venue is proper in "a judicial district where any defendant resides, if all defendants reside in the same State."). Just as this court has diversity subject matter jurisdiction over this action, the United States District Court for the Southern District of Ohio would have subject matter jurisdiction over this action. Thus, this action could have been brought in the United States District Court for the Southern District of Ohio.

**B. Factors Regarding Transfer**

The court should adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness. *Jones, 211 F.3d at 498.* The defendant "must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker, 805 F.2d at 843.* The moving party bears the burden [*18] of establishing that the balance of conveniences favors transfer. *Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 279 (9th Cir. 1979).* As discussed above, there are numerous factors the court should consider when deciding whether to transfer pursuant to *Section 1404(a).*

*1. The location where the relevant agreements were negotiated and executed*

The parties dispute where the relevant agreements were negotiated, where the relevant agreements were executed, and what the agreements were for. According to Plaintiff's facts, all agreements at issue in this action were made over then phone, when Plaintiff was in California and Defendant Arnott was presumably in Ohio. According to Plaintiff, over the phone, Plaintiff and Defendant Arnott agreed: (1) Plaintiff would have Norm Johnson withdraw his bid on 31-4020; (2) Defendant Arnott would then sell Plaintiff any cylinders he needed from 31-4020 at $ 20.00 per cylinder; and (3) Plaintiff would go to Virginia and prepare the cylinders and send them to Defendants in Ohio and Defendant would pay Plaintiff $ 3.00 per cylinder for this service. Defendants offer evidence that the agreements concerning [*19] Defendants giving Plaintiff a commission for sales and Plaintiff recording and shipping the cylinders to Ohio were negotiated in Virginia, and executed in Virginia and Ohio. As for the agreement concerning Plaintiff preparing and sending the cylinders, Defendants claim that they agreed to pay Plaintiff $ 2.00 per cylinder, and the $ 10.00 commission Plaintiff would make on sales to his customers included the $ 2.00 recoding and shipping fee. Defendants claim Defendant Arnott never called Plaintiff in California and never asked Plaintiff to have Norm Johnson withdraw his high bid.

Defendants have the burden of showing that Ohio is a more appropriate forum for this action than California. See *Jones, 211 F.3d at 499.* Defendants have not shown that Ohio is a more appropriate forum because the relevant agreements were negotiated and executed in Ohio. This action is premised on agreements Plaintiff claims were made over the phone, when Plaintiff was in California. Defendants provide no evidence that the agreements discussed in the complaint were made in Ohio. Rather, Defendants' evidence shows that the agreements underlying this action were never made. Defendants' evidence [*20] is that any agreements between the parties were reached in Virginia and Ohio and they were for different terms than those set forth in the complaint and Plaintiff's affidavit. Thus, Defendants have not shown that Ohio is a more appropriate forum for this action because the agreements underlying this action were negotiated and executed in Ohio. To the contrary, Defendants' evidence shows that there is no appropriate forum for this action because the agreements underlying this action were never made. Thus, the court cannot find that Defendants' evidence shows Ohio is a more appropriate forum based on where the agreements underlying this action were negotiated and executed.

*2. The state that is most familiar with the governing law*

Plaintiff's complaint alleges numerous counts based on California law. There are no counts based on Ohio law or federal law in this action. Defendants have argued generally that Ohio law should govern, but have again explained this contention based on Defendants' version of events, alleging that no phone call was ever made to California. Defendants have not shown that Ohio law should govern the agreements alleged in the complaint, as opposed [*21] to the agreements Defendants' contend the parties had. As this court sits in California, the Eastern District is more familiar with the California law alleged in the complaint. This factor weighs against transfer.

*3. The plaintiff's choice of forum*

The third factor weighs in favor of Plaintiff because Plaintiff chose a California forum and resides in the Eastern District of California. This factor is generally given significant weight when the plaintiff resides in the chosen forum. *Warfield v. Gardner, 346 F. Supp. 2d 1033, 1044 (D.Ariz. 2004); Williams v. Bowman, 157 F. Supp. 2d 1103, 1106 (N.D.Cal. 2001).* Because Plaintiff resides in the Eastern District of California, this factor weighs against transfer.

Defendants do point out that Plaintiff did not choose this forum. Rather, Plaintiff chose the Tulare County Superior Court, and this action is currently in this court because Defendants removed the action. While Plaintiff

did not choose this court to adjudicate this action, Plaintiff did choose a California state court lying in this judicial district, and Plaintiff has indicated a strong desire to litigate this action in this court. [*22] Because there is no indication that Plaintiff's choice of forum was a result of forum shopping, see *Williams, 157 F. Supp. 2d at 1106*, the court still finds that this factor weighs against transfer.

#### 4. The respective parties' contacts with the forum

The fourth factor is not entirely clear. Obviously, Plaintiff has substantial contacts with California. Plaintiff lives in California and appears to run his purchase and resale business from California. What is unclear are the precise contacts of Defendants. Defendants offer no evidence regarding their contacts with California, other than to deny the phone calls during which the agreements underlying this action were allegedly made. Plaintiff's complaint alleges that Defendants have maintained close, systematic, and regular business related contracts with California since 1998, when Defendants began purchasing cylinders from Plaintiff. Plaintiff's complaint alleges that Defendant Arnott has traveled to Plaintiff's Barstow facility, and while in California, Defendants purchased large quantities of cylinders from California. Plaintiff's complaint also alleges that Defendants have a steady stream of customers [*23] in California, and Defendants have shipped their product to customers in California. In summary, Plaintiff's complaint indicates that Defendants have had contact with California in their business. However, these contacts do not appear to be substantial. Absent evidence from Defendants showing no contacts with California, this factor does not greatly weigh for or against transfer, but does tilt toward a California forum.

#### 5. The contacts relating to the plaintiff's counts in the chosen forum

As with the first factor, the parties dispute whether there were contacts with California regarding the parties' agreements. Defendants deny any phone call to California and contend that any representations and agreements occurred in Virginia and Ohio. Plaintiff provides evidence that the agreements at issue in the complaint were made over the phone, when Defendant Arnott placed a phone call to Plaintiff in California. It is Defendants' burden to show inconvenience under *Section 1404(a)*. However, as with the first factor, Defendants have only provided evidence that the agreements alleged in the complaint were never made. Such evidence does not weigh in favor of transferring this [*24] case to Ohio; If true, this evidence simply supports an ultimate judgment in Defendants' favor.

#### 6. The differences in the costs of litigation in the two forums/Relative court congestion

The sixth factor is unknown as no dollar amounts, economic data, or court data have been provided. Furthermore, no party has expressly addressed this factor. Because there is no argument made or evidence provided, it is a neutral factor.

#### 7. The availability of compulsory process to compel attendance of unwilling non-party witnesses/Convenience of Witnesses

Live testimony is a primary reason courts are concerned about the convenience of witnesses. *Sackett v. Denver & R.G.W.R. Co., 603 F. Supp. 260, 262 (D.Colo.1985)*. A court will therefore favor a forum where non-party witnesses will fall under the court's subpoena power. *Commercial Solvents Corp. v. Liberty Mut. Ins. Co., 371 F. Supp. 247, 250 (S.D.N.Y. 1974)*. Any witnesses who reside in the Southern District of Ohio can be compelled to attend trial in the Southern District of Ohio court. Any witnesses who reside in the Eastern District of California can be compelled to attend trial [*25] in this court. In his affidavit, Plaintiff indicates that he does not believe Defendants' employees will have relevant information, and Plaintiff implies that he does not intend to subpoena Defendants' employees. Plaintiff does not indicate what witnesses would be unavailable to Plaintiff in Ohio. Plaintiff has not shown that, other than Norm Johnson, his witnesses would be unable or unwilling to travel to Ohio to voluntarily testify. While Plaintiff has shown Norm Johnson will not travel, Norm Johnson's proposed testimony has not been disclosed and it is unclear whether the parties could not make other arrangements to preserve his testimony. In their evidence, Defendants imply that Steve Carroll and Cory Miller, Defendants' Ohio employees, may be relevant witnesses.

This factor does not greatly weigh in favor or against transfer. While Defendants mention Steve Carroll and Cory Miller as possible witnesses, Defendants have not informed the court what their testimony will be, why their testimony is relevant, and that they will be unavailable without a subpoena. See *A.J. Industries, Inc. v. United States Dist. Ct., 503 F.2d 384, 389 (9th Cir.1974); Florens Container v. Cho Yang Shipping, 245 F. Supp. 2d 1086, 1092-93 (N.D. Cal. 2002)*; [*26] *Williams, 157 F. Supp. 2d at 1108*. Without a more persuasive account, Defendants, as the parties with the burden of proof, fail to establish that the convenience of the witnesses factor weighs in favor of litigation in Ohio. Further, it appears that the Ohio witnesses are also Defendants' employees. There is not a showing that Defendants would be unable to have them testify in California on Defendants' behalf. In this case, no party has provided sufficient information regarding any proposed witness's testimony and unwillingness to voluntarily appear that requires transfer to another jurisdiction so that the wit-

ness can be subpoenaed. As such, this factor is neutral or tilts in favor of the current forum.

### 8. The ease of access to sources of proof

The eighth factor tilts in favor of Ohio. Evidence appears to come from Ohio, California, Virginia, and Washington state. Maintaining suit in one district will cause some of the same problems as maintaining it in another district. Defendants' records are in Ohio. Plaintiff's records are presumably in California. Other records may be in Virginia. The defective cylinders most likely are in Washington. Cylinders [*27] from the same lot as the defective cylinders are in Ohio. In total, there is probably more physical evidence in Ohio than any other one location because Defendants' facility is in Ohio, the cylinders were refurbished in Ohio, Defendants' records are in Ohio, and remaining cylinders may be in Ohio.

The party seeking a transfer cannot rely on vague generalizations as to the convenience factors. The moving party is obligated to identify the key witnesses and evidence and provide a statement why the witnesses and evidence are necessary. See *Heller Financial, Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1293 (7th Cir. 1989)*. Defendants have not provided sufficient proof that they will be prejudiced if they are required to produce their evidence in California. This is a breach of contract action. The contracts and any written manifestations of the parties' agreements do not appear to voluminous. Defendants have neither provided a list of specific physical evidence that they need to maintain their defense nor shown that it would be difficult to transport it to California. In the event Plaintiff demands considerable discovery from Defendants that is found in Ohio, the court [*28] is confident that the parties and the assigned Magistrate Judge can fashion a solution in which Defendants do not bear the entire burden of mailing and transportation. While this factor does indicate Ohio is a better forum, it simply is not strong enough to trump the factors against transfer.

### 9. Convenience of the parties

This factor does not help either side. The competing forums, the Eastern District of California and the Southern District of Ohio, are thousands of miles apart. For Defendants, it is obviously more convenient to litigate in Ohio, and for the Plaintiff, California. This is a neutral consideration.

Plaintiff complains that he does not have counsel in Ohio. Defendants respond that their counsel is inconvenienced by litigating this action in California, and Defendants' counsel had to seek admission to this court pro hoc vice. The word "counsel" is not found in Section 1404(a), and the convenience of counsel is irrelevant and not a factor to be assessed in determining whether to

transfer a case under *Section 1404(a). In re Volkswagen AG, 371 F.3d 201, 206 (5th Cir. 2004); Solomon v. Continental Am. Life Ins Co., 472 F.2d 1043, 1047 (3rd Cir. 1973);* [*29] *Bunker v. Union Pacific Railroad Co., 2006 WL 193856, *2 (N.D.Cal. 2006).* This argument will be given no weight.

### 10. Forum Selection Clause

No one has argued a forum selection clause and there is no such clause in the documents provided by the parties. This is a neutral consideration.

### 11. Public Policy Considerations Of The Forums/Local Interest In The Controversy

No party has cited authority why California or Ohio have a greater interest in regulating the conduct of agreements allegedly made over the phone, which resulted in performance in at least four different states. Neither party adequately addresses this factor. Accordingly, this is a neutral factor.

### 13. Conclusion

From the evidence submitted, it is clear that the parties dispute the terms of the agreements between them. The parties also dispute when and where the agreements were entered into. This action alleges breaches of agreements that Plaintiff maintains were entered into when Defendant contacted Plaintiff in California over the phone. While disputing the existence of these telephone agreements, Defendants have not offered sufficient argument or evidence [*30] that a better place to litigate whether Defendants' breached these agreements and address Defendants' defense that there are no agreements is Ohio rather than California. Defendants evidence, if taken as true, provides support for a finding that the agreements alleged in the complaint did not occur and that this action should not be brought in any forum. Defendants have not met their burden of proof to show that Ohio is a better forum.

The Jones factors set considerations for the court in order to determine whether transfer is proper under § 1404(a). As applied to this case, a number of factors are neutral. Except for one factor, all other factors tilt toward a California forum. The one factor tilting toward an Ohio forum is the fact more physical evidence appears to be in Ohio than any other potential forum. However, Defendants have not specifically listed the physical evidence they believe is necessary in their moving papers, and Defendants have not shown that it would be overly burdensome to present this evidence at trial in California. It is Defendants' burden to make a "strong showing" that transfer should be ordered. See *Jones, 211 F.3d at 499; Decker, 805 F.2d at 843;* [*31] *Warfield, 346 F. Supp. 2d at 1044; Robinson Corp., 304 F. Supp. 2d 1232, 1243;*

*Williams, 157 F. Supp. 2d at 1106.* Defendants have provided insufficient evidence and have not met their burden for the court to order a transfer under *Section 1404(a).*

### C. Forum Non-Conveyance

In their motion, Defendants also request transfer under the doctrine of *forum non conveniens. Section 1404(a)* partially displaces the common law doctrine of forum non conveniens. *Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986); Miskow v. Boeing Co., 664 F.2d 205, 207 (9th Cir. 1981).* For the same reasons why transfer is not appropriate pursuant to *Section 1404(a),* the court finds that transfer under the doctrine of *forum non conveniens* is also not appropriate.

### ORDER

Accordingly, based on the above memorandum opinion, the court ORDERS that Defendants' motion to transfer venue for convenience under *28 U.S.C. § 1404(a)* and the doctrine of *forum non conveniens* is DENIED.

IT IS SO ORDERED.

**Dated: May 12, 2006**

**/s/ Anthony W. Ishii**

UNITED [*32] STATES DISTRICT JUDGE